**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*, | Case No. 24-12008 (TMH) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF MARK SMITH, RESTRUCTURING ADVISOR**
**TO FULCRUM BIOENERGY, INC., IN SUPPORT OF THE**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark J. Smith, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Fulcrum BioEnergy, Inc. ("Fulcrum BioEnergy" or "Fulcrum Parent", together with its direct and indirect subsidiaries, "Fulcrum" or the "Company," and together with its affiliated debtors and debtors in possession, the "Debtors").

2.      I have more than 3 years of experience in restructuring and bankruptcy.  During that time, I led a distressed firm as Chief Executive Officer through bankruptcy and a successful emergence.  My background includes executive management, operations management, M&A support, stakeholder negotiations and insurance recoveries.

3.      On September 9, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the

---

[1]    The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); Fulcrum Sierra Holdings, LLC (8498).  The location of the Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.  All Court filings can be accessed at: https://www.veritaglobal.net/Fulcrum.

circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under the Bankruptcy Code.

4.        As the Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.   Except where specifically noted, the statements in this Declaration are based on (a) my personal knowledge, (b) information obtained from the Debtors' employees, contractors, or advisors, and (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge.  I am over the age of eighteen, and I am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## **<u>INTRODUCTION</u>**

5.        A pioneer in the clean energy space, the Company's founders conceptualized a "waste-to-fuel" process whereby trash—an abundant, low-cost feedstock[2] source that does not need to be grown or pulled from a well—is converted into drop-in fuels[3] through the utilization of gasification, Fischer-Tropsch and other technologies[4] (all as further discussed herein).  Through its first-of-its-kind proprietary process that incorporates commercially proven technologies, Fulcrum set out to simultaneously solve two environmental challenges—reducing the amount of

---

[2]   Feedstock is raw material that is supplied to a machine or processing plant.  *Feedstock*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/feedstock (last visited Aug. 9, 2024).

[3]   "Drop-in" fuel is a type of "fuel produced from biomass sources through a variety of biological, thermal, and chemical processes."  Drop-in fuel may also be referred to as renewable fuel.  *See Renewable Gasoline*, U.S. DEPT. OF ENERGY, https://afdc.energy.gov/fuels/emerging_hydrocarbon.html (last visited Aug. 9, 2024).

[4]   Fischer-Tropsch technology was developed in the mid-1920s in Germany to provide liquid fuels from coal.  Today, this technology "is the means by which synthesis gas containing hydrogen and carbon monoxide is converted to hydrocarbon products."  Fischer-Tropsch fuels are cleaner than their petroleum derived counterparts.  See A.P. Steynberg, *Chapter 1-Introduction to Fischer-Tropsch Technology*, 152 STUDIES IN SURFACE SCIENCE AND CATALYSIS 1, 1 (2004).

waste going to landfills and reducing carbon emissions in the aviation industry. In the United States alone, the average person produces approximately five pounds of municipal solid waste ("MSW")—colloquially known as garbage—each day, which aggregates to approximately 300 million tons of household garbage each year. Continuing at this rate, by 2050, the world is expected to produce approximately 3.4 billion tons of MSW each year. Absent a radical change in waste management, the majority of this MSW will continue to be dumped into landfills. Another significant contributor to climate change, aviation is responsible for approximately twelve percent of global carbon dioxide emissions from all transport sources, with commercial aviation responsible for about two to three percent of carbon emissions worldwide.

6.      Fulcrum's Sierra BioFuels Plant (the "Sierra Plant") located approximately twenty miles east of Reno, Nevada, first brought this "waste-to-fuel" process to life in December 2022, successfully producing low-carbon synthetic crude oil from landfill waste.

7.      However, despite the Company's successful proof of concept at the Sierra Plant and substantial progress with ongoing research and development, Fulcrum faced significant headwinds that strained the Company's liquidity profile and ability to invest in the business. Among other challenges, the Sierra Plant experienced certain equipment issues following its initial operations in December 2022, which delayed the plant's full-scale operations. As a result, the Company was unable to counteract its cash burn.

8.      As a result of the delays to reach operational status, the Debtors also encountered challenges within their capital structure. The Company's Parent Prepetition Term Loan Facility (as defined herein) matured on December 23, 2023. In anticipation of this maturity, and to provide additional runway to address the Sierra Plant's operational issues and to fund the development of new waste-to-fuel plants, the Company attempted an equity raise during the second and third

quarters of 2023.  As part of its equity raise efforts, the Company launched a marketing process that included outreach to more than twenty strategic parties that resulted in hours of diligence and several management presentations.  Unfortunately, because of broader market pressures combined with the Company's existing capital structure and lender fatigue due to the delays at the Sierra Plant, no actionable proposals were received.

9.      Throughout 2023 and into 2024, while the Debtors were undertaking the above activities, certain of the Debtors' stakeholders, including (a) PCL Administration LLC ("PCL"), as administrative agent and as collateral agent for the Parent Prepetition Term Loan Facility, and (b) the Bonds Trustee (as defined herein) for the Sierra BioFuels Bonds (as defined herein) and the Sierra Holdings Bonds (as defined herein), began also searching for additional financing for the Company.

10.     Contemporaneously with the Company's inability to raise capital in the fall of 2023 and the failure of certain Debtors to make monthly deposits to the Bonds Trustee for the Sierra BioFuels Bonds and the Sierra Holdings Bonds, the Bonds Trustee delivered a notice of defaults and accelerated the bonds and related obligations on October 16, 2023.  At the same time, the Bonds Trustee's counsel engaged a financial advisory and restructuring firm, RPA Advisors ("RPA"), to assist the trustee and its counsel in assessing the carrying costs of the real and personal property owned by Debtor Fulcrum Sierra BioFuels, LLC ("Sierra BioFuels") and to explore options in marketing the assets should the trustee have chosen to seek to foreclose on the assets that served as security for the Sierra BioFuels Bonds.

