## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*, | Case No. 24-12008 (TMH) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION BONDHOLDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-debtor affiliates, "Fulcrum") respectfully state as follows in support of this motion (this "Motion") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) 364(c)(3), 364(d), 364(e), 503 and 507 of Title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001(b) and (c), 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") (i) authorizing the Borrower Debtors (as defined below) to obtain post-petition financing, granting superpriority liens and

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); Fulcrum Sierra Holdings, LLC (8498). The location of the Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566. All Court filings can be accessed at: https://www.veritaglobal.net/Fulcrum.

administrative expenses status pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (2)

authorizing the use of cash collateral, (3) granting adequate protection, (4) modifying the automatic

stay, and (5) granting related relief:

## **RELIEF REQUESTED**

1.    Through this Motion, the Debtors request that the Court enter the Interim Order,

substantially in the form annexed hereto as **Exhibit 1**, seeking the following relief:

    a.    authorization for the Borrower, Fulcrum Sierra BioFuels, LLC ("Sierra BioFuels," also defined as "Borrower" in the DIP Note (as defined below)) to obtain postpetition financing pursuant to the DIP Facility (as defined below), and for each of the Guarantors, Fulcrum Sierra Holdings, LLC ("Sierra Holdings") and Fulcrum Sierra Finance Company, LLC ("Sierra Finance," and collectively with Sierra Holdings and as defined in the DIP Note, the "Guarantors," and collectively with Sierra BioFuels, the "Borrower Debtors") to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth in the DIP Note in all respects, the Borrower's obligations under the DIP Facility, consisting of a senior secured super-priority term loan facility (the "DIP Facility"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Note" and, together with any other related agreements, documents, security agreements, or pledge agreements, including this Interim Order and (when entered) the Final Order, collectively, the "DIP Loan Documents"), by and among the Borrower, the Guarantors, Switch, Ltd. ("Switch"), as lender (in such capacity together with its permitted successor and assigns, the "DIP Lender"), in an aggregate principal amount of up to $5.0 million in term loan commitments, which shall be available as term loans (the "DIP Loans") to the Borrowers upon entry of this Interim Order and satisfaction of the other conditions set forth therein in an interim amount not to exceed $ 3,204,103 million (the "Interim DIP Loan") prior to entry of the Final Order, and the remainder of the DIP Facility available upon entry of the Final Order to the extent set forth therein;

    b.    authorization for the Borrower Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Borrower Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

    c.    authorization for the Borrower Debtors to pay the principal, interest, fees, expenses and other amounts payable to the DIP Lender pursuant to the DIP Loan Documents, including, without limitation, all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or

for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to the DIP Lender arising under the DIP Loan Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the DIP Loan Documents, including all principal, interest, fees, charges, expenses, reasonable and documented attorneys' fees and any other sum chargeable to Borrower under the DIP Loan Documents (such obligations, the "DIP Obligations");

d.  authorization for the Borrower Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Facility solely for the purposes permitted under the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below), subject to permitted variances and other exclusions set forth in the DIP Loan Documents;

e.  the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Lender, in respect of all DIP Obligations, subject and subordinate only to the Carve-Out (as defined below);

f.  granting the DIP Lender valid, enforceable, non avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below) to secure the DIP Obligations, which DIP Liens shall be subject and subordinate to the Carve-Out and Permitted Liens (as defined below);

g.  authorization for the Debtors to use, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided herein and in the DIP Loan Documents, any Cash Collateral in which any of the Prepetition Bonds Secured Parties (as defined below) may have an interest, and the granting of adequate protection solely to the extent of any diminution in the value of their respective interests in the Prepetition Bonds Collateral, including, without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral, (iii) the subordination of the Prepetition Bond Obligations to the DIP Obligations and the Carve-Out, (iv) any other diminution in value of the Prepetition Bonds Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Bonds Collateral or the proceeds thereof, (v) the priming of the Prepetition Bonds Liens by the DIP Liens, and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

h.  the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

i.    subject to entry of the Final Order, a waiver of the Borrower Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and the Prepetition Bonds Collateral, and any right of the Borrower Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

j.    this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

k.    the scheduling of a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

l.    granting the Debtors such other and further relief as is just and proper.

<b><u>JURISDICTION AND VENUE</u></b>

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363 and 364 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

**CONCISE STATEMENT PURSUANT TO**
**BANKRUPTCY RULE 4001(c)(1)(B) AND LOCAL RULE 4001-2:**

4.      In accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2, below

is a summary of the terms of the proposed DIP Facility[2]:

| | |
|---|---|
| **Borrower:** | Fulcrum Sierra BioFuels, LLC, as borrower |
| **Guarantors:** | Fulcrum Sierra Finance Company, LLC, and Fulcrum Sierra Holdings, LLC, as guarantors |
| **Loan Parties:** | Borrower and Guarantors |
| **DIP Lender:** | Switch, Ltd. |
| **DIP Credit Facility:** | Secured debtor-in-possession term credit facility in the maximum amount of $5,000,000. |
| **Closing Date:** | The Business Day when each of the conditions applicable to the funding of the Term Loans (other than any Final Order Term Loans) and listed in Section 2(a) of the DIP Note shall have been satisfied or waived in a manner satisfactory to the DIP Lender |
| **Maturity:** | The earliest to occur of (i) eighty days after the Petition Date, or if such date is not a Business Day the immediately following Business Day, (ii) thirty days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (iii) the consummation of a sale of all or substantially of the Debtors' assets or the sale of the Acquired Assets pursuant to the Bidding Procedures Order or otherwise; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16 of the DIP Note |
| **Availability:** | Amounts under the DIP Facility may be borrowed and repaid, but may not be reborrowed. The initial borrowing shall be limited to $ 3,204,103 million, subject to the limitations set forth in the Approved Budget, which amount shall be necessary to avoid immediate and irreparable harm. |

---

[2]    This section serves as a summary of the DIP Facility only and is qualified in its entirety by the terms of the DIP Note, Interim Order and Final Order.

| | |
|---|---|
| **Interest Rate:** | A rate per annum equal to 10.0% per annum, which shall be payable in kind. |
| **Use of Proceeds:** | The proceeds of the DIP Facility will be used exclusively in accordance with the Approved Budget. |
| **Scheduled Interest and Principal Repayments:** | Interest on the Term Loans shall be payable monthly, in arrears, on the last Business Day of each month (each an "<u>Interest Payment Date</u>"), commencing on the last Business Day of the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. On each Interest Payment Date, the Issuer shall pay interest by increasing the principal amount of the DIP Note (such amounts the "<u>PIK Amounts</u>").  Following an increase in the principal amount of the DIP Note as a result of a payment of a PIK Amount, the DIP Note will accrue interest on such increased principal amount from and after the applicable Interest Payment Date.  References herein to the "principal amount" of the Note include all increases in the principal amount of the Note as a result of a payment of PIK Amounts.  Principal is due on maturity. |
| **Mandatory Prepayments:** | i.   No later than three (3) Business Days following receipt by any Loan Party of cash proceeds of (x) any asset Disposition (other than Dispositions permitted by Section 15(f)) or (y) any Disposition of all or a portion of the Acquired Assets, unless the DIP Lender agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (x) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), and (y) with respect to proceeds from the Disposition of assets securing obligations owed to a third party, which Lien is senior to the Liens securing the Obligations under the DIP Note, the amount of such proceeds required by an order of the Bankruptcy Court to repay such third party obligations. |
| | ii.   No later than one (1) Business Day following receipt by any Loan Party of cash proceeds of any debt securities or other indebtedness not permitted under the DIP Note, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith. |
| | iii.   No later than five Business Days following receipt by any Loan |

Party of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of (x) any expenses (including reasonable broker's fees or commissions and legal fees) incurred in connection with such Extraordinary Receipts,  and (y) with respect to Extraordinary Receipts from assets securing obligations owed to a third party, which Lien is senior to the Liens securing the Obligations under the DIP Note, the amount of such Extraordinary Receipts required by an order of the Bankruptcy Court to repay such third party obligations.

