### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*,[1] | Case No. 24-12008 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 12** |

**OBJECTION OF THERMOCHEM RECOVERY INTERNATIONAL, INC. TO THE DEBTORS' MOTION FOR (I) AN ORDER PURSUANT TO SECTIONS 105, 363, 364, 365 AND 541 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING AN AUCTION AND SALE HEARING; (E) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF, AND REQUEST FOR ADEQUATE PROTECTION OF TRI'S PROPRIETARY INTERESTS**

ThermoChem Recovery International, Inc. ("TRI"), by its undersigned counsel, objects to the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections;*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); and Fulcrum Sierra Holdings, LLC (8498) (individually and/or collectively, the "Debtors"). The location of the Debtors' service address is: Fulcrum BioEnergy, Inc., P.O. Box 220 Pleasanton, CA 94566.

*(C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (I) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [Docket No. 12] (the "Bids Procedures Motion"),[2] and requests that any Order granting any relief with respect to the Bid Procedures Motion include provisions to provide adequate protections of TRI's proprietary interests under Section 363(e).  In support of this Objection, TRI respectfully states as follows:

## I.      Preliminary Statement

1.      If the Debtors had limited their initial Bid Procedures Motion to a request to approve the stalking horse bid for the Sierra Plant and bid procedures for submitting higher and better bids for the Sierra Plant, that would have been a reasonable start to the Debtors' liquidation process.  Even that limited part of the Bid Procedures Motion raises issues that require protection of TRI's technology and proprietary interests in the TRI equipment and proprietary data located at the Sierra Plant.

2.      But the Debtors' Bid Procedures Motion is much more troubling than this.  Without any disclosure or even mention of the nature of the "Expanded Assets" owned by the Non-BioFuels Debtors, including certain patent rights co-owned by TRI, the Bid Procedures Motion attempts to rush through the Court's approval process an accelerated sale of undisclosed assets that offers no protections whatsoever for TRI and other parties who have specialized technology and proprietary

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion.

interests well-known to the Debtors, without giving TRI a reasonable opportunity to protect those interests through appropriate litigation in the proper forum for determining such rights. Even worse, the Bid Procedures Motion offers no compelling reason why the Debtors are attempting to rush the sale process for the Expanded Assets at the expense of the rights of other parties like TRI.

3.      For the reasons discussed below, TRI respectfully asks the Court to limit any Order approving relief requested in the Bid Procedures Motion to approval of bid procedures for the Sierra Plant, to incorporate into those bid procedures protections to which TRI is entitled to protect its proprietary interests in the TRI equipment and data located at the Sierra Plant, and to deny any further relief with respect to any bid procedures for the sale of the Expanded Assets, without prejudice to the rights of the Debtors to come back to the Court with appropriate disclosure of what these assets are and proposed protections to ensure that any such sale process is without prejudice to the rights of TRI.

4.      Because TRI does not know whether the Debtors will agree with this more reasonable and fair approach for the sale of the Expanded Assets, TRI will outline here the nature of its rights and interests and the Bankruptcy Code provisions that entitle TRI to protection of its interests through the Debtors' sale process, to inform the Court of the seriousness of the issues that ultimately must be litigated in an appropriate forum unless the Debtors and TRI are able to reach agreement on a proper process for the sale of the Debtors' assets without infringing TRI's proprietary rights.

## II.     Relevant Facts Concerning TRI and its Proprietary Interests

### A.     TRI and its Essential Role in the Sierra Plant

5.      Founded in 1996, TRI has successfully developed and demonstrated unique and proprietary technology for the gasification of wastes to syngas suitable for producing liquid fuels and chemicals. Headquartered in Baltimore, Maryland, the company has developed intellectual

property and commercial experience with a wide range of feedstocks including woody biomass, agricultural waste, municipal solid waste ("MSW"), lignite and subbituminous coals, coal/biomass and coal/MSW blends and others.  Over the past 24 years, over $150 million has been invested in the development of TRI's technology, including significant funds from the U.S. Department of Defense and the U.S. Department of Energy.  TRI first demonstrated its technology at commercial scale in 2003.  More relevant here, it was selected as the technology supplier for the world's first MSW to jet fuel project at the Debtors' Sierra Plant in Reno, Nevada, where demonstrations confirmed that TRI's technology works.[3]

