## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*, | Case No. 24-12008 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket Nos. 11, 52**<br>**Hearing Date: October 9, 2024, at 1:00 p.m. (ET)** |

**OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO
OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING;
(II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION
BONDHOLDERS; (III) AUTHORIZING USE OF CASH COLLATERAL;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its undersigned proposed counsel, Eversheds Sutherland (US) LLP and Morris James LLP, hereby files this objection (the "Objection") to the *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Bondholders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); Fulcrum Sierra Holdings, LLC (8498). The location of the Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.

*Hearing; and (V) Granting Related Relief* [Docket No. 11] (the "DIP Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors' postpetition financing (the "DIP Facility") from Switch, Ltd. (the "DIP Lender") accomplishes two things: one, it sends the Debtors down a value-destructive path which unfairly benefits the DIP Lender, who also is the proposed buyer ("Stalking Horse Bidder") of the Debtors' *unvalued* assets;[3] and two, it ushers the Debtors' assets through a court approved liquidation sale for the benefit of the Prepetition Bonds Secured Parties that will render the estates administratively insolvent.  These two things cannot and should not be done at the expense of the Debtors' unsecured creditors.[4]

2.      In exchange for access to roughly $2.5 million in cash[5] to pay "operating" expenses necessary to secure the Debtors' assets until they can be liquidated, the DIP Facility proposes to absorb every conceivable unencumbered asset of the borrowers and guarantors under the DIP Facility (collectively, the "DIP Loan Parties"), and further consume any value which may be available to creditors of Debtor Fulcrum Bioenergy, Inc. ("Fulcrum Parent"). Specifically, the DIP Facility will encumber *all* previously unencumbered property of the DIP Loan Parties, including, but not limited to: (a) Avoidance Proceeds, (b) claims against the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion and Interim Financing Order.

[3] Contemporaneously with the filing of this Objection, the Committee is objecting to the Debtors' Bidding Procedures Motion [Docket No. 12].

[4] The Committee is strongly considering a motion to convert these cases to chapter 7.  The objections set forth herein and in the contemporaneously filed objection to the Debtors' Bidding Procedures Motion are in no way a concession that even if any of these objections are sustained by the Court, these bankruptcy cases should proceed in chapter 11.

[5] While the DIP Facility is in the total amount of $5 million, almost half of it is consumed by professional fees over the course of these chapter 11 cases, including at least $400,000 payable to the DIP Lenders' counsel under the Interim Financing Order for prepetition fees.

Debtors' D&O policies; (c) commercial tort claims, and (d) any proceeds of the foregoing claims (collectively, the "Unencumbered Assets"). In addition, the DIP Motion proposes to grant an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") with recourse over all assets—and all proceeds thereof—of non-borrower, non-guarantor Fulcrum Parent, subject only to the Carve-Out.

3.    Besides the DIP Lender's unbridled scooping up of unencumbered assets, the DIP Facility will also (a) grant broad adequate protection liens to the Prepetition Bonds Secured Parties against the Unencumbered Assets; (b) cause an adequate protection superpriority claim to be payable to the Prepetition Bonds Secured Parties from the assets of Fulcrum Parent; (c) grant 506(c), 552(b), and marshaling waivers; (d) provide for the cash payment of the DIP Lender's professional fees, including payment of *at least* $400,000 currently included in the Approved Budget, plus grant a superpriority administrative expense claim for any additional unpaid professional fees of the DIP Lender; and (e) grant overly broad releases and indemnification rights to the DIP Lender and the Prepetition Bonds Secured Parties (as well as each of their nameless affiliates *and* their respective officers, directors, employees, attorneys, agents, and representatives) in their multiple capacities in these chapter 11 cases. This relief, if granted, would be overreaching and severely prejudicial to the Debtors' unsecured creditors.

4.    Moreover, the DIP Facility locks the Debtors into restrictive and likely value-destructive milestones, requiring, *inter alia*, that the auction for their assets be held no later than 60 days after the Petition Date—and mandate entry of a sale order acceptable to the DIP Lender/Stalking Horse Bidder within 65 days of the Petition Date. Such a restrictive timeframe

is insufficient for the Debtors and their advisors to properly market their ***unvalued assets***, and all but ensures that the Stalking Horse Bidder will be the only party to bid on the Debtors' assets.[6]

5.  Finally, the DIP Facility inappropriately restricts the Committee's ability to discharge its fiduciary duties, by, *inter alia*, hamstringing the Committee by unduly limiting the time and professionals' fee budget for the Committee to investigate the prepetition liens, claims and causes of action against the Prepetition Bonds Secured Parties.

