# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FULCRUM BIOENERGY, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-12008 (TMH)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 12<br>Hearing Date: October 9, 2024, at 1:00 p.m. (ET) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR (I) AN ORDER PURSUANT TO SECTIONS 105, 363, 364, 365 AND 541 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING AN AUCTION AND SALE HEARING; (E) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its undersigned proposed counsel, Eversheds Sutherland (US) LLP and Morris James LLP, hereby files this objection (the "Objection") to the *Debtors' Motion for (I) An Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures for the Sale of Substantially all of the*

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); Fulcrum Sierra Holdings, LLC (8498). The location of the Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.

16968559/1

*Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 12] (the "Bidding Procedures Motion").[2] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. These chapter 11 cases are being prosecuted solely for the benefit of the DIP Lender who also serves as the Stalking Horse Bidder and to liquidate the prepetition secured lenders' collateral. Contemporaneously with the filing of this Objection, the Committee is objecting to the Debtors' DIP Motion and requested post-petition financing.[3]

2. The Bidding Procedures Motion, if granted without revisions necessary to address the issues raised herein, will chill bidding, discourage interest, limit due diligence, and stifle competition for the sale of substantially all the Debtors' assets. Although the Committee does not object, in principle, to the sale of the Debtors' assets, the Committee objects to the compressed timeline for the sale of the Debtors' assets, and to certain aspects of the proposed procedures which

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Motion, the DIP Motion, or the First Day Declaration (each as defined herein), as applicable.

[3] At this time, the Committee is strongly considering moving to convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. This Objection, even if sustained by the Court, is not and shall not be deemed to be a concession that the Debtors' cases should proceed under chapter 11 of the Bankruptcy Code.

2

16968559/1

could allow the DIP Lender to acquire many of the Debtors' assets without a competitive sale process and for less than reasonable value.

3. As discussed herein, the Debtors' proposed bidding procedures (the "Bidding Procedures"), among other things, seek to expeditiously sell substantially all the Debtors' assets, including the Sierra Biofuels plant, a water treatment facility, valuable water and power contracts (collectively, the "Sierra BioFuels Plant Assets"), various can and catalyst equipment and the Debtors' patent portfolio related to its operations which purportedly convert household and municipal waste into renewable transportation fuel. The Debtors did not adequately market such assets prepetition. Moreover, the Debtors have undertaken no valuation of their assets, and in fact, the Debtors' Schedules reflect the value of many assets up for sale as "undetermined."[4] Yet, the Debtors now seek to hand over the Sierra BioFuels Plant Assets to the DIP Lender/Stalking Horse Bidder for a $15 million purchase price (plus the assumption of certain liabilities) for use as a data processing center.

4. While the Committee recognizes the necessity of a sale process (which could also be conducted in a chapter 7 case)[5], there is no good reason to subject the Debtors' assets to the compressed Milestones that govern the proposed sale of their assets. The Bidding Procedures risk chilling competitive bidding and therefore minimizing the likelihood for a going-concern purchaser and minimizing potential recoveries for the Debtors' creditors and other stakeholders. In fact, the Committee has reason to believe that the Debtors' assets were not marketed to other

---

[4] A review of the Debtors' Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("SOFA's") reflect the value of a vast majority of the Debtors' assets as "**Undetermined**."

[5] In the Committee's view, it is obvious that the Prepetition Bonds Secured Parties, whether for liability reasons or otherwise, do not wish to foreclose on the Sierra Plant.

16968559/1

data processing centers similar to Switch. The Committee also objects to certain other Bidding Procedures that unfairly tilt the sale process in favor of the DIP Lender.

5. The Committee submits that the modifications to the Bidding Procedures, Bid Protections, and other related provisions requested herein are reasonable, necessary, and appropriate to maximize value of these estates for parties other than the DIP Lender.

## BACKGROUND

### A. The Chapter 11 Cases

6. On September 9, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

7. On the Petition Date, the Debtors also filed the Bidding Procedures Motion, seeking approval of certain procedures for the sale of all or substantially all their assets.

8. On September 19, 2024, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for Region 3 appointed the Committee. D.I. 74. On September 21, 2024, the Committee selected Eversheds Sutherland (US) LLP as its proposed counsel and Dundon Advisers, LLC as its proposed financial advisor. On September 23, 2024, the Committee selected Morris James LLP as its proposed co- counsel.

