## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*,[1] | Case No. 24-12008 (TMH) |
| Debtors. | (Jointly Administered) |
| | **RE D.I. 12; 91; 92; 104** |

**REPLY OF THE DEBTORS IN SUPPORT OF MOTION FOR (I)
AN ORDER PURSUANT TO SECTIONS 105, 363, 364, 365 AND 541 OF
THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006 AND
9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BIDDING
PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS; (B) APPROVING THE DEBTORS' ENTRY INTO
STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS (C)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OR
REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (D) SCHEDULING AN AUCTION AND SALE HEARING; (E) APPROVING
FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES
IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF; (II) AN
ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR
OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") hereby file this reply (the "Reply") in further support of the *Debtors' Motion for (I) an*

*Order Pursuant to Sections 105, 363, 364, 365 And 541 of the Bankruptcy Code, Bankruptcy Rules*

*2002, 6004, 6006 AND 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding*

*Procedures for the Sale of Substantially all of the Debtors' Assets; (B) Approving the Debtors'*

---

[1]  The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); and Fulcrum Sierra Holdings, LLC (8498).  The location of the Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.

*Entry Into Stalking Horse Agreement and related Bid Protections; (C) Approving Procedures for the Assumption or Assignment or Rejection of Designated Executory contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates Times and Places in Connections Therewith; and (F) Granting Related Relief; (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 12] (the "Bidding Procedures Motion")[2] and in response to (i) ThermoChem Recovery International, Inc.'s ("TRI") objection [D.I. 91] (the "TRI Objection"); (ii) Johnson Matthey Davy Technologies Ltd.'s ("JMD") limited objection [D.I. 92] (the "JMD Objection"); (iii) and the Official Committee of Unsecured Creditors ("UCC") objection [D.I. 104] (the "UCC Objection,") (collectively, the "Objections"). In support of the Bidding Procedures Motion and this Reply, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT[3]

1.      By their Objections, the UCC (and in part TRI) attempt to create a false narrative of the Debtors', Stalking Horse Bidder's, and the Prepetition Bonds Secured Parties' (herein referred to as the "Bondholders") attempt to impose an unfair sale process on the unsecured creditors and this Court.  Nothing could be further from the truth.

2.      Following the UCC's appointment, the Debtors have been in almost constant contact and negotiations with the UCC's professionals about various aspects of the sale process and the DIP financing.  The Debtors' extended the UCC's deadlines to object to the second

---

[2]      All capitalized terms used but not defined here are defined in the Bidding Procedures Motion.

[3]      The Debtors, UCC, Bondholders, and DIP Lender are in discussions to attempt to resolve the UCC Objection. Notwithstanding the filing of this Reply, the Debtors will continue to attempt to resolve all remaining objections.

day orders and the Bidding Procedures Motion multiple times and moved the hearing on the second day orders and Bidding Procedures Motion more than a week to accommodate the UCC's requests for more time and to allow negotiations to continue.  As set forth in this Reply and the revised Bidding Procedures Order, attached hereto as **Exhibit A** (the "Revised Bidding Procedures"), these negotiations have resulted in the incorporation of many of the items the UCC presents as "Additional Objections" into the Bidding Procedures Order.  What remains are Bidding Procedures that reflect hard fought negotiations between the Debtors, the Stalking Horse Bidder, and the Bondholders.  It is the Debtors' business judgment that entry of the Bidding Procedures Order will provide the best opportunity to maximize the value of the Debtors' assets.  The Court should defer to this reasoned and prudent exercise of the Debtors' business judgment.

3.       Moreover, the sale process proposed by the Debtors is far from extraordinary.  Switch, Ltd. ("Switch"), the DIP Lender and Stalking Horse Bidder, is a third-party with no prior relationship with the Debtors.  There are no prepetition claims or investigations to undertake with respect to Switch, as its only transactions with the Debtors have been approved by this Court.  Moreover, the Bondholders, in supporting the Debtors' estates, agreed to subordinate their liens to the DIP Lender and to allow the use of cash collateral to run a sale process that enables the Debtors to seek higher or better bids for their assets.  This case is an example of what parties *should do* in a Chapter 11 sale case, and they are being unfairly maligned and attacked for doing so.

