**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al.*,[1] | Case No. 24-12008 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 11 & 103.** |

**REPLY IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR INTERIM AND
FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363,
364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR
SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A)
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS
AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION
BONDHOLDERS; (III) AUTHORIZING USE OF CASH COLLATERAL;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") submit this reply (this "Reply") in support of the *Debtors' Emergency Motion for

Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I)

Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II)

Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection

To Certain Prepetition Bondholders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a

Final Hearing; and (V) Granting Related Relief* [D.I. 11] (the "DIP Motion")[2] and in response to

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); and Fulcrum Sierra Holdings, LLC (8498).  The location of the Debtors' service address is:  Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the First Day Declaration and the DIP Motion.

the *Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Bondholders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 103] (the "Objection") filed by the official committee of unsecured creditors (the "Committee").  In further support of the DIP Motion and this Reply, the Debtors state as follows:

## PRELIMINARY STATEMENT[3]

1.      The Committee's true complaint about the DIP Financing is not about the Debtors' need for financing – this is undisputed.  It is also undisputed that that there is no alternative financing available on better terms; indeed, the only available financing is from the DIP Lender.

2.      The Committee obscures its actual objection until the end of its preliminary statement, where it finally states its goals and intentions in these cases: the Committee will object to the DIP financing, bidding procedures, and the sale unless the DIP Lender and the Bondholders agree to set aside funds for general unsecured creditors and confirm a plan, regardless of whether the absolute priority rule entitles general unsecured creditors to any recovery.  *See* Obj. ¶ 6.  As judges on this Court have said for years, it is not a requirement for a lender to make payments to unsecured creditors when they are otherwise entitled to none to access chapter 11 ("There is

---

[3]      The Debtors, Committee, the DIP Lender and the Bondholders are in discussion to attempt to resolve the Objections raised by the Committee.  Notwithstanding the filing of this Reply, the Debtors will continue to attempt to resolve all remaining Objections.

nothing that requires a buyer to pay anything to the unsecured if it feels that the enterprise does not have that value." *In re Boomerang Tube, LLC*, Case No. 15-11247 (MFW) (Bankr. D. Del. July 17, 2015) [D.I. 276], Hr'g. Tr. 105:21-06:6; "[W]e take the pre-petition capital structure as we find it. What we do care about is are we maximizing value and if the bankruptcy process is being used for the purpose of maximizing value, then that value falls the way it falls and there's nothing wrong with doing that." *In re Nova Wildcat Shur-line Holdings, Inc., et al*, Case No. 23-10114 (CTG) (Bankr. D. Del. Mar. 2, 2023) [D.I. 212], Hr'g. Tr. 87:6-21). What is required is maximizing value and that a secured creditor pay for the anticipated administrative costs of the case, which is precisely what this DIP financing does in these chapter 11 cases.

3.      The Committee also complains at length about the risk of administrative insolvency. What they fail to note for the Court, however, is that the primary risk of administrative insolvency will come from the Committee's professional fees, not the Debtors' inability to pay for anticipated expenditures during the sale process. It simply cannot be the rule that the Court will refuse to approve DIP financing due to overbudget spending by the Committee's professionals, which the Debtors have no ability to control. This would be an unprecedented result that would create the wrong incentives for chapter 11 cases.

4.      As detailed below, the DIP budget provides the Committee professionals with approximately 40% of the budget allocated for the Debtors' professionals (financial advisor and counsel). This is well in excess of the 25-30% "rule of thumb" that this Court has typically stated should be allocated for Committee's professionals. *See In re Nova Wildcat Shur-line Holdings, Inc., et al*, Case No. 23-10114 (CTG) (Bankr. D. Del. Mar. 2, 2023) [D.I. 212], Hr'g Tr. 87:23-88:6 (stating that it is customary and reasonable that the committee's professional fees are around a quarter of that of the debtors). In its objection, the Committee requests a budget of

$850,000 for their professionals, totaling more than 71% of the Debtors' budgeted professional fees.  There is no justification for the Committee professionals incurring close to the same amount of fees as the Debtors' professionals, who have many more tasks and obligations in these chapter 11 cases.

5.      Finally, as with the Committee's objections to the bidding procedures motion, the Debtors have been engaged in extensive and continuous negotiations with the Committee since their appointment, providing multiple extensions of the objection deadlines and moving the final hearing on approval of the DIP Motion for more than a week.  During this time, the Debtors, the DIP Lender, and the Bondholders have incorporated language into the final DIP order to address many of the Committee's complaints, as set forth in the final DIP order attached to this Reply as **Exhibit A**.  With respect to the remaining objections, the provisions of the final DIP order are market, reflect a package financing from the DIP Lender, and are a sound exercise of the Debtors' business judgment.