11.     After more than six months under a forbearance agreement, in early May 2024, the Debtors lost any sources of funding for the equipment maintenance outage and continued operations at the Sierra Plant.  At this point, and without any additional capital infusion from the

equity raise, the Company was forced to take swift and decisive action regarding potential strategic alternatives. Having found no additional capital, the Company was not able to stabilize operations and Fulcrum's business, which at the time consisted of operations at the Sierra Plant as well as planning for additional plants, ceased work at the Sierra Plant and shutdown operations at the Company in May of 2024.

12.     Upon learning of this development, and in coordination with the Debtors, RPA began to market certain of the assets that served as security for the Sierra BioFuels Bonds. Towards the end of the sale process, the Debtors engaged Morris, Nichols, Arsht & Tunnell LLP ("MNAT") as legal counsel to assist the Debtors in evaluating the letters of intent received during this marketing process. During this process, the Company received letters of intent ("LOIs" or, individually, an "LOI") from various parties, including Switch, Ltd. ("Switch").

13.     The Switch LOI contemplated the filing of a voluntary bankruptcy under the Bankruptcy Code and a 363 sale process, whereby Switch would serve as the stalking horse bidder, subject to approval by the Court. The Switch LOI also provided for debtor-in-possession financing (the "DIP Facility") to fund the chapter 11 case and sale process. The Debtors and Switch executed the Switch LOI on August 3, 2024. However, while negotiating the asset purchase agreement (the "APA") with Switch, it appeared that the parties would be unable to come to a firm agreement and the Switch LOI terminated by its terms.

14.     Over the Labor Day weekend, Switch reengaged with the Debtors and sought to finalize the APA. After much back-and-forth, the Debtors and Switch were able to finalize the APA, which represents the highest and best offer for the purchase of certain of the Debtors' assets as of this date.

15.     As a result of these successful negotiations, Fulcrum enters chapter 11 with commitment of a $5 million DIP Facility.  To familiarize the Court with Fulcrum, its business, and the circumstances leading up to these chapter 11 cases, this Declaration is organized into four sections:

- *Part I* provides a general overview of Fulcrum's corporate history and business operations;

- *Part II* describes Fulcrum's organizational structure, prepetition capital structure, and other obligations;

- *Part III* offers detailed information on the events preceding the commencement of these chapter 11 cases; and

- *Part IV* consists of a statement in support of the Debtors' First Day Motions (as defined herein).

## I.     The Company's History and Business Operations.

### A.     Corporate History.

16.     Since its inception seventeen years ago, Fulcrum made significant strides in the waste-to-fuel process.  Founded in July 2007, Fulcrum was started by a team of veteran energy industry employees from Calpine Corporation, one of the largest generators of electricity from natural gas and geothermal resources in the United States.  The beginning years of the business were focused on securing sources of MSW and patenting Fulcrum's proprietary waste-to-fuels process.  In 2008, just a year after its formation, Fulcrum entered into a master agreement with a large U.S. waste management services company to supply Fulcrum with MSW located throughout the United States.  In 2011, in an effort to increase its national supply of MSW, Fulcrum entered into a second master agreement with another large U.S. waste management services company.

17.     In 2013, the United States Patent and Trademark Office granted Fulcrum's first patents with respect to the MSW-to-ethanol process, which was only the start of Fulcrum's extensive intellectual property catalog.  After securing several patents, one year later in 2014,

6

Fulcrum began to enter into offtake agreements with strategic partners, including airlines, for Fulcrum's net-zero carbon fuel.  Even beyond the offtake agreements, 2014 was a pivotal year for Fulcrum, as the business was awarded $74.7 million in a two-phased grant from the United States Department of Defense and also successfully completed a test of its process at its process demonstration unit.

18.     In 2015, Fulcrum entered into another offtake and investment agreement with another major international airline for 900 million gallons of fuel, its largest offtake agreement since its formation.  Fulcrum also began construction of the Sierra Plant's feedstock processing facility ("FPF"), which began operations in 2017.

19.     In 2017 and early 2018, Fulcrum raised new capital by issuing $175 million of tax-exempt bonds to the bondholders referenced previously, and an additional $114 million of new capital was raised between late 2018 and 2020 through an additional tax-exempt bond issuance. These financing arrangements, with Morgan Stanley as lead underwriter, financed a portion of the construction costs of the Sierra Plant.[5]  Shortly thereafter, Fulcrum received the first United States' patent for producing a high biogenic concentration of Fischer-Tropsch liquids from MSW. Fulcrum also entered into an investment agreement and fourth offtake with an aviation fuel logistics provider for 50 million gallons of fuel.

20.     In 2018, Fulcrum broke ground on a new plot to build the Sierra Plant's biorefinery, which is located approximately 15 miles away from the FPF.  With the development of the Sierra Plant well underway, Fulcrum took its first step towards expanding operations by selecting and launching the development of a second biorefinery in Gary, Indiana (the "Centerpoint Plant").

---

[5]     *Using Green Bonds to Turn Garbage into Jet Fuel*, MORGAN STANLEY, (Apr. 24, 2019), https://www.morganstanley.com/ideas/fixed-income-finances-fulcrum-bioenergy.

Fulcrum also entered into a fifth offtake and investment agreement with an international airline for 330 million gallons of fuel and, in 2019, entered into its sixth and largest offtake and investment agreement to date with a large fuels logistics company for one billion gallons of fuel.[6]  Notably, the Company's ability to enter into multiple offtake agreements even before achieving operational status underscored the need for, and belief in, Fulcrum's business.