**Collateral:**

The assets and property covered by the DIP Orders and the other Collateral Documents (as defined in the DIP Note) and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the DIP Lender, to secure the Obligations and the Guaranteed Obligations (as defined in the DIP Note).  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof; provided, however, that the FT Catalyst and FT CANS shall not constitute Collateral.  Additionally, the assets of Debtor Fulcrum BioEnergy, Inc. ("Fulcrum Parent" or "Parent") are not Collateral, and Fulcrum Parent is not one of the Borrower Debtors.

**Conditions Precedent:**

The conditions include (unless otherwise waived by DIP Lender):

• the Borrower shall have paid any payment obligations based on delivered invoices then payable hereunder (including the reasonable and documented out-of-pocket fees and expenses of the DIP Lender, including, without limitation, those of counsel for the DIP Lender) or under any other DIP Document;

• the Loan Parties shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to the DIP Lender with respect to the DIP Note and the other DIP Documents and the transactions contemplated hereby and thereby;

• the Loan Parties shall have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to the DIP Lender with respect to the DIP Note and the other DIP Documents and the transactions contemplated hereby and thereby;

• any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be true and correct in all

material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

• The Loan Parties shall have commenced the Chapter 11 Case and all of the "first day motions," "first day orders" and all related pleadings entered or to be entered at the time of the Petition Date or shortly thereafter shall have been made available to the DIP Lender in advance, and shall be satisfactory in form and substance to the DIP Lender;

• (i) with respect to the Term Loan made on the Closing Date, (A) the Bankruptcy Court shall have entered the Interim Order and (B) the Interim Order shall not have been stayed, vacated, reversed, modified or amended without the DIP Lender's consent, or (ii) with respect to the Final Order Term Loan, (A) the Bankruptcy Court shall have entered the Final Order and (B) the Final Order shall have not been stayed, vacated, reversed, modified or amended without the DIP Lender's consent;

• no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the Term Loans and the transactions contemplated herein;

• after giving effect to the making of the Term Loans, the outstanding principal amount of all Term Loans would not exceed the Maximum Amount;

• the DIP Lender shall have received and approved the Approved Budget in accordance with the DIP Note and the DIP Orders;

• the Chapter 11 Case shall not have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

• the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, authorizing the Loan Parties to use Cash Collateral in a manner consistent with the Approved Budget;

• the DIP Lender and the Borrower shall have entered into the Stalking Horse Purchase Agreement in form and substance acceptable to the DIP Lender; and

• with respect to the Term Loan made on the Closing Date that follows entry of the Interim Order, the Borrower shall have paid, or

cause to be paid, at least $400,000 in legal expenses to Latham & Watkins LLP (subject to any requirements in the Interim Order),

**Certain Affirmative Covenants:**

The affirmative covenants include, without limitation, the following:

- Upon reasonable request of the DIP Lender, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the DIP Lender to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and upon reasonable advance notice, to discuss the Loan Parties' affairs with any of their directors, officers, employees or accountants, so long as a Responsible Officer of a Loan Party is invited to attend such discussions. The Borrower will permit the DIP Lender, or any of its officers, employees, accountants, attorneys or agent, upon reasonable prior notice, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours; provided, that, unless an Event of Default hereunder is continuing, the Loan Parties shall not be required to reimburse the DIP Lender for more than one such visit, audit, review or inspection. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the DIP Lender (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

- The Loan Parties and their Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (ii) the Loan Parties and their Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted to the extent contemplated by the Approved Budget or the DIP Orders, the failure of which to do so could reasonably be expected to have a Materially Adverse Effect.

- The Loan Parties and their Subsidiaries will pay or discharge, before delinquency, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Loan Parties and their Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party or such Subsidiary, (2) taxes

the nonpayment of which is permitted or required by the Bankruptcy Code or the DIP Note or (3) taxes as set forth on Schedule II to the DIP Note, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Loan Parties and their Subsidiaries.

• The Loan Parties and each of their Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Approved Budget or the DIP Orders or as otherwise permitted hereunder, (ii) the Loan Parties and each of their Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Loan Parties and each of their Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and liens otherwise permitted by the DIP Orders, in each case, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

• The Loan Parties and their Subsidiaries will maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, commercial general liability, worker's compensation and business interruption insurance) with respect to the Collateral and its other properties (including all real property leased or owned by it) and business, in such amounts and covering such risks as is (i) carried generally in accordance with sound business practice by companies in similar businesses similarly situated, (ii) required by any law or regulation, and (iii) required by any material contract. All property and commercial general liability/hazard policies covering the Collateral are to be made payable to the DIP Lender as a lender loss payee/mortgagee, other than proceeds required by an order of the Bankruptcy Court to be applied to the repayment of debt secured by a Lien on the related assets that is senior to the Liens securing the Obligations under the DIP Note, and are to contain such other provisions as the DIP Lender may reasonably require to fully protect its interest in the Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the DIP Lender and the policies are to be premium prepaid with the lenders' loss payee and additional insured endorsement in favor of the DIP Lender, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the DIP Lender of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the DIP Lender may

arrange for such insurance, but at the Borrowers' expense and without any responsibility on the DIP Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the sole right, in the name of the DIP Lender, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. The Loan Parties may settle, adjust or compromise any insurance claim on terms reasonably acceptable to the DIP Lender, as long as the proceeds are delivered to the DIP Lender pursuant to The DIP Note and the DIP Orders.