6.      Prior to bankruptcy, the Debtors were a biorefinery company founded in 2007.  Much like a general contractor, Fulcrum's business model was to align with technology partners to assemble biorefinery operations in the United States and abroad, integrating technology components for the transformation of MSW into biofuels.  As discussed in further detail below, TRI is one such partner that has provided its advanced technology solutions to Fulcrum since Fulcrum's inception in 2007.  In June of that year, TRI provided its insights to Fulcrum in an introductory presentation to explore a potential business relationship.  In particular, TRI disclosed to Fulcrum its gasification technology for converting MSW to Fischer-Tropsch ("FT") based fuels.  Unlike TRI, Fulcrum focused its efforts on the transformation of biofuels through gasification to a different output—ethanol.

7.      As explained in more detail below, TRI and Fulcrum BioEnergy, Inc. entered into a Master Agreement dated as of July 15, 2008, which was amended and restated as the Amended

---

[3] The Court will recall that the Declaration of Mark Smith filed in support of first-day motions [Docket No. 9] described the operations at the Sierra Plant in terms of five main steps.  Declaration of Mark Smith, ¶26.  TRI's technology and equipment are what make the gasification step, Step 2, possible.  The Debtors are on record acknowledging that the three-stage gasification design developed by TRI is the novel part of the patent disclosure and provides the key technology for the MSW-to-FT fuel to work.

and Restated Master Agreement dated as of March 15, 2013 (as amended, the "Master Agreement").[4]  TRI and Fulcrum Sierra BioFuels also entered into a Plant License Agreement dated May 21, 2015,[5] which governs the use of TRI's technology at the Sierra Plant.  And in 2017, TRI executed a contract with Fulcrum Sierra Biofuels's construction contractor for Project Sierra, to provide for the proprietary design services and proprietary equipment of TRI's gasification system, which contract has been assumed by Fulcrum Sierra Biofuels.  Separately, TRI executed a license for its proprietary gasification technology to Fulcrum Sierra BioFuels directly.  This fully paid up, royalty free license provided for the use of TRI's technology on MSW solely for use at the Sierra Plant along with TRI's equipment.

8.      Over the years, TRI continued to further innovate and improve its gasification system.  Over time, TRI has secured 104 issued and allowed patents (56 in the US and 48 International).  It has 11 patent applications in review (2 in the US, 7 International, and 2 PCT); and 3 Provisional applications.

B.      **The Agreements between the Debtors and TRI Protecting TRI's Technology**

9.      The Plant License Agreement was a precondition for the Debtors to purchase TRI's equipment for the Sierra Plant, and it imposes a number of restrictions on the Debtors' ability to transfer or otherwise dispose of TRI's technology, including (i) obligations to keep confidential all of TRI's proprietary and technical information, data and disclosures provided by TRI in connection with the manufacture, design and operation of the TRI equipment, (ii) prohibition of

---

[4] A copy of the Master Agreement will be provided to the Court at the appropriate time.

[5] A copy of the Plant License Agreement will be provided to the Court at the appropriate time.

transfer of the TRI confidential information to any TRI competitor or other third party and (iii) limits the use of the licensed TRI technology to the Sierra Plant.[6]

10.    The Master Agreement confirms that TRI is the owner of the gasification technology and includes a number of provisions to protect TRI's proprietary interests in its technology. Exhibit G to the Master Agreement confirms that at the time the parties entered into the agreement, the Debtors had no technology of their own at the Sierra Plant.  Exhibit G also includes, among other things, a provision for joint ownership and automatic assignment of intellectual property that constitutes "Combination Technology" as well as the automatic assignment to TRI of any intellectual property that constitutes "Improvements to TRI Technology".

11.    Under the terms of the Master Agreement, TRI has at a minimum a co-ownership interest to certain patents that the Debtors apparently are attempting to sell.  These patent assets include at least 46 U.S. and foreign patent assets that the Debtors have not included in their schedule of assets for Fulcrum Bioenergy, Inc.  TRI claims co-ownership interest in 35 of the 39 scheduled patent assets, and at least 46 U.S. and foreign patent assets not yet disclosed in the schedules.