6.  While the Committee does not dispute the Debtors' need for liquidity in these cases (to the extent they should remain in chapter 11, which is not conceded) the DIP Facility, and the protections contained therein, must not come at the expense of the Debtors' general unsecured creditors, and solely benefit the DIP Lender and prepetition lenders.  Accordingly, unless the Committee's concerns are addressed though modifications of the final DIP order (the "Final Financing Order"), all administrative expenses of these cases are paid, and there is a clear path to recovery for unsecured creditors, the Committee opposes the Debtors' entry into the DIP Facility.  As currently postured, unsecured creditors would fare better if these cases were converted to Chapter 7.

## BACKGROUND

7.  On September 9, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to manage their assets as debtors in possession pursuant to

---

[6] Curiously, and as more fully set forth in the Committee's Objection to the Bidding Procedures Motion, the prepetition marketing efforts were led by the Prepetition Bonds Secured Parties and their advisor(s), rather than by the Debtors.  Even assuming a data center is the "best use" for the Debtors' assets, such assets do not appear to have been marketed to any similar data center operators besides the DIP Lender/Stalking Horse Bidder.

16968501/1

sections 11077(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

8.      On September 11, 2024, the Debtors filed the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [Docket No. 12] (the "Bidding Procedures Motion").  By and through the Bidding Procedures Motion, the Debtors seek, *inter alia*, to approval of certain bidding procedures for the sale of all or substantially all of the Debtors' assets, to sell certain assets to the Stalking Horse Bidder, and seek approval of a breakup fee and other bid protections in favor of the Stalking Horse Bidder— who is also the DIP Lender.  Notably, as contemplated by the Bidding Procedures Motion and the proposed the Stalking Horse Bidder Asset Purchase Agreement ("Stalking Horse APA"), Switch intends to credit bid the DIP Facility as part of its proposed $15 million purchase price (plus assumption of certain liabilities) for the DIP Loan Parties' assets.

9.     On September 11, 2024, the Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Bondholders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 52] (the "Interim Financing Order").

10.     On September 19, 2024, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed the Committee [Docket No. 74].  On September 21, 2024, the Committee selected Eversheds Sutherland (US) LLP as its proposed co-counsel and Dundon Advisers, LLC as its proposed financial advisor.  On September 23, 2024, the Committee selected Morris James as its proposed co-counsel.

11.     By agreement of the parties, the Committee's objection deadline to the DIP Financing Motion, the Bidding Procedures Motion and entry of final orders on the Debtors' "First Day Motions" was extended to October 2, 2024, at 4:00 p.m. (prevailing Eastern Time). The hearing to approve the DIP Motion on a final basis is currently scheduled for October 9, 2024, at 1:00 p.m. (prevailing Eastern Time).

## OBJECTION

12.     Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender." *In re Def. Drug Stores, Inc*., 145 B.R. 312, 317 (9th Cir. BAP 1992). As a result, courts are hesitant to approve financing terms that are considered harmful to an estate and its creditors. *See, e.g., In re Ames Dep't Stores*, *Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.") While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender. *See, e.g., Ames,* 115 B.R. at 38 (noting that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors … to one specially crafted for the benefit" of one creditor) (citing *In re Tenney Vill. Co.,* 104 B.R. 562, 568 (Bankr. D.N.H. 1989)).

13.     The DIP Facility and the Interim Financing Order include a number of provisions that, if approved, will (a) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtors, and the Committee, (b) unjustifiably benefit the DIP Lender and the Debtors' prepetition lenders at the expense of the unsecured creditors, (c) diminish the value of the Debtors' assets that are presently being marketed for a rush sale; (d) give the DIP Lender and Prepetition Bonds Secured Parties undue control over these chapter 11 cases, that are being run solely for their benefit; and (e) render the Debtors' estates administratively insolvent.