9. By agreement of the parties, the Committee's objection deadline for the Bidding Procedures Motion is October 2 at 4:00 p.m. (prevailing Eastern Time). The hearing to approve

the Bidding Procedures Motion is currently scheduled for October 9, 2024, at 1:00 p.m. (prevailing Eastern Time).

**B. Summary of Bidding Procedures**

10. The Bidding Procedures allow parties to submit bids for the Acquired Assets and the Expanded Assets, subject in all respects to the requirements set forth in the Bidding Procedures, some of which are summarized below.

11. The Debtors propose the following sale timeline (such timeline, the "Proposed Sale Timeline"):

| Event | Deadline |
|---|---|
| **Deadline for Debtors to File Notice of Proposed Cure Amounts and Adequate Assurance** | Three (3) business days after entry of the Bidding Procedures Order |
| **Cure Notice Objection Deadline** | Fourteen (14) days after service of the Cure Notice |
| **Sale Objection Deadline** | October 25, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Bid Deadline** | October 25, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Deadline to Designate Qualified Bids** | October 29, 2024 |
| **Auction** | November 1, 2024, at 10:00 a.m. (prevailing Eastern Time) |
| **Deadline to Serve Notice of Winning Bidder and Supplemental Cure Notice** | One (1) business day after the close of the auction |
| **Deadline to File Supplemental Sale Objection and Objection to Assumption or Cure Amount (If Winning Bidder is Different Than Stalking Horse Bidder)** | November 6, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Sale Hearing (proposed)** | November 11, 2024 |

Bidding Procedures Motion at 3; Bidding Procedures Motion, Ex. A (the "Proposed Order") at 6, 11-15.

**OBJECTION[6]**

12.    The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). The purpose of bidding procedures orders is to facilitate an open and fair public sale designed to maximize value for the estate. *See, e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See id.*; *see also In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (quoting *In re Food Barn Stores, Inc.*, 107 F.3d at 565 (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets")).

13.    For the reasons discussed below, the truncated post-petition sale process and the Bidding Procedures fail to meet these goals. In fact, the Bidding Procedures Motion, if approved by the Court, authorizes the Debtors to sell all or substantially all their ***unvalued*** assets at warp speed for liquidation value (or less). As a result, the only likely beneficiaries of the Bidding Procedures Motion at this juncture are the DIP Lender (which, as noted herein, is also the proposed Stalking Horse Bidder) and the Prepetition Bonds Secured Parties. The proposed sale process, unless modified, will eliminate any possibility of other bidders and of anyone other than the DIP Lender and Prepetition Bonds Secured Parties realizing any value from the proposed sale.

---

[6] This Objection is limited to the Bidding Procedures Motion and is not intended to raise the Committee's objections relating to the Stalking Horse Bid, the Stalking Horse Agreement, the Sale, or any Sale Order. The Committee reserves all rights with respect to each of the foregoing.

### A. The Proposed Sale Timeline Is Unreasonable

14.     As asserted herein, the Proposed Sale Timeline seeks to accomplish a sale of the Acquired Assets at warp speed, without any attempt by the Debtors or their professionals to value the assets, or a reasonable time and opportunity for prospective third-party purchasers to adequately participate in the sale process.  An accelerated sale process for the Debtors, especially under the facts of these chapter 11 cases, is not designed to generate a robust sale process or the highest value for the Debtors' assets.

15.     The Debtors' prepetition marketing efforts were nothing short of inadequate and, essentially, non-existent.  According to the *Declaration of Mark Smith, Restructuring Advisor to Fulcrum BioEnergy, Inc., in Support of Chapter 11 Petitions and First Day Motions* [D.I. 9] (the "First Day Declaration"):

> Contemporaneously with the Company's inability to raise capital in the fall of 2023 . . . the Bonds Trustee's counsel engaged a financial advisory and restructuring firm, RPA Advisors, to assist the trustee and its counsel in assessing the carrying costs of the real and personal property owned by . . . [Sierra BioFuels] and to explore options in marketing the assets should the trustee have chosen to seek to foreclose on the assets that served as security for the Sierra BioFuels Bonds.