4.       Finally, the objections raised by TRI and JMD are wholly premature.  The Debtors are not seeking approval of the sale or assumption and assignment of contracts at the Bidding Procedures hearing.  Bidding procedures are "procedural" only.  The point of bidding procedures is to establish an orderly process to enable a debtor to market their assets, after which

they will return to the court to seek approval of the sale.  TRI in particular asks for relief that is both unprecedented and that has no basis under their agreements with the Debtors, requesting that this Court permit TRI to have extraordinary supervisory and veto rights over the marketing process and sale.  These objections will be presented at a sale hearing *if they become ripe*, but as of today, the Debtors are not seeking relief that requires this Court to rule on the numerous hypothetical issues TRI raises.

5.     For these and the reasons set forth below, the Objections should be overruled.

## **GENERAL BACKGROUND**

A.     The Events Leading to the Filing of Chapter 11

6.     As described more fully in the *Declaration of Mark J. Smith, Restructuring Advisor to Fulcrum BioEnergy, Inc., in Support of the Chapter 11 Petitions and First Day Motions* [D.I. 9] (the "First Day Declaration"), the Debtors began to experience liquidity issues towards the end of 2023 due to certain equipment issues and resulting operational delays.

7.     Prior to, and in response to these liquidity issues, the Debtors and their advisors engaged in capital raising and marketing efforts to obtain new financing needed to repair equipment and achieve full operational status. These efforts included management presentations and the engagement of approximately twenty-eight (28) parties in due diligence, but the process did not yield any credible proposals.

8.     With no success in obtaining new money financing and after negotiations stalled with existing stakeholders on a path forward that would allow the Debtors the necessary liquidity to continue operations, the trustee for the Bondholders retained RPA Advisors, LLC ("RPA") to assist the trustee and its counsel in assessing the carrying costs of the real and personal

property owned by Debtor Fulcrum Sierra BioFuels, LLC ("Sierra BioFuels") and to explore options in marketing the assets should the trustee foreclose on the assets that served as security for the Sierra BioFuels Bonds.

9.    The Debtors, with no independent funding to run a sale process, were actively involved in the RPA prepetition marketing and sale process, developing an initial outreach list of eighteen (18) parties based on the Debtor's previous marketing efforts and materials. Ultimately, thirty-six (36) potential purchasers were contacted and had discussions with RPA and/or the Debtors regarding the purchase of the Debtors' assets over the nearly two-month marketing process, with sixteen (16) parties executing a non-disclosure agreement ("NDA") to access diligence materials. The Debtors also hosted nine (9) site visits at the Sierra BioFuels Plant (the "Sierra Plant") for six (6) different potential purchases that desired to view the assets in person. Of the thirty-six (36) potential purchasers, six (6) parties submitted Letters of Intent ("LOIs"), three (3) of which were liquidation offers, and the LOI from Switch represented the highest value contemplated for the Debtors' assets prepetition.

10.    To continue and expand upon the prepetition sale process, the Debtors retained Development Specialists, Inc. ("DSI") to run a robust postpetition sale process, which was made possible by the DIP Facility provided by Switch.  As of the filing of this Reply, DSI has contacted approximately two hundred and thirty-two (232) potential purchasers, which includes any party that engaged with the Debtors or RPA prepetition, and twenty-two (22) of those parties have requested or executed a NDA in order to conduct due diligence.  Additionally, four (4) parties have conducted site visits at the Sierra Plant with four (4) visits scheduled in the coming days. DSI also submitted a teaser to (i) BioMass Magazine, which was sent to 78,403 entities and individuals via email, 12,361 of which were opened and 1,577 interacted with the linked material;

(ii) SAF Magazine, which was sent to 159,902 entities and individuals via email, 26,292 of which were opened and 550 interacted with the linked material; and (iii) the bid solicitation notice was advertised on the Daily DAC and National Law Review websites for three concurrent weeks commencing on September 19, 2024 and the sale has been exposed to over 38,800 individuals and 392 interacted with the linked material.

11.     Contrary to the UCC and TRI's unsupported assertions, the Debtors' sale process has been far from "stifled", "chilled", or limited.  In fact, it has been incredibly active due to the hard work and effort of the Debtors' management team and DSI.