6.      For the reasons set forth herein, the Objection should be overruled, and the DIP Motion should be approved.

## **REPLY**

### I.    **The Estates are Administratively Solvent.**

7.      Much of the Committee's objection focuses on the assertion that the DIP Facility does not provide sufficient funds to ensure administrative solvency.  Obj. ¶ 14.  This is incorrect.  The carefully negotiated DIP budget and revised DIP budget (the "Revised Budget"), attached hereto as **Exhibit B** covers all anticipated administrative expenses that the Debtors predict, plus an appropriate budget for the Committee's professionals.  Under the Revised Budget, the DIP Lender continues to provide up to $5 million dollars of DIP funding, and they have further

consented to the Debtors using the savings the Debtors have been able to achieve to pay for all expected administrative costs through a sale.

8.      Contrary to the Committee's statement, in no way are the DIP Lender and the Bondholders getting a "free option" to run a sale process.  *See* Obj. ¶¶ 15, 17.  Upon final approval of the DIP Financing, the DIP Lender will be committed to extending up to $5 million dollars of new money financing and the Bondholders have consented to the priming of their liens with this loan.  Every dollar spent – including the fees of the Committee's professionals – erodes the collateral base of the Bondholders.  There is no "free option" being given here.

9.      The only potential administrative cost that may not be covered by the Revised Budget is if the Committee incurs an excessive amount of professional fees.  None of the cases cited by the Committee supports the proposition that a DIP lender must ensure that every dollar incurred by the Committee professionals must be paid.  For example, in both *In re Allen Family Foods Inc*., Case No. 11-11764 (KJC) (Bankr. D. Del. Aug. 2, 2011), and *In re Townsends Inc., et al*., Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011), this Court commented about administrative solvency related to the payment of section 503(b)(9) claims, which do not exist in these cases.  Nowhere did these courts say that for a DIP loan to be approved it must cover any and all fees incurred by committee professionals.[4]

10.      The Debtors were very mindful when selecting their professionals and negotiated hard to ensure that the fees of Development Specialists, Inc. ("DSI"), the Debtors' investment banker, were the lowest possible while still ensuring that a qualified investment banker would conduct the sale process.  Indeed, even though DSI is pursuing a dual role of investment

---

[4]   Here, the Committee retained more professional firms than the Debtors (3 sets for the UCC and 2 for the Debtors), which also increases the Committee's fees.

5

banker and financial adviser, its budgeted fees are less than what is budgeted for the Committee's financial advisor.  The Court should require the Committee to utilize the same discipline.  The Committee's professionals are well respected and experienced, but also are expensive.  The decision to retain them was the Committee's prerogative, but that choice has a consequence – their higher rates will consume their budgeted fees more quickly than less expensive options.

11.     As stated above, it simply cannot be that the Committee can cause administrative insolvency through their professionals' fees and then use that outcome to defeat financing that no party disputes the Debtors desperately need and is the only option available.  Establishing this unprecedented rule would create only the wrong incentives in chapter 11.

## II.     There is No Rule that Lenders Must Provide for a Recovery to Unsecured Creditors if the Value of the Debtors' Assets are Less than the Secured Debt.

12.     The Committee demands that the DIP Lender and the Bondholders not only cover the administrative costs of the sale process, but also provide funding to pay for confirmation of a liquidating plan and "carve-out" a recovery for unsecured creditors.  Of course, these are all laudable goals and the Debtors hope that the sale process results in bids with sufficient value that may enable such a result.  It is not, however, a legal *requirement* that access to chapter 11 is contingent upon the existence of these items and, of course, the Committee cites no legal authority for its demands.  *See* Obj. ¶18.

13.     To the contrary, the case law in this District has been consistent over the decades that this is *not* a requirement.  For example, in *Boomerang Tube*[5], Judge Walrath ruled that "[t]here is nothing wrong with the DIP that's paying only for a sale process or a process where the result will be the DIP lenders will end up owing the company.  There's nothing that requires a

---

[5]     The excerpt from the transcript is attached hereto as **<u>Exhibit C</u>**.

buyer to pay anything to the unsecured if it feels that the enterprise does not have that value." Case

No. 15-11247 (MFW) (Bankr. D. Del. July 17, 2015) [D.I. 276], Hr'g. Tr. at 105:21-06:15.