21.     In 2020, Fulcrum further expanded its patent portfolio by receiving additional United States' patents for the production of Fischer-Tropsch liquids from MSW.  The Company also entered into its seventh offtake and investment agreement with an international company for 50 million gallons of fuel, which was amended in 2022 for a total of 125 million gallons of fuel. In line with these developments, Fulcrum continued to scale its operations by beginning the initial planning process for additional projects across the United States.

22.     In 2021, approximately three years after breaking ground, the Sierra Plant's biorefinery finished construction, a significant step towards achieving operational status.  That same year, the Company received a grant from the United Kingdom's Secretary of State for Transport and launched the development of the first United Kingdom waste-to-fuel plant (the "NorthPoint Plant").[7]

23.     As noted above, December 2022 was a pivotal point in the Company's history, as the Sierra Plant completed the first successful gasification of MSW and undertook its first shipment of fuel.  Fulcrum also received its first international patents for its propriety waste-to-fuel process.

---

[6]     On November 13, 2023, the Debtors and BP Products North America Inc. mutually terminated their offtake and investment agreement.

[7]     The entity that owns the NorthPoint Plant has neither filed for bankruptcy in the U.S. nor is under administration in the U.K. at this time.

B.      **The Company's Operations.**

(1)      **Net-Zero Carbon Plants.**

24.      Fulcrum endeavored to create a network of net-zero carbon fuel plants across the United States, as well as to develop and evaluate project opportunities in select countries around the world.  At the height of its operations, Fulcrum's United States plant portfolio consisted of the Sierra Plant, the proposed Centerpoint Plant under development in Indiana, and other plants at various stages of development.

25.      *The Sierra Plant.*  The Sierra Plant, located approximately twenty miles east of Reno, Nevada, was intended to be the world's first commercial-scale plant converting household garbage into renewable transportation fuel.

26.      The Sierra Plant consists of an FPF that prepares the feedstock[8] for the Sierra Plant's biorefinery, which ultimately produces the clean fuels.  The Sierra Plant's FPF is in close proximity to the biorefinery, which allowed the Company to reduce transportation costs and simplify its supply chain.  The Sierra Plant is also strategically located adjacent to one of the largest landfills in the western United States.  The operations at the Sierra Plant can be distilled down to five main steps, as follows:

- *Step 1 – Feedstock Preparation*:  At the FPF, incoming waste, destined for the landfill, is sorted, separated, processed and sized so that recyclable products and other inorganic materials are removed.  Once the non-processable materials are filtered out, the prepared feedstock is then transported to the biorefinery.

- *Step 2 – Gasification*:  After the prepared feedstock arrives at the biorefinery, it is loaded into the gasifier and undergoes the process of gasification to convert the feedstock into syngas, which is made up of primarily carbon monoxide and hydrogen molecules.

---

[8]      Of note, unlike landfill waste, alternative feedstocks—such as corn, sugarcane, and other sources of biomass— are subject to higher costs, volatile pricing, transport costs, lack of reliable supply, and inclement weather.

- ***Step 3 – Syngas Clean-up***:  The syngas then goes through a gas clean-up process to remove particulate, acid gas and excess water in a wet scrubbing process. Additional syngas clean-up steps remove additional impurities from the syngas and prepare the syngas for further processing.

- ***Step 4 – Fischer-Tropsch***:  The Fischer Tropsch reactor converts the syngas to synthetic crude oil, or syncrude.  A separator then takes the unreacted syngas and returns it to the Fischer Tropsch reactor, while the Fischer Tropsch liquids continue on to upgrading.

- ***Step 5 – Upgrading***:  The Sierra Plant has been designed to include upgrading at a future date.  In the upgrading process, a hydrocracker cracks the syncrude into smaller chain hydrocarbons and a fractionator separates what is now jet fuel from other heavier byproducts.  The heavier byproducts are recycled back to the hydrocracker, while the jet fuel is ready to be delivered to the customer as a drop-in jet fuel product.

27.    ***The Centerpoint Plant.***   Before the Company ceased operations, Fulcrum was actively developing a plant in Gary, Indiana, which was being designed to produce more than 30 million gallons of sustainable aviation fuel per year.

28.    ***International Operations.***[9]  Fulcrum is in the process of developing its first facility in the United Kingdom—the NorthPoint Plant—at the Essar Stanlow Manufacturing Complex in Ellesmere Port, Cheshire.  The site was chosen due to its industrial nature, the skilled local workforce, and the existing refinery infrastructure, including a direct pipeline to Manchester Airport which can be used to transport the sustainable aviation fuel.

(2)    **Patent Portfolio.**

29.    Fulcrum has a robust patent portfolio in both the United States and internationally. Altogether, Fulcrum has more than 70 United States and foreign issued patents and pending patent applications.

---

[9]    As noted above, the Company has not determined whether to commence restructuring proceedings (whether in the United States or otherwise) for its international entities.

30. ***United States Patent Portfolio.*** Fulcrum's United States patent portfolio includes the following: (1) four patents granted for the MSW-to-ethanol process; (2) nine patents awarded in connection with the high biogenic Fischer-Tropsch liquids and fuels derived from MSW; (3) one patent awarded for feedstock processing systems and methods; and (4) five pending applications, all in connection with the high biogenic Fischer-Tropsch liquids and fuels derived from MSW.

31. ***Foreign Patent Portfolio.*** Fulcrum's foreign patent portfolio includes the following: (1) in the United Kingdom, eleven issued patents and one pending application; (2) in Hong Kong, six issued patents and six pending applications; (3) in Japan, five issued patents and two pending applications; (4) in Canada, two issued patents and one pending application; (5) in Mexico, two issued patents and one pending application; and (6) pending applications in numerous other countries, including Australia, Brazil, Columbia, Europe, Kuwait, Qatar, Saudi Arabia, South Korea, Spain, and the United Arab Emirates.