• The Loan Parties and their Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Approved Budget or the DIP Orders or as permitted hereunder, or to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

• The Loan Parties and their Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "<u>Milestone</u>"):

• no later than 2 days after the Petition Date, the Loan Parties shall file a motion seeking approval of an order approving, among other things, the DIP Lender as a stalking horse bidder, the Bidding Procedures, the Break-Up Fee, and the Expense Reimbursement (each as defined in the Stalking Horse Purchase Agreement) in the form attached as Exhibit A to the Stalking Horse Purchase Agreement and otherwise in form and substance acceptable to DIP Lender (the "<u>Bidding Procedures Order</u>");

• no later than 3 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court in form and substance acceptable to the DIP Lender;

• no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance acceptable to the DIP Lender;

• no later than 30 days after the Petition Date, the Final Order approving the DIP Note shall be entered by the Bankruptcy Court

in form and substance acceptable to the DIP Lender;

- no later than 60 days after the Petition Date the Borrower shall have held the auction for the Acquired Assets or cancelled the auction and named Lender the winning bidder for the Acquired Assets;

- no later than 65 days after the Petition Date the Bankruptcy Court shall have entered an order approving the sale of the Acquired Assets to the DIP Lender and authorizing the assignment of the Assigned Contracts to the DIP Lender, in form and substance acceptable to the DIP Lenders, or an order approving for an alternative sale of all or substantially all of the Loan Parties' assets that results in payment of the Obligations in full in cash prior to the Maturity Date; and

- no later than 80 days after the Petition Date the sale of the Acquired Assets to the DIP Lender or other winning bidder approved by the Bankruptcy Court shall have been consummated in full.

- The Borrower will deliver (which delivery may be made by electronic communication (including email)) to the DIP Lender and Bond Trustee each of the reports and other items set forth on Schedule I attached to the DIP Note no later than the times specified therein (or such later time as the DIP Lender may agree). No less than once per week, the Borrower shall make its senior management and its advisors available at reasonable times and upon reasonable notice to the DIP Lender to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

| | |
|---|---|
| **Certain Negative Covenants:** | The negative covenants include: |

- Neither the Loan Parties nor any of their Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the DIP Lender (which consent shall not be unreasonably withheld), other than, in each case, any such action approved by an order of the Bankruptcy Court.

- Neither the Loan Parties nor any of their Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the DIP Orders,

Permitted Indebtedness.

• Neither the Loan Parties nor any of their Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

• Neither the Loan Parties nor any of their Subsidiaries shall make any Restricted Payment, except dividends and distributions by Subsidiaries of the Loan Parties paid to the Borrower. Except for claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, neither the Loan Parties nor any of their Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the DIP Lender in writing; *provided*, that, nothing in this subsection (d) shall prohibit the Borrower from paying prepetition ordinary course obligations that are the subject of typical first day relief, set forth in the budget, or otherwise approved by the Bankruptcy Court.

• Neither the Loan Parties nor any of their Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Loan Parties or any of their Subsidiaries).

• Neither the Loan Parties nor any of their Subsidiaries will Dispose of any of its property, business or assets, whether now owned or hereafter acquired other than (i) the sale of Inventory and other assets held for sale in the ordinary course of business, (ii) the Disposition of obsolete, damaged, unusable, immaterial, uneconomical, surplus or worn out property or equipment, (iii) the sale of other property on terms acceptable to the DIP Lender, (iv) leasing or subleasing assets in the ordinary course of business and the termination or cancellation of any lease or sublease in the ordinary course of business, (v) the lapse of Intellectual Property of the Loan Parties to the extent no longer used in or material to the conduct of their business, so long as such lapse is not materially adverse to the interests of the DIP Lender, (vi) any involuntary loss, damage or destruction of property or involuntary condemnation, seizure by taking, exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property, (vii) so long as such Disposition would not be otherwise prohibited hereunder, the transfer of assets from any Loan Party to another Loan Party, (viii) dispositions of property subject to casualty events, (ix) termination of leases, subleases, licenses, sublicenses or

similar use and occupancy agreements by the applicable Loan Party that do not interfere in any material respect with the business of such Loan Party, and (x) Dispositions that are Permitted Liens.

- Neither the Loan Parties nor any of their Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (i) the DIP Orders or (ii) the Prepetition Obligations.

- Neither the Loan Parties nor any of their Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

- Neither the Loan Parties nor any of their Subsidiaries shall change its fiscal year.

- As of each Variance Testing Date, the Borrower shall not permit: the aggregate amount of Actual Disbursement Amounts to exceed the aggregate amount of Budgeted Disbursement Amounts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance.

- Neither the Loan Parties nor any of their Subsidiaries shall, directly or knowingly indirectly, use the Term Loans or the proceeds of the Term Loans, or lend, contribute or otherwise make available the Term Loans or the proceeds of the Term Loans to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, in violation of Sanctions applicable to any party hereto, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as DIP Lender or otherwise) of Sanctions.

**Approved Budget:**    A rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the Initial Approved Budget or otherwise in form and substance acceptable to the DIP Lender and shall be approved by the DIP Lender, in the DIP Lender's sole discretion.

**Permitted Variance**: With respect to any Variance Testing Period, in respect of the aggregate amount of Actual Disbursement Amounts, 15% for such Variance Testing Period.

**Professionals'
Carve-Out:**

Under the Interim Order and DIP Note, "Carve-Out" shall mean: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "Statutory Fees"); plus the sum of (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below) (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise, subject to the Approved Budget, all unpaid fees, costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or the Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve-Out Trigger Notice (the "Pre Trigger Carve-Out Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 (inclusive of any prepetition retainer held by the applicable Professional Person to the extent not previously applied or returned) incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap" and such amounts set forth in clauses (i) through (iv), the "Carve-Out Cap"); provided that, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email by the DIP Lender to the Debtors, their restructuring counsel, counsel to the Prepetition Trustees, the U.S. Trustee, and counsel to the Committee, if any (collectively, the "Carve-Out Trigger Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event, and shall describe in reasonable detail such DIP Termination Event that is alleged to have occurred and be continuing and stating that the Post Carve-Out Trigger Notice Cap has been invoked. Neither the DIP Lender nor the Prepetition Bonds Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under

any chapter of the Bankruptcy Code, other than payment or reimbursement of any fees or disbursements from proceeds of DIP Collateral to the extent of the Carve-Out. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Bonds Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

**Expenses and Indemnification:**
The Borrower shall indemnify and hold harmless the DIP Lender and each of its affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket attorneys' fees and expenses limited to the reasonable and documented out-of-pocket fees and expenses of one primary outside counsel to the Indemnified Persons taken as a whole (and, if necessary, one local counsel in each relevant jurisdiction)) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under the DIP Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the DIP Lender on the one hand and the Loan Parties on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person (a) to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as determined in a final non-appealable judgment by a court of competent jurisdiction or (b) any dispute that is among Indemnified Persons that a court of competent jurisdiction has determined in a final non-appealable judgment did not involve actions or omissions of any Loan Party or any of their respective Affiliates and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED

OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A
RESULT OF ANY OTHER TRANSACTION CONTEMPLATED
HEREUNDER OR THEREUNDER