12.    The Debtors cannot credibly claim that they invented the MSW-to-FT technology independent of TRI.  The co-owned patent assets ("the MSW-to-FT Patents") consist of worldwide patents and patent applications that Fulcrum began prosecuting on July 14, 2015, *after* spending years working alongside TRI.  Each of the MSW-to-FT Patents stem from a common patent

---

[6] TRI, through counsel, has asked the Debtors to confirm that none of the TRI proprietary information is included in the data room the Debtors are using to provide information to potential bidders.  The Debtors have confirmed that no such proprietary information is included in the sale data room.  TRI reserves all rights, claims and remedies in the event that it is determined that any such information was disclosed to third parties during the sale process.

specification that relates to the use of a three-stage gasification system for converting MSW into FT liquids.  To the extent that the Debtors assert that the MSW-to-FT Patents are not considered "Combination Technology," they must be "Improvements to TRI Technology" as TRI, not the Debtors, developed the three-stage gasification process for converting MSW into FT.  In this case, TRI would be the ***sole*** owner of the MSW-to-FT Patents.  Either way, the Master Agreement automatically assigns TRI ownership rights that must be acknowledged and protected.

13.     Ownership of a patent is not merely an economic interest. Patent ownership permits the owner to practice the patented technology and to exclude others from doing so.  Under U.S. patent law, each co-owner holds an undivided interest in the whole patent.  Thus, each co-owner can practice or license the patented invention without accounting to any other co-owner.  35 U.S.C.A. § 262.  Unlike a lien or security interest, TRI's ownership rights, therefore, cannot be protected monetarily.

14.     Under applicable bankruptcy and non-bankruptcy law, any attempt by the Debtors to sell TRI's equipment or to sell patents in which TRI has co-ownership interests under the Master License Agreement must be conditioned on restrictions to ensure the protection of TRI's technology and other proprietary interests.  With respect to both the Master Agreement and the Plant License Agreement, the parties agreed that any dispute arising thereunder will be resolved under the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

C.     **Pending Arbitration Proceedings between the Debtors and TRI**

15.     Consistent with the terms of the Master Agreement, TRI officially recorded its patent ownership rights to make them known to the public.  On June 5, 2023, TRI recorded its ownership rights against all then-pending U.S. MSW-to-FT Patents with the U.S. Patent & Trademark Office (USPTO).  The USPTO officially recorded TRI's submission on June 8, 2023.  On February 23, 2024, the USPTO published the Debtors' recordation (submitted on January 2,

7

2024) disputing TRI's ownership interest.  TRI subsequently applied for a Declaration of Ownership against all pending Australian MSW-to-FT Patents and pending applications on February 21, 2024.  Further, TRI applied for and received a Certificate of Registration from the Canadian Intellectual Property Office on March 14, 2024, registering TRI's ownership rights in the Canadian MSW-to-FT Patents.

16.      After learning of the Debtors' submission at the USPTO disputing TRI's ownership, TRI submitted a Notice of Dispute to Fulcrum pursuant to the Master Agreement on February 28, 2024.  Unable to resolve the dispute under the dispute resolution procedures, TRI filed a demand for arbitration on April 2, 2024 under the Commercial Rules of the American Arbitration Association ("AAA") as required by the terms of the Master Agreement.  In its demand, TRI seeks, among other things, "a declaration that it is the sole or joint owner of certain Fulcrum-prosecuted patents and applications and that Fulcrum execute, deliver, and/or file all necessary documentation providing legal and equitable title to TRI's ownership interest." The Debtors previously agreed that the arbitration is the proper forum to resolve TRI's and Fulcrum's ownership dispute.  For example, the Debtors informed the Australian Patent Office of the arbitration and requested the proceedings in Australia to be stayed pending the outcome of the arbitration., attached hereto as **Exhibit 1** is a true and correct copy of the letter sent to the Australian Patent Office.  *See* Ex. 1 at 1 ("We also request that in view of the fact that there are currently arbitration proceedings in relation to this dispute in the United States that we have a stay in the section 36 proceedings before the Commissioner in Australia pending the outcome of the Arbitration proceedings in the United States.").