**I.      The DIP Facility Will Render the Debtors' Estates Administratively Insolvent.**

14.     The DIP Facility fails to provide the Debtors with sufficient funds to ensure the administrative solvency of these chapter 11 cases.  The Approved Budget attached to the Interim Financing Order only extends out to the week ending November 1, 2024 – ten (10) days prior to the requested hearing to approve the sale of substantially all of the Debtors' assets and almost four (4) weeks shy of any projected closing for the sale of the Debtors' assets.  Moreover, the Approved Budget reflects that the Debtors will have consumed all but $143,000 of the DIP

Facility by the week ending on November 1.  Between the anticipated date of the sale hearing and the outside date for closing, the Debtors will continue to have certain costs unaccounted for in the budget, including all operational costs, salaries and professional fees.  Given the Debtors' limited cash on hand at the filing, that the Debtors have no source of funds flowing into the estates other than the DIP Facility, the Stalking Horse Purchase Agreement makes no provision for post-sale wind down expenses and does not adequately provided for the fees and expenses of the Committee Professionals, this Court should have grave concerns about the Debtors' ability to fully fund all administrative expenses in these chapter 11 cases.

15.     The DIP Lender and Prepetition Bonds Secured Parties should not get a free option to run a sales process solely for their benefit while leaving other creditors of the Debtors holding the proverbial empty bag.  The DIP Lender, with the Prepetition Bonds Secured Parties' support, made the affirmative choice to fund this bankruptcy and serve as the DIP Lender to facilitate its purchase of the Acquired Assets through chapter 11.  It, along with the Prepetition Bonds Secured Parties, must, in turn, be required to ensure that the Debtors' estates are administratively solvent during and following a sales process that is being run for their benefit.  Accordingly, the Debtors and the DIP Lender must set forth a budget that establishes that the Debtors have sufficient cash to (i) fully fund the sales process, (ii) pay all administrative expenses of these chapter 11 estates, (iii) fund wind down costs associated with confirming a chapter 11 plan, and (iv) provide a recovery for unsecured creditors.

16.     The Court should not allow the bankruptcy process to be used if it only benefits a secured creditor.  *See, e.g., In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–56 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and which

would render the estate administratively insolvent, noting that an "asset sale can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own"); *see also Def. Drug Stores*, 145 B.R. at 317 (prohibiting "terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.").

17.    Consistent with this theme, courts in this district, as well as bankruptcy courts elsewhere, have held that a secured lender cannot benefit from a section 363 sale unless they are willing to "pay the freight."  In other words, to obtain the benefits of bankruptcy, the secured lender must ensure that the debtor's estate is administratively solvent after the sale.  *See, e.g., In re Golden Cnty. Foods, Inc.*, No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015), ECF No. 175 (final DIP financing order required that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt*); In re Allen Family Foods Inc.,* Case No. 11-11764 (KJC), (Bankr. D. Del. Aug. 3, 2011, Hr'g Tr. at 44:6 – 45:3) (court approved a quick sale process even though it was "troubled" by the prospect of the debtors' administrative insolvency and the probability of insufficient funds to fully pay all Section 503(b)(9) administrative-priority claims, but note that the secured lender agreed, however, to fund the payment of post-petition trade payables and other operating expenses, pre-petition claims of critical vendors and professional fees.)[7]; *In re Townsends, Inc., et al.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011, Hr'g Tr. at 23:25-24:01) (in response to the statement of debtors' counsel that section 503(b)(9) claims would not be paid in full, the Court stated: "Well, we've got a problem.  Not going to run

---

[7] The cited excerpts from this transcript are annexed hereto as **Exhibit A.**

an administratively insolvent estate.")[8]; *In re NEC Holdings Corp.*, et al. Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010, Hr'g Tr. at 100:17-20) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate.").[9]

18.    The DIP Lender and Prepetition Bonds Secured Parties should not be permitted to use this Court and the chapter 11 process to liquidate or foreclose on their collateral for their sole benefit.  Not only will the combination of the DIP Facility with the Debtors' proposed sale process lead to the Debtors' eventual dismissal or conversion to chapter 7, the Debtors' budget reflects that, even prior to the scheduled sale hearing, the Debtors' estates will be administratively insolvent.[10]  By grabbing all Unencumbered Assets that otherwise existed on the Petition Date, the DIP Lender and Prepetition Bonds Secured Parties are putting the estates and unsecured creditors in a worse position than if the DIP Facility and sales process did not proceed and these cases were in chapter 7.  Congress' intent in enacting section 1129(a)(7) was to avoid this very result.

19.    While the Committee is hopeful that the DIP Lender/Stalking Horse Bidder and/or the Prepetition Bonds Secured Parties will provide an acceptable proposal that will: (a) satisfy all chapter 11 administrative expenses,[11] and (b) provide for a recovery to unsecured

---

[8] The cited excerpts from this transcript are annexed hereto as **Exhibit B.**

[9]  The cited excerpts from this transcript are annexed hereto as **Exhibit C.**

[10] The Prepetition Bonds Secured Parties clearly did not want to foreclose on their collateral or otherwise rely on other state law remedies with respect to the Sierra biofuels plant.