First Day Declaration at 4.  The First Day Declaration also notes that "upon learning of [developments that the Company was unable to stabilize operations and eventually shut down operations in May of 2024], and in coordination with the Debtors, **_RPA_** began to market certain of the assets that served as security for the Sierra BioFuels Bonds." *Id.* at 5.  It is only toward the end of this purportedly adequate RPA-led sale process that "the Debtors engaged [MNAT] as legal counsel to evaluate any letters of intent received during the marketing process," including that of Switch, which ultimately led to this bankruptcy filing and the proposed sales process with Switch serving as the proposed Stalking Horse Bidder. *See id.*  Thus, by the Debtors' own admissions via the First Day Declaration, the prepetition marketing process was, for all intents and purposes, run

by RPA (a financial advisor to the Bonds Trustee's counsel) rather than by the Debtors themselves.[7]

16. Accordingly, to conduct a more robust and adequate sale process (and therefore increase any prospects for value maximization to the bankruptcy estates), the Committee requests a 30-day extension of all sale-related deadlines, including all applicable sale milestones. Such an extension is entirely reasonable and appropriate given the circumstances. *Cf. In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 3, 2014) (Case No. 14-10979) (CSS) Tr. (the relevant excerpt of which is attached hereto as **Exhibit A**) at 20:16-20 (holding that ". . . the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction . . . and the . . . committee to . . . get up to speed.").

**B. Bid Protections**

17. Pursuant to the Bidding Procedures Motion, in addition to seeking approval of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement, the Debtors seek approval of certain Bid Protections, which consist of, in part, a break-up fee in the amount of $600,000. A break-up fee is intended to "compensate[] the stalking horse for the risk it shoulders in being the first bidder." *In re 310 Assocs.*, 346 F.3d at 34; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 203 (3d Cir. 2010) ("The practice of paying a breakup fee to an initial bidder for assets has developed . . . to compensate the bidder for memorializing its interest in acquiring the asset.").

---

[7] Not only is this process curious, but absent a going concern purchaser for the assets, and assuming that a data processing center is the best alternative use of the Sierra Plant, it is unfathomable that there were not (upon the Committee's information and belief) broader marketing efforts to other data processing centers similar to Switch. Furthermore, based on information and belief, Reno, Nevada (the approximate location of the Sierra Plant) is one of the most prominent data center markets in the United States given its close proximity to major highways like I-80, parallel data trunk lines, and short distance to the Bay Area.

18. Relying on the Third Circuit's test in *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Debtors contend that the break-up fee is appropriate in these chapter 11 cases. Bidding Procedures Motion at 30. The Debtors' reliance on *O'Brien* however, is misplaced. The court in *O'Brien* emphasized that break-up fees should only be approved if they provide a demonstrable benefit to the bankruptcy estate, aligning their decision with the administrative expense standard under 11 U.S.C. § 503(b). *Id.* at 536-37. The court made clear that such fees must be necessary to preserve the estate's value and provide a tangible benefit to the debtor's estate—such as fostering more competitive bidding or facilitating the sale process. *See id.* ("Rather than adopting the specific factors identified by the [b]ankruptcy [c]ourt as the appropriate test to be used for all break-up fee determinations, we consider whether the record evidence supports the [b]ankruptcy [c]ourt's implicit conclusion that awarding Calpine break-up fees was not necessary to preserve the value of O'Brien's estate. As we have explained, that inquiry stems directly from § 503(b)(1)(A), which requires that an expense provide some benefit to the debtor's estate").

19. Furthermore, while break-up fees are not inherently objectionable, they must be reasonable relative to the purchase price and the efforts of the Stalking Horse Bidder. Here, a 4% break-up fee is disproportionate when compared to industry norms and may significantly chill the auction process. And, in fact, courts have held that "bidding incentives such as break-up fees are carefully scrutinized in § 363(b) asset sales to [e]nsure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *See In re Hupp Indus., Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (denying approval of a 2.1% breakup fee due to its failure to meet the standards of section 503(b) of the Bankruptcy Code).