12.     The proposed Bidding Procedures were designed by the Debtors' advisors to provide an appropriate amount of time and procedures to effectively market their assets within the DIP funding provided by Switch.  The UCC's demand for an additional thirty (30) day marketing period relies upon some imaginary source of financing that does not exist.

B.     The Debtors' Relationship with TRI

13.     In 2012, following the review and evaluation of different gasification technologies, the Debtors identified TRI as a potential provider.  After testing and evaluating the TRI gasification technology, the Debtors and TRI entered into a master agreement in March 2013, which provided for the use of the TRI gasification technology. In May 2015, the Debtor and TRI entered into a site license agreement providing for the use of the TRI gasification technology at the Sierra Plant.

14.     Following the start of construction at the Sierra Plant during the second half of 2018, TRI was involved in monitoring the construction of the gasification island at the Sierra Plant; however following the initial start-up and commissioning of the Sierra Plant, it was determined that there were numerous issues with key equipment within the TRI gasification

system. These issues required the Debtors to stop initial operations in October 2023.  TRI accepted

responsibility for the equipment issues and in December 2023 entered into an agreement which

required TRI to redesign, repair and re-install the equipment at TRI's cost, which was not

completed until April 2024.  Unfortunately, the delays occasioned by TRI's equipment defects set

the start of operations back several months, and the Debtors ultimately were unable to obtain

additional funding to restart operations.

15.     On April 2, 2024, in response to a disagreement as to the ownership rights

of certain of the Debtors' intellectual property, TRI filed a demand for arbitration under the

Commercial Rules of the American Arbitration Association ("AAA").  However, contrary to TRI's

assertions, this Arbitration has not "advanced significantly."  In fact, the Debtors never participated

prepetition due to a lack of funding and it was stayed upon the Debtors' filing for bankruptcy.

Although the Debtors understand that the arbitrator entered a scheduling order, it was entered

without the Debtors' input, consent, or participation.

16.     Moreover, as of the Petition Date, no discovery has been conducted nor have

legal issues been briefed.  The fact is that little has occurred in the arbitration, and TRI is

embellishing the history of its dispute with the Debtors in order to attempt to build a record to

support a future motion to have these issues decided by anyone but this Court. TRI does not attempt

to hide this objective in its Objection, stating that it is going to move for stay relief to compel

arbitration or, if that fails, to withdraw the reference to seek to have the district court decide a

straightforward contract interpretation issue that could be decided by this Court.

17.     Nevertheless, while the Debtors contest many of TRI's assertions, a reply

in support of the Bidding Procedures Motion is not the proper time to brief these issues, and the

Debtors will respond to TRI's arguments at the appropriate time.

**REPLY**

18.     The Court should approve the Bidding Procedures as they present the best opportunity to maximize the value of the Debtors' assets.  The Bidding Procedures permit the continued marketing of the Debtors' assets to the highest and best purchaser under a timeline that strikes an appropriate balance between enabling a robust sale process and the reality of the Debtors' limited available financing.

I.   **The UCC's and TRI's Assertions Regarding the Debtors' Marketing and Sale Process Ignore the Facts.**

A.   The Debtors' Assets Have Been and Will Continue to be Thoroughly and Extensively Marketed During These Cases.

19.     Both the UCC and TRI ignore the fact that the Debtors' assets have been marketed since at least May of this year.  Over the last five (5) months, numerous parties have met with the Debtors' management, conducted due diligence and site visits, and made decisions on whether to pursue a purchase of the Debtors' assets.  The Bidding Procedures allow for these opportunities to continue in these chapter 11 cases.

20.     Contrary to the UCC and TRI's Objections, the sale process has neither been "rushed" or "hurried" nor does it "chill bidding, discourage interest, limit due diligence, [or] stifle competition for the sale of substantially all the Debtors' assets."  TRI Objection ¶¶ 27-28; UCC Objection ¶ 2.  As described herein, building upon the work the Debtors and RPA conducted prepetition, the DSI team has already contacted two hundred and thirty-two (232) potential purchasers, which includes any party that engaged with the Debtors or RPA prepetition, and twenty-two (22) of those parties have requested or executed a NDA in order to conduct due diligence.  Additionally, four (4) parties have conducted site visits at the Sierra Plant with four (4) visits scheduled in the coming days. The Debtors expect these numbers to grow over the twenty-

8

two (22) days that remain before Bids are due under the Proposed Bidding Procedures.  This is in addition to broader marketing efforts in industry publications as described above.