14.     Judge Goldblatt issued a similar ruling in *In re Nova Wildcat Shur-line Holdings, Inc., et al.*[6], stating "I am not one who believes that there necessarily needs to be a recovery for unsecured in order to legitimately invoke the bankruptcy process. I think that we take the pre-petition capital structure as we find it. What we do care about is are we maximizing value and if the bankruptcy process is being used for the purpose of maximizing value, then that value falls the way it falls and there's nothing wrong with doing that. On the flip side, if you're a secured creditor and want to invoke the bankruptcy process for the purpose of what will likely be maximizing the value of your collateral, you don't get to impose the costs of that on other people. So, you've got to pay the freight associated with running a process that will maximize your value. And that includes paying the expected administrative expenses and the administrative expenses include reasonable committee fees." Case No. 23-10114 (CTG) (Bankr. D. Del. Mar, 2, 2023) [D.I. 212], Hr'g. Tr. 87:6-21.

15.     In *In re NEC Holdings Corp., et al.,*[7] Judge Sontchi ruled the same: stating, "I generally have held in the past that you can run a case for the benefit of a secured creditor. It's the crime of having collateral that some people seem to say that they can't. They've got to pay the freight, and the freight is, at least -- the freight is not necessarily a tip to the unsecureds, but the freight is certainly an administratively solvent estate. And while there's not a guarantee, there has to be something other than a wing and a prayer on the payment of the admin claims. . . It doesn't

---

[6]    The excerpt from the transcript is attached hereto as **Exhibit D**.

[7]    The excerpt from the transcript is attached hereto as **Exhibit E**.

need to be in the DIP budget, necessarily, but there has to be something – and again, not a *guarantee*, but something, some evidence that there's a possibility – probability that they'll be paid." Case No. 10-11890 (CSS) (Bankr. D. Del. July 13, 2010), [D.I. 224], Hr'g. Tr. 100:12-101:6.

16.    The Debtors will present evidence to the Court at the hearing that the Revised Budget approved by the DIP Lender and the Bondholders does precisely this – provides for the payment of expected administrative expenses but does not guarantee a tip to unsecured creditors.

17.    The Committee's objection that the DIP Financing should be denied unless there is a gift for its constituency should be overruled.

### III.    The Lien Package for the DIP Lender and the Bondholders is Appropriate.

A.    <u>The (i) Bankruptcy Code Explicitly Authorizes the Debtor to Grant Liens on Previously Unencumbered Assets and (ii) the DIP Lender Has Granted the Committee a Carve-out</u>.

18.    First, the Committee's objection to liens on the proceeds of avoidance actions is moot given that the DIP Lender and the Bondholders have agreed to not seek liens on avoidance actions. *See* Final DIP Order at § 2.2.

19.    With respect to other unencumbered assets, which the Debtors believe is limited to commercial tort claims, at least presently the Debtors are not presently aware of any such claims. That said, the practical impact of a lien on commercial tort claims is minimized due to (a) the fact that the DIP Lenders' liens will be extinguished through their successful credit bid or overbid, and (b) at the request of the Committee, the DIP Lenders and the Bondholders have agreed to "soft-marshal" against such assets, covenanting to look to other collateral before seeking recovery against commercial tort claims.

20.    Notwithstanding, liens on commercial tort claims are permissible where, as here, the liens are the subject of a heavily negotiated financing package that will fund these chapter 11 cases and there is no alternative financing available that does not seek liens on such assets.  *See* 11 U.S.C. § 364(c)(2).  It is typical and customary for a secured creditor to receive superpriority claims and liens on all assets if, without such DIP Liens on otherwise unencumbered assets, the DIP lender is otherwise unwilling to provide post-petition financing.  *See e.g.*, *In re Timber Pharm., Inc*., Case No. 23-11878 (JKS) (Bankr. D. Del. Dec. 15, 2023) [D.I. 125] at ⁋ 5 (the DIP lender is granted superpriority claims and liens on DIP collateral, including but not limited to commercial tort claims); *In re Yellow Corp*., Case No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) [D.I. 571] at ⁋⁋ 7-8 (the DIP lender is granted superpriority claims and liens on unencumbered properties that included all tangible and intangible prepetition and postpetition property of the DIP loan parties); *In re Western Global Airlines, Inc*., No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) [D.I. 236] at ⁋ 9 (DIP secured parties are granted superpriority claims and liens on all unencumbered assets)*; In re Southcross Energy Partners*, Case No. 19-10702 (MFW) (Bankr. D. Del. May 7, 2019) [D.I. 200] at ⁋ 8 (DIP lender is granted superpriority claims and liens on unencumbered properties, including but not limited to commercial tort claims); *In re Avenue Stores*, Case No. 19-11842 (LSS) (Bankr. D. Del. Aug. 13, 2019) [D.I. 223] at ¶ II(A) (same); *In re Emerge Energy Services*, Case No. 19-11563 (KBO) (Bankr. D. Del. Aug. 14, 2019) [D.I. 209] at ¶ 13 (same).