## II. The Company's Organizational Structure and Prepetition Capital Structure

### A. Organizational Structure.

32. As set forth on the structure chart attached hereto as **Exhibit B**, Debtor Fulcrum BioEnergy, Inc. (also previously defined as "Fulcrum Parent") is the ultimate parent entity of the Company and was established in July 2007 and organized under the laws of Delaware. Fulcrum Parent owns, directly or indirectly, thirteen subsidiaries, of which nine are U.S. entities and four are international entities. Four of the Fulcrum Parent U.S. entities constitute the Debtors. The four Fulcrum Parent international entities are not debtors in these chapter 11 proceedings.

33. Of these entities, Fulcrum Parent is the borrower and promissory noteholder on approximately $160.2 million of the Debtors' prepetition debt and a guarantor of the BioFuels Bonds and Holdings Bonds, six of its subsidiaries are guarantors on the Parent Prepetition Term Loan Facility (as defined below), and two of its subsidiaries are borrowers on one or more of

Fulcrum's bonds (each as detailed further below).  None of Fulcrum's international entities are obligors on any of this funded debt.

### B.    Prepetition Capital Structure.

34.    Fulcrum's prepetition capital structure included approximately $456.6 million in outstanding principal on its funded debt just prior to the Petition Date, consisting of: (a) the Parent Prepetition Term Loan Facility; (b) Parent Secured Convertible Promissory Notes; (c) the Parent Unsecured Convertible Promissory Notes; (d) the Sierra BioFuels Term Loan Facility; (e) the Sierra BioFuels Bonds; and (f) the Sierra Holdings Bonds (each as defined below).

35.    As of the Petition Date, Fulcrum's prepetition funded indebtedness can be summarized as follows:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount (Approximate)** |
| *Fulcrum Parent Debt* | | |
| **Parent Prepetition Term Loan Facility** | May 20, 2024 | $90,500,000 |
| **2021 A&R Secured Convertible Promissory Notes** | December 31, 2023 | $30,000,000 |
| **2020 Secured Convertible Promissory Notes** | December 31, 2023 | $34,500,000 |
| **Unsecured Convertible Promissory Note** | June 23, 2024 | $5,000,000 |
| **Paycheck Protection Program Loan** | May 6, 2025 | $169,896 |
| *Sierra Holdings Debt* | | |
| **6.950% Series 2018 Sierra Holdings Bonds** | February 15, 2038 | $39,638,065 |
| **5.750% Series 2019 Sierra Holdings Bonds** | February 15, 2038 | $46,002,680 |
| **6.750% Series 2020 Sierra Holdings Bonds** | February 15, 2038 | $18,426,837 |
| *Sierra BioFuels Debt* | | |
| **5.875% Series 2017 Sierra BioFuels Bonds** | December 15, 2027 | $29,203,151 |
| **6.250% Series 2017 Sierra BioFuels Bonds** | December 15, 2037 | $101,769,499 |
| **5.125% Series 2017B Sierra BioFuels Bonds** | December 15, 2037 | $18,971,740 |
| **5.250% Series 2018 Sierra BioFuels Bonds** | December 15, 2037 | $2,633,702 |
| **Sierra BioFuels Term Loan Facility** | December 31, 2023 | $39,774,423 |
| | **Total Outstanding Debt:** | **$456,589,993** |

These obligations are discussed below:

        **(1)**      **Debtor Financing Facilities.**

        **(a)**      ***Parent Prepetition Term Loan Facility.***

36.    12.    On June 23, 2023, Fulcrum Parent, as borrower, and certain of its subsidiaries as guarantors thereto entered into that certain credit agreement (as amended by the Second Amendment to Credit Agreement dated as of May 20, 2024, the "Prepetition Term Loan Credit Agreement") with PCL Administration LLC ("PCL"), as administrative agent and as collateral agent, providing for a term loan facility in an initial aggregate principal amount of $84,500,000, which was subsequently increased on September 29, 2023, by an amendment thereto to a total aggregate principal amount of $90,500,000 (the "Parent Prepetition Term Loan Facility"). Certain of the Debtors' obligations under the Parent Prepetition Term Loan Facility are guaranteed by eight of Fulcrum Parent's direct and indirect subsidiaries. The Parent Prepetition Term Loan Facility is secured on a first lien basis by substantially all of the personal and real property assets of Fulcrum Parent and those subsidiaries which provided a guaranty thereunder. The Parent Prepetition Term Loan Facility has an interest rate of twenty percent (20.00%) and matured on December 23, 2023. As of the date hereof, the entire $90,500,000 principal amount of the Parent Prepetition Term Loan Facility remains outstanding.

        **(b)**      ***Parent Secured Convertible Promissory Notes.***

37.    Fulcrum Parent is party to the following secured convertible promissory notes (the "Parent Secured Convertible Promissory Notes"): (a) those certain secured convertible promissory notes issued to Newtop Partners and Newtop Partners II pursuant to that certain Securities Purchase Agreement, dated as of July 29, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) in the principal amount of $15,000,000 with respect to Newtop Partners and $15,000,000 with respect to Newtop Partners II, (b) those

certain secured convertible promissory notes issued to Crestline Praeter, L.P. – Fulcrum ("Crestline"), BP Technology Ventures Limited ("BP"), Rustic Canyon Ventures III, L.P. ("Rustic Canyon"), and Cathay Pacific Airways Limited ("Cathay") pursuant to that certain Securities Purchase Agreement, dated as of November 13, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) in the principal amount of $26,000,000 with respect to Crestline, $5,000,000 with respect to BP, $2,500,000 with respect to Rustic Canyon, and $1,000,000 with respect to Cathay. Fulcrum Parent also had secured promissory notes, as amended, issued to BP and Marubeni America Corporation ("Marubeni"), dated as of March 15, 2023, and February 15, 2023, respectively, in the principal amount of $10,000,000 with respect to BP and $4,500,000 with respect to Marubeni. Through the terms of the amended secured promissory notes, the outstanding principal and accrued interest on these secured promissory notes were converted into shares of Fulcrum Parent's Series D-8 Preferred Stock on December 31, 2023. Certain of the Debtors' obligations under the Parent Secured Convertible Promissory Notes are guaranteed by several of Fulcrum Parent's direct and indirect subsidiaries and secured on a first-lien basis by substantially all of the personal and real property assets, subject to the lien granted to PCL, as administrative agent, pursuant to the Parent Prepetition Term Loan Facility. The Parent Secured Convertible Promissory Notes bear interest ranging up to fifty percent (50%). As of the date hereof, $64,500,000 of the principal amount of the Parent Secured Convertible Promissory Notes remains outstanding.