## ADDITIONAL DISCLOSURES

5.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession

seeking authority to use cash collateral or obtain financing must disclose the presence and location

of certain provisions contained in the documentation evidencing the cash collateral usage or

financing.  The debtor in possession must also justify the inclusion of such provisions.  Set forth

below are the disclosures required in accordance with such rules:

a.   Local Rule 4001-2(a)(i)(N) requires a debtor to disclose whether it has
granted cross-collateralization to a prepetition secured creditor in
connection with the debtor's cash collateral usage or additional financing.
**The proposed Interim Order does not provide for the granting of
cross-collateralization protection to any prepetition secured
creditor.**

b.   Local Rule 4001-2(a)(i)(O) requires disclosure of provisions that deem
prepetition secured debt to be postpetition debt or use postpetition loans
from a prepetition secured creditor to pay part or all of that secured
creditor's prepetition debt (other than as provided in section 552(b) of
the Bankruptcy Code).  **The proposed Interim Order does not contain
provisions that deem prepetition secured debt to be postpetition debt
or use postpetition loans from a prepetition secured creditor to pay
part or all of that secured creditor' prepetition debt (other than as
provided in section 552(b) of the Bankruptcy Code).**

c.   Local Rule 4001-2(a)(i)(P) requires disclosure of provisions that provide
for the priming of any secured lien without the consent of that lienholder.
**The proposed Interim Order provides for the consensual priming of
the Prepetition Bonds Secured Parties.  Interim Order, ¶ 2.1(b).  The
proposed Interim Order also provides for the "priming" of certain
filers of mechanics liens on the Sierra Plant (as defined below) that
are junior to the Prepetition Biofuels Bond Liens on the Sierra Plant
and are thus unsecured pursuant to section 506(a) of the Bankruptcy
Code.  Interim Order.**

d.   Local Rule 4001-2(a)(i)(Q) and Bankruptcy Rule 4001(c)(1)(B)(iii)
require the disclosure of provisions or findings of fact that (i) bind the
estate or other parties in interest with respect to the validity, perfection

or amount of a secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters. **The proposed Interim Order contains certain limited findings and admissions by the Borrower Debtors relating to the validity, perfection, enforceability and amount of the Prepetition Bonds Secured Parties' prepetition liens and claims, as set forth therein. Interim Order, ¶¶ E(v),(vi),(vii), (viii), (ix), 4.1.**

e. Local Rule 4001-2(a)(i)(R) requires the disclosure of provisions that immediately approval all terms and conditions of the underlying loan agreement. **The proposed Interim Order provides for the immediate approval of DIP Loan Documents and DIP Obligation. Interim Order, ¶ 1.3.**

f. Local Rule 4001-2(a)(i)(S) and Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order describes the modification of the automatic stay to the extent necessary to implement the Interim Order. Interim Order, ¶ 3.4. The proposed Interim Order provides for the requisite five (5) business days prior to the expiration of the Remedies Notice Period before the exercise of remedies. Interim Order, ¶ 3.3.**

g. Local Rule 4001-2(a)(i)(T) requires the disclosure of provisions that limit what arguments parties can raise using a default remedies period. **The proposed Interim Order does not prohibit parties from raising any particular defenses during the Remedies Notice Period. Interim Order, ¶ 3.3.**

h. Local Rule 4001-2(a)(i)(U) and Bankruptcy Rule 4001(c)(1)(B)(xi) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The DIP Collateral includes the proceeds of avoidance actions, except for actions under Section 549 of the Bankruptcy Code upon entry of a Final Order. Interim Order, ¶ F(vi).**

i. Local Rule 4001-2(a)(i)(V) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order provides, subject to entry of the Final Order, that the Borrower Debtors waive irrevocably all claims and rights, if any, it or its estates might otherwise assert against the DIP Collateral pursuant to Sections 506(c) of 105(a) of the Bankruptcy Code. Interim Order, ¶ 5.11.**

j.   Local Rule 4001-2(a)(i)(W) requires disclosure of provision that affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1). **The proposed Interim Order does not include any provision that affects the Court's power to consider the equities of the case. The Interim Order does provide that such a waiver will be applicable upon entry of the Final Order. Interim Order, ¶ 5.12.**

k.   Local Rule 4001-2(a)(i)(X) requires disclosure of provision that affect the Court's power to use the equitable doctrine of marshaling. **The proposed Interim Order does not include any provision that affects the Court's power to marshal assets. The Interim Order does provide that such a limitation will be applicable upon entry of the Final Order. Interim Order, ¶ 5.13.**

l.   Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order provides that the Prepetition Bonds Secured Parties are entitled to adequate protection of their interests in the Prepetition Bonds Collateral (including Cash Collateral) solely to the extent of the diminution in value of the Prepetition Bonds Collateral. Interim Order, ¶ 2.5.**

m.   Bankruptcy Rule 4001(c)(1)(B)(v) requires disclosure of a waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364. **The proposed Interim Order does not include any such provisions.**

n.   Bankruptcy Rule 4001(c)(1)(B)(vi) requires disclosure of the establishment of deadlines for filing a plan of reorganization, for approval of a disclosures statement, for a hearing on confirmation, or for entry of a confirmation order. **The proposed Interim Order does not include any such provisions.**

o.   Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order includes provisions that provide for the automatic perfection and validity of the DIP Lien and Prepetition Adequate Protection Liens without the necessity of any further filing or recording under the laws of any jurisdiction. Interim Order, ¶ 2.1.**

p.   Bankruptcy Rule 4001(c)(1)(B)(viii) requires disclosure of a release, waiver, or limitation on any claim or other cause of action belonging to

the estate or the trustee, including any modification of the statute of limitations or other deadlines to commence an action. **The Interim Order provides that, subject to the Final Order, the Releasors, including the Debtor, release, discharge and acquit the Releasees, including the DIP Lender and each of the Prepetition Bonds Secured Parties, from all Released Claims. Interim Order, ¶ 5.17.**

q. Bankruptcy Rule 4001(c)(1)(B)(ix) requires disclosure of the indemnification of any party**. The DIP Documents provide the Borrower will indemnify (subject to customary carve-outs for gross negligence, fraud and willful misconduct) the DIP Lender and their respective affiliates against any liabilities arising out of the transaction, in each case whether or not any of the transactions close or are consummated. Interim Order, ¶ 1.4.**

## BACKGROUND

6.      On September 9, 2024 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that their cases be consolidated for procedural purposes only and administered jointly. No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.

7.      The Debtors were formed in 2007 to develop and implement a commercially viable "waste to fuel" process whereby trash is converted into usable fuel through the utilization of gasification and other technologies. The Debtors' Sierra BioFuels Plant (the "Sierra Plant"), owned by Debtor Sierra BioFuels, located approximately twenty miles east of Reno, Nevada, began successfully producing low carbon synthetic crude oil from landfill waste in December 2022.

8.      Despite the Debtors' successful proof of concept at the Sierra Plant and substantial progress with ongoing research and development, the Debtors have faced significant liquidity

issues in the last few years and were forced to cease operations at the Sierra Plant in May 2024. The Debtors have determined that a comprehensive financial restructuring, through chapter 11 bankruptcy, is the only path forward to realize value on the Debtors assets for the benefit of their stakeholders.

9.        For further information about the Debtors and the circumstances that have led to the filing of these Chapter 11 Cases, the Debtors refer to the *Declaration of Mark Smith, Restructuring Advisor to Fulcrum, BioEnergy, Inc. in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed simultaneously herein and incorporated herein by reference.