17.      At the time of the Debtors' bankruptcy filing, the arbitration had advanced significantly.  An arbitrator had been appointed and the arbitrator has issued a scheduling order for

opening and responsive briefing to be completed by December 6, 2024. Attached hereto as **Exhibit 2** is a true and correct copy of the AAA Scheduling Order. *See* Ex. 2 at 21. By the terms of the Master Agreement, TRI and the Debtors agreed that "all disputes arising in connection with" the Agreement "shall be finally settled under the Commercial Arbitration Rules of the AAA." Thus, arbitration is the proper venue to finally resolve TRI's ownership interest. Moreover, the appointed arbitrator, Stephen Gilbert, has over forty years of patent experience as well as chemical engineering experience, making him well equipped to handle the complexities (both legal and factual) of this patent ownership dispute. Attached hereto as **Exhibit 3** is a true and correct copy of Stephen Gilbert's resume.

### III.   Argument

A.   **Bid procedures for the sale of the Sierra Plant must include protections for TRI's proprietary interests in the TRI equipment and related technical information and data as adequate protection under Section 363(e) of the Bankruptcy Code.**

18.   TRI requests, pursuant to Section 363(e), adequate protection from the potential harm that would result from the relief sought by the Bid Procedures Motion. To the extent that the Debtors are unable to satisfy this requirement, Section 363(e) "prohibit[s]" the sale from proceeding as to TRI's proprietary and protected rights.[7] *See, e.g.*, *In re Dewey Ranch Hockey, LLC*, 414 B.R. 577 (Bankr. D. Ariz. 2009) (prohibiting a sale of assets under Section 363(f) because adequate protection of National Hockey League's noneconomic interest in regulating transfers was not given as required by Section 363(e)); *Reiser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689 (6th Cir. 1992) (applying Section 363(e) to protect golf club members on waiting list from a Section 363 auction).

---

[7] The Debtors must sell subject to, not free and clear of, TRI's proprietary and protectable interests, even if the Debtors satisfy the conditions required by 11 U.S.C. § 363(f)(1)-(5).

19.     Based on the limited information provided in connection with the Bid Procedures Motion, it may well be that Switch, the Stalking Horse Bidder for the Sierra Plant, has no interest in operating the TRI equipment or in the technical information and data relating to the TRI equipment.  If that is the case, then as a condition for the sale of the Sierra Plant to Switch, TRI requests that prior to or promptly upon closing, TRI be permitted to remove the TRI equipment, that it elects, at TRI's expense, and that TRI be permitted to witness the destruction of the TRI equipment that it does not elect to remove.  In the event of an attempted sale to a TRI competitor, the Debtors must permit such removal and destruction before the transfer of the Sierra Plant to the purchaser and all TRI Proprietary Data must be excluded from any such sale.

20.     In the event that Switch is not the Successful Bidder, TRI is entitled to approve the Successful Bidder as a purchaser, assuming such Successful Bidder is not a TRI competitor.  If the Successful Bidder is a party that does not intend to operate the TRI equipment (or is a TRI competitor), then TRI must have the right to remove or oversee destruction of the TRI equipment. If TRI approves the purchaser, the purchaser must be required, as a condition for acquiring the TRI equipment, to assume the TRI License for use of the TRI equipment, without any fee required to be paid for such assumption or ongoing fees or royalties under the TRI license.

21.     In the event that any sale of the Sierra Plant were to include TRI's confidential designs, drawings, calculations and other engineering information (the "TRI Proprietary Data"), no such sale can be approved if to a TRI competitor and, in any event, TRI must have the right to object to the sale of any such TRI Proprietary Data with any such objection to be the subject of an evidentiary hearing.

22.     These protections are the bare minimum necessary to protect TRI's proprietary interests in its equipment and TRI Proprietary Data.  Pursuant to Section 363(e) of the Bankruptcy

Code, TRI requests that the sale of TRI's equipment and TRI Proprietary Data be prohibited or
conditioned on the requested protections.