[11] The unpaid administrative expenses of these chapter 11 cases will clearly include the fees of the Committee's and Debtors' professionals given that the fees included in the Approved Budget are seriously inadequate.  As far as the Committee is concerned, the DIP Facility and the Approved Budget are designed to cause the Committee to "lay down" and go along with the proposed process which the Committee and its professionals, as fiduciaries, simply cannot do.

16968501/1

creditors—absent such acceptable proposal, neither the DIP Facility, the Bidding Procedures Motion nor any of the documents related thereto should be approved.

**II.     The (i) DIP Liens, (ii) the DIP Superpriority Claim, (iii) the Prepetition Adequate Protection Liens, and (iv) the Prepetition Bonds Secured Parties Adequate Protection Claim Should Not Encumber the Unencumbered Assets or the Assets of Non-Borrower and Non-Guarantor Fulcrum Parent.**

20.     The Committee objects to the DIP Lender and the Prepetition Bonds Secured Parties receiving any liens on, or recourse for DIP Liens, the DIP Superpriority Claim, the Prepetition Adequate Protection Liens and/or the Prepetition Bonds Secured Parties Adequate Protection Claims against the Unencumbered Assets and the assets of non-borrower and non-guarantor Fulcrum Parent and the proceeds thereof.  Rather, the Unencumbered Assets and any value available in Fulcrum Parent should be preserved for the benefit of the unsecured creditors. The DIP Lender's and Prepetition Bonds Secured Parties' requests to obtain DIP Liens and Prepetition Adequate Protection Liens on the Unencumbered Assets and a DIP Superpriority Claim and Prepetition Bonds Secured Parties Adequate Protection Claim on any Unencumbered Assets or the assets of Fulcrum Parent is overreaching, unnecessary, and prejudicial to unsecured creditors.

21.     With respect to the proposed liens on and claims in Avoidance Proceeds, such relief is fundamentally at odds with the unique purposes served by Avoidance Actions. Avoidance Actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors.  *See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244-245 (3d Cir. 2000) (identifying underlying intent of avoidance powers to recover valuable assets for the benefit of all estate creditors), *rev'd en banc on other grounds*, 330 F.3d 548 (3d Cir. 2003); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law

permits all unsecured creditors to benefit from avoidance action recoveries"). The DIP Facility should not be a means by which unsecured creditors are stripped of the Avoidance Proceeds, which may be an important source of recovery in these cases.

22.     For that reason, DIP financing orders in this District often exclude proceeds from avoidance actions from DIP Collateral, absent the consent of the official committee of unsecured creditors. *See, e.g., In re Ravn Air Group, Inc*., No. 20-10755 (BLS) (Bankr. D. Del. Apr. 29, 2020, Hr'g Tr. at 80:21-23) ("I'll say this, I don't believe that I have ever approved . . . a lien on avoidance actions or proceeds of avoidance actions over a committee [objection], and I would be reluctant to do so. . ."); *id*. at 91:25-92:2 ("And so I would not be prepared to authorize a lien on the proceeds of avoidance actions, again, over a committee objection . . .");[12] *see also In re YogaWorks, Inc.*, No. 20-12599 (KBO) (Bankr. D. Del. Nov. 9, 2020), ¶ 3(a) [Dkt. No. 133] (excluding avoidance action proceeds from DIP collateral); *In re Emerge Energy Services LP*, No. 19-11563 (KBO) (Bankr. D. Del. Aug. 14, 2019), ¶ 13(a)(i) [Dkt. No. 209] (same).[13]

23.     The Debtors have not, and cannot, provide any justification for the grant of liens on the Avoidance Proceeds, or for the potential payment of the DIP Superpriority Claim or the Prepetition Bonds Secured Parties Adequate Protection Claim with the Avoidance Proceeds.  To the contrary, there is no legal basis to grant such relief.  Accordingly, the Avoidance Proceeds should be wholly excluded from the DIP Collateral, DIP Liens and the Prepetition Adequate Protection Liens and reserved for the benefit of the Debtors' unsecured creditors.

---

[12] The cited excerpts of this transcript are attached hereto as **Exhibit D**.