16968559/1

20. There is no evidence that the $600,000 fee is necessary to preserve the value of the Debtors' estates or that it has any relation to the legitimate costs incurred by the Stalking Horse Bidder– especially given that Switch does not intend to operate the Sierra Plant as a going concern operation. Moreover, the break-up fee is payable even in the absence of an alternative viable sale transaction as an administrative priority claim. At 4% of Switch's proposed purchase price, the fee is a significant financial burden that would diminish the estates' assets. Without a showing that the break-up fee would maximize value or bring more bids to the table, it should not be approved as requested. The Committee respectfully submits that, if this Court determines that any break-up fees is appropriate in the first instance, the amount of such fee should be reduced to $450,000 or such other lower amount that the Court deems appropriate.

### C. Credit Bid Rights Must Be Consistent with Bankruptcy Code Section 363(k)

21. Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section or property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property.

11 U.S.C. § 363(k).

22. The Proposed Order should provide that any credit bid rights, including those of the DIP Lender, the Prepetition Bonds Secured Parties and any other prepetition secured lenders are qualified by and subject to section 363(k) of the Bankruptcy Code, and nothing shall limit the Committee's right to argue that a lienholder's credit bid rights, including those of the DIP Lender, the Prepetition Bonds Secured Parties, and any other prepetition secured lenders, should be limited "for cause" pursuant to section 363(k) of the Bankruptcy Code.

**D. Additional Objections**

23. In addition to the foregoing concerns, the following provisions of the Bidding Procedures, Proposed Order, and the proposed cure notice (the "<u>Cure Notice</u>") are objectionable to the Committee for the reasons stated below:

| **Sections[8]** | **Issue** |
|---|---|
| Bid Requirements (Bidding Procedures at 4 - 6) | This section does not specify to whom a Potential Bidder must submit the required materials in order to qualify as a Bid under the Bidding Procedures. Therefore, it should be clarified that such materials must be submitted to the Debtors and the Consultation Parties by the Bid Deadline.<br><br>Furthermore, the Committee requests that the following changes be made to this section of the Bidding Procedures:<br><br><u>Item No. 1</u>: This item should be modified to delete the requirement that the Potential Bidder offer to purchase the Acquired Assets upon substantially the same terms and conditions set forth in the Stalking Horse Agreement. The Potential Bidder should be allowed to structure its Bid terms as desired, so long as it provides a comparison of those terms against the Stalking Horse Agreement.<br><br><u>Item No. 3</u>: This item should be modified to delete the requirement that the Purchase Price must include an amount of cash consideration at closing. A Bid should not be required to include *cash* consideration, specifically, that exceeds the aggregate consideration of the Stalking Horse Bid and the minimum bid increment, so long as the aggregate consideration exceeds that value. Additionally, and subject to the Court's determination that any break up fee is appropriate, the final sentence of this item should be revised to state, "For the avoidance of doubt, the Minimum Purchase Price must also include cash consideration sufficient to pay, in full, in cash, the Payoff Amount (as defined in the Stalking Horse Purchase Agreement) **and the Break-Up Fee** from the proceeds of such bid at the initial closing of the transaction."[9] |

---

[8] All section references in this chart shall be to the Bidding Procedures, Proposed Order, or the Cure Notice, as indicated.
[9] If Qualifying Bids will be compared against the value of the Stalking Horse Bid including the Assumed Liabilities, the Assumed Liabilities should be ascribed a value in advance.