B.    The Sale Timeline and Related Milestones are Reasonable Under the Circumstances of These Cases.

21.    Just days before these chapter 11 cases were filed, the Debtors were preparing to file for chapter 7 with little cash in its bank accounts and no financial support from its existing lenders.  Notwithstanding, the Debtors' board of directors and management continued to search for a stalking horse bid and DIP lender that would allow for a chapter 11 sale process that they believed would provide the best opportunity to maximize the value of the Debtors' assets.

22.    At the eleventh hour, the Debtors were ultimately able to reach an agreement with the DIP Lender and Stalking Horse Bidder and the Bondholders that provided for the financing for this sale process and a stalking horse bid that establishes a "floor" purchase price and form asset purchase agreement upon which other interested parties may bid against.  Without the DIP financing provided by the Stalking Horse Bidder, a chapter 7 trustee would have been handed a company without money in its bank account to support the Debtors' limited workforce, extend critical insurance coverage, secure the Debtors' real property and plants, or  much less run a fulsome sale process, inevitably leading to the destruction of value for the Debtors' creditors.

23.    It should not be surprising to the UCC that the DIP Lender and Stalking Horse Bidder, which is not a prepetition lender, has an incentive to close the Sale as soon as possible.  However, at the Debtors' insistence, Switch has agreed to balance its desire to close quickly with a budget and timeline that allows the Debtors to run a fulsome sale process.  Indeed, the UCC's assertions that this process is "truncated" or conducted at "warp speed" that eliminates the possibility of other bidders is simply not grounded in reality.  UCC Objection ¶ 13.  The sale process that is ongoing has generated substantial interest.  Moreover, a 60-day sale process is far

from uncommon in this District if the circumstances require it.  *See In re iSun Inc.*, Case No. 24-11144 (TMH) (Bankr. D. Del.) (57 days)*; In re Amerimark Interactive, LLC*, Case No. 23-10438 (TMH) (Bankr. D. Del.) (45 days)*; In re HyLife Foods Windom LLC*, Case No. 23-10520 (TMH) (Bankr. D. Del.) (37 days); *In re MediaMath Holdings, Inc.*, Case No. 23-10882 (LSS) (Bankr. D. Del.) (52 days); *In re Independent Pet Partners Holdings, LLC*, Case No. 23-10153 (LSS) (Bankr. D. Del.) (46 days); *In re Sientra, Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del.) (58 days); *Tricida, Inc.*, Case No. 23-10024 (JTD) (41 days); *In re Structurlam Mass Timber U.S., Inc.*, Case No. 23-10497 (CTG) (Bankr. D. Del.) (40 days); *In re Express, Inc.*, Case No. 24-10831 (KBO) (Bankr. D. Del.) (53 days); *In re Supply Source Enterprises, Inc.*, Case No. 24-11054 (BLS) (Bankr. D. Del.) (49 days ); *In re Numbers Holding, Inc.*, Case No. 24-10719 (JKS) (Bankr. D. Del.) (45 days); *Fast Radius, Inc.*, Case No. 22-11051 (JKS) (32 days); *In re Knotel, Inc., et al.*, Case No. 21-10146 (MFW) (Bankr. D. Del.) (46 days).

24.    Here, the DIP Lender provided $5,000,000 in financing to conduct a sale process in approximately sixty (60) days, something no other party was willing to do.  The UCC's request to add an additional thirty (30) days relies upon hypothetical funding that does not exist and certainly would not be available in a chapter 7 case.

25.    The UCC's objection should be overruled.

**II.    The Terms of the Stalking Horse Agreement are Reasonable Under the Circumstances of these Cases.**

A.    <u>The Bid Protections Were the Product of Extensive, Good Faith, Arm's Length Negotiations Between the Debtors and the Stalking Horse Bidder During the Period Leading Up to the Petition Date.</u>

26.    The Bid Protections were the subject of hard-fought negotiations between the Debtors, the Stalking Horse Bidder, and the Bondholders and reflect the Debtors' business judgment that having a "floor" set by the Stalking Horse Bidder that the Debtors' determined

provides a material benefit to the Debtors' estates.   The Court should defer to this business judgment.