21.    The Debtors were on the verge of a chapter 7 filing when the DIP Lender and the Bondholders handed this case a "lifeline."  *In re Fulcrum BioEnergy, Inc., et al*., Case No. 24-12008 (TMH) (Bankr. D. Del. Sept. 12, 2024), Hr'g Tr. 6:6-19.  The granting of DIP liens to the DIP Lender and adequate protection liens to the Secured Bondholders on previously

unencumbered assets was negotiated in good faith and at arm's length, as is typical for DIP loans under the Debtors' circumstances.  The encumbrance of commercial tort claims and their proceeds were an essential component to obtaining post-petition financing and it is this financing that allows the Debtors to run a sale process to maximize recoveries for their stakeholders.  The Committee's objection should be overruled.

**IV.    A Superpriorty Claim at Fulcrum Parent is Appropriate Because the DIP Financing Allows for a Sale of Fulcrum Parent's Assets.**

22.    As explained at the First Day Hearing, the funding being provided by the DIP Lender and the Bondholders to conduct the sale process provides the ability to sell the assets of Fulcrum Parent and Fulcrum Parent's lenders have refused to provide any funding for a sale of their assets,[8] yet the DIP Lender and the Bondholders agreed to do so at the Debtors' request as some potential bidders had stated that they would only bid for all of the Debtors' assets, not only the project company's assets.  This sale process benefits Fulcrum Parent's creditors, justifying the superpriority claims at that entity.  Absent such a claim, creditors of Fulcrum Parent would be receiving a "free ride" on the DIP financing and, as such, the superpriority claim should be approved.

**V.    The Milestones in the DIP Terms are Reasonable under the Circumstances.**

23.    The milestones in the DIP Financing are reasonable under the circumstances and allow for a thorough sale process designed to maximize bids and value for the Debtors' assets.

24.    Under the DIP, an auction must be held no later than sixty (60) days after the Petition Date, and an order approving the sale shall be entered no later than sixty-five (65)

---

[8]    As previously explained to the Court, the Debtors refused to grant any DIP lien or adequate protection liens at Fulcrum Parent and limited the DIP Lender and the Bondholders to an unsecured superpriority claim at that entity.

days. Although of course, the Debtors would prefer additional time, faced with no funding other than the DIP financing and an extensive prepetition marketing process, the timeline is reasonable and should be approved as a reasonable exercise of the Debtors' business judgment. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. De. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of a lender." Further, under the business judgment rule, "courts will not second-guess a business decision so long as the management exercised a minimum level of care in arriving at the decision."); *In Spansion, Inc*., 426 B.R. 114, 140 (Bankr. D. Del. 2010) ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors."); *In re AbitibiBowater Inc*., 418 B.R. 815, 831 (Bankr. D. Del. 2009) (In determining whether the Debtors have exercised sound business judgment in selecting the DIP Facility, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances.").

25. Further, courts in this District have approved sale processes that were on similar, and indeed shorter timelines under appropriate circumstances. *See In re iSun Inc., et al*., Case No. 24-11144 (TMH) [D.I. 183] (the Court approved a sale process of fifty-one (51) days) ; *In re Amerimark Interactive, LLC*, Case No. 23-10438 (TMH) [D.I. 146] (the Court approved a sale process of forty-one (41) days) ; *In re HyLife Foods Windom LLC*, Case No. 23-10520 (TMH) [D.I. 114] (the Court approved a sale process of twenty-nine (29) days); *In re MediaMath Holdings, Inc*., Case No. 23-10882 (LSS) [D.I. 187] (the Court approved a sale process of forty-nine (49) days); *In re Independent Pet Partners Holdings, LLC*, Case No. 23-10153 (LSS) [D.I. 187] (the Court approved a sale process of forty-three (43) days); *In re Sientra, Inc.*, Case No. 24-10245 (JTD) [D.I. 123] (the Court approve a sale process of forty-three (43) days); *In re Tricida, Inc*., Case No. 23-10024 (JTD) [D.I. 100] (the Court approved a sale of process of thirty-five (35)