### (c)    *Parent Unsecured Convertible Promissory Notes.*

38.    Fulcrum Parent is party to the unsecured convertible promissory note (the "Parent Unsecured Convertible Promissory Note") dated as of June 23, 2023, issued to Rustic Canyon Ventures III, L.P., in the principal amount of $5,000,000. This Parent Unsecured Convertible Promissory Note remains outstanding as of the date hereof. In late 2022 and early 2023, the

Company issued the following unsecured convertible promissory notes: (a) that certain convertible promissory notes issued to BP, dated as of September 8, 2022 and November 23, 2022 in the principal amount of $14,500,000 and $10,500,000, respectively, (b) that certain convertible promissory note issued to CDP Infrastructures Fund G.P., dated as of September 8, 2022, in the principal amount of $4,500,000, (c) that certain convertible promissory note issued to Marubeni Corporation, dated as of October 26, 2022, in the principal amount of $10,500,000, (d) that certain convertible promissory note issued to OCI Fuels USA Inc., dated as of January 13, 2023, in the principal amount of $9,000,000, and (e) that certain convertible promissory note issued to SK Innovation Co., Ltd., dated as of February 27, 2023, in the principal amount of $10,000,000. Through the terms of these unsecured promissory notes, the outstanding principal and accrued interest on these unsecured promissory notes were converted into shares of the Company's Series D-8 Preferred Stock on December 31, 2023.

### (d)    *Paycheck Protection Program Promissory Note*

39.    In May 2020, Fulcrum Parent received loan proceeds in the amount of $1,624,434 under the Paycheck Protection Program ("PPP") established by the Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act"). In August 2022, $1,232,210 was forgiven by the Small Business Administration ("SBA"). The loan bears interest of one percent (1%). As of the date hereof, approximately $169,896 of the principal remains outstanding. The Borrower Debtors are not borrowers or guarantors of this financing.

### (e)    *Sierra BioFuels Term Loan Facility.*

40.    On October 13, 2023, Debtor Sierra BioFuels, as borrower, entered into that certain senior unsecured term loan agreement (as amended, restated, supplemented or otherwise modified in accordance with the terms thereof, the "Sierra BioFuels Term Loan Agreement") with PCL, as administrative agent, providing for a term loan facility in an initial aggregate principal amount of

$2,400,000, which has been subsequently increased by amendments thereto on October 25, 2023, November 17, 2023, December 8, 2023, December 22, 2023, January 19, 2024, February 8, 2024, March 5, 2024, March 25, 2024 and April 5, 2024 to a total aggregate principal amount of $40,900,000 (the "Sierra BioFuels Term Loan Facility"). The Sierra BioFuels Term Loan Facility is unsecured and Sierra BioFuels' obligations under the Sierra BioFuels Term Loan Facility are not guaranteed by any other Debtors. The Sierra BioFuels Term Loan Facility has an interest rate of twenty percent (20.00%) and matured on December 31, 2023, and amounts loaned after such maturity date were payable on demand. As of the date hereof, $39,774,423 of the principal amount of the Sierra BioFuels Term Loan Facility remains outstanding.

### (f)    *Bonds.*

#### i.    **The Sierra BioFuels Bonds**

41.    In October 2017, the Director of the State of Nevada Department of Business and Industry issued $150,000,000 in aggregate principal amount of bonds (the "Series 2017A BioFuels Bonds") and loaned the proceeds of such issuance to Sierra BioFuels pursuant to a certain financing agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "BioFuels Financing Agreement"). The Series 2017A BioFuels Bonds were issued pursuant to a certain trust indenture, dated as of October 1, 2017 (as amended and supplemented as of December 1, 2017, and again as of March 1, 2018, the "BioFuels Trust Indenture") by and between the Director of the State of Nevada Department of Business and Industry, as issuer, and the Bank of New York Mellon Trust Company, N.A., as trustee ("BNY"). Then, in December 2017, the Director of the State of Nevada Department of Business and Industry issued an additional $21,960,000 in bonds on a parity basis with the Series 2017A BioFuels Bonds (the "Series 2017B BioFuels Bonds," and together with the Series 2017A BioFuels Bonds, the "2017 BioFuels Bonds"), as authorized by the BioFuels Trust Indenture (as amended and supplemented in

16

connection with this issuance) and loaned the proceeds to Sierra BioFuels pursuant to the BioFuels Financing Agreement.  Again, in March 2018, the Director of the State of Nevada Department of Business and Industry issued an additional $3,040,000 in bonds on a parity basis with the 2017 BioFuels Bonds, (the "Series 2018A BioFuels Bonds," and together with the 2017 BioFuels Bonds, the "BioFuels Bonds"), as authorized by the BioFuels Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds to Sierra BioFuels pursuant to the BioFuels Financing Agreement.  UMB Bank, N.A., is successor trustee for the BioFuels Bonds (in such capacity, the "BioFuels Trustee").