### The Debtors Prepetition Financing

**I.        Overview.**

10.        The debtors' prepetition capital structure included approximately $456.6 million in funded debt just prior to the Petition Date, consisting of: (a) the Parent Prepetition Term Loan Facility; (b) Parent Secured Convertible Promissory Notes; (c) the Parent Unsecured Convertible Promissory Notes; (d) the Sierra BioFuels Term Loan Facility; (e) the Sierra BioFuels Bonds; and (f) the Sierra Holdings Bonds (each as defined below).

11.        As of the Petition Date, the Debtors' prepetition funded indebtedness can be summarized as follows:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount (Approximate)** |
| *Fulcrum Parent Debt* | | |
| **Parent Prepetition Term Loan Facility** | December 23, 2023 | $90,500,000 |
| **2021 A&R Secured Convertible Promissory Notes** | December 31, 2023 | $30,000,000 |

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount (Approximate)** |
| **2020 Secured Convertible Promissory Notes** | December 31, 2023 | $34,500,000 |
| **Unsecured Convertible Promissory Note** | June 23, 2024 | $5,000,000 |
| **Paycheck Protection Program Loan** | May 6, 2025 | $169,896 |
| *Sierra Holdings Debt* | | |
| **6.950% Series 2018 Sierra Holdings Bonds** | February 15, 2038 | $39,638,065 |
| **5.750% Series 2019 Sierra Holdings Bonds** | February 15, 2038 | $46,002,680 |
| **6.750% Series 2020 Sierra Holdings Bonds** | February 15, 2038 | $18,426,837 |
| *Sierra BioFuels Debt* | | |
| **5.875% Series 2017 Sierra BioFuels Bonds** | December 15, 2027 | $29,203,151 |
| **6.250% Series 2017 Sierra BioFuels Bonds** | December 15, 2037 | $101,769,499 |
| **5.125% Series 2017B Sierra BioFuels Bonds** | December 15, 2037 | $18,971,740 |
| **5.250% Series 2018 Sierra BioFuels Bonds** | December 15, 2037 | $2,633,702 |
| **Sierra BioFuels Unsecured Term Loan Facility** | December 31, 2023 | $39,774,423 |
| | **Total Outstanding Debt:** | **$456,589,993** |

These obligations are discussed below:

## II.     Debtor Financing Facilities.

### A.     Parent Prepetition Term Loan Facility.

12.     On June 23, 2023, Fulcrum Parent, as borrower, and certain of its subsidiaries as guarantors thereto entered into that certain credit agreement (as amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "Prepetition Term Loan Credit Agreement") with PCL Administration LLC, as administrative agent and as collateral agent, providing for a term loan facility in an initial aggregate principal amount of $84,500,000, which was subsequently increased on September 29, 2023, by an amendment thereto to a total aggregate principal amount of $90,500,000 (the "Parent Prepetition Term Loan Facility"). Certain of the Debtors' obligations under the Parent Prepetition Term Loan Facility are guaranteed by eight of Fulcrum Parent's direct and indirect subsidiaries. The Parent Prepetition Term Loan Facility is secured on a first-lien basis by substantially all of the personal

and real property assets of Fulcrum Parent and those subsidiaries which provided a guaranty thereunder.  The Parent Prepetition Term Loan Facility has an interest rate of twenty percent (20.00%) and matured on December 23, 2023.  As of the date hereof, the entire $90,500,000 principal amount of the Parent Prepetition Term Loan Facility remains outstanding.  The Borrower Debtors are not borrowers or guarantors of this financing, and none of the Borrower Debtors' assets secure this financing.

### B.     Parent Secured Convertible Promissory Notes.

13.     Fulcrum Parent is party to the following secured convertible promissory notes (the "Parent Secured Convertible Promissory Notes"):  (a) those certain secured convertible promissory notes issued to Newtop Partners and Newtop Partners II pursuant to that certain Securities Purchase Agreement, dated as of July 29, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) in the principal amount of $15,000,000 with respect to Newtop Partners and $15,000,000 with respect to Newtop Partners II, (b) those certain secured convertible promissory notes issued to Crestline Praeter, L.P. – Fulcrum ("Crestline"), BP Technology Ventures Limited ("BP"), Rustic Canyon Ventures III, L.P. ("Rustic Canyon"), and Cathay Pacific Airways Limited ("Cathay") pursuant to that certain Securities Purchase Agreement, dated as of November 13, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) in the principal amount of $26,000,000 with respect to Crestline, $5,000,000 with respect to BP, $2,500,000 with respect to Rustic Canyon, and $1,000,000 with respect to Cathay.  Fulcrum Parent also had secured promissory notes, as amended, issued to BP and Marubeni America Corporation ("Marubeni"), dated as of March 15, 2023, and February 15, 2023, respectively, in the principal amount of $10,000,000 with respect to BP and $4,500,000 with respect to Marubeni.  Through the terms of the amended secured promissory notes, the outstanding principal and accrued interest on these secured promissory notes

were converted into shares of Fulcrum Parent's Series D-8 Preferred Stock on December 31, 2023. Certain of the Debtors' obligations under the Parent Secured Convertible Promissory Notes are guaranteed by several of Fulcrum Parent's direct and indirect subsidiaries and secured on a first-lien basis by substantially all of the personal and real property assets, subject to the lien granted to Nuveen EIC pursuant to the Parent Prepetition Term Loan Facility. The Parent Secured Convertible Promissory Notes bear interest ranging up to fifty percent (50%). As of the date hereof, $64,500,000 of the principal amount of the Parent Secured Convertible Promissory Notes remains outstanding. The Borrower Debtors are not borrowers or guarantors of this financing, and none of the Borrower Debtors' assets secure this financing.

### C.      Parent Unsecured Convertible Promissory Notes.

14.      Fulcrum Parent is party to the unsecured convertible promissory note (the "Parent Unsecured Convertible Promissory Note") dated as of June 23, 2023, issued to Rustic Canyon Ventures III, L.P., in the principal amount of $5,000,000. This Parent Unsecured Convertible Promissory Note remains outstanding as of the date hereof. In late 2022 and early 2023, the Company issued the following unsecured convertible promissory notes: (a) that certain convertible promissory notes issued to BP, dated as of September 8, 2022 and November 23, 2022 in the principal amount of $14,500,000 and $10,500,000, respectively, (b) that certain convertible promissory note issued to CDP Infrastructures Fund G.P., dated as of September 8, 2022, in the principal amount of $4,500,000, (c) that certain convertible promissory note issued to Marubeni Corporation, dated as of October 26, 2022, in the principal amount of $10,500,000, (d) that certain convertible promissory note issued to OCI Fuels USA Inc., dated as of January 13, 2023, in the principal amount of $9,000,000, and (e) that certain convertible promissory note issued to SK Innovation Co., Ltd., dated as of February 27, 2023, in the principal amount of $10,000,000. Through the terms of these unsecured promissory notes, the outstanding principal and accrued

interest on these unsecured promissory notes were converted into shares of the Company's Series D-8 Preferred Stock on December 31, 2023. The Borrower Debtors are not borrowers or guarantors of this financing, and none of the Borrower Debtors' assets secure this financing.