23.     Providing such adequate protections to TRI under Section 363(e) is a paramount
condition to any relief under the Bid Procedures Motion (and ultimately any sale thereunder).  In
that regard, Section 363(f) is preempted by the requirements of Section 363(e) itself, which
provides in pertinent part as follows:

> **Notwithstanding any other provision of this section, at any
> time,** on request of an entity that has an interest in property used,
> sold, or leased, or proposed to be used, sold, or leased, by the
> trustee, the court … **shall prohibit or condition** such use, sale, or
> lease **as is necessary to provide adequate protection of such
> interest**.

11 U.S.C. § 363(e) (emphasis added).  This protection expressly overrides Section 363(f), because
Section 363(e) applies "notwithstanding" Section 363(f).

24.     Section 363(e) requires that TRI receive the "indubitable equivalent" of its
proprietary and protected rights.  A sale cannot evade or extinguish those rights and the Court
should fashion such adequate protection within any order approving the Bid Procedures Motion,
*i.e.*, at this time.  The meaning of "at any time," as used in Section 363(e), is plain.  This Court can
rule on the scope and nature of adequate protection that TRI receives, but the statute itself bars the
Debtors from interfering with TRI's right to seek adequate protection "at any time."

25.     While the relief TRI seeks is less common than economic relief such as a lien or
cash payments, other courts have found that when a party seeks to protect a non-economic interest,
"the[y] are not monetary/economic rights such that impounding funds would be adequate
protection."  *In re Dewey Ranch Hockey,* 414 B.R. at 591.  While it likely will indeed prove
impossible to provide TRI with the "indubitable equivalent" of its proprietary and protectable
interests, in any event the Debtors bear the burden under Section 363(p)(1) of proving that such

equivalence has been given.  *See also generally In re Kellstrom Indus., Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002) (discussing the interplay among Sections 361, 363(e) and 363(f) in the context of a sale of assets, where adequate protection required full payment in cash for all goods sold under a supply agreement); *see also* 3 COLLIER ON BANKRUPTCY ¶ 363-05 (citing, at n. 19, *In re Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819, 823 (E.D. Pa. 1987), for the proposition that "[t]he burden of the Debtor is stiffer on a § 363 Motion than it is in withstanding . . . a § 362 Motion.").  In the present case, the Debtors have not even attempted to satisfy their burden; offering no protections whatsoever for TRI and other parties who have specialized technology and proprietary interests, well-known to the Debtors.  In fact, the Debtors failed to include any information in the Bid Procedures Motion about TRI's interests or any information about the nature of the Expanded Assets and TRI's interests in them.

26.    Furthermore, the failure to grant TRI adequate protection as requested would not only be an unjustified and cause irreparable harm to TRI, it also would create significant claims against the Debtors' estates.  *Illinois Dep't of Revenue v. Hanmi Bank (In re Hanmi Bank)*, 895 F.3d 465, 473 (7th Cir. 2018) ("an entity whose lien or other interest is removed from property in order to facilitate its sale is entitled to compensation for whatever loss the removal causes the entity).  In this case, the harm to TRI would be incalculable, and the best interest of not only TRI but all parties will best be served by including the requested protections of TRI's proprietary interests in any Order approving bid procedures for the Sierra Plant.

B.    **Bid procedures for any sale of Debtors' patents should not be approved unless limited to the sale of the Debtors' rights, title and interests in the patents, with <u>any such sale to be subject to TRI's co-ownership rights.</u>**

27.    Given the complete lack of disclosure in the Bid Procedures Motion with respect to the sale of Expanded Assets by Non-BioFuels Debtors, TRI requests that the Court deny approval

Case 24-12008-TMH    Doc 91    Filed 09/25/24    Page 13 of 18

of any bid procedures for such Expanded Assets. The Debtors have offered no reason for their attempt to rush the sale process for the Expanded Assets, and the Bankruptcy Code does not permit the sale of such assets to be given such short shrift when the rights of TRI and other third parties are at risk.

28.     Indeed, the Debtors' sale process obscures and frustrates TRI's access to due process with respect to the Expanded Assets and the manner with which the Debtors seeks to conduct the sale of the Expanded Assets prevents TRI from knowing the full nature of the threats posed by a third-party buyer – threats against which TRI requires adequate protection under Section 363(e) **now** if the Court were to be inclined to permit the sale of the Expanded Assets on a hurried basis.