[13] *See also In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. June 15, 2020) ¶ 7 [Dkt No. 179] (excluding avoidance action proceeds, except for postpetition transfers under section 549 of the Bankruptcy Code); *In re Pronerve Holdings, LLC*, No. 15-10373 (KJC) (Bankr. D. Del. Mar. 20, 2015), ¶ 7 [Dkt. No. 115] (excluding avoidance action proceeds from DIP collateral); *In re Hipcricket, Inc.*, No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015), ¶ 14 [Dkt. No. 117] (same); *In re LSP Energy Limited Partnership*, No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012), ¶ 12(a) [Dkt. No. 79] (same).

24.     With respect to any DIP Liens, DIP Superpriority Claim, Prepetition Adequate Protection Liens or Prepetition Bonds Secured Parties Adequate Protection Claim against the Debtors' other Unencumbered Assets, including the (a) D&O claims (b) commercial tort claims, and (c) the proceeds of each of (a) and (b), to the extent those assets were unencumbered prepetition, and they should remain unencumbered postpetition for the benefit of the Debtors' unsecured creditors.  The DIP Lender and the Prepetition Bonds Secured Parties should not be granted recourse against D&O claims, or any commercial torts claims—both of which may be important sources of recovery in these cases for unsecured creditors.  Instead, all D&O claims, commercial tort claims, and any proceeds derived therefrom should be preserved as unencumbered assets for the benefit of unsecured creditors.

25.     Fulcrum Parent is not a borrower or a guarantor under the DIP Facility.  There is no justification for the DIP Superpriority Claim and the Prepetition Bonds Secured Parties Adequate Protection Claim to be payable from, or have recourse against, the assets of Fulcrum Parent and the proceeds thereof.  Given that neither Fulcrum Parent nor any of its creditors are beneficiaries of the DIP Facility, there is no justification for the DIP Superpriority Claim or the Prepetition Bonds Secured Parties Adequate Protection Claim to be payable from these assets.

26.     For these reasons, the Committee objects to any unencumbered assets, including the Unencumbered Assets (a) being included in DIP Collateral, subject to DIP Liens or the Prepetition Adequate Protection Lien; (b) subject to the DIP Superpriority Claim or the Prepetition Bonds Secured Parties Adequate Protection Claim; and (c) making the assets of non-borrower and non-guarantor Fulcrum Parent available to satisfy the DIP Superpriority Claim or the Prepetition Bonds Secured Parties Adequate Protection Claim.

**III.    The Milestones in the DIP Facility Must be Extended By At Least Thirty (30) Days to Allow for a Value-Maximizing Sale Process.**

27.    The proposed DIP Facility further handcuffs the Debtors by imposing very restrictive deadlines for the approval of the sale of the Debtors' assets.  The DIP Facility has a maturity date of no later than eighty (80) days after the Petition Date (or Thursday, November 28th) and pursuant to the milestones set forth in the DIP Motion and DIP Note, the following must occur by the dates below:

- No later than sixty (60) days after the Petition Date—November 8, 2024—an auction of the Debtors' assets must be held, or the auction must be cancelled, and the DIP Lender named the winning bidder.

- No later than sixty-five (65) days after the Petition Date—November 13, 2024—the Court shall have entered an order approving the sale of the Acquired Assets to the DIP Lender or an alternative sale that results in payment of the DIP Loan in full in cash prior to the Maturity Date.

- No later than eighty (80) days after the Petition Date—November 28, 2024—the sale of the Acquired Assets to the DIP Lender (or other winning bidder approved by the Court) shall be consummated in full.

28.    These milestones are unreasonably short.  By admission, the Debtors have undertaken **no valuation** of their complex assets (separately owned within two capital structures no less) which are proposed to be sold through these chapter 11 cases.[14]  As more fully set forth in the contemporaneously filed objection to the Bidding Procedures Motion, the Committee should have an opportunity to, among other things, vet the Debtors' prepetition marketing efforts, independently test the market for interest in the Debtors' assets, understand and analyze potential bids for the Debtors' assets, perform a valuation analysis, and analyze any other issues that may be implicated in a sale.  Moreover, Development Specialists, Inc. ("DSI") began

---

[14] A review of the Debtors' Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("SOFAs") reflect the value of a vast majority of the Debtors' assets as "**Undetermined**."