11

16968559/1

|  | Item No. 7: This item should be modified to state, "provide a commitment to close within 14 days after the Sale Hearing**, or within such additional time as may be required to obtain required governmental, licensing, regulatory or other filings, approvals or consents as described in subparagraph 9 below, if any.**" |
|---|---|
| Auction Procedures (Bidding Procedures at 9) | The Bidding Procedures should include procedures to bid on the Expanded Assets or any assets not subject to the Stalking Horse Bid. The Bidding Procedures should confirm whether a minimum Overbid amount applies to the Expanded Assets. *See* Bidding Procedures at 6. The procedures are currently silent on this issue. |
| Contract Assumption Objection Deadline (Bidding Procedures ¶ 27(c); Proposed Order ¶ 22(c); Cure Notice at 5) | The Cure Notice provides that "if and only if the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets, Counterparties to the Contracts and Leases shall have until the Sale Hearing to object to the assumption and assignment of the Contracts and Leases solely on the issue of whether the Successful Bidder can provide adequate assurance of further performance as required by section 365 of the Bankruptcy [Code]." The Bidding Procedures and the Proposed Order, which will govern in this instance, provide that counterparties to the Debtors' Contracts and Leases will have until November 6, 2024 at 4:00 p.m. (prevailing Eastern Time) (*not* the Sale Hearing) to object to the assumption and assignment of a Contract or Lease with respect to the above-mentioned issue. Therefore, the Cure Notice should be modified to reflect that the applicable objection deadline is November 6, 2024, at 4:00 p.m. (prevailing Eastern Time). |
| Selection of Successful Bid (Bidding Procedures at 10) | The Bidding Procedures provide that "[t]he Auction will close when the Debtors announce that the Auction has concluded and a Successful Bid and, to the extent the Debtors determine, a Back-Up Bid, has been selected." Bidding Procedures at 10. The Debtors should modify this language to make clear that they will consult with Consultation Parties to determine whether a Back-Up Bid has been selected.<br><br>The applicable language in the Bidding Procedures should read as follows: "The Auction will close when the Debtors announce that the Auction has concluded and a Successful Bid and, to the extent the Debtors determine **in consultation with the Consultation Parties**, a Back-Up Bid, has been selected." |
| Joint Bids | The Bidding Procedures should provide that the Debtors may, upon written consent of the Committee, approve joint Bids in their reasonable business judgment on a case-by-case basis. If the Committee does not provide written consent to |

12

16968559/1

| | |
|---|---|
| | a joint Bid, the Debtors may seek Court approval of such joint Bid on an emergency basis.<br><br>The Proposed Order and Bidding Procedures currently lack provisions for potential third-party purchasers to submit joint bids on the Debtors' assets. Incorporating a mechanism for joint bids could enhance interest and competition among prospective purchasers during the bidding process. |
| Committee Contact Information | With the formation of the Committee and the selection of its counsel now complete, the Proposed Order and Bidding Procedures must incorporate the contact information of the Committee's counsel where the Notice Parties' contact information is listed. The contact information for the Committee's counsel is as follows: (1) Eversheds Sutherland (US) LLP, The Grace Building, 40th Floor, 1114 Avenue of the Americas, New York, New York 10036, Attn: Todd C. Meyers (ToddMeyers@eversheds-sutherland.com), Jennifer B. Kimble (JenniferKimble@eversheds-sutherland.com), and Sameer M. Alifarag (SameerAlifarag@eversheds-sutherland.com); and (2) Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Jeffrey R. Waxman (jwaxman@morrisjames.com) and Eric J. Monzo (emonzo@morrisjames.com). |

## **RESERVATION OF RIGHTS**

24.  The Committee and its professionals, which were engaged only ten days ago, are continuing to gather information, and communicate with the Debtors and other parties in interest regarding these chapter 11 cases and the proposed sale process. Accordingly, the Committee expressly reserves the right to object to the Bidding Procedures Motion, the Bidding Procedures, and the Proposed Order on any grounds at or prior to the hearing.

16968559/1

**CONCLUSION**

The issues raised by the Committee herein and in the contemporaneously filed objection to the DIP Motion are significant and potentially case-defining issues with respect to the posture of these cases, the Bidding Procedures Motion, the Bidding Procedures, and the Proposed Order. The Committee respectfully requests that the objections raised therein and herein be addressed and incorporated into revised Bidding Procedures and a revised order on the Bidding Procedures Motion that are satisfactory to the Committee. Furthermore, the Committee hereby reserves all rights to raise additional and/or supplemental objections prior to or at any hearing on the Bidding Procedures Motion.

Dated:  October 2, 2024                **MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Christopher M. Donnelly (DE Bar No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6800
Email: jwaxman@morrisjames.com
           emonzo@morrisjames.com
           cdonnelley@morrisjames.com
-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
999 Peachtree Street NE
Suite 2300
Atlanta, Georgia 30309
Tel:    (404) 868-6645
Email: toddmeyers@eversheds-sutherland.com

-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Jennifer B. Kimble (admitted *pro hac vice*)

The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 389-5000
Fax:    (212) 389-5099
Email: toddmeyers@eversheds-sutherland.com
          jenniferkimble@eversheds-sutherland.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

16968559/1