27.     Contrary to the UCC's assertions, a four percent (4%) Break-Up Fee is within the range of Bid Protections approved in this District, *see In re iSun, Inc.*, 24-11144 (TMH) (Bankr. D. Del.) (approving a 5% Break-Up Fee); *In re Plastiq Inc.*, 23-10671 (BLS) (Bankr. D. Del.) (Same); *In re Orexigen Therapeutics, Inc.*, 18-10518 (JTC) (Bankr. D. Del.) (Same); *In re ATopTech, Inc.*, 17-10111 (MFW) (Bankr. D. Del.) (approving a 4% Break-Up Fee); *In re: Casa Systems, Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del.) (approving 4.8% in bid protections), and the Break-Up Fee satisfies the standards established in *O'Brien*.   In particular, the Bid Protections facilitated the execution of a Stalking Horse Agreement that "established a bid standard or minimum for other bids", "placed the estate property in a 'sale configuration mode'", and is reasonable in relation to the Purchase Price. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536 (3d Cir. 1999).  As previously noted, the Stalking Horse Bidder was the only party willing to submit a bid that, if approved, will serve as a floor for competitive bidding, and a DIP Facility to facilitate the process. Were it not for the Stalking Horse Bidder, there would be no process to maximize the value of the Debtors' assets at all, and the Bid Protections, consisting of a $600,000 Break-Up Fee (equating to 4% of the purchase price) - with no separate expense reimbursement - were one of the many heavily negotiated elements of the Stalking Horse Agreement.

28.     As discussed in the First Day Declaration, the Purchase Price contemplated by the Stalking Horse Bid is substantially higher than any other potential bids received as of the Petition Date and represents a superior recovery for the estate to the alternatives, including in a chapter 7 liquidation.  The bid of the Stalking Horse Bidder sends a message to all potential bidders

that the assets are at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids. Therefore, without the benefit of the bid of the Stalking Horse Bidder, and the Bid Protections that facilitated the bid, the bids received at an auction for the assets could be substantially lower.

29.     Additionally, at the request of the United States Trustee, the Stalking Horse Bidder has agreed to limit the circumstances of when it will receive the Break-Up Fee to payment from the closing of an Alternative Bid or the filing of a separate motion for payment of the Break-Up Fee under the scenarios set forth in section 8.3(a) of the Stalking Horse Agreement. This concession by the Stalking Horse Bidder moots the objection of the UCC to the circumstances under which the Break-Up Fee will be payable.

B.      The Stalking Horse Credit Bid is Not Subject to Challenge for Cause.

30.     Because the DIP Lender and Stalking Horse Bidder is not a prepetition secured party and the DIP Lender's DIP Liens will be approved by the Court, its right to credit bid its debt should be unqualified and not subject to any challenge right from the UCC or any other party. Separately, the right of the Bondholders to credit bid is already qualified and subject to section 363(k) of the Bankruptcy Code under the DIP Order and the challenge period.

31.     Thus, the Court should overrule the UCC's Objections as to the Bid Protections provided to the Stalking Horse Bidder and the credit bid rights of the Stalking Horse Bidder and Bondholders.

## III.    The UCC's Additional Objections Have Already Been Incorporated Into the Revised Bidding Procedures Order.

32.     The Debtors have been engaged in almost non-stop negotiations with the UCC since its formation. Indeed, the Debtors extended the UCC's objection deadline to object to the Bidding Procedures multiple times and also adjourned the hearing on the Bidding Procedures

Motion for more than a week to allow negotiations to continue.  The net result of this is the

incorporation of a significant number of the UCC's comments into the Revised Bidding Procedure

order, which is reflected in **Exhibit A** attached hereto.