days); *In re Structurlam Mass Timber U.S., Inc*., Case No. 23-10497 (CTG) [D.I. 87] (the Court approved a sale process of thirty-three (33) days); *In re Express, Inc*., Case No. 24-10831 (KBO); *In re Casa Systems, Inc*., Case No. 24-10695 (KBO) [D.I. 427] (the Court approved a sale process of fifty-one (51) days); *In re Supply Source Enterprises, Inc*., Case No. 24-11054 (BLS) [D.I. 173] (the Court approved a sale process of forty-nine (49) days); *In re 99 Cents Only Stores LLC*, Case No. 24-10719 (JKS) [D.I. 463] (the Court approved a sale process of forty-five (45) days); *In re Timber Pharmaceuticals, Inc.*, Case No. 23-11878 (JKS) [D.I. 126] (the Court approved a sale process of sixty-three (63) days). Here, moreover, the Stalking Horse Bidder and the DIP Lender is not an insider but is a true third-party new money lender. All of the typical concerns over a rushed sale to an insider that would give that insider an unfair advantage over other bidders are simply not present.

26.     Additionally, the Committee's request for a thirty (30) day extension of the sale process fails for the simple reason that the Debtors do not have funding for this extension. The Committee has not come to the Debtors with alternative DIP financing that would fund this extension and no such financing exists.

27.     The Committee attempts to overcome these facts by repeatedly stating that the Debtors have not commissioned a separate valuation of their assets. Respectfully, this argument makes no sense. *See* Obj. ¶ 28.

28.     The entire point of a marketing and sale process is to allow the "market" to set the value of the assets, not a paid expert. Indeed, in numerous valuation disputes, courts in this District have stated that an expert's valuation is less reliable than a true market test, which is precisely what the Debtors are seeking to do here. *See VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 632-33 (stating that "absent some reason to distrust it, the market price is 'a more reliable

measure of the stock's value than the subjective estimates of one or two expert witnesses,'" quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *In re Samson Res. Corp.,* No. 15-11934 (BLS), 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023) ("It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market. A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process."), *cert. denied*, No. 15-11934 (BLS), 2024 WL 2390401 (Bankr. D. Del. May 23, 2024); *In re Horsehead Holding Corp., et al.,* Case No. 16-10287 (CSS) (Bankr. D. Del. Sept. 2, 2016) [D.I. 1640], Hr'g. Tr. 7:22–8:7 (stating that allowing a market check would have provided evidence other than expert valuation testimony that the Court could reply on); *In re Allonhill, LLC*, Case No. 14-10663 (KG), 2019 WL 1868610, at *1 (Bankr. D. Del. Apr. 25, 2019), *aff'd in part, remanded in part*, No. 13-11482 (KG), 2020 WL 1542376 (D. Del. Mar. 31, 2020) (confirming the Court's previous view that a "market test – reflecting the actual price a willing buyer agrees to pay – is the best determination of fair market value," and a thorough and arm's length market test is the best evidence of fair market value at the time of a § 363 sale).

29.    Here, the Debtors will achieve the "market" price for their assets through the proposed sale process. The Debtors' assets were marketed extensively prepetition and with the assistance of DSI, the Debtors continue to extensively market their assets postpetition. As of the date of this Reply, DSI has contacted approximately two hundred and five (232) potential purchasers, which includes any party that engaged with the Debtors or RPA prepetition, and nineteen (22) of those parties have requested or executed a NDA in order to conduct due diligence. Additionally, four (4) parties have conducted site visits at the Sierra Plant with three (3) visits scheduled in the coming days. DSI also submitted a teaser to (i) BioMass Magazine, which was sent to 78,403 entities and individuals via email, 12,361 of which were opened and 1,577 interacted

with the linked material; (ii) SAF Magazine, which was sent to 159,902 entities and individuals via email, 26,292 of which were opened and 550 interacted with the linked material; and (iii) the bid solicitation notice was advertised on the Daily DAC and National Law Review websites for three concurrent weeks commencing on September 19, 2024 and the sale has been exposed to over 38,800 individuals and 392 interacted with the linked material.

30.     For the reasons stated above, the Objection should be overruled.

## VI.    The Waivers of Sections 506(c) and 552(b) of the Bankruptcy Code are Warranted.

### A.    The Section 506(c) Waiver is Appropriate.

31.     The Committee also objects to the Debtors' waiver of their section 506(c) surcharge rights.  Obj. ¶ 32.  Section 506(c) of the Bankruptcy Code provides a debtor the right to "recovery from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of" such property.  11 U.S.C. § 506(c).  Section 506(c) claims are available to, and are an asset of, the Debtors, and not any other party in interest.  *See In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) … allows only the 'trustee' or debtor-in-possession, to take advantage of this exception … § 1109(b) does not entitle parties in interest, such as [the debtor]'s creditors, to usurp the debtor-in-possession's role as legal representative of the estate.").