42.    The BioFuels Bonds are secured by (a) all of Sierra BioFuels' personal property, (b) all of Sierra Finance's membership interests in Sierra BioFuels, (c) the revenues and other moneys and rights Trust Estate (as defined in the BioFuels Trust Indenture), (d) the Sierra BioFuels' Sierra Plant through a deed of trust recorded with the County Recorder of Storey County, Nevada on October 26, 2017, and (e) all funds held in certain accounts.  The BioFuels Bonds are also guaranteed by Fulcrum Parent.  For the Series 2017A BioFuels Bonds, $29,203,151.29 of remaining principal bears interest at a default rate of 8.875% and had an initial stated maturity of December 15, 2027, and $101,796,499.63 of remaining principal bears interest at a rate of 9.250% and had an initial stated maturity of December 15, 2037.  For the Series 2017B BioFuels Bonds, $18,971,740.83 of remaining principal bears interest at a rate of 8.125% and had an initial stated maturity of December 15, 2037.  For the 2018 BioFuels Bonds, $2,633,702.82 of remaining principal bears interest at a default rate of 8.250% and had an initial stated maturity of December 15, 2037.  All principal, interest, and other amounts owed under the Biofuels Bonds became immediately due and payable upon delivery of the notice of defaults, events of default, and acceleration by the BioFuels Trustee, on October 16, 2023.  After delivering such notice, the

BioFuels Trustee forbore from continuing or taking additional enforcement actions pursuant to a forbearance agreement ("Bond Forbearance Agreement"), dated as of October 25, 2023, between the BioFuels Trustee, Holdings Trustee, certain holders of BioFuels Bonds and Holdings Bonds, Sierra BioFuels, Debtor Fulcrum Sierra Holdings, LLC ("Sierra Holdings"), and certain other Debtors, until the Bond Forbearance Agreement expired on May 8, 2024.

### ii.   The Sierra Holdings Bonds

43.     In September 2018, the Director of the State of Nevada Department of Business and Industry issued $44,000,000 in aggregate principal amount of bonds (the "Series 2018 Holdings Bonds") and loaned the proceeds of such issuance to Sierra Holdings, pursuant to a certain financing agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "Holdings Financing Agreement").  The Series 2018 Holdings Bonds were issued pursuant to a certain trust indenture, dated as of September 1, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Holdings Trust Indenture") by and between the Director of the State of Nevada Department of Business and Industry, as issuer, and BNY, as trustee.  Then, on September 1, 2019, the Director of the State of Nevada Department of Business and Industry issued an additional $50,000,000 in bonds on a parity basis with the Series 2018 Holdings Bonds (the "Series 2019 Holdings Bonds"), as authorized by the Holdings Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds of such issuance to Sierra Holdings pursuant to the Holdings Financing Agreement. Again, in December 2020, the Director of the State of Nevada Department of Business and Industry issued an additional $20,000,000 in bonds on a parity basis with the Series 2018 Holdings Bonds and the Series 2019 Holdings Bonds (the "Series 2020 Holdings Bonds," and together with the Series 2018 Holdings Bonds and the Series 2019 Holdings Bonds, the "Holdings Bonds"), as authorized by the Holdings Trust Indenture (as amended and supplemented in connection with this

issuance) and loaned the proceeds of such issuance to Sierra Holdings pursuant to the Holdings Financing Agreement.  UMB Bank, N.A., is successor trustee for the Holdings Bonds (in such capacity, the "Holdings Trustee," and together with the BioFuels Trustee, the "Bonds Trustee").

44.     The Holdings Bonds are secured by (a) all of Sierra Holdings' and Sierra Finance's personal property and (b) the revenues and other moneys and rights that constitute the Trust Estate (as defined in the Holdings Trust Indenture), (c) all of Sierra Holdings' membership interests in Sierra Finance, (d) all of Fulcrum Parent's membership interests in Sierra Holdings, and (e) all funds held in certain accounts.  The Holdings Bonds are also guaranteed by Fulcrum Parent.  For the Series 2018 Holdings Bonds, $39,638,065.21 of remaining principal bears default interest at a rate of 9.95% and had an initial stated maturity of February 15, 2038.  For the Series 2019 Holdings Bonds, $46,002,680.90 of remaining principal bears interest at a default rate of 8.75% and had an initial stated maturity of February 15, 2038.  For the Series 2020 Holdings Bonds, $18,426,837.29 of remaining principal bears interest at a default rate of 9.75% and had an initial stated maturity of February 15, 2038.  All principal, interest, and other amounts owed under the Holdings Bonds became immediately due and payable upon delivery of the notices of default, events of default, and acceleration by the Holdings Trustee, on October 16, 2023.  After delivering such notice, the Holdings Trustee forbore from continuing or taking additional enforcement actions pursuant to the Bond Forbearance Agreement, until the Bond Forbearance Agreement expired on May 8, 2024.

III.    **Circumstances Leading to Chapter 11 Filing.**

A.      **Challenges Facing the Debtors' Business.**

45.     As the first-of-its kind, the Debtors' business represents a revolutionary idea with grand potential to impact the global environmental landscape.  As with all cutting-edge businesses, the cost of innovation has been born through delays in operations and the inability to anticipate

issues based on prior ventures and experiences.  Instead, the Debtors confronted all problems as issues of first impression.

46.     Through the initial operations at the Sierra Plant, the Debtors achieved proof of concept.  Such achievement also illuminated certain equipment and operational needs that the Debtors attempted to address.  Due to the custom nature of the equipment and parts required for the plant's operations, changes to the process and equipment required significant investments of time and capital.  Macroeconomic issues also impacted certain necessary supply chains, which in turn compounded the delays with respect to securing the equipment required to achieve full operational status at the Sierra Plant.