### D.   Paycheck Protection Program Promissory Note

15.     In May 2020, Fulcrum Parent received loan proceeds in the amount of $1,624,434 under the Paycheck Protection Program ("PPP") established by the Coronavirus Aid, Relief, and Economic Securities Act ("CARES Act"). In August 2022, $1,232,210 was forgiven by the Small Business Administration ("SBA"). The loan bears interest of one percent (1%). As of the date hereof, approximately $169,896 of the principal remains outstanding. The Borrower Debtors are not borrowers or guarantors of this financing, and none of the Borrower Debtors' assets secure this financing.

### E.   Sierra BioFuels Term Loan Facility.

16.     On October 13, 2023, Debtor Sierra BioFuels, as borrower, entered into that certain senior unsecured term loan agreement (as amended, restated, supplemented or otherwise modified in accordance with the terms thereof, the "Sierra BioFuels Term Loan Agreement") with PCL, as administrative agent, providing for a term loan facility in an initial aggregate principal amount of $2,400,000, which has been subsequently increased by amendments thereto on October 25, 2023, November 17, 2023, December 8, 2023, December 22, 2023, January 19, 2024, February 8, 2024, March 5, 2024, March 25, 2024 and April 5, 2024 to a total aggregate principal amount of $40,900,000 (the "Sierra BioFuels Term Loan Facility"). The Sierra BioFuels Term Loan Facility is unsecured and Sierra BioFuels' obligations under the Sierra BioFuels Term Loan Facility are not guaranteed by any other Debtors. The Sierra BioFuels Term Loan Facility has an interest rate of twenty percent (20.00%) and matured on December 31, 2023, and amounts loaned after such

maturity date were payable on demand.  As of the date hereof, $39,774,423 of the principal amount of the Sierra BioFuels Term Loan Facility remains outstanding.

       **F.**      **Bonds.**

          **a.**      **The Sierra BioFuels Bonds**

      17.      In October 2017, the Director of the State of Nevada Department of Business and Industry issued $150,000,000 in aggregate principal amount of bonds (the "Series 2017A BioFuels Bonds") and loaned the proceeds of such issuance to Sierra BioFuels pursuant to a certain financing agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "BioFuels Financing Agreement").  The Series 2017A BioFuels Bonds were issued pursuant to a certain trust indenture, dated as of October 1, 2017 (as amended and supplemented as of December 1, 2017, and again as of March 1, 2018, the "BioFuels Trust Indenture") by and between the Director of the State of Nevada Department of Business and Industry, as issuer, and the Bank of New York Mellon Trust Company, N.A., as trustee ("BNY").  Then, in December 2017, the Director of the State of Nevada Department of Business and Industry issued an additional $21,960,000 in bonds on a parity basis with the Series 2017A BioFuels Bonds (the "Series 2017B BioFuels Bonds," and together with the Series 2017A BioFuels Bonds, the "2017 BioFuels Bonds"), as authorized by the BioFuels Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds to Sierra BioFuels pursuant to the BioFuels Financing Agreement.  Again, in March 2018, the Director of the State of Nevada Department of Business and Industry issued an additional $3,040,000 in bonds on a parity basis with the 2017 BioFuels Bonds, (the "Series 2018A BioFuels Bonds," and together with the 2017 BioFuels Bonds, the "BioFuels Bonds"), as authorized by the BioFuels Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds to Sierra BioFuels

pursuant to the BioFuels Financing Agreement.  UMB Bank, N.A., is successor trustee for the BioFuels Bonds (in such capacity, the "BioFuels Trustee").

18.     The BioFuels Bonds are secured by (a)  all of Sierra BioFuels' personal property, (b)  all of Sierra Finance's membership interests in Sierra BioFuels, (c) the revenues and other moneys and rights Trust Estate (as defined in the BioFuels Trust Indenture), (d) the Sierra BioFuels' Sierra Plant through a deed of trust recorded with the County Recorder of Storey County, Nevada on October 26, 2017, and (e) all funds held in certain accounts.  The BioFuels Bonds are also guaranteed by Fulcrum Parent.  For the Series 2017A BioFuels Bonds, $29,203,151.29 of remaining principal bears interest at a default rate of 8.875% and had an initial stated maturity of December 15, 2027, and $101,796,499.63 of remaining principal bears interest at a rate of 9.250% and had an initial stated maturity of December 15, 2037.  For the Series 2017B BioFuels Bonds, $18,971,740.83 of remaining principal bears interest at a rate of 8.125% and had an initial stated maturity of December 15, 2037.  For the 2018 BioFuels Bonds, $2,633,702.82 of remaining principal bears interest at a default rate of 8.250% and had an initial stated maturity of December 15, 2037.  All principal, interest, and other amounts owed under the Biofuels Bonds became immediately due and payable upon delivery of the notice of defaults, events of default, and acceleration by the BioFuels Trustee, on October 16, 2023.  After delivering such notice, the BioFuels Trustee forbore from continuing or taking additional enforcement actions pursuant to a forbearance agreement ("Bond Forbearance Agreement"), dated as of October 25, 2023, between the BioFuels Trustee, Holdings Trustee, certain holders of BioFuels Bonds and Holdings Bonds, Sierra BioFuels, Debtor Fulcrum Sierra Holdings, LLC ("Sierra Holdings"), and certain other Debtors, until the Bond Forbearance Agreement expired on May 8, 2024.

### b.    The Sierra Holdings Bonds

19.    In September 2018, the Director of the State of Nevada Department of Business and Industry issued $44,000,000 in aggregate principal amount of bonds (the "Series 2018 Holdings Bonds") and loaned the proceeds of such issuance to Sierra Holdings, pursuant to a certain financing agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "Holdings Financing Agreement").  The Series 2018 Holdings Bonds were issued pursuant to a certain trust indenture, dated as of September 1, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Holdings Trust Indenture") by and between the Director of the State of Nevada Department of Business and Industry, as issuer, and BNY, as trustee.  Then, on September 1, 2019, the Director of the State of Nevada Department of Business and Industry issued an additional $50,000,000 in bonds on a parity basis with the Series 2018 Holdings Bonds (the "Series 2019 Holdings Bonds"), as authorized by the Holdings Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds of such issuance to Sierra Holdings pursuant to the Holdings Financing Agreement.  Again, in December 2020, the Director of the State of Nevada Department of Business and Industry issued an additional $20,000,000 in bonds on a parity basis with the Series 2018 Holdings Bonds and the Series 2019 Holdings Bonds (the "Series 2020 Holdings Bonds," and together with the Series 2018 Holdings Bonds and the Series 2019 Holdings Bonds, the "Holdings Bonds"), as authorized by the Holdings Trust Indenture (as amended and supplemented in connection with this issuance) and loaned the proceeds of such issuance to Sierra Holdings pursuant to the Holdings Financing Agreement.  UMB Bank, N.A., is successor trustee for the Holdings Bonds (in such capacity, the "Holdings Trustee," and together with the BioFuels Trustee, the "Bonds Trustee").