29.     The Bankruptcy Code provides special protections for any attempt by a debtor to sell an asset subject to a co-ownership interest. Section 363(h) of the Bankruptcy Code provides:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest … and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> (1)     partition in kind of such property among the estate and such co-owners is impracticable;
>
> (2)     sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>
> (3)     the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; **and**
>
> (4)     such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h) (emphasis added).

13

30.     By its clear terms, a sale of property subject to a co-ownership interest held by a non-debtor cannot be approved by a bankruptcy court unless the court finds that **all** of the conditions set forth in § 363(h) are satisfied.

31.     Moreover, under Rule 7001(3) of the Federal Rules of Bankruptcy Procedure, any attempt to sell under § 363(h) both the interest of the bankruptcy estate and a co-owner in property must be brought by an adversary proceeding.  Accordingly, any bid procedures for the sale of the patents subject to TRI's co-ownership interests must either provide for any such sale to be subject to TRI's patent rights or, must be delayed until the patent rights of TRI and the protections under Section 363(h) may be litigated in a court of competent jurisdiction.

32.     In the Master Agreement governing the rights of the parties, any dispute under the Master Agreement is to be decided by AAA arbitration.  TRI has exercised its rights under the Master Agreement, and the parties are in the midst of binding arbitration governing the ownership of certain patent assets that Debtors intend to sell.  In the near future, unless TRI and the Debtors are able to work out mutually acceptable arrangements otherwise, TRI will file a motion for relief from the stay to permit the AAA arbitration to proceed to determine any issue with respect to the parties' co-ownership patent rights.[8]

33.     In any event, TRI maintains that a sale of the Debtors' patents could never properly be approved under Section 363(h), as any such sale would never meet all of the requirements of the statute for such a sale in disregard of TRI's rights.  TRI will more fully brief this issue at the appropriate time, but given its importance, raises it here to ensure that the Court has a more

---

[8] In the event that there were to be litigation under Section 363(h) of the Bankruptcy Code and TRI were to be denied relief from the stay to complete the pending AAA arbitration, TRI submits that any such litigation must be determined by the District Court, and TRI reserves its right to request mandatory withdrawal of the reference for any such litigation under 28 U.S.C. §157(d), as any such litigation would require consideration of both bankruptcy and federal patent laws.

66299/0001-48507448

complete understanding of the problems and issues inherent in the Bid Procedures Motion with respect to the Expanded Assets.

34.    In the event the Court were inclined to permit a sale of the Expanded Assets on a hurried basis as proposed in the Bid Procedures Motion, any such sale process must, at a minimum, provide for adequate protection of TRI's interests, including without limitation that any such sale would be subject to TRI's co-ownership rights.  Selling the Expanded Assets free and clear under Section 363(f) and then placing the proceeds into an escrow account for future allocation between the Debtors and TRI is not an option, given the nature of TRI's interests and the requirements of Section 363(h).  Even if Section 363(h) were not part of the Bankruptcy Code requirements limiting what kind of sale is permitted in a bankruptcy case, there are great challenges inherent in any meaningful allocation as to (i) any claims or interests that would be stripped under Section 363(f), and (ii) TRI's right to adequate protection under Section 363(e).[9]  The allocation of sale proceeds in TRI's favor would need to include, without limitation, any harm TRI may suffer from the Debtors or any buyer if TRI is stripped of its co-ownership rights in the patents – not merely limited to the Debtors' gain.  How this can be accomplished as a practical matter raises many complex and challenging issues, both on the merits and procedurally, particularly because the sale proceeds may only cover a fraction of TRI's potential losses resulting from the sale.[10]  By contrast, the preservation of TRI's co-ownership rights against the Debtors' buyers, so that TRI is left no worse off after the sale, would not deprive the Debtors of anything other than opportunities to which they are not entitled.  Accordingly, the Bid Procedures Motion should be denied to the extent

---

[9] Congress added the "adequate protection" requirement in Section 363(e) in order to assure due process to a victim of the debtor's sale efforts and to avoid a "taking" under the Fifth Amendment.