16968501/1

working with the Debtors on August 8, 2024, providing DSI with little time to assess and value the Debtors' assets and commence a comprehensive marketing process.  Indeed, the Committee understands that there was little attempt prepetition to market the Debtors' assets to alternative-use buyers and DSI has not performed a fulsome valuation analysis of the Debtors' assets as of the date hereof.  Mandating a sale within sixty (60) days of the Petition Date and requiring the entry of a sale order just five (5) days later gives the estate professionals limited time to properly market the Debtors' assets and maximize value for all creditors, not just the DIP Lender. Terminating the DIP Facility for failure to comply with these milestones solely benefits the DIP Lender/Stalking Horse Bidder.

29.    For these reasons, the milestones related to the sale should be extended by at least thirty (30) days to provide for sufficient time to market the Debtors' assets and provide for a value-maximizing transaction.  Alternatively, the Final Financing Order should provide that all milestones are subject to extension by order of the Court for cause shown.

### IV.    The Waivers of Sections 506(c) and 552(b) of the Bankruptcy Code and Related Provisions are Unwarranted and Not Supported by the Record.

30.    The Debtors are seeking a waiver of the estates' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code, as well as a marshaling waiver and a waiver of the estates' right under section 552(b) of the Bankruptcy Code. These waivers are entirely inappropriate at this time, and in any event, not justified by the record.

### A.    Surcharge Rights Under Section 506(c) Should Not be Waived.

31.    Upon entry of the Final Financing Order, neither the DIP Collateral nor the Prepetition Bonds Collateral can be surcharged pursuant to section 506(c) of the Bankruptcy Code.  Section 506(c) of the Bankruptcy Code is a rule of fundamental fairness for all parties in interest and provides that secured creditors shall share the burden of satisfying administrative

15

expenses where funds are expended for the purpose of preserving and selling their collateral. Section 506(c) of the Bankruptcy Code ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries. *See, e.g.*, *Sw. Sec. v. Milo H. Segner, Jr., in His Capacity as Tr. of the Domistyle, Inc. Tr. (In re Domistyle, Inc.),* 811 F.3d 691, 696 (5th Cir. 2015) (stating that section 506(c) addresses the "unfairness of requiring the general estate and unsecured creditors . . . to bear the cost of protecting what is not theirs") (internal quotations omitted); *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (stating, "section 506(c) is designed to prevent a windfall to the secured creditor"); *In re Senior-G & A Operating Co., Inc.*, 957 F.2d 1290, 1299 (5th Cir. 1992) (holding that bankruptcy court did not commit error in concluding that secured creditor could be surcharged portion of costs of necessary postpetition oil well workover).

32.     These chapter 11 cases are being run solely to liquidate secured creditors' collateral.  By waiving the estates' section 506(c) rights, the Debtors are agreeing to pay for all expenses associated with the preservation and disposition of the DIP Collateral and the Prepetition Bonds Collateral, even where, as here it is patently obvious from the budget and the Milestones that the budget will not cover all expenses through consummation of the sale.  As such, the Debtors' waiver of section 506(c) of the Bankruptcy Code would eliminate a further avenue of recovery for the Debtors' estates solely for the benefit of the DIP Lender and Prepetition Bonds Secured Parties and foists the costs of the Debtors' chapter 11 cases onto unsecured creditors.  Indeed, if these chapter 11 cases proceed according to milestones as currently proposed, the DIP Lender and Prepetition Bonds Secured Parties will reap all of the benefits of these chapter 11 cases while rendering the cases administratively insolvent.

33.     Courts have routinely rejected surcharge waivers under these circumstances.  *See e.g.*, *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors."); *see also* Hr'g Tr. at 20-21, *In re Mortg. Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 27, 2007) [Dkt. No. 346]; Hr'g Tr. at212-13, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) [Bankr. D. Del Mar. 5, 2014] [Dkt. No. 3927]; *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. BAP 1998) (denying enforceability of Section 506(c) waiver).  Furthermore, because such waivers are binding upon all parties in interest, they should not be granted absent compelling reasons.  *See Hen House, Hartford Underwriters Ins. Co. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.)*, 530 U.S. 1, 11-12 (2000) (noting that a debtor-in-possession "is obliged to seek recovery under [Bankruptcy Code Section 506(c)] whenever his fiduciary duties so require.").

34.     While the Committee suspects that the Debtors are hopeful (or perhaps naively optimistic) that the Approved Budget captures all the expenses that will be incurred in the administration of these cases, there can be no assurance at this early juncture that the administrative expenses of these cases will be paid by the Debtors in the ordinary course. Furthermore, if an event of default is called under the DIP Facility, the budgeted amounts that

were incurred and not paid at such time could remain unpaid. For these reasons, the Court should not approve a section 506(c) waiver at this time.