| UCC Objection | Revised Bidding Procedures Order |
|---|---|
| This section does not specify to whom a Potential Bidder must submit the required materials in order to qualify a Bid under the Bidding Procedures. Therefore, it should be clarified that such materials must be submitted to the Debtors and the Consultation Parties by the Bid Deadline. | The Revised Bidding Procedures provide that Bids must be submitted to the Debtors' Professionals and once a Bid is received and verified by the Debtors' Professionals, the Debtors will provide the Bid to the Consultation Parties. *See* pgs. 4-6 of the Revised Bidding Procedures. |
| **Item No. 1:** This item should be modified to delete the requirement that the Potential Bidder offer to purchase the Acquired Assets upon substantially the same terms and conditions set forth in the Stalking Horse Agreement. The Potential Bidder should be allowed to structure its Bid terms as desired, so long as it provides a comparison of those terms against the Stalking Horse Agreement. | **Item No. 1:** The Revised Bidding Procedures removed the requirement that a Potential Bidder must offer to purchase the SH Acquired Assets upon substantially the terms and conditions set forth in the Stalking Horse Agreement and clarifies that Bids can include offers to purchase the Expanded Assets or any subset of the SH Acquired Assets or Expanded Assets in accordance with the Package Bid requirements described in the Bidding Procedures. *See* pg. 4 of the Revised Bidding Procedures. Additionally, as noted on pg. 5 of the Revised Bidding Procedures in Item No. 5, the Bidding Procedures already require that "any Bid must include a copy of the proposed asset purchase agreement marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder including, but not limited to, treatment of any assumed liabilities." |
| **Item No. 3:** This item should be modified to delete the requirement that the Purchase Price must include an amount of cash consideration at closing. A Bid should not be required to include *cash* consideration, specifically, that exceeds the aggregate consideration of the Stalking Horse Bid and the minimum bid | **Item No. 3:** The Revised Bidding Procedures provide that a bid for the SH Acquired Assets must include cash consideration sufficient to satisfy the Break-Up Fee, the minimum bid increment of $250,000, plus the Payoff Amount, which consists of the amounts owing under the DIP Financing.  It is entirely |

| | |
|---|---|
| increment, so long as the aggregate consideration exceeds that value. Additionally, and subject to the Court's determination that any break up fee is appropriate, the final sentence of this item should be revised to state, "For the avoidance of doubt, the Minimum Purchase Price must also include cash consideration sufficient to pay, in full, in cash, the Payoff Amount (as defined in the Stalking Horse Purchase Agreement) **and the Break-Up Fee** from the proceeds of such bid at the initial closing of the transaction." | appropriate that a Bid for the SH Acquired Assets must include cash consideration to satisfy these amounts so that the DIP Obligations, Break-Up Fee, and the minimum bid increment are covered.<br><br>The Bidding Procedures do not otherwise limit the forms of consideration that a bidder may propose, but the Debtors will evaluate whether such consideration is higher and better than what is provided by the Stalking Horse Agreement. |
| **Item No. 7:** This item should be modified to state, "provide a commitment to close within 14 days after the Sale Hearing, or within such additional time as may be required to obtain required governmental, licensing, regulatory or other filings, approvals or consents as described in subparagraph 9 below, if any." | **Item No. 7:** The Debtors do not have financing to extend the closing date to whatever time period a Potential Bidder needs for governmental approvals. If a Potential Bidder needs additional time, this will be taken into consideration as to whether such Bid is higher and better. |
| The Bidding Procedures should include procedures to bid on the Expanded Assets or any assets not subject to the Stalking Horse Bid. The Bidding Procedures should confirm whether a minimum Overbid amount applies to the Expanded Assets. [*See* Bidding Procedures at 6. The procedures are currently silent on this issue.] | The Bidding Procedures already provide that a Potential Bidder may bid on any asset or package of assets. *See* Bidding Procedures pgs. 4-8. |
| The Cure Notice provides that "if and only if the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets, Counterparties to the Contracts and Leases shall have until the Sale Hearing to object to the assumption and assignment of the Contracts and Leases solely on the issue of whether the Successful Bidder can provide adequate assurance of further performance as required by section 365 of the Bankruptcy [Code]." The Bidding Procedures and the Proposed Order, which will govern in this instance, provide that counterparties to the Debtors' Contracts and Leases will have until November 6, 2024 at 4:00 p.m. (prevailing Eastern Time) (not the Sale Hearing) to object to the assumption and assignment of a Contract or Lease with respect to the abovementioned issue. Therefore, the Cure Notice should be modified to reflect that the applicable | The Revised Bidding Procedures Cure Notice was revised to include the correct supplemental Cure Notice objection deadline. *See* revised Cure Notice, pg. 5, attached as Exhibit 2 to the Revised Bidding Procedures. |