32.     Additionally, a section 506(c) waiver is appropriate where, as here, a secured creditor has agreed to pay, from its collateral, estate administrative costs and subordinate its liens to the carve out for professional fees and other administrative expenses, as the DIP Lenders and Bondholders have done here. *See, e.g.*, *In re Mineral Park, Inc.*, Case No. 14-11996 (KJC) (Bankr. D. Del. Sept. 23, 2014), Hr'g Tr. 43:10–12 (overruling the committee's objection and stating "given what [the secured lenders are] funding, I think [they've] paid for a 506(c) waiver

and I would be willing to grant it"); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014), Hr'g Tr. 58:11–12; 93:12–20, (where a carve-out is provided, a 506(c) waiver is often an "acceptable trade-off").

33.     Further, it is well-established that the right to waive the 506(c) surcharge is within a debtor's discretion. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (holding that only a trustee or a debtor in possession may seek recovery under section 506(c)). The Debtors have the sole authority and discretion to waive such rights, and the Debtors believe that such waiver is justified in light of the facts and circumstances of these cases. The DIP Lenders or the Bondholders would not have agreed to provide the DIP Loan nor consented to the Debtors' continued use of Cash Collateral without a section 506(c) waiver, and the Debtors determined, in their business judgment, that such a waiver was reasonable and appropriate in light of the considerable benefits arising from the DIP Facility and consensual use of cash collateral.

B. The 552(b) Waiver is Reasonable and Appropriate.

34.     The Committee also objects to the Debtors' agreement to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code. *See* Obj. ¶¶ 35-36. The Debtors believe that such waiver is reasonable and appropriate in light of the circumstances of the chapter 11 cases. Section 552(b) of the Bankruptcy Code generally ensures that an entity's prepetition security interest in the proceeds of collateral extends to such proceeds acquired postpetition, subject to a limited exception from this general rule to the extent that the "equities of the case" so require. *See* 11 U.S.C. § 552(b)(1).

35.     This exception has been found to be inapplicable where the secured creditor possesses a lien over substantially all the debtor's assets such that any appreciation in estate assets will almost necessarily originate from the use of the lender's cash collateral. *See Muma Servs.*

*Inc.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005). Here, the Debtors have stipulated (subject to the challenge period under the DIP order) that the Bondholders have liens in substantially all of the Debtors' assets. Moreover, there has been no showing by the Committee that the Bondholders will obtain a windfall as a result of this waiver.

36.     Further, in cases where secured parties have agreed to subordinate their claims to a carve-out and have agreed to be primed by substantial postpetition financing—as the Bondholders have done here—courts in this District routinely have approved waivers of the "equities of the case" exception as part of adequate protection packages. *See, e.g., In re Never Slip Holdings, Inc*., Case No. 24-10663(LSS) (Bankr. D. Del. Apr. 26, 2024) [D.I. 133] (approving waiver of section 552(b) "equities of the case" exception upon entry of the final order); *In re Joann Inc*., No. 24-10418(CTG) (Bankr. D. Del. Apr. 12, 2024) [D.I. 224] (same); *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [D.I. 169] (same); *In re DeCurtis Holdings, LLC*, Case No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [D.I. 285] (same); *In re Plastiq Inc*., Case No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) [D.I. 138] (same); *In re Christmas Tree Shops, LLC*, Case No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023) [D.I. 229] (same); *In re Structurlam Mass Timber U.S., Inc*., Case No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) [D.I. 136] (same); *In re Tritek International Inc*., Case No. 23-10520 (TMH) (Bankr. D. Del. May 19, 2023) [D.I. 116] (same); *In re Amerimark Interactive, LLC*, Case No. 23-10438 (TMH) (Bankr. D. Del. May 9, 2023) [D.I. 190] (same); *In re Virgin Orbit Holdings, Inc*., Case No. 23-10405 (KBO) (Bankr. D. Del. May 1, 2023) [D.I. 202] (same); *In re SiO2 Medical Products, Inc*., Case No. 23-10366 (JTD) [D.I. 216] (Bankr. D. Del. April 26, 2023) (same); *In re Ryze Renewables II, LLC*, No. 23-10289 (BLS) (Bankr. D. Del. April 11, 2023) [D.I. 96] (same).

37.    The benefit provided by the DIP Lender and the Bondholders to the estates are clear, through the funding of a new money DIP loan, use of cash collateral, and subordination of the Bondholders' liens, and justify the waiver of §506(c), the "equities of the case" under § 552(b), and the equitable doctrine of marshalling of collateral.[9]

38.    For the reasons stated, the Committee's objection for the Waivers of sections 506(c) and 552(b) should be overruled.

## VII.    Most of the Remaining "Objectionable Provisions" Have Been Mooted through Language Added to the Final DIP Order.