**B.     Proactive Approach to Addressing Financial Issues.**

47.     The Company's board of directors and management team recognized that the construction delays at the Sierra Plant would not obviate the need for incremental financing. Consequently, following the extension of the Sierra Plant's timeline for completion, the Company turned to new and existing lenders in the spring of 2023 to provide the necessary runway.  The Company entered into the Parent Prepetition Term Loan Facility in June 2023 to provide the Company with the requisite liquidity necessary to continue its capital raise and sale marketing efforts to identify holistic, long-term solutions for the Company's capital structure.

48.     Concurrently with its entry into the Parent Prepetition Term Loan Facility, the Company initiated capital raise efforts that were intended to yield approximately $200 million to $250 million in new liquidity. The capital raise outreach resulted in many management presentations, due diligence questions and follow-up calls with the Company with various potential investors. However, these external capital raise efforts unfortunately coincided with a period of significant macroeconomic headwinds and global volatility.  Rampant inflation and interest rate "hikes" by the U.S. Federal Reserve contributed to fears of a global recession and pullback in

consumer spending, which created a difficult market environment for raising capital.  Ultimately, the capital raise process did not result in definitive investment documents.

49.     Simultaneous with the attempted equity raise, the Company and its advisors conducted a broader marketing process, including initial outreach to twenty-eight strategic parties. The Company provided these parties with a copy of its investor presentation and access to a virtual data room with incremental information regarding the Company's business operations and financial position.  The virtual data room was robust, was supplemented throughout the marketing process, and contained hundreds of pages of diligence information.  Members of the Company's management team also presented to one of the interested third parties on the business, recent performance, and management's business plan.  However, ultimately, the marketing process did not yield any credible proposals.

### C.    Recapitalization Negotiations, the Bondholder Marketing Process, and the Proposed Debtor in Possession Financing.

#### (1)    Recapitalization Negotiations.

50.     Without the additional, immediate capital infusion from the equity raise or the marketing process, the Company was forced to take swift and decisive action regarding potential strategic alternatives.  The Company worked with certain of its existing stakeholders to receive an incremental upsize of the Parent Prepetition Term Loan Facility to provide additional runway to a comprehensive solution.  As the Company and its key stakeholders continued to engage on a value-maximizing path forward, the Company received additional bridge financing through the Sierra BioFuels Term Loan Facility, which was incrementally upsized to address the Company's liquidity needs that persisted while parties worked to finalize the terms of the broader transaction. to allow the parties to continue negotiating a comprehensive restructuring transaction.

51.     Accordingly, the Company received restructuring proposals from certain of its stakeholders.  The Company immediately pursued negotiations with these stakeholders.  As discussions progressed with and between the various holders of the Debtors' funded debt, the Company and their advisors attempted to bridge the outstanding issues between the groups and provide for a largely consensual reorganization.  Ultimately, however, negotiations stalled, and a deal was not reached amongst the relevant parties.

### (2)     Acceleration of the Bonds and Forbearance

52.     Following the failure of certain Debtors to make monthly deposits to the Bonds Trustee on behalf of the Sierra BioFuels Bonds and the Sierra Holdings Bonds, the Debtors and the Bonds Trustee entered into a forbearance agreement dated as of September 29, 2023.  At the same time, the Bonds Trustee's counsel engaged a financial advisor and investment banker, RPA, to assist the Bonds Trustee and its counsel in assessing the carrying costs of the Sierra Plant and to explore options in marketing the Sierra Plant should the Bonds Trustee have sought to foreclose on the Sierra Plant.

53.     Following the expiration of the September 2023 forbearance agreement, on October 16, 2023, the Bonds Trustee delivered to the relevant parties a notice of defaults, Events of Default, and acceleration of the bonds and related obligations.  Despite delivery of that notice, the Bonds Trustee again nevertheless continued to defer commencing any foreclosure action after the Debtors executed three forbearance agreements, one with the Bonds Trustee and two with PCL under the Parent Prepetition Term Loan Facility and the Sierra BioFuels Term Loan Facility, each dated as of October 25, 2023.  On the same date, the lenders under the Sierra BioFuels Term Loan Facility made their initial loan to Sierra Biofuels.

**(3)    RPA Marketing Process**

54.    After negotiations stalled with existing stakeholders, in May of 2024, **no party was willing to** provide additional funding to support Company operations or repairs to the Sierra Plant. In response, Company management acted quickly to develop plans to de-staff and secure the physical facility and secure funding for final payroll and "paid time off" liabilities.

55.    Shortly after the termination of the forbearance agreements on May 8, 2024, RPA renewed its efforts to evaluate the carrying costs of the Sierra Plant and to market the Sierra Plant in an effort to preserve the value of the collateral for the estate.

56.    The Debtors worked constructively with RPA to develop an initial outreach list of eighteen (18) parties based on the Company's previous marketing efforts and materials.  RPA then supplemented this 18-party outreach list with an additional eight (8) parties that included liquidators, potential assignees, a financial party and a strategic party that RPA had prior conversations with about the Company's assets dating back to November 2023.  RPA, working closely with the Debtors, established a data room with relevant company information and reached out to the twenty-six (26) parties to gauge interest in participating in the sale process.  In addition, a combination of RPA, the Company, and the Bonds Trustee received ten (10) unsolicited indications of interest and requests for further information regarding a sale of the Sierra Plant as well as certain of the Debtors' other assets.