20.    The Holdings Bonds are secured by (a) all of Sierra Holdings' and Sierra Finance's personal property and (b) the revenues and other moneys and rights that constitute the Trust Estate

(as defined in the Holdings Trust Indenture), (c) all of Sierra Holdings' membership interests in Sierra Finance, (d) all of Fulcrum Parent's membership interests in Sierra Holdings, and (e) all funds held in certain accounts.  The Holdings Bonds are also guaranteed by Fulcrum Parent.  For the Series 2018 Holdings Bonds, $39,638,065.21 of remaining principal bears default interest at a rate of 9.95% and had an initial stated maturity of February 15, 2038.  For the Series 2019 Holdings Bonds, $46,002,680.90 of remaining principal bears interest at a default rate of 8.75% and had an initial stated maturity of February 15, 2038.  For the Series 2020 Holdings Bonds, $18,426,837.29 of remaining principal bears interest at a default rate of 9.75% and had an initial stated maturity of February 15, 2038.  All principal, interest, and other amounts owed under the Holdings Bonds became immediately due and payable upon delivery of the notices of default, events of default, and acceleration by the Holdings Trustee, on October 16, 2023.  After delivering such notice, the Holdings Trustee forbore from continuing or taking additional enforcement actions pursuant to the Bond Forbearance Agreement, until the Bond Forbearance Agreement expired on May 8, 2024.

## **BASIS FOR RELIEF AND IMMEDIATE NEED FOR FINANCING**

21.     The Debtors have an immediate and critical need to obtain post-petition financing in order to pursue their efforts to maximize value of their estates in chapter 11.  Specifically, due to severe liquidity constraints[3], if the Debtors do not immediately receive the DIP Facility, they will be unable to secure and maintain their assets, including obtaining insurance on their property, paying their utility providers, and obtaining physical security to protect and preserve the plant, which is now idled.  Moreover, the Debtors need the DIP Facility to pay for the costs of administering their chapter 11 cases, including the payment of professional fees, while pursuing a going-concern sale of their assets.

---

[3]     In fact, to the best of the Debtors' knowledge, the estates have zero liquidity.

22.    Prior to the Petition Date, the Debtors diligently pursued pre- and post-petition financing sources and potential stalking horse bidders.  The Debtors have been unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority claim pursuant to section 364(a)(1) of the Bankruptcy Code, without the grant of liens on assets.

23.    The Debtors have been unable to obtain funding on terms that are more favorable than offered by the DIP Lender.

24.    The DIP Lender has indicated a willingness to provide the Debtors with certain financing, but only in compliance with the terms and conditions set forth in the DIP Loan Documents, including the DIP Note and Interim Order.  The Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender represents the best financing presently available to the Debtors.  These funds will be used to immediately secure the Debtors' assets during the pendency of their chapter 11 case—including to obtain insurance, pay utilities and obtain a security force—while the Debtors pursue a going-concern sale of substantially all of their assets which will maximize the value of the Debtors' estate.  The DIP Facility will also be used to cover the costs of administration of these chapter 11 cases and to pay for such other costs expressly agreed to by the DIP Lender in accordance with the Approved Budget.

25.    The Debtors have negotiated the DIP Facility in good faith with the DIP Lender. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

## APPLICABLE AUTHORITY

**A.    The Debtors Should be Permitted to Obtain Post-Petition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

26.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> (d)(1) authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
>> (A) the [debtor] is unable to obtain credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.    In evaluating proposed post-petition financing under sections 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;
>
> c.    the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.    the proposed financing agreement was negotiated in good faith and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.   the proposed financing agreement adequately protects prepetition secured creditors. *See e.g. In re Aqua Assoc.*, 132 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.,* 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

28.    For the reasons discussed below, the Borrower Debtors satisfy the standards required to access post-petition financing on a secured superpriority and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**B.    The Debtors Were Unable to Obtain Financing on More Favorable Terms**

29.    The Debtors solicited several alternative financing proposals prior to the Petition Date in connection with seeking a potential stalking horse purchaser for their assets.  However, the Debtors were unable to procure unsecured financing.  The current proposal is on the terms that are most beneficial to the estate.  The Debtors believe their efforts to obtain post-petition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.  *See e.g. In re Los Angeles Dodges LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("The Court 'may not approve any credit transaction under subsection (c) [of Section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b).'"); *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

30.     Additionally, given the immediate and critical need for the Borrower Debtors to obtain financing—*i.e.*, the Debtors will be unable to secure and maintain their assets and pursue a going-concern sale to maximize the value of their assets—the Debtors do not have an unlimited amount of time to find more favorable terms.  *See e.g. In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code "imposes no duty to seek credit from every possible lender, particularly when time is of the essence to preserve a vulnerable seasonal enterprise").

**C.     The DIP Facility is Necessary to Preserve and Maximize the Assets of the Debtors' Estates.**

31.     As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize the assets of their estates.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The DIP Facility allows the Borrower Debtors to satisfy such obligation.  As noted *supra*, the Debtors need financing and was forced into these chapter 11 cases as a result of severe liquidity constraints and depleted lending resources.  Without the agreement of the DIP Lender to provide the Borrower Debtors with financing, the Debtors would be unable to preserve their assets and purse a going-concern sale of their assets pursuant to Section 363 of the Bankruptcy Code, which will enable the Debtors to maximize value and recovery to their creditors.  The Borrower Debtors immediately need financing for critical expenses, including to secure insurance on their property, pay for utilities and hire a security force to protect the idled plant.  The Borrower Debtors' inability to make such payments would certainly cause immediate harm to the Debtors, the Prepetition Lenders, and the Debtors' creditors.

**D.     The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

32.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential

lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *See also In re Ellingsen MacLean Oil Co.*, 65 B.R. 385, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

33.     Prior to the Petition Date, the Debtors, and representatives of the Bond Trustee, reached out to a number of parties to solicit interest in providing both pre- and postpetition financing to the Debtors in connection with a sale of substantially all of the Debtors' assets.  As a result of these efforts, only one potential lender and stalking horse purchaser was serious about providing a post-petition loan to the Borrower Debtors.  The DIP Facility was negotiated in good faith between the Borrower Debtors and the DIP Lender, and the terms of the DIP Facility were the best terms available to the Borrower Debtors under the circumstances.  The Borrower Debtors' negotiations with the DIP Lender resulted in an agreement which will allow the Debtors to immediately secure and maintain their assets and pursue an orderly sale of their assets which will maximize value for the estates.

**E.      Entry into the DIP Facility Reflects the Debtors' Sound Business Judgment.**

34.     A debtor's decision to enter into a post-petition financing arrangement under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See e.g. In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr.S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

35.     Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13. (Bankr. D. Utah 1981).  The court will generally not second-guess a debtor-in-possession's business decisions involving a

"business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14.