[10] Moreover, such issues must be adjudicated though the AAA arbitration process or alternatively, if this Court were to deny stay relief to pursue that process, by way of adversary proceedings or withdrawal of the reference pursuant to 28 U.S.C. § 157(d).

that the Debtors are attempting to sell the Expanded Assets free and clear of the TRI's co-ownership interests.

35.     The requirement to provide adequate protection under Section 363(e) means that TRI must be "indubitably" protected against losses or harm resulting from the Debtors' proposed sale even now, before it is known what if any bids might be made for the Expanded Assets. If the Debtors cannot guarantee a sale free from harm to TRI, then Section 363(e) bars the Debtors from selling free and clear of TRI's "interests."  *See*, *e.g.*, *Dewey Ranch Hockey*, 414 B.R. 577; *Magness*, 972 F.2d 689; *see also In re SUD Properties, Inc.*, No. 11-03833-8-RDD, 2011 Bankr. LEXIS 4656 at *16 (Bankr. E.D.N.C. Aug. 23, 2011) ("There is inherent difficulty in satisfying the indubitable equivalent standard.  If any doubt exists, the plan [or sale] should not be confirmed [or permitted].")  (citations omitted).

36.     Each of TRI's objections set forth in this Objection demonstrates harm that would result from the proposed process the Debtors propose, and so TRI is entitled to protections against each such harms, both substantive and procedural.  *See* 11 U.S.C. § 361 (providing non-exclusive examples of adequate protection); 3 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 363.05 (16th Ed. Rev. 2024) (noting that Section 363(e) provides flexibility in the protection to be given depending on the circumstances of each case) (citing at n. 3 *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992)).

37.     Because adequate protection under Section 363(e) is mandatory ("the court . . . shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection . . .") (emphasis added), any proposed sale free and clear cannot proceed if TRI will suffer any loss or prejudice without the adequate protection to which it is entitled.  *See*, *e.g.*, *Dewey Ranch Hockey*,

16

414 B.R. 577; 3 COLLIER ON BANKRUPTCY ¶ 363-05 n. 10 and accompanying text, citing *Magness*, 972 F.2d 689; *Crocker Nat'l Bank v. American Mariner Indus. (In re American Mariner Indus.)*, 734 F.2d 426 (9th Cir. 1984), overruled on other grounds; *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365 (1988); *Martin v. Commodity Credit Corp.*, 761 F.2d 472 (8th Cir. 1985); *In re George Ruggiere Chrysler-Plymouth*, 727 F.2d 1017 (11th Cir. 1984); *First Bank of Miller v. Wieseler*, 45 B.R. 871 (D.S.D. 1985).

## IV.   <u>Conclusion</u>

For these reasons, TRI respectfully requests that any Order approving the Bid Procedures Motion with respect to the Sierra Plant incorporate the protections of TRI's proprietary interests in the TRI equipment and TRI Proprietary Data requested in this Objection; that the Court deny the Bid Procedures Motion to the extent it seeks approval of sale procedures for the sale of the Expanded Assets; and that TRI be granted adequate protection and such other and further relief as is just and proper.

Dated:    September 25, 2024        **COLE SCHOTZ P.C.**
          Wilmington, Delaware

                                    */s/ Melissa M. Hartlipp*
                                    Melissa M. Hartlipp (No. 7063)
                                    500 Delaware Avenue, Suite 1410
                                    Wilmington, DE 19801
                                    Telephone: (302) 652-3131
                                    Facsimile: (302) 652-3117
                                    mhartlipp@coleschotz.com

                                    -and-

                                    Irving E. Walker (admitted *pro hac vice*)
                                    1201 Wills Street, Suite 320
                                    Baltimore, MD 21321
                                    Telephone: (410) 230-0660
                                    Facsimile: (410) 230-0667
                                    iwalker@coleschotz.com

                                    -and-

                                    David M. Bass (admitted *pro hac vice*)
                                    Court Plaza North
                                    25 Main Street
                                    Hackensack, NJ 07601
                                    Telephone: (201) 489-3000
                                    Facsimile: (201) 489-1536
                                    dbass@coleschotz.com

                                    *Attorneys for Thermochem Recovery International, Inc.*