      **B.**    **The Equities of the Case Exception Under 552(b) and Marshaling Rights Must be Preserved.**

35.    The Debtors' willingness to waive their rights under section 552(b) of the Bankruptcy Code is, at best, premature. The Court should also not permit a section 552(b) waiver before allowing parties in interest—including the Committee—to properly examine the "equities of the case". *See, e.g., Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying summary judgment request for 552(b) waiver as premature because factual record was not fully developed). If unencumbered assets are used to increase the value of the secured creditors' collateral, unsecured creditors should be able to argue that such value inures to them, and not to secured creditors. *See In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 Bankr. LEXIS 1533, at 20 (Bankr. S.D.N.Y. June 23, 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make"); *see also In re iGPS Co. LLC*, No. 13-11459 (KG) (Bankr. D. Del. July 1, 2013), [Dkt. No. 225 at ¶ 56] (no waiver of the "equities of the case" exception with respect to creditors committee). In the alternative, any section 552(b) waiver should be subject in all respects to the Committee's challenge rights.

36.    Moreover, the Debtors should not waive any rights with respect to the marshaling doctrine in the Final Financing Order. Such favorable treatment, which would enable the DIP Lender or Prepetition Bonds Secured Parties to "cherry pick" the collateral they want to liquidate most expeditiously, is unwarranted under the circumstances of these cases. Accordingly, marshaling rights should be preserved for the Committee. *See, e.g., In re Newcorn Enters. Ltd.*,

287 B.R. 744, 750 (Bankr. E.D. Mo. 2002) (granting unsecured creditors' committee derivative standing to bring marshaling claim against secured lender in an effort to increase payout to unsecured creditors, where debtor refused to do so); *Official Comm. Of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert this [marshaling] claim.").

### V.     The DIP Facility Contains Other Objectionable Provisions Which Should Not Be Approved by the Court.

37.     The Committee objects to the provisions of the DIP Facility and Interim Financing Order referenced below and requests that the Final Financing Order be amended accordingly.  By objecting to these provisions in bullet point format, the Committee does not suggest that these objections are either technical or minor in nature.

- DIP Proceeds Restriction.  The following language should be added to the Final Financing Order: "Notwithstanding the provisions of this Final Financing Order, the Carve-Out, the proceeds of the DIP Facility, and DIP Collateral may be used for the allowed fees and expenses incurred by the Committee and its professionals in furtherance of its duties as set forth under section 1103 of the Bankruptcy Code, including, but not limited to, any objection filed to the DIP Motion, any objection to credit bidding, any objection filed to any disclosure statement or plan of reorganization or liquidation filed in these Chapter 11 Cases, and any objection or other pleading contesting whether the DIP Lender or the Prepetition Bonds Secured Parties have the right to the exercise of remedies, including the prosecution of any such motions and objections."

- Definition of "Indemnified Person" is Overly Broad.  Indemnification of the DIP Lender under the DIP Facility must be limited solely to its capacity and role as a DIP Lender.  Moreover, indemnification rights should not extent to any unnamed affiliates of the DIP Lender (or each of their respective officers, directors, employees, attorneys, agents, and representatives) or to the DIP Lender in other capacities in these chapter 11 cases, including the DIP Lender's capacity as the Stalking Horse Bidder.

- Credit Bidding.  The Committee's right to oppose a credit bid should be preserved to the maximum extent provided for under the Bankruptcy Code.   The following language should be added to any Final Financing Order: "The Official Committee of Unsecured Creditors (the "Committee") preserves and reserves its rights to

19

object to any credit bid put forth by the DIP Lender and/or the Prepetition Bonds Secured Parties if taken before expiration of the Challenge Deadline.  The failure of the Committee to object to a bid put forth by the DIP Lenders or the Prepetition Bonds Secured Parties, or the Court's approval of any such credit bid shall not (a) prejudice or impair the rights of the Committee to bring a Challenge or otherwise challenge the nature, extent, validity, priority, perfection or amount of the alleged liens, security interests and claims or (b) release the DIP Lender or the Prepetition Bond Secured Parties from any causes of action which can be brought by or on behalf of the Debtors' estates."

- <u>Releases.</u>  The releases granted to the DIP Lender and the Prepetition Bonds Secured Parties should expressly be limited to the DIP Lender and the Prepetition Bond Secured Parties in their roles as such.  Moreover, such releases should not be extended to each of these parties unnamed successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns except for in their specific capacity as related to the DIP Facility and the Prepetition Bond Obligations.