| | |
|---|---|
| objection deadline is November 6, 2024, at 4:00 p.m. (prevailing Eastern Time). | |
| The Bidding Procedures provide that "[t]he Auction will close when the Debtors announce that the Auction has concluded and a Successful Bid and, to the extent the Debtors determine, a Back-Up Bid, has been selected." Bidding Procedures at 10. The Debtors should modify this language to make clear that they will consult with Consultation Parties to determine whether a Back-Up Bid has been selected. The applicable language in the Bidding Procedures should read as follows: "The Auction will close when the Debtors announce that the Auction has concluded and a Successful Bid and, to the extent the Debtors determine in consultation with the Consultation Parties, a Back-Up Bid, has been selected." | The Debtors incorporated consultation rights into the identification of a Successful Bid and Back-Up Bid on pg. 11 of the Revised Bidding Procedures. |
| The Bidding Procedures should provide that the Debtors may, upon written consent of the Committee, approve joint Bids in their reasonable business judgment on a case-by-case basis. If the Committee does not provide written consent to a joint Bid, the Debtors may seek Court approval of such joint Bid on an emergency basis. The Proposed Order and Bidding Procedures currently lack provisions for potential third-party purchasers to submit joint bids on the Debtors' assets. Incorporating a mechanism for joint bids could enhance interest and competition among | The Debtors do not agree that the UCC should have a veto right over any Bid, including a joint bid. The Debtors agree that they will consult with the UCC and the other Consultation Party about any joint bid and if the UCC or other Consultation Party disagrees with the Debtors' business judgment about whether to accept such a joint bid, they may raise the objection with the Court. *See* FN 7, pg. 10 of the Revised Bidding Procedures. |
| With the formation of the Committee and the selection of its counsel now complete, the Proposed Order and Bidding Procedures must incorporate the contact information of the Committee's counsel where the Notice Parties' contact information is listed. | The Debtors have added UCC contact information throughout the Bidding Procedures. |

## IV.    TRI's and, in Part, JM's Objections Are Premature.

33.    The Stalking Horse Agreement does not contemplate (i) the purchase of the Expanded Assets, which includes TRI's alleged co-ownership interests in certain of Fulcrum BioEnergy, Inc.'s intellectual property or (ii) the assumption and assignment of the executory

contracts or licenses with JMD (the "JMD Contacts").  Moreover, Switch is not a "TRI Competitor" as it has no intention of operating the Sierra Plant.  Although the Bidding Procedures do provide an opportunity for a Potential Bidder to submit a Bid that includes the Expanded Assets and the JMD Contracts, thus far no Bids have been received for either and there is the possibility that no such bids will ever be received.  The proposed Bid Deadline is not until October 25, 2024 (the "Bid Deadline"), so it will not be until that date when the Debtors will know if any bidder wants to acquire the Expanded Assets or the JMD Contracts.

34.    In their Objections, (i) TRI argues that the Expanded Assets cannot be sold free and clear of its alleged co-ownership interests and that it is somehow entitled to adequate protection (an issue which would be heard at the Sale Hearing) and (ii) JMD argues that the JMD contracts cannot be assigned to a third party without its consent.[4]  Both of these objections are premature.

35.    Even if the Expanded Assets or the JMD Contracts are included in a proposed Sale, whether and to what extent the Expanded Assets can be sold free and clear of interests as permitted under section 363(f) of the Bankruptcy Code or assumed and assigned pursuant to section 365 is not before the Court at this time.

36.    The Proposed Bidding Procedures establish a Sale Objection Deadline of October 25, 2024, for the sale of the SH Acquired Assets to the Stalking Horse Bidder and a Supplemental Sale Objection Deadline of November 6, 2024 if the Successful Bidder at an Auction, if held, is not the Stalking Horse Bidder. Therefore, in the event TRI's alleged interests are implicated in either Sale, TRI can properly object to the Sale at that time.