39.    The Committee rounds out its Objection with a bullet point list of unsupported objections.  *See* Obj. ¶ 37.  Not only do courts not rewrite the terms of a proposed financing, but these points have been mooted.

| ISSUE | RESPONSE |
|---|---|
| **DIP Proceeds Restriction**: The Committee requests the following language in the final DIP order: "Notwithstanding the provisions of this Final Financing Order, the Carve-Out, the proceeds of the DIP Facility, and DIP Collateral may be used for the allowed fees and expenses incurred by the Committee and its professionals in furtherance of its duties as set forth under section 1103 of the Bankruptcy Code, including, but not limited to, any objection filed to the DIP Motion, any objection to credit bidding, any objection filed to any disclosure statement or plan of reorganization or liquidation filed in these Chapter 11 Cases, and any objection or other pleading contesting whether the DIP Lender or the Prepetition Bonds Secured Parties have the right to the exercise of remedies, including the | Clarifying language has been added to the Final DIP Order that the Committee may use DIP proceeds to perform its functions in these cases, provided that the Committee may not use DIP proceeds to sue the DIP Lender or the Bondholders.  *See* Final DIP Order at 5.4. |

---

[9]    Subject to the DIP Lender's and the Bondholders' agreement to "soft marshal" with respect to commercial tort claims.

| | |
|---|---|
| prosecution of any such motions and objections." | |
| **Definition of "Indemnified Person" is Overly Broad:**<br>Indemnification of the DIP Lender under the DIP Facility must be limited solely to its capacity and role as the DIP Lender. Moreover, indemnification rights should not extent to any unnamed affiliates of the DIP Lender (or each of their respective officers, directors, employees, attorneys, agents, and representatives) or to the DIP Lender in other capacities in these chapter 11 cases, including the DIP Lender's capacity as the Stalking Horse Bidder. | The Final DIP Order has been revised to provide that the DIP Lender and its affiliates will only receive indemnification in their respective capacities as the DIP Lender and/or officers, directors, employees, attorneys, agents and representatives of the DIP Lender. *See* Final DIP Order § 1.4 |
| **Credit Bidding:**<br>The Official Committee of Unsecured Creditors (the "Committee") preserves and reserves its rights to object to any credit bid put forth by the DIP Lender and/or the Prepetition Bonds Secured Parties if taken before expiration of the Challenge Deadline. The failure of the Committee to object to a bid put forth by the DIP Lenders or the Prepetition Bonds Secured Parties, or the Court's approval of any such credit bid shall not (a) prejudice or impair the rights of the Committee to bring a Challenge or otherwise challenge the nature, extent, validity, priority, perfection or amount of the alleged liens, security interests and claims or (b) release the DIP Lender or the Prepetition Bond Secured Parties from any causes of action which can be brought by or on behalf of the Debtors' estates. | This issue has been addressed in the Debtors' Reply to the Committee's Objection to the Debtors' Bidding Procedures Motion. *See* Reply in Support of the Debtors' Bidding Procedures Motion ¶¶ 30-31. The DIP Lender should have an unqualified right to credit bid the full amount of its DIP Loan. Additionally, any credit bid by the Bondholders is already subject to section 363(k) and the challenge period. *See* Final DIP Order at 5.14. |
| **Releases**:<br>The releases granted to the DIP Lender and the Prepetition Bonds Secured Parties should expressly be limited to the DIP Lender and the Prepetition Bond Secured Parties in their roles as such. Moreover, such releases should not be extended to each of these parties unnamed successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, | Section 4.1 of the DIP Order already provides that the "releases … contained in the Interim Order and this Final Order" shall be subject to the challenge rights set forth in section 4.1. |