57.    June 10, 2024, marked the beginning of RPA's and the Debtors' formal outreach to potential interested buyers, which included a request for indications of interest and alerting the parties of the existence of a data room that contained relevant company information, as supplied by the Debtors, for interested purchasers to review in connection with their diligence efforts.  Prior to the beginning of the formal outreach process, RPA and the Debtors also held discussions with interested purchasers who either reached out prospectively to express interest in the purchase or

were previously involved in the Company's previous marketing process.  Ultimately, thirty-six (36) potential purchasers had discussions with RPA and/or the Debtors regarding the Sierra Plant and the Debtors' other asset over the nearly two-month marketing process, with sixteen (16) parties executing NDAs to access diligence materials.  The Debtors also hosted nine (9) site visits at the Sierra Plant for six (6) different potential purchases that desired to view the assets in person.  Of the 36 potential purchasers, six (6) parties submitted Letters of Intent (LOIs), three of which were liquidation offers, and the LOI from Switch, Ltd. ("Switch") represented the highest value contemplated for the Debtors' assets to date.

58.     The Switch LOI was executed on August 3, 2024.  However, while negotiating the APA with Switch, it appeared that the parties would be unable to come to a firm agreement and the Switch LOI terminated by its terms.

59.     Over the Labor Day weekend, Switch reengaged with the Debtors and sought to finalize the APA.  After much back-and-forth, the Debtors and Switch were able to finalize the APA, which contemplated a total purchase price of $15 million and the provision of a debtor-in-possession loan of up to $5 million to fund the Debtors' bankruptcy cases, and which represents the highest and best offer for the purchase of certain of the Debtors' assets as of this date.

**(4)     Switch Stalking Horse Agreement.**

60.     On September 10, 2024, the Company entered into a Stalking Horse Asset Purchase Agreement with Switch (the "Switch APA").  Under the Switch APA, Switch and the Debtors agreed, subject to the terms and conditions thereof, to file voluntary petitions under title 11 of the Bankruptcy Code and conduct a 363 sales process with Switch, after approval of the Court, serving as the stalking horse bidder.

61.     With a deal in hand, the Debtors commenced these chapter 11 cases to gain access to the DIP Facility (as defined below) and initiate the sales process that is contemplated by the

Switch APA.  It is critical that the Debtors move through their chapter 11 process as efficiently as possible to limit the administrative burden on the Debtors' estates.  To that end, the Debtors propose to proceed with these chapter 11 cases in an expeditious timeline:

62.     In order to ensure that the Switch APA provides the maximum value for the Company's assets, during the pendency of the 363 sale process the Debtors will work, together with their proposed banker, to provide all interested parties with any requested diligence materials and access to the Company data room should any third party be willing and able to provide a superior alternative to the Switch APA.  The Debtors have requested and received an accounting of RPA's outreach process – which RPA has committed to supplement with any contact information in its possession that the Debtors may further request – and will continue that process now that these chapter 11 cases have commenced.  These efforts will help ensure that any other interested parties, should they value the Company's assets beyond what is contemplated by the Switch APA, are in a position to outbid the Switch APA at the auction.

### (5)     The Proposed Debtor in Possession Financing.

63.     In the month leading up to the commencement of these chapter 11 cases, Fulcrum took significant steps to preserve liquidity and reduce operational costs by ceasing operations on May 17, 2024.  The Debtors are now in need of immediate liquidity to fund the cost of these chapter 11 cases and the contemplated 363 sale process.  Debtors commence these chapter 11 cases with essentially no cash on hand, which is obviously insufficient to fund these chapter 11 case and sale the Debtors' assets.  To preserve value pending the final hearing on the DIP Facility, it is essential that the Debtors have access to postpetition financing on an interim basis.

64.     Without debtor-in-possession financing in the early stages of these chapter 11 cases, the Debtors and their constituents risk significant value degradation.  Failure to obtain immediate access to the DIP Facility would prevent the Debtors' from preserving the value of its

assets and would result in immediate and irreparable harm.  It would not be possible to administer these chapter 11 estates without postpetition financing.

65.     The DIP Facility is the product of an arm's length negotiation between the Debtors and Switch, and represents a needed lifeline for the Debtors to preserve their assets and prevent the destruction in estate value that would result without the funding providing by it.

66.     As part of the analysis of the Debtors' projected cash needs, the Debtors and their advisors prepared projections (the "Approved Budget")[10] of postpetition cash needs for the Debtors' business in the initial 13 weeks of these chapter 11 cases.  The Approved Budget includes detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the Debtors' longer-term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.  Based on my discussions with other members of the Debtors' management team and their advisors regarding the needs of the business, I believe that the Approved Budget, including its projections, provide an accurate reflection of the Debtors' likely funding requirements over the 13-week period ending in November 2024, and are reasonable and appropriate under the circumstances.  Based on the DIP Budget, and as discussed, the DIP Facility will provide the Debtors with the necessary liquidity to fund the sale of its assets and administrative expenses during these chapter 11 cases.

## IV.    The First Day Motions.

67.     Contemporaneously herewith, the Debtors have filed a number of motions (collectively, the "First Day Motions")[11] seeking orders granting various forms of relief intended

---

[10]    The Approved Budget is attached to the proposed Interim Order.

[11]    Capitalized terms used but not defined herein have the correlative meaning ascribed to such term as in the corresponding First Day Motion, as applicable.

to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions include the following:

A.   **Joint Administration Motion.**   Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion");

B.   **Cash Management Motion.**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Maintain Existing Business Forms, and (II) Granting Related Relief (the "Cash Management Motion");

C.   **Wages Motion.**   Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Granting Related Relief (the "Wages Motion");

D.   **Insurance Motion.**   Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, (B) Pay all Obligations with Respect Thereto, and (II) Granting Related Relief (the "Insurance Motion"); and

E.   **Utilities Motion.**   Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").

68.   I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with Company counsel to ensure that I understand each First Day Motion and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

69.   Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions, including the DIP Motion, is (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with

minimal loss of value, (b) critical to the Debtors' achieving a successful sales process; and (c) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 10, 2024

*/s/ Mark J. Smith*
Mark J. Smith
Chief Restructuring Officer to Fulcrum BioEnergy, Inc.