36.     As noted above, the Debtors have exercised sound business judgment in determining that the DIP Facility satisfies the legal prerequisites to incur debt under section 364 of the Bankruptcy Code.  As definitively set forth in the DIP Note and DIP Loan Documents, the Debtors believe the DIP Facility provides the best terms that are available under the circumstances. The DIP Facility is essential to enable the Debtors to avoid irreparable harm to the value of the Debtors' assets, the Prepetition Bonds Secured Parties, and the Debtors' other secured and unsecured creditors.

37.     Therefore, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to enter the DIP Facility and to obtain the DIP Facility on the secured and administrative superpriority basis described herein.

**F.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

38.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

39.     By this Motion, the Debtors seek authority to use Cash Collateral whenever or wherever acquired, and the proceeds of Prepetition Bonds Collateral, in accordance with the terms of the DIP Loan Documentation, including the Approved Budget and on terms consistent with the

Interim Order.  Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

40.     Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm.  The Debtors' inability to secure and preserve their assets during their chapter 11 cases would result in the loss of going concern value at the expense of the Debtors' stakeholders.  Thus, immediate access to Cash Collateral is essential to the Debtors' continued viability and ability to successfully reorganize.

## G.     Sections 105 and 363 of the Bankruptcy Code Authorize the Debtors' Use of Cash Collateral

38.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. 11 U.S.C. § 363(c).  Section 105(a) of the Bankruptcy Code provides that the court may issue any order that is necessary or appropriate to carry out the provisions of title 11. 11 U.S.C. § 105(a).

39.     Here, the Debtors have the consent of the Prepetition Bonds Secured Parties to access Cash Collateral on the terms described in the Motion and set forth in the DIP Orders and Approved Budget.  In addition, the Prepetition Bonds Secured Parties' interests in the Prepetition

Bonds Collateral are adequately protected by a combination of protections proposed in the Interim

Order and through the preservation of going concern value in the Debtors' assets.

**H.     The Proposed Adequate Protection of the Prepetition Bonds Secured Parties Is Warranted**

40.     As set forth above, Section 364(d)(1) of the Bankruptcy Code provides that the

Court may authorize the Debtors to obtain credit or incur debt secured by priming lien only if (a)

the Debtors is unable to obtain such credit otherwise; and (b) there is adequate protection of the

holder of the lien on the property of the estate on which the priming lien is proposed to be granted.

Additionally, Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the

court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of

such interest." 11 U.S.C. § 363(e).  Courts typically authorize a debtor to use cash collateral to

continue operations so long as the interests asserted by affected creditors in such collateral, which

equal the value of the collateral rather than of the debt, are adequately protected or they consent to

such use. *Id*.; *U.S. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)

(interest in property referenced in 11 U.S.C. § 363(e) refers to the value of the collateral as opposed

to the value of the loan).  What constitutes adequate protection must be decided on a case-by-case

basis. *See, e.g., MBank Dallas v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir.

1987) (citing *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985)); *Metro.

Life Ins. Co. v. Monroe Park (In re Monroe Park)*, 17 B.R. 934, 940 (D. Del. 1982) (citations

omitted).

41.     Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate

protection by granting replacement liens, making periodic cash payments, or granting such other

relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.  According to the legislative history of section 361 of the Bankruptcy Code, a finding of adequate protection is "left to case-by-case interpretation and development.  It is expected that the courts will apply the concept [of adequate protection] in light of the facts of each case and general equitable principles." H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; *see also O'Connor*, 808 F.2d at 1396-97 ("[T]he courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis.").

42.     The Interim Order provides that the Prepetition Bonds Secured Parties will be entitled to adequate protection of their interests in the Prepetition Bonds Collateral (including Cash Collateral) solely to the extent of the diminution in value of the Prepetition Bonds Collateral as a result of (a) the provisions of the Interim Order granting first priority and/or priming liens on such Prepetition Bonds Collateral to the DIP Lender, (b) the Debtors' use of the Prepetition Bonds Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code, and (d) otherwise, pursuant to Sections 361, 363(c), and 364(d)(l) of the Bankruptcy Code.  In addition to the payment of its legal fees in accordance with the Approved Budget, the Prepetition Bonds Secured Parties will be granted, solely to the extent of Diminution in Value of the Prepetition Bonds Liens in the Prepetition Bonds Collateral from and after the Petition Date, a replacement lien in all DIP Collateral (the "Prepetition Adequate Protection Lien"), junior only to (i)  the DIP Loan and (ii) the Permitted Liens.

43.     The proposed adequate protection described above is fair and reasonable and compensates the Prepetition Bonds Secured Parties for any possible diminution in value of the Prepetition Bonds Collateral.  Given the significant value that the Debtors stand to lose in the event

they are unable to obtain the DIP Facility and/or denied access to the continued use of Cash Collateral, such protections are appropriate.  Without access to the DIP Facility or the use of Cash Collateral, the Debtors will be unable to secure and preserve their assets or pursue a value maximizing sale of their assets, and their creditors will be irreparably damaged.

## I.   Interim Approval of the DIP Facility Should be Granted.

44.     It is essential that the Borrower Debtors immediately receive financing to secure and maintain their property.  The court should grant the Debtors' request for immediate authority to use the DIP Facility to prevent immediate and irreparable harm to the Debtors' estates and stakeholders pending a final hearing on the motion pursuant to Bankruptcy Rule 4001(c).  The availability of sufficient capital through the DIP Facility is vital to the preservation of the Debtors' estates and the value of the Debtors' assets.  The Debtors, therefore, seek authority to obtain approval of the DIP Facility on an immediate interim basis.

45.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

46.     In examining requests for interim relief under this rule, courts apply the same business judgment standard to other business decisions. *See e.g. Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449.  Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.

47.     The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the approval of the DIP Facility.

## REQUEST FOR A FINAL HEARING

48.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, in no event later than fourteen days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to the motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

49.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

50.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware, Attn: Rosa Sierra-Fox, 844 King Street, Suite 2207, Wilmington, Delaware 19801, rosa.sierra@usdoj.gov; (b) the holders of the 30 largest unsecured claims against the Debtors; (c) counsel to the DIP Lender; (d) counsel to the Prepetition Bonds Secured Parties and other secured lenders to the Debtors; (e) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (f) any such other party entitled to notice pursuant to Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **CONCLUSION**

WHEREFORE the Debtors respectfully request that the Court enter the DIP Orders granting the relief requested in this Motion, and such other and further relief as the Court may deem just and appropriate.

Dated: September 10, 2024
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Clint M. Carlisle*
Robert J. Dehney, Sr. (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Clint M. Carlisle (No. 7313)
Avery Jue Meng (No. 7238)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:   (302) 658-9200
Facsimile:   (302) 658-3989
Email: rdehney@morrisnichols.com
      cmiller@morrisnichols.com
      dbutz@morrisnichols.com
      ccarlisle@morrisnichols.com
      ameng@morrisnichols.com

*Proposed Counsel for the Debtors and Debtors in Possession*