- <u>Carve-Out</u>. The Committee believes that payment under the Carve-Out should not be conditioned on complying with the timing under the Approved Budget for professional fees.  Carve-Out amounts should be payable regardless of when the fees are incurred by estate professionals.

- <u>Remedies Period.</u>  The Final Financing Order should include language making clear that during the Remedies Notice Period, in the event the Debtors seek an emergency hearing from the Court, the Remedies Notice Period shall be stayed pending resolution of such dispute by the Bankruptcy Court.

- <u>Material Amendments.</u>  The Committee should receive notice of all material amendments, and all material amendments should be approved by the Court regardless of whether they fall under the limited definition of "Material DIP Amendments" as set forth in the Interim Financing Order.

- <u>Estate Professional Fees</u>.

  - The Professional Fee Escrow should be fully funded before payment of any DIP Fees and DIP Lender Expenses and the Professional Fee Escrow should be fully funded following a DIP draw (versus funded weekly in accordance with the Approved Budget as required by the Interim Financing Order).

  - The Professional Fee Escrow should not be reduced in the event any Approved Budget is adjusted down.

16968501/1

- o Reduction of the amount of Professional Fees included in any Approved Budget should require the consent of the Debtors and Committee.

- o To the extent any of Committee's counsel and financial advisors (the "Committee Professionals") have unused fee amounts in the Approved Budget, the excess of one goes to the other, if needed; provided, that if the Debtors' professionals have unused fee amounts in the Approved Budget, any excess shall be paid to the Committee Professionals, if necessary.

- **Committee Professional Fee Budget and Challenge Budget**. The Committee Professionals are presently budgeted at $360,000, collectively, which is just 30% of the $1,185,000 for which the Debtors' professionals are budgeted, and less than the minimum $400,000 cash required to be paid to DIP Lenders counsel (and the DIP Lender's additional fees, even in just that capacity will get paid out of the sales proceeds and, on information and belief, are already in excess of $400,000).[15] The Committee Professionals' fee budget must be increased to $850,000 so that the Committee can properly discharge its fiduciary duties in these chapter 11 cases. Moreover, the Challenge Budget should be increased from $25,000 to $75,000.

- **DIP Lender Fees**. Any fees and expenses payable to the DIP Lender's professionals should be explicitly limited to those incurred in the DIP Lender's capacity as DIP Lender and should not include any fees and expenses incurred in the capacity of Stalking Horse Bidder.

- **Financial Reporting**. All weekly financial reporting the Debtors send to the DIP Lender and Prepetition Bonds Secured Parties pursuant to Paragraph 2.5(b) of the Interim Financing Order and the DIP Loan Documents should be simultaneously provided to the Committee.

## **RESERVATION OF RIGHTS**

38.     As of the filing of this Objection, the Committee is in the process of reviewing the various prepetition financing documents. While the Committee has attempted to engage in negotiations with the DIP Lender, Prepetition Bond Secured Parties and the Debtors over the DIP Facility, no satisfactory resolution has been reached. Accordingly, the Committee reserves all of its rights to supplement or amend this Objection at or prior to the Final Hearing on the DIP Motion.

---

[15] The Debtors' claims agent alone has a budget of $250,000, which is only slightly less than the entire budget for the Committee Professionals.

16968501/1

39.     The Committee also reserves all rights with respect to any filing by the Debtors or the DIP Lender prior to the Final Hearing.  The Committee further reserves its respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during any hearing on the DIP Motion. Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, the Prepetition Bond Secured Parties or the DIP Lender, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) condition entry of an order approving the DIP Motion on a final basis unless the Final Financing Order and the DIP Facility are modified as requested in this Objection; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  October 2, 2024                 **MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Christopher M. Donnelly (DE Bar No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6800
Email: jwaxman@morrisjames.com
        emonzo@morrisjames.com
        cdonnelly@morrisjames.com

-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
999 Peachtree Street NE
Suite 2300
Atlanta, Georgia 30309
Tel:     (404) 868-6645
Email: toddmeyers@eversheds-sutherland.com

-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Jennifer B. Kimble (admitted *pro hac vice*)
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 389-5000
Fax:     (212) 389-5099
Email: toddmeyers@eversheds-sutherland.com
          jenniferkimble@eversheds-sutherland.com

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors*

16968501/1