---

[4]    JMD requests that language be inserted into the Bidding Procedures Order that makes clear the Court is not making a ruling on the Debtors' right to assume and assign the JMD contracts.  The Bidding Procedures clearly seek approval of only the procedure for assuming and assigning contracts, nothing more.

37.     Additionally, the Proposed Bidding Procedures propose a process for contract counterparties to object to the assumption and assignment of their contract with the Debtors, which if approved, will be fourteen (14) days after service of the Cure Notice, or approximately October 25, 2024 if the Bidding Procedures Order is entered on October 9, 2024. Therefore, in the event JMD wants to object to the assumption and assignment of its contracts, it may do so by that date.

38.     As courts have previously stated, whatever rights TRI or JMD may have today are the same rights TRI and JMD will have if the Court approves the Bidding Procedures because bidding procedures are just that, procedural:

> It is important to clarify that neither the motion to establish bidding procedures nor the objection raised by the State is the proper vehicle for this Court to make a final determination of the full extent or the value of any interest that Debtor has in [an asset]. The Bidding Procedures Order is procedural in nature. It merely establishes a process whereby interested parties may examine what Debtor offers for sale, conduct the necessary due diligence, and participate in a public auction process. See Federal Rule of Bankruptcy Procedure 7001 (2).

*In re Durango Ga. Paper Co.*, 336 B.R. 594, 597 (Bankr. S.D. Ga. 2005).  Through the Bidding Procedures Motion, the Debtors are not asking the Court to approve a Sale to the Stalking Horse Bidder or to assign contracts to the Stalking Horse Bidder at this time.  The Debtors are merely seeking to establish a process for interested parties to conduct due diligence, consider submitting a bid to purchase all or a subset of the Debtors' assets, and establish an orderly process for parties to object to the sale or assumption of contracts.

39.     Although the Debtors reserve the right to respond to TRI's references to irrelevant provisions of the Bankruptcy Code in an attempt to create novel and wholly unnecessary issues for this Court to decide, including with respect to section 363(h) of the Bankruptcy Code,

which applies to undivided interests as tenants in common, joint tenants, or tenants by the entirety, the Debtors do not believe it is appropriate to brief those issues at the Bidding Procedures stage.[5]

40.     For these reasons, TRI's objection to the Sale sand JMD's objection to the assignment of the JMD Contracts should be overruled without prejudice and addressed at the appropriate hearing date, subject to any objections or other responses the Debtors may assert at that time, all of which are expressly reserved.

### V.     The Debtors Have Taken Appropriate Steps to Safeguard Confidential Information.

A.     Neither TRI's nor JMD's Alleged Confidential Information is in the Debtors' Data Room.

41.     The Debtors previously informed counsel for TRI that none of TRI's alleged confidential information is in the Debtors' data room.  TRI chose to ignore that fact in its preliminary statement—relegating this important piece of information to a footnote on page 6 of the TRI Objection—instead proclaiming that the sale process offers "no protections whatsoever" to TRI.  TRI Objection ¶ 2.  In light of the protection of TRI's alleged confidential information and communications to TRI's counsel, this is simply not true.  TRI's alleged confidential information was not placed in the data room due to the Debtors' knowledge of TRI's claims and TRI is at no risk of it being disclosed during the marketing process.

Additionally, JMD's alleged confidential information is not in the Debtors' data room, so there is also no risk of disclosure or other inappropriate use of JMD's confidential information. To the extent an interested party indicates an interest in the JMD Contracts or confidential information, the Debtors will work with JMD to provide appropriate safeguards for sharing that information.

---

[5]     The Debtors are unaware of any case law where section 363(h) has been addressed by a court in the intellectual property context. 363(h) is often invoked in chapter 7 cases and in the context of real property disputes. *See e.g. Guiliano v. Coy (In re Coy)*, 2011 Bankr. LEXIS 3196 (Bankr. D. Del. Aug. 22, 2011).

Dated: October 7, 2024
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Clint M. Carlisle*
Robert J. Dehney, Sr. (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Clint M. Carlisle (No. 7313)
Avery Jue Meng (No. 7238)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Email: rdehney@morrisnichols.com
cmiller@morrisnichols.com
dbutz@morrisnichols.com
ccarlisle@morrisnichols.com
ameng@morrisnichols.com

*Proposed Counsel to the Debtors and
Debtors in Possession*