| | |
|---|---|
| officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns except for in their specific capacity as related to the DIP Facility and the Prepetition Bond Obligations. | |
| **Carve-Out**: <br> The Committee believes that payment under the Carve-Out should not be conditioned on complying with the timing under the Approved Budget for professional fees. Carve-Out amounts should be payable regardless of when the fees are incurred by estate professionals | This objection is mooted by new language added to the Final DIP Order that permits the Debtors to escrow the full amount of budgeted professional fees upon entry of the Final DIP Order. *See* Final DIP Order § 2.4. |
| **Remedies Period**: <br> The Final Financing Order should include language making clear that during the Remedies Notice Period, in the event the Debtors seek an emergency hearing from the Court, the Remedies Notice Period shall be stayed pending resolution of such dispute by the Bankruptcy Court. | The Final DIP Order provides the Debtors with 7 business days upon the receipt of written notice from the DIP Lender of the existence and occurrence of a DIP Termination Event. During this period of time, the Debtors and/or Committee will be able to seek an emergency hearing from the Court. *See* Final DIP Order § 3.3 |
| **Material Amendments:** <br> The Committee should receive notice of all material amendments, and all material amendments should be approved by the Court regardless of whether they fall under the limited definition of "Material DIP Amendments" as set forth in the Interim Financing Order. | The Debtors have agreed to provide the Committee with notice of any amendment to the DIP Loan Documents, regardless of whether the Debtors believe such amendment is material. If the Committee believes that any such amendment is problematic they may seek relief from the Court. *See* Final DIP Order § 1.3(d). |
| **Estate Professional Fees**: <br>    (a) The Professional Fee Escrow should be fully funded before payment of any DIP Fees and DIP Lender Expenses and the Professional Fee Escrow should be fully funded following a DIP draw (versus funded weekly in accordance with the Approved Budget as required by the Interim Financing Order). <br>    (b) The Professional Fee Escrow should not be reduced in any event any Approved Budget is adjusted down. <br>    (c) Reduction of the amount of Professional Fees included in any Approved Budget should require the consent of the Debtors and Committee. | Item (a) has been addressed above. <br> Item (b) is addressed through language added in the Final DIP Order. *See* Final DIP Order at footnote 7 on page 31. <br> Item (c) is mooted as the DIP Lender has agreed that the full amount of budgeted professional fees may be escrowed upon entry of the Final DIP Order. *See* Final DIP Order § 2.4. <br> Item (d): the DIP Lender does not objection to the Committee professionals sharing their budget between each professional firm. The DIP Lender has not agreed to permit the use of any excess amount of the Debtors' professional fees for the Committee. |

| | |
|---|---|
| (d) To the extent any of Committee's counsel and financial advisors (the "Committee Professionals") have unused fee amounts in the Approved Budget, the excess of one goes to the other, if needed; provided, that if the Debtors' professionals have unused fee amounts in the Approved Budget, any excess shall be paid to the Committee Professionals, if necessary | |
| **Committee Professional Fee Budget and Challenge Budget**:<br>The Committee Professionals are presently budgeted at $360,000, collectively, which is just 30% of the $1,185,000 for which the Debtors' professionals are budgeted, and less than the minimum $400,000 cash required to be paid to DIP Lenders counsel (and the DIP Lender's additional fees, even in just that capacity will get paid out of the sales proceeds and, on information and belief, are already in excess of $400,000). The Committee Professionals' fee budget must be increased to $850,000 so that the Committee can properly discharge its fiduciary duties in these chapter 11 cases. Moreover, the Challenge Budget should be increased from $25,000 to $75,000. | This objection is addressed above. *See* Reply ¶ 4. |
| **DIP Lender Fees:**<br>Any fees and expenses payable to the DIP Lender's professionals should be explicitly limited to those incurred in the DIP Lender's capacity as DIP Lender and should not include any fees and expenses incurred in the capacity of Stalking Horse Bidder. | The language in the Final DIP Order is sufficiently clear that the fees and expenses payable to the DIP Lender is limited to the DIP Lender's capacity as DIP Lender. *See* Final DIP Order § 5.15. |
| **Financial Reporting**:<br>All weekly financial reporting the Debtors send to the DIP Lender and Prepetition Bonds Secured Parties pursuant to Paragraph 2.5(b) of the Interim Financing Order and the DIP Loan Documents should be simultaneously provided to the Committee. | The DIP Lender has agreed and resolved this objection. *See* Final DIP Order § 2.5(b). |

**RESERVATION OF RIGHTS**

40.    For the avoidance of doubt, the Debtors reserves its rights to supplement this Reply to the extent that any party raises additional issues or arguments with respect to the proposed DIP Financing.

**CONCLUSION**

WHEREFORE, for reasons set forth herein, the Debtors respectfully request that the Court overrule the Committee's Objection (to the extent still outstanding), grant the DIP Motion, enter the proposed Final DIP Order, and grant such other and further relief as is just and proper.

*[Signature page follows]*

Dated: October 7, 2024
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Curtis S. Miller*
Robert J. Dehney, Sr. (No. 3578)
Curtis S. Miller (No. 4583)
Daniel B. Butz (No. 4227)
Clint M. Carlisle (No. 7313)
Avery Jue Meng (No. 7238)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Email: rdehney@morrisnichols.com
        cmiller@morrisnichols.com
        dbutz@morrisnichols.com
        ccarlisle@morrisnichols.com
        ameng@morrisnichols.com

*Proposed Counsel to the Debtors and
Debtors in Possession*