**Exhibit A**

**Engineering, Procurement and Construction Contract**

*Execution Version*

**ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT**

**BETWEEN**

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

**AND**

**FULCRUM SIERRA BIOFUELS, LLC**

**DATED AS OF**

**October 18, 2017**

Confidential

TABLE OF CONTENTS

Page

1.    DEFINITIONS.................................................................................5
2.    RESPONSIBILITIES OF OWNER.............................................19
3.    RESPONSIBILITIES OF CONTRACTOR ................................23
4.    REPRESENTATIONS AND COVENANTS CONCERNING THE WORK AND CONTRACTOR ..............................................................32
5.    OPERATING UTILITY SERVICES AND OPERATING CONSUMABLES ...............34
6.    SPARE PARTS..............................................................................34
7.    FIXED CONSTRUCTION PRICE AND ADJUSTMENTS TO FIXED CONSTRUCTION PRICE ...............................................36
8.    TERMS OF PAYMENT ................................................................38
9.    COMMENCEMENT OF THE WORK .........................................44
10.   TRADE SUBCONTRACTORS AND SUPPLIERS......................45
11.   LABOR RELATIONS...................................................................46
12.   DETAILED PLANS; INSPECTION; EFFECT OF REVIEW AND COMMENT .........47
13.   DELIVERY OF FEEDSTOCK MSW.........................................50
14.   START-UP....................................................................................51
15.   [RESERVED]................................................................................53
16.   PERFORMANCE TESTS; SUBSTANTIAL COMPLETION ......53
17.   DELAY LIQUIDATED DAMAGES; EARLY COMPLETION BONUS ......57
18.   FINAL COMPLETION.................................................................61
19.   CHANGES IN WORK ..................................................................63
20.   [RESERVED]................................................................................66
21.   WARRANTIES CONCERNING THE WORK .............................66
22.   TITLE ...........................................................................................68
23.   DEFAULT AND TERMINATION UPON DEFAULT.................69
24.   TERMINATION FOR CONVENIENCE......................................73
25.   SUSPENSION ..............................................................................74
26.   FORCE MAJEURE ......................................................................75
27.   INSURANCE.................................................................................78
28.   LOSS OR DAMAGE....................................................................86
29.   INDEMNIFICATION...................................................................87
30.   PATENT INFRINGEMENT AND OTHER INDEMNIFICATION RIGHTS.................90
31.   TREATMENT OF PROPRIETARY INFORMATION .................91
32.   INVENTIONS AND LICENSES ..................................................93
33.   ASSIGNMENT BY OWNER ........................................................94
34.   ASSIGNMENT BY CONTRACTOR............................................94
35.   INDEPENDENT CONTRACTOR................................................94
36.   LIENS AND CLAIMS ..................................................................95
37.   DISPUTE RESOLUTION AND ARBITRATION .......................95

- ii -

38.     NOTICES AND COMMUNICATIONS ...................................................................97
39.     PERFORMANCE SECURITY AND PAYMENT ACCOUNT .......................................98
40.     MISCELLANEOUS PROVISIONS ..................................................................101

LIST OF EXHIBITS

Exhibit A - Scope of Work and Specifications
Exhibit B - Facility Site
Exhibit C - Owner Permits
Exhibit D - Utility Services to be provided to the Facility
Exhibit E - Major Equipment Suppliers and Major Trade Subcontractors
Exhibit F - Performance Tests and Contractor Performance Guarantees
Exhibit G - Progress Schedule
Exhibit H - Progress Payment Schedule
Exhibit I - Invoice Form
Exhibit J-1 - Form of Contractor's Interim Lien Waiver and Certification
Exhibit J-2 - Form of Contractor's Final Lien Waiver and Certification
Exhibit K - Form of Parent Guaranty
Exhibit L - Report Regarding Conditions at the Facility Site
Exhibit M - Syngas Fuel and Syncrude Product Specifications
Exhibit N - Contractor Rates
Exhibit O - Contractor Permits
Exhibit P - Facility Operating Personnel
Exhibit Q - Design Basis Feedstock Specifications
Exhibit R - Operation and Maintenance Manual Requirements
Exhibit S - Form of Collateral Assignment Agreement
Exhibit T - Interconnection Drawing
Exhibit U - Taxes
Exhibit V -Schedule of Values
Exhibit W - Financing Requirements
Exhibit X - Detailed Plans
Exhibit Y - **[Reserved]**
Exhibit Z - Documented Cost Items
Exhibit AA - DoD Grant Requirements
Exhibit BB - USDA Guarantee Requirements
Exhibit CC - **[Reserved]**
Exhibit DD –Form of Payment and Performance Bond
Exhibit EE - Limited Notice to Proceed 01(LNTP-1)
Exhibit FF - Limited Notice to Proceed 02 (LNTP-2)
Exhibit GG - Escalation of Fixed Price
Exhibit HH - Form of Purchasing Agreement
Exhibit II - Labor and Material Baseline (exclusive of civil, buildings and building structural)

- iii -

                                                                    FUL_0204321

Exhibit JJ - Form of Monthly Progress Report
Exhibit KK - Form of Change In Work Form
Exhibit LL - Forms of Owner's Notice of Mechanical Completion, Notice of Substantial Completion and Notice of Final Completion
Exhibit MM - Form of Letter of Credit
Exhibit NN - Contractor Key Personnel
Exhibit OO - Limited Notice to Proceed 03 (LNTP-3a)
Exhibit PP - Subcontractor Direct Payment Account Terms

Confidential                                                                      FUL_0204322

THIS ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT ("**Agreement**") is made and entered into as of this 18th day of October, 2017 ("**Effective Date**"), by and between Fulcrum Sierra Biofuels, LLC, a limited liability company formed under the laws of the State of Delaware (the "**Owner**"), and Abeinsa Abener Teyma General Partnership, a general partnership formed under the laws of Delaware ("**Contractor**").

WITNESSETH:

WHEREAS, Owner intends to own and operate a Feedstock MSW to Syncrude Product processing facility (as defined below, the "**Facility**") on a site located in McCarran, Nevada (as defined below, the "**Facility Site**");

WHEREAS, Owner or its affiliate is the owner of an MSW processing facility (the "**MSW Processing Facility**") near the Facility Site and will generate Feedstock MSW (as defined below, "**Feedstock MSW**") to be used as feedstock for the Facility;

WHEREAS, Contractor intends to design, engineer, procure materials, construct, start-up, commission and conduct performance tests of the Facility for Owner;

WHEREAS, Owner has selected Contractor in reliance upon Contractor's skill, expertise and past experience, as well as the experience and expertise of its subcontractors and suppliers, to design, engineer, procure materials, construct, start-up and conduct performance tests of the Facility; and

WHEREAS, Owner intends, at some time not later than three (3) years after commencement of commercial operations at the Facility, to enhance the Facility by installing a system that will convert the Syncrude Product produced at the Facility into jet fuel for sale to one or more off-takers.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## 1. DEFINITIONS

For purposes of this Agreement, the capitalized words and phrases used in this Agreement (including the Exhibits hereto) shall have the following meanings:

**Additional Spare Parts**:  Has the meaning given in **Section 6.1.2**.

**Affected Party**: Has the meaning given in **Section 26.1**.

**Affiliate**: With respect to any Person, means any Parent of such Person, or any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such Person.  "Control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership

FUL_0204323

of voting securities or by contract or otherwise.  No individual shall be deemed to be an Affiliate of a Person solely by reason of his or her being a director, committee member, officer or employee of such Person.

**Agreement**:  Has the meaning given in the preamble and includes any subsequent written amendments, modifications and supplements made in accordance with this Agreement.

**Air Permit**:  Has the meaning given in **Exhibit C**.

**Btu**:  means a British thermal unit.

**Business Day**:  A calendar day excluding Saturdays, Sundays and any other day that national banks located in New York, New York or Reno, Nevada are not open for business.  In the event that an obligation to be performed under this Agreement falls due on a Saturday, Sunday or a day on which national banks located in New York, New York or Reno, Nevada are not open for business, the obligation shall be deemed due on the next Business Day thereafter.

**Buydown Amount**:  Has the meaning given in **Section 17.4**.

**Change In Law**:  Any change in Law after the Effective Date affecting or related to the obligations to be performed by either Party, including without limitation, the imposition of any new or additional permit requirements, which change occurs after the Effective Date, provided, that any such change that has been announced or enacted prior to the Effective Date but does not take effect until after the Effective Date shall be deemed to be a requirement of existing Law, and not a Change In Law, for the purposes of this Agreement, and provided further, that a change in Law affecting taxes payable by either Party based upon net income shall not be a Change In Law for the purposes of this Agreement.

**Change In Work**:  Has the meaning given in **Section 19.1**.

**Change In Work Form**:  Has the meaning given in **Section 19.2**.

**Confidentiality Provisions**:  Has the meaning given in **Section 31.1**.

**Contractor**:  Has the meaning set forth in the preamble and includes its successors and assigns permitted under this Agreement.

**Contractor Guarantor**:  means Abengoa, S.A., a Sociedad Anónima organized under the laws of Spain.

**Contractor Indemnified Parties**:  Has the meaning given in **Section 29.2**.

**Contractor Permits**:  All permits and approvals of any Governmental Entities necessary for Contractor to perform the Work, other than Owner Permits. Contractor Permits include all permits and approvals of any Governmental Entities necessary to complete the Facility and commence operations that are not listed in **Exhibit C**.

6

FUL_0204324

**Contractor Taxes**:  All Taxes required to be paid by Contractor pursuant to **Part II** of **Exhibit U**, together with any other Taxes required to be paid by Contractor to perform the Work.  In no event shall Contractor Taxes include any Owner Taxes.

**CPM**:  the critical path method for scheduling a set of project activities.

**Credit Rating**:  For any Person the current ratings issued or maintained by Standard & Poor's or Moody's with respect to such Person's senior, unsecured, unsubordinated long-term debt obligations (not supported by third-party credit enhancements) or if such Person does not have a rating for its senior, unsecured, unsubordinated long-term debt obligations, then the rating then assigned to such Person as an issuer rating by Standard & Poor's or Moody's.

**Cure Period**:  Has the same meaning given in **Section 17.4.7**.

**Day or day**:  A calendar day, unless otherwise specified.

**Debt**:  The notes, bonds or other evidence of indebtedness issued to pay costs associated with the Facility, including (without limitation) the Financing.

**Deemed Substantial Completion**:  Has the meaning set forth in **Section 17.4.7**.

**Deemed Substantial Completion Date**:  The date on which Deemed Substantial Completion occurs pursuant to the terms of this Agreement.

**Design Basis Feedstock**:  Feedstock MSW meeting the criteria set forth in **Exhibit Q**.

**Detailed Plans**:  Has the meaning set forth in **Section 12.5**.

**Disclosing Party**:  Has the meaning given in **Section 31.1**.

**Dispute**:  Any claim, controversy, disagreement or other matter in question between the Parties that arise out of or relate to the terms and conditions of this Agreement or with respect to the performance by the Parties of their respective obligations under this Agreement, including any claim for breach or repudiation thereof.

**Documented Cost Invoice**:  Has the meaning given in **Section 8.3.1**.

**Documented Cost Items**:  All items for which Contractor is to be paid or reimbursed pursuant to this Agreement other than items that are included in a Payment Milestone. Documented Cost Items include, without limitation, the items and services set forth in **Exhibit Z**.

**Documented Costs**:  The actual, documented costs paid by Contractor for the applicable Documented Cost Item.

**DoD Grant**:  The grant received by the Owner from the United States Department of Defense.

7

**DoD Grant Requirements**:  The requirements of the DoD Grant agreement as set forth in **Exhibit AA** that relate to the quality, manner of performance or requirements relating to the Work, or that requires information or data regarding the Work or otherwise relate to the Work.

**Dollars**:  Dollar amounts in U.S. dollars.

**Early Completion Bonus**:  Has the meaning given in **Section 17.5.**

**Effective Date**:  Has the meaning given in the preamble.

**EFT**:  Emerging Fuels Technology, Inc.

**Electricity Consumption Guarantee**:  The electricity consumption guarantee described in **Exhibit F**.

**Emissions, Effluent and Noise Guarantee**:  The emission, effluent and noise guarantee described in **Exhibit F**.

**Equity Amount**: has the meaning given in **Section 7.5**.

**Event of Default(s)**:  Has the meaning given in **Article 23.1**.

**Expected Performance Tests**:  Has the meaning given in **Section 16.7.1**.

**Expected Production Capability**:  Has the meaning given in **Section 16.7.1**.

**Facility**:  The facility to be designed, engineered, constructed, equipped and tested by Contractor at the Facility Site pursuant to this Agreement.

**Facility Site**:  The real property owned or leased by Owner and located in McCarran, Nevada, on which the Facility is to be located, as more particularly described in **Exhibit B**, together with other property rights affixed, connected or associated with such real property.

**Feedstock MSW**:  MSW that (i) has been delivered to and processed at the MSW Processing Facility, and (ii) satisfies the applicable criteria set forth in **Exhibit Q**.

**Feedstock MSW Schedule**:  Has the meaning set forth in **Section 13.1**.

**Final Completion**:  Completion of the Facility in accordance with, and to the extent set forth in, **Article 18** of this Agreement.

**Final Completion Date**:  The date on which Final Completion occurs as specified in the Notice of Final Completion issued pursuant to **Section 18.5**.

**Final Milestone Payment**:  Has the meaning set forth in **Section 7.1**.

8

FUL_0204326

**Financing**:  The effective date of the Financing Agreements entered into by the Owner, the Lenders and the Financing Agent for the Debt to pay the costs of acquiring, designing and constructing the Facility and the Facility Site upon terms and conditions that are satisfactory to Owner.

**Financing Agent**:  The administrative agent and the collateral agent acting on behalf of the Lenders in accordance with the Financing Agreement, together with their successors and assigns permitted thereunder, including any trustee or other representative of the Lenders.

**Financing Agreement**:  The financing agreement, credit agreement or other similar agreement between, among others, Owner, the Lenders and the Financing Agent, as amended from time to time in accordance with its terms.

**Financing Documents**:  The Financing Agreement, the USDA Guarantee, and any other agreements or documents entered into by, among others, Owner or between Owner and the Lenders or Financing Agent related to the Financing, as amended from time to time in accordance with their terms.

**First Arbiter**: Has the meaning given in **Section 37.4.1**.

**Fixed Construction Price**:  Has the meaning given in **Section 7.1**.

**Fixed Construction Price Adjustments**:  The adjustments to the Fixed Construction Price set forth in **Section 7.2**.

**Float**:  Float or slack means the amount of time between the early start date and the late start date, or the early finish date and the late finish date, of any of the activities described in the Progress Schedule.

**Force Majeure**:  Has the meaning given in **Section 26.2**.

**Fulcrum**: Has the meaning given in **Section 7.1**.

**Full Performance Guarantees**:  Has the meaning given in **Exhibit F**.

**Governmental Entities**:  means any and all national, federal, state, county, city, provincial, municipal, local or regional authorities, departments, bodies, bureaus, instrumentalities, commissions, corporations, branches, directorates, agencies, ministries, courts, tribunals, judicial authorities, legislative bodies, administrative bodies, regulatory bodies, autonomous or quasi-autonomous entities or taxing authorities or any department, municipality or other political subdivision thereof, including but not limited to, any Person (whether autonomous or not) exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any of the foregoing entities.

**Hazardous Materials**:  Any element, compound, mixture, solution, particle or substance:

Confidential                                                                                    FUL_0204327

(i)    which is or may become dangerous, harmful or potentially dangerous or harmful to the health and welfare of life or the physical environment, such as, but not limited to, explosives, petroleum products, radioactive materials, hazardous wastes, toxic substances and related materials, and including, without limitation (A) any substance or material included within the definitions of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "hazardous pollutants" or "toxic pollutants" in all applicable laws, statutes, regulations, rules, ordinances, codes, licenses, permits, orders and similar items of all Governmental Entities or other instrumentalities of the United States of America or the State of Nevada and all applicable judicial, administrative and regulatory decrees, judgments and orders relating to the protection of human health or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 *et seq.*, the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. Sections 6901 *et seq.* ("**RCRA**"), the Toxic Substances Control Act, 15 U.S.C. Sections 2601 to 2671, the Clean Air Act, 42 U.S.C. Sections 7401 *et seq.*, and/or the Federal Water Pollution Control Act, 33 U.S.C. Sections 1251 to 1387, as the foregoing may be amended from time to time (B) any "PCBs" or "PCB items" as defined in 40 CFR Section 761.3; and (C) any "asbestos", as defined in 40 CFR Section 763.63;

(ii)    the presence of which requires investigation or remediation under any federal, state or local law, statute, regulation, ordinance, order, action, policy or common law;

(iii)    which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is or becomes regulated as a "Hazardous Waste" or "Hazardous Material" by any Governmental Entities or instrumentality or the United States of America or the State of Nevada; or

(iv)    the presence of which on the Facility Site causes or threatens to cause a nuisance upon the Facility Site or to the adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about the Facility Site or on or about the adjacent properties.

"**Hazardous Materials**" shall also include underground storage tanks as defined in Section 9001 of RCRA, 42 U.S.C. § 6991.

**ICC**: Has the meaning given in **Section 37.2**.

**Indemnified Party**:  Has the meaning given in **Section 29.3**.

**Indemnifying Party**:  Has the meaning given in **Section 29.2**.

**Independent Engineer**:  Any firm of engineers selected by Owner and approved by the Financing Agent as the Independent Engineer.  Owner shall provide Contractor a Notice with the name and contact Person selected by Owner.

**Initial Progress Schedule**:  The Progress Schedule set forth in Exhibit G.

10

**Key Personnel**:  means Contractor's site manager, engineering manager, safety manager, start-up manager and Project Manager, each as identified on **Exhibit NN**, or any other site manager, engineering manager, safety manager, and start-up manager or Project Manager nominated by Contractor and approved by Owner, which approval shall not be unreasonably withheld or delayed, in accordance with the provisions of this Agreement.

**Late Payment Rate**:  The interest rate, calculated and capitalized on a semi-monthly (twice each month) basis, equal to the higher of (i) one and one-half per cent per month or fraction of a month, and (ii) the three-month LIBOR rate plus a margin of 400 basis points (4.00%), but in no event greater than the maximum rate allowed by Law.

**Law(s)**:  All national, federal, state and local constitutions, charters, acts, statutes, laws (including environmental laws), ordinances, codes, rules, regulations, orders, permits and approvals (including, without limitation, the Project Permits) of any Governmental Entities, or other legislative or administrative action of any Governmental Entities, or final decrees, judgments or orders of a court, and the requirements set forth in the engineering and construction codes in each case applicable to Contractor, any Person performing Work for or on behalf of Contractor, Owner, any Person performing any activity for or on behalf of Owner that Owner is required to perform or undertake pursuant to this Agreement, the Work, the Facility Site or the design, engineering, construction, equipping, testing or operation of the Facility, including without limitation the DoD Grant Requirements and the USDA Guarantee Requirements.

**Lenders**:  The holders from time to time of the Debt or the agents or trustees representing them.

**Letter of Credit**:  One or more first demand unconditional irrevocable letters of credit issued by a Qualified Financial Institution, which (a) has a stated expiration date that is not earlier than twelve (12) months after the date of its issuance, (b) is drawable if it is not renewed or replaced at least fifteen (15) Business Days prior to its scheduled expiration date, (c) is drawable if the issuer fails to meet the requirements of a Qualified Financial Institution and such failure is not cured within twenty (20) days after such event, (d) is otherwise drawable if and to the extent Contractor fails to perform its obligations under this Agreement, (e) shall be substantially in the form of **Exhibit MM**.

**Lien(s)**:  means any mortgage, pledge, hypothecation, assignment, mandatory deposit arrangement, encumbrance, security interest, charge, lien (statutory or other), preference, priority or other collateral agency agreement of any kind or nature whatsoever which has the effect of constituting a security interest, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same effect as any of the foregoing and the filing of any financing statement or similar instrument under the United States Federal Uniform Commercial Code or comparable law of any jurisdiction, domestic or foreign.

**Limited Notice to Proceed**:  A Notice executed by an authorized officer of Owner and delivered to Contractor that authorizes Contractor to commence limited specified portions

11

FUL_0204329

of the Work under this Agreement (including LNTP-1, LNTP-2 and LNTP-3a, as applicable).

**LNTP-1**:  The Limited Notice to Proceed, dated as of May 21, 2015, as set forth in **Exhibit EE.**

**LNTP-2**:  The Limited Notice to Proceed, dated as of December 14. 2015, as set forth in **Exhibit FF**.

**LNTP-3a**:  The Limited Notice to Proceed, dated as of November 7, 2016, as set forth in **Exhibit OO**.

**LNTP-3b**:  Has the meaning given in the Purchasing Agreement.

**Major Subcontractors**:  Has the meaning given in **Section 8.1.1**.

**Mechanical Completion**:  Completion of the Facility in accordance with and to the extent set forth in **Section 14.2**.

**Mechanical Completion Date**:  The date on which Mechanical Completion occurs as specified in the Notice of Mechanical Completion issued pursuant to **Section 14.2.3**.

**Minimum Performance Requirements**:  Has the meaning given in **Section 17.4.7.**

**Monthly Progress Report**:  Means a written report prepared by Contractor setting forth the detail required in **Exhibit JJ**, pursuant to **Section 3.1.23**.

**Moody's**:  Moody's Investors Service, Inc., or any successor to its statistical rating business.

**MSW**:  Municipal solid waste.

**MSW Processing Facility**:  Has the meaning given in the Recitals.

**Natural Gas Consumption Guarantee**:  The natural gas consumption guarantee described in **Exhibit F**.

**Normal Business Hours**:  Eight (8) hours per day (8:00 a.m.- 4:00 p.m.) on each Business Day.

**Notice**:  A written communication between the Parties that is required or permitted by this Agreement and conforms to the requirements of **Article 38** of this Agreement.

**Notice of Final Completion**:  Has the meaning given in **Section 18.5**.

**Notice of Mechanical Completion**:  Has the meaning given in **Section 14.2.3**.

**Notice of Substantial Completion**:  Has the meaning given in **Section 16.4**.

12

**Notice to Proceed**:  A Notice executed by an authorized officer of Owner that is delivered to Contractor that authorizes Contractor to commence full performance of the Work under this Agreement.

**Notice to Proceed Date**:  The date of the Notice to Proceed.

**O&M Contract**:  The agreement between Owner and the O&M Contractor providing for the operation and maintenance of the Facility in accordance with the terms thereof.

**O&M Contractor**:  Means the Person who is the counterparty to the Owner under the O&M Contract.

**Operating Consumables**:  Means oxygen, nitrogen, scrubber chemicals, water treatment chemicals, potable water (including firewater and process water) and demineralized water, MSW, natural gas and any other chemicals or consumables required for the start-up, commissioning, testing, and operation of the Facility.

**Operating Personnel**:  Has the meaning given in **Exhibit P**.

**Operating Utility Services**:  Electrical and natural gas service, telephone service, internet service, storm water disposal, wastewater disposal, sanitary wastewater, non-hazardous solid waste disposal and any other utility service necessary for the start-up, commissioning, testing, and operation of the Facility.

**Operation and Maintenance Manual**:  A manual consisting of all plans, specifications, manuals, schedules, drawings and other documents (including, without limitation, copies of all warranties relating to equipment and all software access codes, including those access codes necessary to change set points and those access codes necessary to change the ladder logic) and facilities required to be delivered hereunder and the materials described in **Exhibit R** that are necessary or customarily maintained for the ownership, operation and maintenance of the Facility.

**Organizational Documents**:  means the certificates or articles of incorporation, by-laws, limited liability company agreements, certificates and agreements of limited partnership and other formative and governing documents relating to a Person.

**Outside Warranty Date**:  Has the meaning giving in **Section 21.1.5**.

**Owner**:  Has the meaning set forth in the preamble, and includes its successors and assigns permitted under this Agreement.

**Owner Indemnified Parties**:  Has the meaning given in **Section 29.1**.

**Owner Permits**:  The permits and approvals of any Governmental Entities relating to the Facility listed in **Exhibit C** which are to be provided by Owner.

**Owner Taxes**:  All Taxes, including Nevada sales and use taxes, required to be paid by Owner pursuant to **Part I** of **Exhibit U**.

13

**Owner's Engineer**:  means any one or more engineers (including, without limitation, Black & Veatch), designated by Owner in a Notice to Contractor, retained by Owner to assist Owner in (i) the review of materials, documents or other matters to be reviewed by Owner, (ii) the review of information regarding the Work, (iii) the verification of Work completed, (iv) the conduct of inspections by Owner and (v) any other matters directed by Owner related to the Work or performance by Contractor of any of its obligations hereunder.

**Oxygen Consumption Guarantee**:  The oxygen consumption guarantee described in **Exhibit F**.

**Parent**:  With respect to any Person, means any other Person in possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

**Parent Guaranty**: Has the meaning given in **Section 39.1**.

**Party**:  Each of Owner and Contractor hereunder and **Parties** means Owner and Contractor collectively.

**Paying Agent**: means the Financing Agent or one of its Affiliates.

**Payment Account**:  A lock-box account held by the Financing Agent or other non-affiliate trustee under the Financing Documents from which, subject to the terms and conditions of the Financing Documents, funds may be withdrawn to make payments to Contractor in accordance with the Progress Payment Schedule and other applicable provisions of this Agreement.

**Payment and Performance Bond**: means the payment and performance bond to be provided by Contractor in accordance with **Section 39.2** substantially in the form attached as **Exhibit DD**.

**Payment Milestones**:  The milestones set forth in **Exhibit H** for the purpose of verifying payments due to Contractor and Major Subcontractors, as applicable, under this Agreement.

**Payment Request**: Has the meaning given in **Section 2.2.18**.

**Performance Guarantees**:  The Contractor performance guarantees set forth in **Exhibit F** of this Agreement.

**Performance Security**:  means the Parent Guaranty and the Letter of Credit (or the Payment and Performance Bond if applicable).

**Performance Test**:  The performance tests to be conducted by Contractor to demonstrate Facility performance in accordance with the procedures set forth in **Article 16** and **Exhibit F**.

14

**Performance Test Report**:  Has the meaning given in **Section 16.1.3**.

**Person**:   means an individual, partnership, corporation, limited liability company, company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

**Post MC Liability Cap**:  Has the meaning given in **Section 40.13.2**.

**Preliminary Performance Test Report**:  Has the meaning given in **Section 16.1.2**.

**Primary Performance Guarantees**: Means the Product Production Guarantee and the Emissions, Effluent and Noise Guarantee.

**Primary Spare Parts**:  Has the meaning given in **Section 6.1**.

**Process Agent**: Has the meaning given in **Section 40.3**.

**Product Production Guarantee**:   The product production guarantee described in **Exhibit F**.

**Product Production Test**:   The product production performance test described in **Exhibit F**.

**Progress Payment Schedule**:  Has the meaning given in **Exhibit H**.

**Progress Schedule**:  The schedule submitted by Contractor setting forth the dates of performance by Contractor of the components of the Work, using CPM, including precedence relationship and Float for major project activities and milestones in reasonable detail, in accordance with **Exhibit A**, as modified from time to time by Contractor, subject to the prior written approval to the extent required pursuant to this Agreement. The Initial Progress Schedule is set forth in **Exhibit G**.

**Prohibited Country**: Has the meaning given in **Section 40.4**.

**Project Director**:  Has the meaning given in **Section 2.2.3**.

**Project Equity**: Has the meaning given in **Section 7.5**.

**Project Equity and Reimbursement Agreement**: Has the meaning given in **Section 7.1**.

**Project Manager**: The person designated as "Project Manager" in **Exhibit NN** or by Contractor thereafter in accordance to **Section 3.1.20** and who will have overall responsibility for the prosecution of the Work and will be authorized to act on behalf of Contractor .

**Project Permits**:  The Owner Permits and the Contractor Permits.

15

**Project Requirements**:  (A) Laws applicable to the performance of the Work, (B) this Agreement and contractual provisions relating to the construction, use or operation of the Facility, (C) the Project Permits, (D) written requirements of Contractor's Subcontractors including requirements necessary to maintain in full force and effect all of their respective warranties, with respect to the installation of such Subcontractor's equipment incorporated into the Work, unless exceptions are consistent with the prevailing standards and practices of the industry under existing conditions, (E) all operating manuals required under this Agreement or the components thereof, (F) Prudent Industry Practices, and (G) the DoD Grant Requirements and USDA Guarantee Requirements set forth in **Exhibit AA** and **Exhibit BB**, as applicable**.**

**Proprietary Information**:  Has the meaning given in **Section 31.1.**

**Prudent Industry Practices**:  The practices described in **Section 3.1.2**.

**Punch List**:  The list of uncompleted items required by the Work that do not affect the safe, reliable commercial operation of the Facility which are to be completed by Contractor; provided, however, that the aggregate value of all Punch List items may not exceed Seven Hundred and Fifty Thousand Dollars ($750,000.00).

**Purchased Equipment and Materials**: has the meaning set forth in **Section 2.2.17**.

**Purchasing Agent**: Has the meaning given in **Section 2.2.17**.

**Purchasing Agreement**: Has the meaning given in **Section 2.2.17**.

**Qualified Financial Institution**:   means, (i) with respect to the Payment and Performance Bond, an insurance company with an A.M. Best Company rating of "A" or better and (ii)  with respect to the Letter of Credit, a banking or financial institution that has a Credit Rating of at least "A-" by Standard and Poor's and "A3" from Moody's.

**Receiving Party**:  Has the meaning given in **Section 31.1**.

**Related Persons**:  Means, with respect to a Party, such Party, such Party's Affiliates, Subcontractors and each of their respective managers, directors, officers, employees, agents, consultants and representatives, provided that the Contractor and its Related Persons shall not be deemed to be Related Persons of the Owner.

**Reliability Guarantee**:  The reliability guarantee described in **Exhibit F**.

**Reliability Test**:  The reliability performance test described in **Exhibit F**.

**Replacement Contractor**:  Has the meaning given in **Section 23.2.2**.

**Representatives**:  Has the meaning given in **Section 31.1**.

**Retainage For Punch List**:  Has the meaning given in **Section 8.1.9**.

16

**Rules**:  Has the meaning given in **Section 3.1.15**.

**Schedule Recovery Plan**: means a plan regarding the actions to be taken and the schedule to remedy delays in completion of the Work.

**Scheduled Final Completion Date**:  The date ninety (90) days after the Substantial Completion Date, as may be adjusted pursuant to the provisions of this Agreement.

**Scheduled Mechanical Completion Date**:  The date seven hundred (700) days after the Notice to Proceed Date, as such date may be adjusted pursuant to the provisions of this Agreement.

**Scheduled Substantial Completion Date**:  The date that is eight hundred twenty three (823) days after the Notice to Proceed Date, as such date may be adjusted pursuant to the provisions of this Agreement.

**Scope of Work and Specifications**:  Means the scope of work and specifications relating to the Facility set forth in **Exhibit A**, together with any additional specifications and drawings prepared by Contractor and submitted, or required to be submitted, to Owner for review and comment with respect to the Work, as described in **Article 12,** including (without limitation) all drawings, sketches, writings and calculations that define or describe the Work or the Facility.

**Second Arbiter**:  Has the meaning given in **Section 37.4.1**.

**Secondary Performance Guarantees**: Means the Oxygen Consumption Guarantee, the Electricity Consumption Guarantee, the Natural Gas Consumption Guarantee and the Reliability Guarantee.

**Security Replacement Event**: means, (i) in respect of the Payment and Performance Bond, a matter equivalent to those described in **Section 23.1.2** occurring in respect of the insurance company that has issued the bond, or such insurance company no longer being a Qualified Financial Institution, or the bond becoming invalid or unenforceable or (ii) in respect of the Letter of Credit, a matter equivalent to those described in **Section 23.1.2** occurring in respect of the financial institution that has issued the Letter of Credit, or such financial institution no longer being a Qualified Financial Institution, or the Letter of Credit becoming invalid or unenforceable.

**Self-Performed Costs**:  means the portion of each Payment Milestone representing labor, material, supplies, consumables, general field costs, other indirect costs, salaries and other costs incurred directly by Contractor for the portion of the Work self-performed by Contractor and not included in **Exhibit E** or the Purchasing Agreement, as set out in detail in **Exhibit H**.

**Signing Parties**: means each party whose signature appears on the signature page of this Agreement.

**Site Inspection**:  Has the meaning given in **Section 4.2**.

17

FUL_0204335

**Site Safety Manual**:  Has the meaning given in **Section 3.3**.

**Site Safety Program**:  Has the meaning given in **Section 3.3**.

**Standard & Poor's**:  Standard & Poor's Rating Group, a division of McGraw Hill, Inc., or any successor to its statistical rating business.

**Start-up Plan**:  Has the meaning given in **Section 14.1.1**.

**Subcontractor**:  Suppliers, vendors, consultants, subcontractors and other Persons, that, directly or indirectly, (other than Contractor, but including any Affiliate of Contractor) perform any part of the Work on behalf of Contractor (whether it be work to be performed under this Agreement or the Purchasing Agreement) or perform any part of Owner's obligations hereunder on behalf of Owner.

**Subcontractor Direct Payment Account**:  means the account created pursuant to **Exhibit PP** from which the major trade Subcontractors listed in **Part 1 of Exhibit E and** major equipment suppliers listed in **Part 2 of Exhibit E** (Major Subcontractors) will be paid in accordance with **Section 2.2.18** by the Paying Agent.

**Substantial Completion**:  Substantial Completion in accordance with and to the extent set forth in **Article 16**.

**Substantial Completion Date**:  The date on which Substantial Completion occurs as specified in the Notice of Substantial Completion issued pursuant to **Section 16.4**.

**Syncrude Product**:  Means the product produced by the Facility satisfying the specifications set forth in **Exhibit M.**

**Syngas Fuel**:  Means Feedstock MSW that satisfies the specifications set forth in **Exhibit Q**.

**System Checkout Packages**:  Has the meaning given in **Section 14.1.2**.

**Taxes**:  Means any and all forms of taxation, charges, customs duties, imposts, levies, tariffs, fees, royalties and rates imposed with respect to any design, equipment, commissioning, testing, materials, labor or services that are part of the Work or the Facility.

**Third Arbiter**:  Has the meaning given in **Section 37.4.1**.

**TRI**: means ThermoChem Recovery International, Inc.

**Unexpected Costs**: Has the meaning set forth in **Section 40.13.2**.

**USDA**: Means the United Stated Department of Agriculture.

**USDA Guarantee**:  The guarantee of a part of the Debt provided by the USDA.

18

FUL_0204336

**USDA Guarantee Requirements**:  The requirements of the USDA Guarantee as set forth in **Exhibit BB** that related to the quality, manner of performance or requirements relating to the Work, or that require information or data regarding the Work or otherwise relate to the Work.

**Warranties**:  The warranties of Contractor under **Article 21** of this Agreement.

**Warranty Period**:  Has the meaning given in **Section 21.1.3**.

**Work**:  All work and activities to be performed by Contractor under this Agreement, including, without limitation, the design, engineering, procurement, project management, construction, interface engineering, interconnection, start-up, supervision, planning, development, training, testing, submittal of documentation, and other services, equipment and materials required by Contractor to achieve Substantial Completion and Final Completion of the Facility in accordance with this Agreement.  The work and activities to be performed by Contractor under LNTP-1, LNTP-2 and LNTP-3a are part of the Work.

## 2.  RESPONSIBILITIES OF OWNER

2.1  Owner shall reasonably cooperate with Contractor during the performance of this Agreement.  This cooperation shall include the timely supply of all materials, services and information required to be supplied by Owner under this Agreement and the timely administration and performance of all of Owner's obligations under this Agreement.

2.2  Owner shall perform the following, in a timely manner:

2.2.1  Legal Right to Access Facility Site.  Furnish the legal right of access to the Facility Site which Contractor shall use to create facilities for ingress and egress to and from the Facility Site for the purpose of performance of the Work; provided, however, that Contractor shall not have exclusive use of the Facility Site during the term of this Agreement and Contractor shall be responsible for the construction, maintenance and improvement of all means of access to, ingress and egress and vehicle and personnel movement to, from and within the Facility Site for the purpose of performance of the Work.

2.2.2  Operating Personnel.  Provide the Operating Personnel for training, start-up, commissioning and testing and operation of the Facility in accordance with the Start-up Plan and pay the salaries and benefits of such Operating Personnel. The quantity and minimum qualifications of the Operating Personnel required for commissioning and testing are set forth in **Exhibit P**.

2.2.3  Owner Project Director.  Designate a person (the "**Project Director**") authorized to act on behalf of Owner to act as a single point of contact for Contractor with respect to the prosecution of the Work.  The Project Director shall have full authority to act on behalf of Owner in connection with this Agreement, except as otherwise expressly stated herein or otherwise provided in a Notice from Owner to Contractor.  Any Notice appointing a Project Director representative shall authorize such representative to exercise any or all of the powers and functions of the Project Director hereunder and any such authorization may be expanded, curtailed or modified by further Notice to Contractor.  The initial Project Director

19

will be designated in a Notice to Contractor delivered within five (5) Business Days following the Effective Date.

2.2.4 <u>Assistance in Obtaining Technical Data</u>. Upon reasonable request by Contractor, timely assist Contractor in obtaining such technical data in the possession of Owner or its consultants or from government or local officials with whom Owner has unique or special access, in any case to the extent that such technical data is necessary for Contractor to perform the Work; provided, however, that Contractor shall remain liable for all Work to be performed and Owner shall be reimbursed by Contractor for all out-of-pocket costs reasonably incurred by it to assist Contractor in obtaining technical data that is not in the possession of Owner or its consultants at the time of Contractor's request for assistance in obtaining such data.

2.2.5 <u>Permits</u>. Obtain all Owner Permits and provide reasonable timely assistance to, and as requested by, Contractor in obtaining the Contractor Permits.

2.2.6 <u>Payments</u>. Make payments to Contractor in respect of the Fixed Construction Price, all Fixed Construction Price Adjustments and Documented Costs in accordance with applicable provisions of this Agreement.

2.2.7 <u>Removal of Certain Hazardous Materials</u>. Remove and dispose of or, if mutually agreed with Contractor, reimburse Contractor for all Documented Cost Items incurred by Contractor to remove Hazardous Materials located at the Facility Site that are identified by Contractor in performing the Work except for Hazardous Materials that were used by or brought onto the Facility Site by Contractor, its Subcontractors or any Person performing Work on behalf of Contractor, in which case such Hazardous Materials are to be removed from the Facility Site and disposed of by Contractor and the costs to store, remove and dispose of such Hazardous Materials and recondition the Facility Site shall be paid by Contractor.

2.2.8 <u>Insurance</u>. Provide insurance as provided in **Section 27.1.**

2.2.9 <u>Access</u>. Provide the rights of way, easements, ingress and egress (including interconnection tie-in points) necessary for interconnection and other utility access to the Facility Site as described in **Exhibit D** and **Exhibit T**.

2.2.10 <u>Operating Consumables and Operating Utility Service.</u> Negotiate, execute, make available to Contractor for start-up, commissioning and testing as needed and make all required payments under agreements for the Operating Consumables and Operating Utility Services in each case meeting the Project Requirements. Provide Operating Consumables and Operating Utility Services connection points at or within the battery limits of the Facility Site in coordination with the Contractor.

2.2.11 <u>Feedstock MSW</u>. Provide Feedstock MSW for start-up, commissioning and performance testing of the Facility, and operation of the Facility thereafter, as more particularly described in **Section 13.1**.

2.2.12 <u>Financing.</u> Provide the Financing for the Facility.

20

FUL_0204338

2.2.13 <u>Feedstock MSW Sampling and Testing</u>. During the Product Production Test and the Reliability Test, Feedstock MSW shall be removed prior to processing at the Facility and tested utilizing laboratory equipment for compliance with the Feedstock MSW criteria set forth in **Exhibit Q**, all as more particularly described in the MSW testing procedures set forth in **Exhibit F**. The Work includes all equipment necessary to perform the MSW testing and sampling as provided in the MSW testing procedures set forth in **Exhibit F**. Accordingly, notwithstanding any other provision herein to the contrary, the Owner shall not be responsible for providing any additional instrumentation or equipment for the performance of Feedstock MSW sampling and testing pursuant to this **Section 2.2.13** and in the MSW testing procedures set forth in **Exhibit F**.

2.2.14 <u>Operating Personnel Equipment</u>. Provide non-operational equipment and furnishings necessary for the use by Operating Personnel, including without limitation restroom supplies, lab room equipment, furniture, operations radios, maintenance tools and supplies and trash bins.

2.2.15 <u>Actions by Owner</u>. Owner may cause any of its rights or obligations hereunder to be exercised or performed by one or more designees or appointees specified in a Notice to Contractor, which Notice shall identify the specific designee or appointee, designate the scope of such Person's authority and the matters concerning which such Person shall have authority to act on behalf of Owner. Owner may amend, supplement or terminate any such appointment or designation, or the scope and authority thereof by Notice to Contractor.

2.2.16 <u>Fisher-Tropsch License and Catalyst.</u> Owner shall provide the initial fill of EFT catalyst and provide Contractor with rights to use the process license and process design package from EFT to perform the Work. Owner shall cause TRI to provide Contractor with rights to use the process license and process design from TRI as necessary to perform the Work. Owner shall pay TRI and EFT all license, and royalty fees required to make their respective process licenses and process design package available to the Facility.

2.2.17 <u>Capital Equipment</u>. Abeinsa Abener Teyma General Partnership as Owner's purchasing agent (the "**Purchasing Agent**") shall enter into a purchasing agent agreement with Owner on or before the date of the Notice to Proceed in the form attached hereto as **Exhibit HH** ("**Purchasing Agreement**"). Pursuant to the Purchasing Agreement all capital equipment, materials and spare parts listed in Schedule 1 to the Purchasing Agreement (collectively the "**Purchased Equipment and Materials**") will be purchased in a manner such that, pursuant to payments made to either Contractor or the Purchasing Agent according to the Progress Payment Schedule in **Exhibit H** (or deposited in the Subcontractor Direct Payment Account pursuant to **Section 8.1.4** and paid to Major Subcontractors as provided in **Section 2.2.18**)), title to all such Purchased Equipment and Materials passes directly from the seller of such Purchased Equipment and Materials to the Owner and neither Purchasing Agent nor Contractor shall have title to, or ownership of, the Purchased Equipment and Materials. All purchase orders for Purchased Equipment and Materials shall contain a statement that Purchasing Agent is purchasing such Purchased Equipment and Materials as agent for the Owner. Such Purchased Equipment and Materials shall be the obligation of Owner through the Purchasing Agent to supply through such Purchasing Agreement. The Owner and Contractor agree under this Agreement that upon delivery of Purchased Equipment and Materials

21

purchased by the Purchasing Agent to Contractor, such Purchased Equipment and Materials shall be considered new and shall become part of the Work for all purposes of this Agreement, including the warranty provisions hereof and upon such delivery Contractor shall accept and assume care, custody and control of the Purchased Equipment and Materials and risk of loss in respect thereof as provided in **Article 28**.  In no event shall Contractor be relieved of its obligations under this Agreement due to any failure of the Purchasing Agent, its Affiliates or any other Person for which Purchasing Agent or its Affiliates are responsible (including subcontractors) to perform its obligations under the Purchasing Agreement.

   2.2.18 <u>Subcontractor Direct Payment Account</u>. Owner shall establish the Subcontractor Direct Payment Account in accordance with the terms of this Agreement.  In each invoice submitted by Contractor pursuant to **Section 8.1.1** for the payment of a Payment Milestone, Contractor shall designate the amount (if any) of that Payment Milestone to be paid directly to the Major Subcontractors.  Concurrently with payment to Contractor of a Payment Milestone in accordance with **Section 8.1.4**, Owner shall deposit the portion of such Payment Milestone designated by Contractor in its invoice and approved and payable by Owner pursuant to **Section 8.1.4**, into the Subcontractor Direct Payment Account.  Contractor may from time to time (but not more than four (4) times in any month), request Owner in writing (each a "**Payment Request**") to pay from funds on deposit in the Subcontractor Direct Payment Account, amounts due to Subcontractor(s); <u>provided</u> that, in no event shall the cumulative amounts requested in the Payment Requests submitted by Contractor exceed the aggregate amount of funds deposited into the Subcontractor Direct Payment Account and Owner shall have no obligation to pay any amounts to the Major Subcontractors  that exceed the amounts deposited into the Subcontractor Direct Payment Account.  Each Payment Request shall    include (i) a copy of the invoice of each such Subcontractor for which payment is requested and wire transfer instructions for each such payment, (ii) a sworn statement and a waiver of Liens from each such Subcontractor for all Work completed and materials provided for which payment is requested (contingent upon receipt of the invoiced amount from Owner) as of the date of such invoice (A) in the form set forth in **Exhibit J-1**, and (B) representing that such Subcontractor has made all  payments or arranged for the payment of all payments due and payable to all of its subcontractors for Work and materials for which Owner has previously made payment to such Subcontractor on behalf of Contractor and (iii) such other documentation reasonably requested by Owner to clarify or support the documentation provided pursuant to (i) and (ii) above.  Owner shall within five (5) Business Days after receipt of a Payment Request pursuant to this **Section 2.2.18**, determine if (A) the Payment Request and invoice have been properly submitted and are accompanied by the appropriate sworn statement and waiver of Liens; and (B) there are sufficient funds in the Subcontractor Direct Payment Account to make the payment(s) requested in the applicable Payment Request. Subject to conditions (A) and (B) in the immediately preceding sentence being satisfied, if Owner fails to pay a Major Subcontractor the amount of a Payment Request as required by this **Section 2.2.18**,  Contractor shall be held harmless of the consequences or liabilities which  any delay or default in payment of such Payment Request to the applicable Major Subcontractor causes to Contractor, including late payment interest payable to such Major Subcontractor (but without duplication of late payment interest payable hereunder or under the Purchasing Agreement), suspension and termination of the Subcontract to which such Major Subcontractor is a party directly related to such defaults or delays in payment, delays in schedule completion dates directly related to such default or delay in payment which causes a delay in schedule

22

activities of Contractor hereunder, damages payable to such Major Subcontractor directly related to such defaults or delays in payment, and any such failure by Owner to pay a Major Subcontractor the amount of a Payment Request as required by this **Section 2.2.18** shall be treated as a failure to pay a Subcontractor for purposes of the Owner Event of Default set forth in **Section 23.4.3**. Notwithstanding the foregoing, in no event shall Owner's determination described in this **Section 2.2.18** or payment of any amount hereunder constitute or be deemed a waiver of Contractor's obligations under any provision of this Agreement, and Owner shall have the right to enforce this Agreement against Contractor notwithstanding any such determination or payment if Owner subsequently determines for any reason that any determination or payment of an invoice under this **Section 2.2.18** was erroneous.  Subject to such determination by Owner and except for disputed portions of a Payment Request, Owner shall pay each applicable Subcontractor (on behalf of and for Contractor's account) within five (5) Business Days after receipt of a Payment Request from Contractor, the amount requested in the Payment Request to be paid to each such Subcontractor.

## 3.    RESPONSIBILITIES OF CONTRACTOR

3.1    Contractor shall:

3.1.1  <u>General</u>.  Perform and prosecute all Work in accordance with the Scope of Work and Specifications and the other terms and provisions of this Agreement and in compliance with all Project Requirements,  using methods and equipment that are accepted as Prudent Industry Practices; conduct the Performance Tests and achieve the Substantial Completion Date and the Final Completion Date by the dates scheduled in the Progress Schedule; and design, install, test and operate all Facility equipment lawfully and safely, in each case, using qualified, competent and, where necessary, licensed personnel; all parts of the Work reasonably inferred from this Agreement and the Exhibits, but not expressly mentioned herein or therein, shall constitute part of the Work to be performed by Contractor without adjustment of the Fixed Construction Price or the other provisions of this Agreement. Notwithstanding any other provision of this Agreement to the contrary, Contractor has reviewed and for all purposes adopted the information contained in the Scope of Work and Specifications and all other provisions of this Agreement as its own and shall not be entitled to any relief or recovery as a result of (i) any information contained therein having been provided by Owner or any other Person, or (ii) any design, engineering, material, facilities, supplies or other materials or actions being required by Owner as provided in the Scope of Work and Specifications and other provisions of this Agreement.  All submissions required of Contractor hereunder shall be made both in electronic format and by hard copy delivered to Owner.

3.1.2  <u>Project Requirements</u>.    Perform the Work so that it meets the requirements  of the Scope of Work and Specifications, all applicable Laws, and Project Requirements, including applicable design, construction and other standards of "**Prudent Industry Practices**", which are defined as those practices, methods and equipment, in effect from time to time for performance of the Work that are commonly used in prudent engineering and operations practices in the waste-to-energy or biomass-to-syngas industries to design, construct, equip and operate waste-to-energy or waste-to-Syncrude Product equipment lawfully and with safety, dependability, efficiency and economy (provided that the requirements of dependability, efficiency and economy as described above are not intended to expand or

23

modify **Exhibit A** and the Scope of Work and Specifications). Owner makes no acknowledgment that the design details specifically set forth in **Exhibit A**, the Project Requirements, or the Scope of Work and Specifications satisfy Prudent Industry Practices or constitute all or sufficient details necessary to satisfy Prudent Industry Practices.

3.1.3 <u>Contractor Permits</u>. Obtain all Contractor Permits required by applicable Laws for the performance of the Work including without limitation those listed in **Exhibit O** and provide reasonable assistance to Owner in obtaining Owner Permits. Contractor shall be responsible for all damages, fines, and penalties which may arise (including but not limited to those that Owner pays or becomes liable to pay) because of the failure to obtain any Contractor Permits or the noncompliance by Contractor with any Contractor Permits or Owner Permits applicable to the Work (irrespective of who is required to obtain such Project Permits), other than any damages, fines and penalties, or any non-performance of the Facility arising from an act or omission of Owner or its Subcontractor and representatives. As of the Effective Date, Contractor has been provided with and reviewed the Owner Permits that have been issued to Owner as of such date. Notwithstanding anything herein to the contrary the Parties agree that if the modifications to the Air Permit reflected in the "Owner Responsibilities" in **Exhibit C** are not approved by NDEP-BAPC or if such approval requires extra costs or causes delay in the achievement of Substantial Completion, Contractor shall have a right to a Change In Work as and to the extent provided in Article 19 for any such impact on cost or schedule. The Work includes all Contractor activities necessary to engineer, design, construct and test the Facility in accordance with the Project Permits and the Fixed Construction Price shall not be adjusted in respect of the requirements of such Project Permits.

3.1.4 <u>Hazardous Materials</u>. Provide Notice to Owner immediately upon encountering any Hazardous Materials in performing the Work. And remove and/or pay for the storage, removal and disposal of such Hazardous Waste as provided in **Section 2.2.7**.

3.1.5 <u>Operating Utility Services; Operating Consumables</u>. Coordinate with the applicable local utility and any other third party for timely interconnection with the utility's electrical system. Coordinate delivery of all Operating Utility Services and Operating Consumables provided by Owner pursuant to **Section 2.2.10** and obtain all other Operating Utility Services and Operating Consumables necessary to perform the Work in accordance with **Section 5.1** and the facilities necessary to receive, handle and store such materials. After completion of the Performance Tests, Contractor shall fully charge or fill tanks with all consumables and provide all Operating Utility Services necessary to provide Owner with a fully charged Facility, payment for which is to be provided by Owner.

3.1.6 <u>Facility Site Conditions</u>. Maintain the Facility Site free of waste material and rubbish and clear the Facility Site of temporary structures, surplus material, equipment and tools upon completion of the Work to which such waste material, rubbish, temporary structures, surplus material, equipment and tools relate. Contractor shall remove all of its and its Subcontractors' personnel, supplies, equipment, waste materials, rubbish, and temporary facilities from the Facility Site prior to the Final Completion Date.

24

FUL_0204342

3.1.7 <u>Price Breakdown</u>.    Provide a detailed Fixed Construction Price breakdown reasonably required by Owner for its fixed asset records and record keeping.  Such detailed Fixed Construction Price breakdown to be in the form provided by Owner.

3.1.8 <u>Protection of Work</u>.  Prior to the Substantial Completion Date or the date when care, custody and control of the Facility transfers to Owner in accordance with **Section 17.4.7,** provide all necessary safeguards for the protection and maintenance of the Work, the Facility, and the Facility Site, access to the Work, the Facility, and the Facility Site and of all Persons and other property related thereto.

3.1.9 <u>Exclusive Responsibility</u>.  Have exclusive responsibility for design and construction methods, means, techniques and procedures and for the establishment of and compliance with safety procedures.

3.1.10 <u>Handling and Storage of Materials and Equipment</u>.  Arrange for complete and safe handling and storage of all materials, equipment and construction equipment required to accomplish the Work, including (but not limited to) inspection, expediting, shipping, unloading, receiving, customs clearance and claims.

3.1.11 <u>Temporary Items</u>.    Provide all temporary construction materials, equipment, supplies and construction utilities and facilities required by Contractor to accomplish the Work.

3.1.12 <u>Contractor Adjustments</u>.  Contractor shall be compensated by Owner as a Fixed Construction Price Adjustment and shall be entitled to an appropriate adjustment of the Progress Schedule, the Scheduled Mechanical Completion Date and the Scheduled Substantial Completion Date for any Force Majeure occurring after the Effective Date affecting the performance of the Work in accordance with the provisions of **Article 26.**

3.1.13 <u>Responsibility for Personnel</u>.    Without limiting **Section 11.6,** take appropriate action with respect to any of Contractor's personnel, including its Subcontractors performing the Work, who are creating a material risk to the completion of the Work in accordance with this Agreement.

3.1.14 <u>Quality Assurance</u>.    Use effective quality assurance programs in performing the Work which reflect Prudent Industry Practices.  Within thirty (30) days of the issuance of the Notice to Proceed, Contractor shall provide to Owner a written program describing the quality assurance programs and procedures to be used by Contractor in the performance of the Work.  Owner shall have the right to review and comment on such program within fourteen (14) days following receipt of the complete program and all reasonable comments by Owner shall be incorporated in the quality assurance program.

3.1.15 <u>Rules</u>.  Develop, implement and enforce reasonable and customary rules (the "**Rules**") regarding activities on the Facility Site (including restrictions to ingress and egress) and coordination of activities at the Facility Site. Within thirty (30) days of the issuance of the Notice to Proceed, Contractor shall provide to Owner a written copy of its proposed Rules. Owner shall have fourteen (14) days to either approve the Rules or provide reasonable

25

FUL_0204343

modifications or supplements thereto, which shall be incorporated into the proposed Rules and together shall constitute the "Rules".

3.1.16 <u>Assistance with Governmental Entities</u>.  Exercise appropriate conduct and behavior (and cause its employees, agents and any Subcontractors and other Persons acting on its behalf to exercise appropriate conduct and behavior) so as to not adversely affect the reputation of Owner or the Facility nor adversely affect the relationship of Owner or the Facility with Governmental Entities or the community in which the Facility is located. Contractor shall undertake all interaction with the community and Governmental Entities necessary to perform its obligations under this Agreement, which obligations shall include the maintenance of good will and a favorable reputation and opinion of Governmental Entities and the community in which the Facility is located.  Contractor shall immediately cease any actions or failure to act that Owner reasonably believes will result in Contractor not being in compliance with its obligations under this Section promptly upon receipt of Notice from Owner of such actions or failure to act.  Contractor shall provide such reasonable assistance as is required by Owner in dealing with any Governmental Entity in any and all matters relating to the performance by Owner of its obligations hereunder, the Facility or the performance by Contractor of the Work.

3.1.17 <u>Independent Engineer and Owner's Engineer</u>.  Cooperate with the Independent Engineer and Owner's Engineer in the conduct of routine progress inspections and in order to facilitate Independent Engineer and Owner's Engineer performance of their respective tasks to witness and review tests and approve test results.  It is understood that the activities of Independent Engineer and Owner's Engineer shall be reasonable and shall not materially interfere with progress of the Work.

3.1.18 <u>Coordination with Syncrude Product Offtaker</u>.  Coordinate with the purchaser or off-taker of Syncrude Product for the packaging, storage, transportation, delivery and receipt of all Syncrude Products.

3.1.19 <u>Public Announcements</u>.  Obtain Owner's prior written approval, which approval may be withheld for any reason and in the sole discretion of Owner, of the text of any public announcement, publication, or other type of public communication (including photographic) concerning the Work.

3.1.20 <u>Contractor Staff</u>.  Employ and designate dedicated, qualified engineering and construction staff for the prosecution of the Work.  The Key Personnel are designated in **Exhibit NN** including the Project Manager, who will have overall responsibility for the prosecution of the Work and will be authorized to act on behalf of Contractor.  The Project Manager will act as a single point of contact in all matters on behalf of Contractor and will have full authority to act on behalf of Contractor in connection with this Agreement.  The construction site manager shall supervise all Work done at the Facility Site and shall receive on behalf of Contractor all Notices, instructions, orders, agreements, approvals, recommendations or consents given to Contractor at the Facility Site by Owner hereunder.  The construction site manager shall be present at the Facility Site throughout normal working hours except when on leave, sick or absent for reasons connected with the proper performance of his duties.  Whenever the construction site manager is absent from the Facility Site a suitably qualified

26

FUL_0204344

person shall act as his deputy.  Each of the Key Personnel will dedicate his professional time and attention to the Work, and Contractor shall not change any of the Key Personnel without the prior written consent of Owner, which consent shall not be unreasonably withheld or delayed; provided, however, that, without prejudice to Owner's rights and remedies hereunder, Contractor may terminate the employment of any such person and such person's replacement shall be subject to Owner's approval, which approval shall not be unreasonably withheld or delayed.  Contractor shall make its best effort to cause each of the Key Personnel approved by Owner to continue in such capacities for so long as required to complete the Work unless such persons are relieved for cause or Owner consents to any replacement of such Key Personnel, Owner´s consent not unreasonably withheld or delayed..  Neither the Project Manager, the construction site manager nor the start-up manager shall be assigned tasks by Contractor unrelated to the performance of the Work while performing his responsibilities as contemplated by this Agreement.  Contractor shall also provide all additional supervisory staff required to perform the Work in accordance with this Agreement.  Contractor shall be responsible for any act or omission of its Project Manager, start-up manager, engineering manager, safety manager and construction site managers, other supervisory staff, employees and Subcontractors and others performing the Work on its behalf as if such act or omission were that of Contractor.

     3.1.21 <u>Provision of Services</u>.   Provide directly or through Subcontractors selected by Contractor all services, labor, materials, testing, supervision and equipment required for the performance of the Work; provided, however, that Contractor shall only use those major equipment suppliers and major trade Subcontractors listed on **Exhibit E** as provided in **Sections 10.1 and 10.2**.

     3.1.22 <u>Liens</u>.   Keep the Facility and the Facility Site free of all Liens or claims arising from, by or through Contractor's or its Subcontractors' acts arising out of or related to the Work and make all payments due to Subcontractors performing any part of the Work on behalf of Contractor as and when due; provided, however, that Contractor shall not be in default hereunder for failing to keep the Facility or the Facility Site free from Liens that arise from Contractor's failure to pay its Subcontractors for Work if such failure is the direct result of Owner's failure to make a payment when due to Contractor hereunder in respect of such Work.

     3.1.23 <u>Progress Reports and Meetings</u>.  Issue to the Project Director a Monthly Progress Report describing in reasonable detail the critical path and Float, all progress since the last Monthly Progress Report, reflecting the progress to date in comparison with the Initial Progress Schedule and the current Progress Schedule, steps being taken to recover any slippage in the progress of the Work and including a current updated copy of the Progress Schedule. Such Monthly Progress Reports shall be submitted at least three (3) Business Days before each monthly progress meeting.  Attend monthly progress meetings with the Project Director and others designated by Owner at the Facility Site, respond to inquiries at such meetings regarding progress of the Work, arrange for its Subcontractors to attend such monthly progress meetings, if reasonably requested by the Project Director, and within three (3) Business Days following each monthly progress meeting provide to the Project Director for his review, comment and approval, detailed minutes of such meeting in the form reasonably requested by Owner.  In addition to the reports described in this **Section 3.1.23** and the Scope of Work and

27

FUL_0204345

Specifications and the other provisions of this Agreement, Contractor shall provide such additional information and reports concerning the Work as reasonably requested by Owner.

3.1.24 <u>Financing Documents; DoD Grant Requirements and USDA Guarantee Requirements.</u> Assist Owner in compliance with requirements of the Financing Documents as set forth in **Exhibit W.** In addition Contractor shall (i) timely and accurately provide any information required to be provided pursuant to the Financing Documents, and (ii) satisfy the other DoD Grant Requirements and USDA Guarantee Requirements in **Exhibit AA** and **Exhibit BB** respectively.

3.1.25 <u>O&M Personnel and Supervision.</u> Contractor shall maintain qualified personnel on-site 24 hours a day during the Performance Tests to consult with Owner and the Independent Engineer and to supervise and direct the Operating Personnel regarding the operation and maintenance of the Facility. The cost of any special instrumentation necessary for the performance of any tests, including (without limitation) the Performance Tests, required by this Agreement shall be paid by Contractor without adjustment of the Fixed Construction Price. Notwithstanding any other provision of this Agreement to the contrary, in no event shall the failure of the Operating Personnel to properly operate or maintain the Facility, other than (i) in case of the gross negligence or willful misconduct of any Operating Personnel, or (ii) Operating Personnel acting with negligence or willful misconduct in direct violation of specific instruction provided to such Personnel by Contractor, constitute a Force Majeure or otherwise relieve Contractor of any of its obligations under this Agreement. If any of the Operating Personnel act with negligence or willful misconduct in direct violation of specific instruction provided to such Persons by Contractor, upon the written request for replacement to Owner by Contractor, Owner shall replace such Operator Personnel. The Operation and Maintenance Manual and substance of the Contractor training program shall by themselves constitute "specific instructions provided to such Persons".

3.1.26 <u>Performance Tests.</u> Perform the Performance Tests in accordance with **Article 16** and **Exhibit F**.

3.1.27 <u>Specialty Tools.</u> Pursuant to **Section 6**, provide and turn over to Owner, in good working condition, all specialty tools provided as part of the Primary Spare Parts or provided as Additional Spare Parts.

3.1.28 <u>Office Trailers.</u> Provide temporary facilities for Owner including two (2) office trailers (10' x 60') for use by Owner which shall be located immediately adjacent to Contractor's main offices. Contractor shall provide connections for water, electrical, sewer service, telephone service and internet service to Owner's trailers. Contractor will provide stairways with handrails to the doors of both Owner trailers. Owner shall equip such trailers and shall be responsible for the telephone and internet usage costs associated with use of the trailers. Contractor will provide and maintain air conditioning of each of the office trailers. Contractor shall provide O&M Contractor with temporary office space, training space and training facilities to perform operations and maintenance of the Facility prior to the Final Completion Date.

Confidential
FUL_0204346

3.1.29 <u>Security</u>.  Provide and maintain a security fence around the area shown as fenced in on the plot plan included in **Exhibit B** and provide all other Facility security on a 24 hour/7 day a week basis as necessary to prevent vandalism, theft and danger to the Facility and Facility Site and material, equipment, personnel and visitors located on the Facility Site through the Final Completion Date which shall include full time security personnel and facilities at the Facility Site as well as on-site and off-site security monitoring and electronic security facilities.

3.1.30 <u>Contractor Assistance with Owner Permits</u>.  To the extent reasonably required by Owner and at Owner's costs if Contractor is required to produce substantially more than a de minimis amount of additional Work beyond Contractor's defined scope of works and deliverables, provide drawings, specifications, schedules or other data to Owner necessary to assist with applications for Owner Permits or public hearings or as required in connection with the Financing.

3.1.31 <u>Training of Operating Personnel</u>.  Provide a training program to educate the Operating Personnel, along with any additional Facility operating personnel reasonably requested by the Owner, in the safe and efficient operation and maintenance of the Facility. The training program shall be carried out during Normal Business Hours at the Facility Site, shall be completed prior to start-up as described in the Start-up Plan and shall contain instruction consistent with Prudent Industry Practices, which upon completion will render the operating personnel so trained, skilled and qualified to operate and maintain the Facility in accordance with the Operation and Maintenance Manual and Prudent Industry Practices.

3.1.32 <u>Geotechnical Conditions</u>.  Perform all Work required to remedy any adverse subsurface geotechnical condition on the Facility Site; provided, however, that Contractor shall be entitled to relief as provided in **Article 26** for any geotechnical conditions at the Facility Site that are not disclosed in, or reasonably inferable or predictable from the Site Inspection or reports and information regarding the Facility Site provided to Contractor prior to the Effective Date.

3.1.33 <u>Operation and Maintenance Manual</u>.  At least one hundred and twenty (120) days before the Scheduled Mechanical Completion Date, prepare and make available to Owner and the Independent Engineer, for review and comments, two copies of the Operation and Maintenance Manual (excluding detailed plans showing preliminary "as built" conditions which must be made available at least forty-five (45) days before the start of the Performance Tests).  Within thirty (30) days after receipt of the complete draft Operation and Maintenance Manual, Owner shall provide Contractor with its written comments thereto and Contractor shall include any reasonable comments provided by Owner in the final Operation and Maintenance Manual.  Before the Substantial Completion Date, Contractor must furnish Owner and the Independent Engineer with two (2) copies of the Operation and Maintenance Manual that are final in all material respects, including any changes required as a result of start-up and performance of applicable Performance Tests.

3.1.34 <u>Owner Taxes</u>.  Take all commercially reasonable actions requested by Owner in writing to minimize the amount of Owner Taxes payable by Owner and assist Owner as reasonably requested by Owner in writing in its efforts to minimize the amount of Owner

29

Taxes payable by Owner, provided that any  third party costs incurred by Contractor to perform its obligations hereunder shall be reimbursed by Owner as a Documented Cost Item.

       3.1.35 <u>CPM</u>.  Within fourteen (14) days after the Effective Date, Contractor shall submit to Owner for review a CPM schedule for completion of the Work, including precedence relationship and Float for major activities and milestones in reasonable detail, all as more particularly described in **Exhibit G**.  Owner shall provide comments to Contractor within fourteen (14) days after receipt of the complete draft of the CPM schedule, and Contractor shall include in the final CPM schedule all reasonable comments of Owner.  The CPM schedule shall be adjusted if and to the extent necessary in connection with any adjustment to the Progress Schedule pursuant to this Agreement.

       3.1.36 <u>Notice of Adverse Events</u>.  Provide Notice to Owner of the occurrence of any event that is, or with the passage of time or giving of Notice will be, reasonably likely to have an adverse effect on the ability of Contractor to perform obligations under this Agreement or, to the Contractor's knowledge, the Contractor Guarantor to perform obligations under the Parent Guaranty.  Contractor shall provide the Notice to Owner described in the preceding sentence within two (2) Business Days of Contractor becoming aware of the occurrence of the event described in the preceding sentence.

       3.1.37 <u>Cooperation with Lenders and Independent Engineer</u>.  Cooperate and provide assistance as reasonably required in connection with the activities of the Independent Engineer and the Lenders pursuant to this Agreement and the Financing Documents.

    3.2    Contractor shall be responsible for the construction, maintenance and improvement of all access to and from the Facility Site for the purpose of performance of the Work.  The safety of Contractor, its Subcontractors and their employees, agents, representatives and invitees and any other Persons under the Contractor's control who enters the Facility Site for any purpose shall be Contractor's responsibility.  Owner shall have no responsibility for Facility Site safety.  Contractor shall promptly provide Notice to Owner of any hazardous conditions, property or equipment at the Facility Site.  If Owner requests that Contractor provide certain safeguards required in Owner's reasonable judgment and consistent with Contractor's Site Safety Program for the protection of Persons or property on or near the Facility Site, and Contractor fails to comply with such request within a reasonable time, Owner may provide such safeguards, and Contractor shall promptly reimburse Owner for the costs thereof.  Such provision by Owner shall not relieve Contractor of its obligations or liabilities hereunder, nor shall it make Owner responsible for Facility Site safety or Contractor's means and methods to ensure Facility Site safety.  Owner and its employees, consultants, agents, representatives and engineers, shall comply with Contractor's Site Safety Program.

    3.3    Contractor shall initiate and maintain safety precautions and programs to conform with applicable Laws and Prudent Industry Practices to protect against and prevent injury to persons or damage to property on, about or adjacent to the Facility Site and shall incorporate all such safety precautions and programs (the "**Site Safety Program**") in a written safety program manual (the "**Site Safety Manual**").  Prior to commencement of the Work at the Facility Site, Contractor shall submit the Site Safety Manual to Owner for Owner's approval

30

and shall include the reasonable comments of Owner provided to Contractor within fourteen (14) days after receipt by Owner of the complete proposed Site Safety Manual.  Contractor shall erect and maintain safeguards for the protection of workers and the public.  Contractor shall exercise reasonable commercial efforts to eliminate or abate all reasonably foreseeable safety hazards created by or otherwise resulting from performance of the Work.

3.4    Contractor shall ensure that it, its employees, agents and invitees and its Subcontractors and their employees, agents and invitees, during performance of any of the Work, comply with all applicable Laws. Contractor shall be responsible for the actions and inactions of Operating Personnel operating and maintaining the Facility during  the Performance Tests and otherwise performing work under the direction of Contractor, in each case, to the same extent Contractor would be responsible for the action or inaction of Contractor's personnel during performance of the Work,

3.5    If (i) a Monthly Progress Report reports that Contractor will fail to achieve Mechanical Completion by the Scheduled Mechanical Completion Date or Substantial Completion by the Scheduled Substantial Completion Date; (ii) a Monthly Progress Report reports that Work on the critical path for completion of the Facility is delayed; or (iii) Owner provides Notice to Contractor that, in the reasonable opinion of Owner, the rate of progress of the Work is too slow to meet the Scheduled Mechanical Completion Date or the Scheduled Substantial Completion Date or that Work on the critical path is delayed, Contractor shall submit a Schedule Recovery Plan to Owner, which shall specify the corrective actions Contractor will take (including adjusting its working hours or performing Work using additional forces (including labor, machinery and equipment)) and the commencement date of such corrective action, for Owner's approval, which shall not be unreasonably withheld or delayed.   The corrective actions described in the Schedule Recovery Plan that Contractor proposes to undertake with respect to the Work will be designed and intended to cause the recovery of the schedule for completion of the Work, in each case, with a reasonable probability of success and without a material risk of damaging or diminishing the performance of any of the Work.  Upon Owner's approval of a Schedule Recovery Plan, Contractor shall promptly and diligently pursue completion of the Schedule Recovery Plan. Contractor shall not be entitled to any Fixed Construction Price Adjustment or adjustment in the Scheduled Mechanical Completion Date, Scheduled Substantial Completion Date, Scheduled Final Completion Date or other Change In Work for taking such corrective action, unless the delay is due to a Force Majeure, Change In Law, or Change In Work.

3.6    Contractor acknowledges and agrees that LNTP-3a has been entered into by the Parties and Contractor will complete some or all of the Work described therein on or before Notice to Proceed and shall be paid a part of the Fixed Construction Price as provided therein.

3.7    Owner has entered into the Purchasing Agreement with the Purchasing Agent pursuant to which the Purchasing Agent will purchase on Owner's behalf the Purchased Equipment and Materials to be incorporated into the Facility as described in **Section 2.2.17**. Contractor agrees that Contractor will incorporate such Owner procured Purchased Equipment and Materials into the Facility and the Purchased Equipment and Materials shall

31

become part of the Work, in each case as part of the Contractor's scope hereunder and Contractor shall guarantee and warrant such Purchased Equipment and Materials as if such Purchased Equipment and Materials had been purchased and procured by Contractor as part of its obligations under this Agreement.  The fact that the Purchased Equipment and Materials were purchased by Purchasing Agent acting for Owner shall not, subject to **Section 2.2.18**, be an excuse for Contractor's failure to perform any of its obligations under this Agreement, including its warranty obligations with respect to such Purchased Equipment and Materials or its obligation to achieve Mechanical Completion by the Scheduled Mechanical Completion Date or to achieve Substantial Completion by the Scheduled Substantial Completion Date.  Notwithstanding anything to the contrary contained in this Agreement or the Purchasing Agreement, Contractor shall not contend that it is not liable for any claim of Owner under or arising out of this Agreement on the grounds that the loss or damage suffered by Owner was caused by an act or omission or the failure to comply with the terms of the Purchasing Agreement by Purchasing Agent (to the extent Purchasing Agent is found in breach of its obligations), its Affiliates or any other Person for which Purchasing Agent or its Affiliates are responsible (including subcontractors) or that such claim properly should have been made under the Purchasing Agreement and Contractor irrevocably waives any such defense in any Dispute.

4. **REPRESENTATIONS AND COVENANTS CONCERNING THE WORK AND CONTRACTOR**

4.1     Contractor represents and agrees that it has the skill, expertise and past experience with the engineering, procurement, equipping, construction, testing, and operation and maintenance of facilities similar to the Facility and associated technologies and the required skills and capacity to perform, and shall diligently perform, the Work in a timely and professional manner utilizing sound engineering principles, project management procedures and supervisory procedures and in accordance with the applicable requirements of this Agreement, including the requirements of all applicable Project Requirements and all applicable Laws.

4.2     Contractor represents and agrees that (i) it has inspected the Facility Site, (ii) it has reviewed information provided to it relating to the Facility Site (including **Exhibit L**), including both surface and subsurface geotechnical conditions (collectively, the "**Site Inspection**").  Contractor further represents and agrees that as a result of its Site Inspection it is familiar with the conditions at the Facility Site, including both surface and subsurface geotechnical conditions and accepts all existing surface and geotechnical subsurface conditions as well as non-geotechnical subsurface conditions disclosed in, or reasonably inferable or predictable from the Site Inspection, for the performance of the Work.  In the event Contractor encounters unknown surface, subsurface or latent physical conditions at the Facility Site (including, but not limited to, man-made obstructions, geotechnical conditions, Hazardous Materials and archeological remains), Contractor shall give immediate Notice of the nature and extent of such differing conditions to Owner.  Owner shall promptly investigate the conditions and direct Contractor as to how it shall proceed.  Contractor is not entitled to an adjustment of the Fixed Construction Price or an extension of the Scheduled Substantial Completion Date or the Scheduled Final Completion Date, nor shall a Force Majeure occur, because of (A) the presence of Hazardous Materials at the Facility Site which

32

FUL_0204350

were introduced to the Facility Site by Contractor or its Subcontractors, (B) any surface condition or (C) any subsurface condition of or at the Facility Site that is disclosed in, or reasonably inferable or predictable from, Contractor's Site Inspection (which includes the reports and information regarding the Facility Site provided to Contractor prior to the Effective Date). Notwithstanding the foregoing, Contractor shall be entitled to relief (Y) as provided in **Article 26** for a Force Majeure event, occurring after the date hereof, that changes conditions at the Facility Site, and such changed conditions materially and adversely affect Contractor's ability to perform its obligations under this Agreement or (Z) in connection with a Change In Work that requires additional Work at the Facility Site.

4.3    Contractor represents and warrants to Owner as of the Effective Date: (i) it is a general partnership duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation; (ii) it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement; (iii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary action on its part; (iv) this Agreement has been duly executed and delivered by it and constitutes a valid and binding agreement, enforceable against it in accordance with the terms thereof, except as may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance and transfers, and moratorium or similar laws affecting the enforcement of creditors' rights; (v) it is not currently in breach of, in default under, or in violation of, and the execution and delivery of this Agreement and the performance of its obligations hereunder will not constitute or result in any breach of, default under, or violation of, any Law or the provisions of its Organizational Documents or any agreement or instrument to which it is bound or to which its assets are subject, which breach, default or violation could reasonably be expected to have a material adverse effect upon its ability to observe the provisions of, and to perform its obligations under, this Agreement; and (vi)  no suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or threatened that would affect the validity or enforceability of this Agreement, its ability to fulfill its commitments hereunder in any material respect, or that could result in any material adverse change in its business or financial condition.

4.4    Contractor represents and warrants to Owner as of the Effective Date**,** that the Contractor Guarantor: (i) is duly incorporated or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation (as applicable); (ii) has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the Parent Guaranty (with all applicable engineering or contractor licenses to be obtained prior to starting the Work); (iii) the execution, delivery and performance of the Parent Guaranty has been duly authorized by all necessary action by the Contractor Guarantor; (iv) the Parent Guaranty has been duly executed and delivered by the applicable Contractor Guarantor and constitutes a valid and binding agreement, enforceable against such Contractor Guarantor in accordance with the terms thereof, except as may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance and transfers, and moratorium or similar laws affecting the enforcement of creditors' rights; (v) is not currently in breach of, in default under, or in violation of, and the execution and delivery of the Parent Guaranty and the performance of its obligations thereunder will not constitute or result in any breach of, default under, or violation of, any Law or the provisions of such its Organizational Documents or any agreement or instrument to which it is bound or to which

33

its assets are subject, which breach, default or violation could reasonably be expected to have a material adverse effect upon its ability to observe the provisions of, and to perform its obligations under, the Parent Guaranty; and (vi) no suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or threatened that would affect the validity or enforceability of the Parent Guaranty, its ability to fulfill its commitments thereunder in any material respect, or that could result in any material adverse change in its business or financial condition.

4.5     Owner represents and warrants to Contractor as of the Effective Date: (i) it is a limited liability company duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation; (ii) it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement; (iii) the execution, delivery and performance of this Agreement has been duly authorized by all necessary action on its part; (iv) this Agreement has been duly executed and delivered by it and constitutes a valid and binding agreement, enforceable against it in accordance with the terms thereof, except as may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance and transfers, and moratorium or similar laws affecting the enforcement of creditors' rights; (v) it is not currently in breach of, in default under, or in violation of, and the execution and delivery of this Agreement and the performance of its obligations hereunder will not constitute or result in any breach of, default under, or violation of, any Law or the provisions of its Organizational Documents or any agreement or instrument to which it is bound or to which its assets are subject, which breach, default or violation could reasonably be expected to have a material adverse effect upon its ability to observe the provisions of, and to perform its obligations under, this Agreement; and (vi) no suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or, to the best its knowledge, threatened that would affect the validity or enforceability of this Agreement, its ability to fulfill its commitments hereunder in any material respect, or that could result in any material adverse change in its business or financial condition.

## 5.     OPERATING UTILITY SERVICES AND OPERATING CONSUMABLES

5.1          Contractor shall obtain, transport, unload, store and maintain, as applicable, all Operating Utility Services and Operating Consumables necessary to perform the Work (except to the extent provided by Owner pursuant to **Section 2.2.10**). Owner shall reimburse Contractor for the Documented Costs for Operating Utility Services and Operating Consumables which are required for operation of the Facility from the Mechanical Completion Date to the Substantial Completion Date, as provided in **Section 8.3**. Contractor shall use reasonable efforts to minimize the amount of Operating Utility Services and Operating Consumables it uses.

## 6.     SPARE PARTS

6.1          <u>Spare Parts</u>.  At least one hundred eighty (180) days prior to the Scheduled Mechanical Completion Date (but as early as the time of the initial acquisition of equipment from vendors), Contractor shall provide Owner with a recommended list of spare parts and special tools for the long-term operation and maintenance of the Facility.  Within forty-five (45) days following receipt of the complete proposed spare parts list, Owner shall provide

34

reasonable comments thereto to Contractor which shall be included in the final list of spare parts and special tools for the long-term operation and maintenance of the Facility (the "**Primary Spare Parts**").  Owner and Contractor acknowledge that the Primary Spare Parts shall have a value not less than One Million Dollars ($1,000,000.00) and not more than One Million Five Hundred Thousand Dollars ($1,500,000.00) in the aggregate.  Purchasing Agent shall purchase the Primary Spare Parts on the best available commercially reasonable terms including all rebates and discounts, and Owner shall reimburse Purchasing Agent the actual purchase price of such Primary Spare Parts as provided in the Purchasing Agreement. Purchasing Agent shall not be entitled to any commission, markup or other payment in connection with its purchase of Primary Spare Parts. Contractor shall receive, inspect, deliver to storage at the Facility Site prior to the Scheduled Substantial Completion Date and take all other actions for the storage and maintenance of the Primary Spare Parts.

6.1.1  Prior to the Substantial Completion Date, Contractor may use any Primary Spare Parts item but must replace each such item, at its sole cost and expense, prior to the Substantial Completion Date to the extent such items are available and as soon thereafter as possible for long lead time items to the extent such long lead time items are permitted to be included on the Punch List; provided, however, that any such items not so available on the Substantial Completion Date shall be included on the Punch List (so long as the inclusion does not violate the limits and requirements associated with Punch List items) and shall be provided by the Final Completion Date.

6.1.2  Contractor shall supply, at its sole cost and expense, any and all spare parts and tools, other than Primary Spare Parts, ("**Additional Spare Parts**") that it requires in connection with the performance of the Work; provided, however, that such Additional Spare Parts shall remain the property of Contractor unless and until sold to Owner as provided below. On or before the Substantial Completion Date, Contractor shall offer to Owner, at a price equal to its out-of-pocket cost therefor, all Additional Spare Parts that are on hand as of such Substantial Completion Date.  Owner may elect to purchase or refuse such Additional Spare Parts in its sole discretion; provided, however, that the cost of any Additional Spare Parts purchased by Owner from Contractor shall be paid to Contractor as a Fixed Construction Price Adjustment pursuant to **Section 7.2**.

6.1.3  Any Additional Spare Parts purchased by Owner shall be deemed to be Primary Spare Parts upon such purchase and may thereafter be used and replaced by Contractor as provided in **Section 6.1.1**.

6.1.4  Contractor shall properly store and categorize all Primary Spare Parts and Additional Spare Parts and shall create and maintain a computerized inventory of all Primary Spare Parts and Additional Spare Parts.  The inventory control system shall be approved by Owner prior to its implementation (such approval not to be unreasonably withheld or delayed), and Contractor shall cause the inventory control system to be transferred to Owner's computer system at the Facility prior to the Substantial Completion Date.

6.1.5  Any Owner comments or objections to proposed Primary Spare Parts or any Additional Spare Parts required under this **Article 6** shall be provided in a Notice delivered

to Contractor within thirty (30) days after Owner's receipt of the proposal, to prevent additional costs or schedule delays.

7. **FIXED CONSTRUCTION PRICE AND ADJUSTMENTS TO FIXED CONSTRUCTION PRICE**

7.1          As full compensation for the Work and the performance of all of its obligations under this Agreement and the Purchasing Agreement, Contractor shall be entitled to payment by Owner of $202,380,221 (the "**Fixed Construction Price**") of which (a) $118,060,730 is to be paid to suppliers and subcontractors by Owner under the Purchasing Agreement as provided herein and therein; and (b) $84,319,491 of which is paid under this Agreement (with the last Fifteen Million Dollars ($15,000,000.00) payable to Contractor as of the Substantial Completion Date or, if only Deemed Substantial Completion is achieved, as otherwise provided in **Section 7.5**, in either case, to be paid in Project Equity (the "**Final Milestone Payment**") by Fulcrum Bioenergy, Inc. ("**Fulcrum**") and subject to Fulcrum's obligation to purchase such equity, all as more particularly set forth in an equity purchase and reimbursement agreement and entered into between Fulcrum and Contractor on or before the Notice to Proceed Date (the "**Project Equity and Reimbursement Agreement**")); provided that, Contractor's sole and exclusive recourse for payment of the Final Milestone Payment shall be against Fulcrum under the Project Equity and Reimbursement Agreement and Owner has no obligation under this Agreement or otherwise to pay the Final Milestone Payment. The Fixed Construction Price may be adjusted by a Fixed Construction Price Adjustment in accordance with **Section 7.2,** and Contractor's Documented Costs for the Documented Cost Items pursuant to **Section 8.3** and subject to the last Payment Milestone pursuant to **Section 7.5** and after March 31, 2017 and until December 31, 2017, the Fixed Construction Price will be escalated based on **Exhibit GG**.   The Fixed Construction Price set forth in this **Section 7.1** together with the Fixed Construction Price Adjustments set forth in **Section 7.2** and the Documented Costs for the Documented Cost Items, constitute the total compensation to Contractor for all of its obligations under this Agreement and Contractor's actual cost to perform the Work in accordance with this Agreement shall be at the risk of Contractor, who hereby acknowledges and shall be deemed to have obtained all information and taken account of all circumstances which may affect such cost before agreeing to the Fixed Construction Price and the Fixed Construction Price Adjustments. The Fixed Construction Price shall be paid in US Dollars (except the Final Milestone Payment to be paid in Project Equity pursuant to the Project Equity and Reimbursement Agreement as provided above) and except as provided in this **Section 7.1** and **Section 7.2**, the Fixed Construction Price shall not be adjusted for any reason including changes in escalation or currency exchange rates, other than escalation based on **Exhibit GG** as provided above in this **Section 7.1**. Owner shall receive a dollar for dollar credit against the Fixed Construction Price for all amounts paid by Owner under LNTP-1, LNTP-2, LNTP-3a, LNTP-3b issued under this Agreement and the Purchasing Agreement and any other Limited Notice to Proceed, which shall be applied against the initial Payment Milestone(s) for the amounts paid under LNTP-1 & LNTP-2 and, for amounts paid under LNTP-3a and LNTP3-b against those Payment Milestones specifically identified in LNTP-3a and LNTP-3b in the respective Exhibits 2 thereto payable hereunder until the credit is exhausted.   For the avoidance of doubt, the Final Milestone Payment shall not be reduced by any such credit against the Fixed Construction Price for amounts paid under LNTPs or the Purchasing Agreement.

36

7.2     The Fixed Construction Price will increase or decrease pursuant to the following "Fixed Construction Price Adjustments":

       7.2.1     The Fixed Construction Price shall be adjusted by the amount set forth in each fully executed Change In Work Form as described in **Article 19**.

       7.2.2     The Fixed Construction Price shall increase by the amount paid by Contractor for Additional Spare Parts that Owner purchases from Contractor as and to the extent provided in **Section 6.1.2**.

       7.2.3     The Fixed Construction Price shall increase by the amounts paid by Contractor as a result of changes in the Scope of Work and Specifications as and to the extent provided in **Section 12.1.5**, but only to the extent such changes are required by Force Majeure or a Change In Law.

       7.2.4     The Fixed Construction Price shall increase by any amounts paid by Contractor for insurance coverage pursuant to **Section 27.1.1**.

7.3     The Fixed Construction Price shall not be adjusted for occupational and income taxes, payroll taxes, customs duties, tariffs, fees, and royalties imposed with respect to any design equipment, testing, materials, labor or services and any and all other Contractor Taxes on any item or service that is part of the Work or the Facility or any other Contractor Taxes, whether such tax is normally included in the price of such item or service or is normally stated separately. In no event shall Contractor be liable for any Owner Taxes.

7.4     Contractor shall reasonably cooperate with Owner in order to minimize, to the maximum extent permitted by applicable Law, any and all Owner Taxes owed by Owner in connection with this Agreement, the Facility or Facility Site.  In the event that (i) Contractor pays any Owner Taxes, then Owner shall promptly reimburse Contractor for such costs as a Documented Cost Item, or (ii) Owner pays any Contractor Taxes, then Contractor shall reimburse Owner for such costs within thirty (30) days following receipt by Contractor of an invoice for such costs from Owner accompanied by complete reasonable documentation.

7.5     Contractor agrees that the Final Milestone Payment shall be payable to Contractor pursuant to the Project Equity and Reimbursement Agreement upon achievement of Substantial Completion or if only Deemed Substantial Completion is achieved, at the end of the Cure Period and after payment of any required Buydown Amounts (up to the limit of liability stated in **Section 40.13**), the other requirements to achieve Substantial Completion have been satisfied and payment of any other undisputed amounts owed by Contractor to Owner hereunder (as adjusted, the "**Equity Amount**"). For clarity, Contractor shall not be entitled to payment of any portion of the Equity Amount if Contractor does not achieve Mechanical Completion (with or without receipt by Contractor of any reimbursement that may be due under the Project Equity and Reimbursement Agreement) and Deemed Substantial Completion (and the other requirements of Substantial Completion). Entitlement to payment of the Equity Amount under the Project Equity and Reimbursement Agreement will be determined in the same manner that the other Payment Milestones are applied for, validated and approved and Contractor agrees that such amount shall be paid by issuance to

37

FUL_0204355

Contractor of equity in the Owner ("**Project Equity**").  The amount of Project Equity to be issued to Contractor shall be determined in accordance with the formula set out in the Project Equity and Reimbursement Agreement.

7.5.1    Project Equity to be issued to Contractor shall be equal to the amount of Project Equity determined pursuant to the Project Equity and Reimbursement Agreement. Examples of the calculation of amounts of Project Equity are set forth in the Project Equity and Reimbursement Agreement.   Contractor's Project Equity will vest on the Substantial Completion Date or at the end of the Cure Period if Deemed Substantial Completion is all that Contractor achieves and all of the other requirements to achieve Substantial Completion have been satisfied, as applicable.   Contractor may not amend the Project Equity and Reimbursement Agreement or waive any rights thereunder or assign any of its rights or obligations under the Project Equity and Reimbursement Agreement including its right to receive Project Equity to any other Person, in each case, without the prior written consent of Owner.  Contractor shall not be entitled to set-off or reduce the Buydown Amount in respect of, or with a corresponding reduction in, its right to receive the Equity Amount.

7.5.2    Notwithstanding anything to the contrary contained in this Agreement, Contractor acknowledges and agrees that, to the fullest extent permitted by Law, (i) Contractor's sole and exclusive right to payment of  the Final Milestone Payment and issuance of the Project Equity shall be under the Project Equity and Reimbursement Agreement and Contractor's sole and exclusive remedies in respect thereof shall be against Fulcrum pursuant to the Project Equity and Reimbursement Agreement and (ii) Contractor shall not contend that Contractor is not liable for any claim of Owner under or arising out of this Agreement if such contention is on the grounds that (1) the Final Milestone Payment has not been paid or the Project Equity has not been issued for any reason whatsoever, (2) Fulcrum is in breach of its representations, warranties, agreements or obligations under the Project Equity and Reimbursement Agreement, (3) the loss or damage was caused by an act or omission or the failure to comply with the terms of the Project Equity and Reimbursement Agreement by Fulcrum, its Affiliates or any other Person for which Fulcrum or its Affiliates are responsible, and Contractor irrevocably waives any such defense in any Dispute.

## 8.    TERMS OF PAYMENT

8.1    Payment to Contractor shall be made as follows:

8.1.1    Between the first (1st) and the tenth (10th) Day of each month, Contractor shall submit an invoice to Owner (with a copy to the Independent Engineer) in the form specified in **Exhibit I**.  Such invoice shall properly represent the Payment Milestones that have been achieved during preceding months and which have not been the subject of a previous invoice and shall be accompanied by reasonable supporting documentation evidencing achievement of the Payment Milestone for which payment is being requested.   Contractor acknowledges and agrees that all amounts payable to major trade Subcontractors listed in **Part 1 of Exhibit E and** major equipment suppliers listed in **Part 2 of Exhibit E** (collectively, "**Major Subcontractors**") for Work performed or supplied shall be deposited into the Subcontractor Direct Payment Account and paid directly to such Major Subcontractors in accordance with **Section 2.2.18**.  Contractor shall specify in each invoice for a payment due

38

under the Progress Payment Schedule in respect of achievement of a Payment Milestone: (i) the portion of the invoiced amount to be paid to Contractor for Self-Performed Costs and (ii) the portion of the invoiced amounts to be due paid into the Subcontractor Direct Payment Account for payment directly to Major Subcontractors as provided in **Section 2.2.18**. Contractor shall not request any amount payable to a Major Subcontractor be paid to Contractor, whether such amount is under dispute with any such Major Subcontractor or otherwise, and Contractor agrees to designate in its invoice that any amounts payable to any Major Subcontractor in respect of a Payment Milestone be paid into the Subcontractor Direct Payment Account for payment directly to each such Major Subcontractor as provided in **Section 2.2.18**.

8.1.2    Contractor shall not be entitled to invoice for Payment Milestones prior to the month in which such Payment Milestones are scheduled to be achieved according to the most recent Progress Payment Schedule, unless (a) such early Payment Milestones are paid in the calendar quarter during which such Payment Milestones were scheduled to occur, and (b) in no case shall Owner's cumulative payments of the Fixed Construction Price as of the last invoice of any calendar quarter exceed the cumulative Payment Milestones scheduled to have been completed as of the end of such calendar quarter.

8.1.3    For each invoice, Contractor shall submit to Owner (with a copy to the Independent Engineer) a sworn statement and a waiver of Liens for all Work completed and materials provided for which payment is requested (contingent upon receipt of the invoice amount from Owner) as of the date of such invoice (i) in the form set forth in **Exhibit J-1**, from Contractor, each Major Subcontractor and any other Subcontractor that has entered into a subcontract for the Work requiring payment of $250,000 or more, and (ii) representing that Contractor has made all  payments or arranged for the payment of all payments due and payable to all of its Subcontractors for Work and materials for which Owner has previously made payment to Contractor.  If any Dispute arises with respect to the payment of any amount due and payable to such Subcontractor, Contractor shall provide to Owner evidence of the payments that Contractor has made, to such Subcontractor and if requested by Owner, Contractor shall provide a written confirmation of such payment from its Subcontractors.

8.1.4    Owner shall, within fifteen (15) days after receipt of an invoice from Contractor pursuant to **Section 8.1.1**, determine whether (A) the Payment Milestones covered by the invoice have been met; (B) the Work performed conforms with the requirements of this Agreement; (C) the invoice and any required backup information have been properly submitted and are accompanied by the appropriate waiver of Liens; and (D) the invoiced amount reflects the payment due under the Progress Payment Schedule and Owner shall inform Contractor as to whether Owner disputes any portion of the invoice.  Notwithstanding the foregoing, in no event shall Owner's determination described in this **Section 8.1.4** or payment of any amount hereunder constitute or be deemed a waiver of Contractor's obligations under any provision of this Agreement, and Owner shall have the right to enforce this Agreement against Contractor notwithstanding any such determination or payment if Owner subsequently determines for any reason that any determination or payment of an invoice under this **Section 8.1.4** was erroneous. Subject to such determination by Owner, and except for disputed portions of any invoice, Owner shall (i) pay Contractor, within thirty (30) days after receipt by Owner of Contractor's invoice, the portion of the invoiced amount for Self-Performed Costs payable to Contractor and

39

FUL_0204357

(ii) deposit into to Subcontractor Direct Payment Account the portion of the invoiced amount specified in Contractor's invoice as payable to Major Subcontractors, in each case, (less the Retainage For Punch List in the case of the penultimate Payment Milestone invoice) minus any disputed portion of such invoice, minus any amounts payable by Contractor to Owner hereunder for the immediately preceding billing period or otherwise.  If more than a single Milestone is included in an invoice, a dispute with respect to the achievement of one or more of the Milestones reflected in such invoice shall not prevent payment of the remaining Milestones as to which there is no dispute. Late payments not resulting from any of the items listed in **Section 8.1.5** shall accrue interest at the Late Payment Rate from the date due until paid.  Late payments resulting from any of the items listed in **Section 8.1.5** shall not accrue interest until the event described in **Section 8.1.5** has been remedied; provided, however, that if Owner withholds funds due to any of the items listed in **Section 8.1.5** and it is later determined that such withholding was improper, then interest shall accrue at the Late Payment Rate on the amount so improperly withheld from the date such funds should have been paid until actual payment is received by Contractor.

    8.1.5   To the fullest extent permitted by Law, Owner, based on its estimate, may withhold such portion of any payment to such extent as may be necessary to protect Owner from loss due to Contractor's failure to comply with items (A), (B), (C) and (D) of **Section 8.1.4** in an amount equal to the sum of the value of:

    (A)    Any work or labor that has not been performed or materials or equipment that has not been furnished for which payment is being sought, unless this Agreement otherwise allows or requires such a payment to be made;

    (B)    Costs and expenses reasonably necessary to correct or repair any work which is the subject of the request for payment and which is not materially in compliance with this Agreement, to the extent that such costs and expenses exceed fifty percent (50%) of the retention amount permitted to be withheld by Owner pursuant to this Agreement; and

    (C)    The amount the Owner has paid or is required to pay pursuant to an official notice from a state agency or employee benefit trust fund, for which the Owner is or may reasonably be liable for the Contractor or its lower-tiered subcontractors in accordance with chapter 608, 612, 616A to 616D, inclusive, or 617 of NRS.

    8.1.6   Owner shall provide a Notice to Contractor within fifteen (15) days after receipt of Contractor's invoice of any actual or reasonable evidence leading to a possible delayed payment of any portion of an invoice.  Upon receipt of such Notice, Contractor shall promptly take any and all reasonable steps available to remedy any condition identified by Owner leading to such claims.  Subject to a mutually agreed upon resolution of Owner's claims or, in the absence thereof, of a final non-appealable arbitration award as provided in **Article 37**, payment of the disputed portion of Contractor's invoice shall be made by Owner within ten (10) days following the date of such agreement or award.

Confidential    FUL_0204358

8.1.7  No action properly taken by either Party in compliance with this **Section 8.1** shall affect the Scheduled Substantial Completion Date or the Scheduled Final Completion Date.

8.1.8  With respect to each invoice, Owner shall not retain any percentage as a fixed percentage retainage. The Owner may retain an amount for Punch List completion pursuant to **Section 8.1.9.**

8.1.9  The Owner may, from the payment for the Payment Milestone immediately preceding the Final Milestone Payment payable pursuant to **Section 7.5**, retain an amount equal to the costs and expenses reasonably necessary to correct or repair any work identified on the Punch List, to the extent that such costs and expenses exceed fifty percent (50%) of the retention amount permitted to be withheld by Owner pursuant to the Agreement, up to Contractor's maximum amount of liability of Seven Hundred Fifty Thousand Dollars ($750,000.00) for Punch List items. If the Owner elects to retain any amount for Punch List items (**"Retainage For Punch List"**), the Owner shall provide the Contractor with a schedule of values justifying the Retainage For Punch List.

8.1.10  Contractor shall diligently pursue the satisfactory completion of all Punch List items in accordance with this Agreement. As Contractor completes Punch List items, Contractor may submit an invoice on a monthly basis to Owner (with a copy to Independent Engineer) for Retainage For Punch List for such Punch List items completed in accordance with this Agreement, which invoice shall be paid to Contractor within thirty (30) days after Owner's receipt thereof. Retainage For Punch List amounts for any Punch List items not completed on or before the Final Completion Date may, at Owner's sole option, be permanently retained by Owner, and the condition to Final Completion specified in **Section 18.2(B)** shall be deemed to have been satisfied and Contractor shall be released from completion of such Punch List items. Notwithstanding the foregoing, such release shall not relieve Contractor from fulfilling any other requirements for Final Completion, other than Punch List items, as set forth in **Section 18.2.**

8.1.11  If there are outstanding Contractor claims against Owner, such claims shall not delay or prevent the release of Retainage For Punch List otherwise due as provided in **Sections 8.1.9** and **8.1.10**, provided such claims have been made in writing, in good faith, and are outstanding at the time Retainage For Punch List release. If there are outstanding Owner claims against Contractor or any Lien claims of any Subcontractor of Contractor for which a bond has not been posted as required in **Section 8.2**, in each case which have been made in writing and in good faith at the time Retainage For Punch List release or the reduction in the amount of any Retainage For Punch List is requested, then Owner may retain all or a portion of such amount as reasonably necessary to ensure full recovery by Owner or the release, as the case may be, of such claim.

8.2    In the event that any Subcontractor of Contractor files a Lien against the Facility, Facility Site, or Owner, at any time after the Owner's payment of a Payment Milestone or Documented Cost Item (as the case may be) in respect of the Work which is the basis of the Lien claim, then Contractor shall, within ten (10) days of Notice thereof, post a bond against such Lien such bond to be at Contractor's sole cost. Upon the failure of Contractor promptly

41

to post a bond against such Lien as required hereby within ten (10) days of Notice thereof, Owner may, but shall not be obligated to, pay, discharge or obtain a bond or security for such Lien and, upon such payment, discharge or posting of security therefor, shall be entitled promptly to recover from Contractor the amount thereof, together with all expenses incurred by Owner in connection with such payment or discharge.  As a condition to the Owner's obligation to payment or transfer of the payment for the Payment Milestone immediately preceding the Final Milestone Payment, Contractor shall submit a sworn statement and a waiver of Liens and shall furnish final waivers of Liens from its Subcontractors, in each case, in the form set forth in **Exhibit J-2** for all amounts paid or then due and payable to Subcontractors.   With respect to amounts due to Subcontractors following payment or transfer of the payment for the Payment Milestone immediately preceding the Final Milestone Payment, Contractor shall submit to Owner a sworn statement and a waiver of Liens and shall furnish final waivers of Liens from each such Subcontractor, in each case, in the form set forth in **Exhibit J-2** upon payment of such amount to each such Subcontractor. If any Subcontractor entitled to One Million Dollars ($1,000,000.00) or less (in the aggregate per Subcontractor) in respect of the Work performed by it on behalf of Contractor, refuses or fails to furnish such waivers of Lien, Contractor may post an indemnity bond in favor of Owner with respect to such Subcontractors.  Such indemnity bond shall expire upon the later of (A) the date of final disposition and satisfaction of the claim secured by such indemnity bond, or (B) with respect to unasserted claims, thirty (30) days after the last date Subcontractors may file Liens or claims against the Facility, Facility Site or Owner, in each case in respect of claims arising in connection with their performance of Work on behalf of Contractor under this Agreement.

8.3     Payment to Contractor of its Documented Costs for Documented Cost Items shall be made as follows:

8.3.1   On or about the first day of each month, Contractor shall submit an invoice to Owner (with a copy to the Independent Engineer), in form and substance reasonably satisfactory to Owner (the "**Documented Cost Invoice**"), for payment of its Documented Costs for the preceding month. The Documented Cost Invoice shall properly represent the Documented Costs that have been paid by Contractor for each Documented Cost Item during the preceding months and which have not been the subject of a previous Documented Cost Invoice.

8.3.2   For each Documented Cost Invoice, Contractor shall submit a Lien waiver in the form set forth in **Exhibit J-1** for all Documented Cost Items provided for which Documented Costs are requested, contingent upon receipt of the Documented Cost Invoice amount from Owner, and representing that Contractor has made or arranged for all payments due to all its Subcontractors for Documented Cost Items for which Owner has previously made payment to Contractor.  If any Dispute arises with respect to the payment of any such Subcontractors, Contractor shall provide to Owner evidence of the payments that Contractor has made, or has represented it has made, to such Subcontractors.  If Contractor is unable to provide the Lien waiver with respect to any amount, Contractor may substitute evidence that a bond has been posted or other appropriate action taken so as to vacate any such Lien against the Facility, Facility Site or Owner.

42

8.3.3    Owner shall, within fifteen (15) days after receipt of a Documented Cost Invoice from Contractor pursuant to **Section 8.3.1**, determine whether (A) the Documented Cost Items covered by the Documented Cost Invoice have been provided by Contractor in accordance with this Agreement; (B) the Documented Cost Items provided conform with the requirements of this Agreement; (C) the Documented Cost Invoice and any required backup information have been properly submitted and are accompanied by the appropriate waiver of Lien or evidence that other appropriate action has been taken so as to vacate any Lien; and (D) the amount of the Documented Cost Invoice reflects the payment due under the provisions of this Agreement and shall inform Contractor as to whether Owner disputes any portion of the Documented Cost Invoice.    Notwithstanding the foregoing, in no event shall Owner's determination described in this **Section 8.3.3** or payment of any amount hereunder constitute or be deemed a waiver of any provision of this Agreement, and Owner shall have the right to enforce this Agreement against Contractor notwithstanding any such determination or payment if Owner subsequently reasonably determines for any reason that any determination or payment of a Documented Cost Invoice under this **Section 8.3.3** was erroneous.    Subject to such determination by Owner, and except for disputed portions of any Documented Cost Invoice, Owner shall pay Contractor, within thirty (30) days after receipt by Owner of the Documented Cost Invoice, one hundred percent (100%) of the amount of the Documented Cost Invoice minus any disputed portion of such Documented Cost Invoice and minus any undisputed amounts due from Contractor to Owner that are outstanding hereunder.    Late payments not resulting from any of the items listed in **Section 8.3.4** shall accrue interest at the Late Payment Rate from the date due until paid.  Late payments resulting from any of the items listed in **Section 8.3.4** shall not accrue interest until the event described in **Section 8.3.4 has** been remedied.

8.3.4    To the fullest extent permitted by Law, Owner, based on its estimate, may withhold such portion of any payment to such extent as may be necessary to protect Owner from loss due to Contractor's failure to comply with **Section 8.3.3** an amount equal to the sum of the value of:

(A)    Any work or labor that has not been performed or materials or equipment that has not been furnished for which payment is being sought, unless this Agreement otherwise allows or requires such a payment to be made;

(B)    Costs and expenses reasonably necessary to correct or repair any work which is the subject of the request for payment and which is not materially in compliance with this Agreement, to the extent that such costs and expenses exceed fifty percent (50%) of the retention amount permitted to be withheld by Owner pursuant to this Agreement; and

(C)    The amount the Owner has paid or is required to pay pursuant to an official notice from a state agency or employee benefit trust fund, for which the Owner is or may reasonably be liable for the Contractor or its lower-tiered subcontractors in accordance with chapter 608, 612, 616A to 616D, inclusive, or 617 of NRS.

43

8.3.5   Owner shall advise Contractor in writing within fifteen (15) days after receipt of Contractor's Documented Cost Invoice of any evidence leading to a possible delayed payment of any portion of a Documented Cost Invoice.   Upon receipt of such Notice, Contractor shall promptly take any and all steps available to remedy any condition identified by Owner leading to such claims.   Subject to a mutually agreed upon resolution of Owner's claims or, in the absence thereof, of an arbitration award as provided in **Article 37**, payment of the disputed portion of the Documented Cost Invoice shall be made by Owner within ten (10) days following the date of such agreement or award.

8.3.6   No action properly taken by either Party in compliance with this **Section 8.3** shall affect the Scheduled Substantial Completion Date or the Scheduled Final Completion Date unless specifically agreed to in writing by Owner.

8.4   Either Party may offset any liability of the other Party under this Agreement against any amount due or to become due from the Party implementing the offset under this Agreement; provided that the failure of a Party to offset such liability against amounts due to it shall in no way limit or restrict the right of such Party to recover such amounts due to it from the other Party. Neither Party may exercise its offset right pursuant to this Section with respect to any disputed amount until the dispute is resolved.   Notwithstanding the foregoing, in no event may Contractor set-off any amount owed by Contractor hereunder (including the Buydown Amount) against the Final Milestone Payment owed to Contractor pursuant to the Project Equity and Reimbursement Agreement.

9.   **COMMENCEMENT OF THE WORK**

9.1   The Notice to Proceed shall not be issued until (A) Financing has been obtained, (B) a collateral assignment agreement in the form set forth in **Exhibit S** setting forth customary conditions, including conditions under which Financing Agent may require Contractor to continue performance on its behalf, has been executed, (C) Contractor has signed an acceptable subcontract with TRI, and (D) the Parties have mutually agreed on the design basis and Exhibits and simultaneous execution of a mutually agreeable Project Equity and Reimbursement Agreement with Fulcrum, and a Purchasing Agreement with Owner.

9.2   Within three (3) Business Days after issuance by Owner of the Notice to Proceed, Contractor shall commence and diligently pursue the Work, assigning to it a priority that will permit Work to be completed in accordance with the Progress Schedule and **Section 3.1.1**. Any Progress Schedule modifications that affect Contractor's ability to achieve Mechanical Completion by the Scheduled Mechanical Completion Date, Substantial Completion by the Scheduled Substantial Completion Date, Final Completion by the Scheduled Final Completion Date, or which substantially affects Owner's obligations under this Agreement or which affects the critical path for completion of the Work, must be approved by Owner pursuant to this **Section 9.2** and such approval shall be in writing prior to making any such modification.

9.3   Owner may terminate this Agreement by Notice to Contractor after the Effective Date and prior to the issuance of a Notice to Proceed without any liability to either Party as a

44

result of such termination except for liabilities and obligations under any Limited Notice to Proceed or service agreements.

9.4    Contractor has no obligation to extend or adjust the Fixed Construction Price and may terminate this Agreement by Notice to Owner if a Notice to Proceed is not issued on or prior to December 31, 2017 without any liability to either Party as a result of such termination except for liabilities and obligations under any Limited Notice to Proceed or service agreements.

## 10.    TRADE SUBCONTRACTORS AND SUPPLIERS

10.1    All trade Subcontractors with subcontract values in excess of Five Hundred Thousand Dollars ($500,000.00) shall be selected from the list of major trade Subcontractors listed in **Part 1 of Exhibit E**, unless otherwise agreed in writing by Owner and Contractor. The inclusion or exclusion of any major trade Subcontractor in **Part 1 of Exhibit E** shall not be construed to alter, amend or waive any provisions or obligations of Contractor under this Agreement or impose any liability on Owner for the performance of Work by such trade Subcontractor. Contractor shall cause all of its subcontracts and purchase orders to be assignable to Owner or, at the request of Owner, to the Lenders, the Financing Agent or any of their designees in the event of a termination of this Agreement for any reason.

10.2    All major equipment suppliers with supply contract values in excess of Five Hundred Thousand Dollars ($500,000.00) will be selected from the list of major equipment suppliers listed in **Part 2 of Exhibit E**, unless otherwise agreed in writing between Owner and Contractor.  The inclusion or exclusion of any major equipment supplier in **Part 2 of Exhibit E** shall not be construed to alter, amend or waive any provisions or obligations of Contractor under this Agreement or impose any liability on Owner for the performance of Work by such equipment supplier.  Contractor shall cause all of its supply contracts with major equipment suppliers with supply contract values in excess of Five Hundred Thousand Dollars ($500,000.00) to be assignable to Owner or, at the request of Owner, to the Lenders, the Financing Agent or any of their designees in the event of a termination of this Agreement for any reason.

10.3    Owner may direct Contractor to utilize a specific Subcontractor to perform Work or to include a specific Subcontractor as a bidder for any Work to be performed by a Subcontractor.  Contractor may refuse to utilize this Subcontractor to perform Work if, in Contractor's sole discretion, such Subcontractor is unacceptable for technical or commercial considerations, and Contractor shall provide a written response to Owner detailing Contractor's reasons for determining such unacceptability.  In the event Owner's selection changes Contractor's costs, such selection shall be handled as a Change In Work and the Fixed Construction Price shall be adjusted accordingly; provided that Contractor shall be fully responsible for the performance of the Subcontractor.  Owner's direction and Contractor's acceptance under this **Section 10.3** of goods, services, or Subcontractors shall not alter, amend or waive any provisions or obligations of Contractor under this Agreement, or impose any liability on Owner for the performance of Work by such Subcontractor.

45

                                                                                      FUL_0204363

10.4    Contractor shall cause all of its Subcontractors to perform their portion of the Work in accordance with the applicable provisions of this Agreement.  Contractor shall furnish such information relative to its Subcontractors as Owner may reasonably request.

10.5    Contractor shall cause all of its Subcontractors (and their respective employees, contractors and agents) to comply with applicable Law and the Project Requirements and to exercise appropriate conduct and behavior so as to not adversely affect the reputation of Owner or the Facility nor adversely affect the relationship of Owner or the Facility with Governmental Entities or the community in which the Facility is located.

## 11.    LABOR RELATIONS

11.1    Except as otherwise provided in this Agreement, Contractor shall exercise management rights in performing the Work that are specifically detailed in, or not expressly limited by, applicable collective bargaining agreement(s).

11.2    Contractor shall promptly take any and all steps that are available in connection with the resolution of alleged violations of labor laws, collective bargaining agreements and jurisdictional disputes and secondary boycotts including, without limitation, the filing of appropriate processes with any court or administrative agency having jurisdiction to settle, enjoin or award damages resulting from violations of collective bargaining agreements or jurisdiction disputes, or violation of the appropriate federal and local labor laws.

11.3    Contractor shall advise Owner promptly, in writing, of any actual, anticipated or threatened labor dispute that might affect the performance of the Work by Contractor or by any of its Subcontractors.

11.4    Contractor shall promptly undertake all reasonable efforts to prevent or resolve any strikes or other labor disputes among its employees or the employees of its Subcontractors, and to minimize any resulting disruption of the progress of the Work.

11.5    As provided in **Article 26**, no labor strike or work stoppage that is limited to the Facility or any Subcontractor(s) shall constitute Force Majeure or otherwise entitle Contractor to relief under this Agreement.

11.6    Notwithstanding anything in this **Article 11** to the contrary, immediately after receiving a request by Owner, Contractor shall remove from the Facility Site, and from any performance of the Work, and cause any Subcontractor to immediately remove from the Facility Site and from any performance of the Work any Person performing the Work (including any of the Key Personnel) (a) who is creating a risk of bodily harm or injury to themselves or others or whose actions create a risk of material property damage, or (b) subject to compliance with Contractor's or the applicable Subcontractor's personnel policies and applicable Law, due to misconduct or negligence.  Contractor acknowledges that Owner desires to maintain a positive perception of the project and a good working relationship with the surrounding communities and that actions of Contractor's employees, Subcontractors, or agents, including any Subcontractor's or agent's employees may affect the local communities.

46

## 12.    DETAILED PLANS; INSPECTION; EFFECT OF REVIEW AND COMMENT

12.1    Detailed Plans.

12.1.1 Contractor shall prepare the Detailed Plans and submit them to Owner, the Independent Engineer and any other third party designee of Owner at least thirty (30) days before the date on which the Work described in them is to be undertaken.  Each submission shall include a reproducible copy of the Detailed Plans that have been submitted to Owner since the immediately preceding submission of Detailed Plans.  Upon the reasonable written request of the Independent Engineer or Owner, which shall be made within ten (10) days of receipt of the proposed Detailed Plans, Contractor shall provide to the Independent Engineer and Owner any information reasonably requested in connection with the Detailed Plans.  This request shall state the reasons why Owner believes that the Detailed Plans may not conform to the Project Requirements.  Owner may, but is not obligated to, have the Independent Engineer review the Detailed Plans submitted by Contractor.  Contractor shall discuss and answer any inquiries concerning the Detailed Plans with Owner or the Independent Engineer.  Within twenty-one (21) days after submission of the Detailed Plans pursuant to this Section, Owner may reject or amend Detailed Plans that are not in accordance with the Project Requirements. If Owner has not rejected or amended the Detailed Plans within the twenty-one (21) day period described in the preceding sentence, then Contractor may proceed with the Work described therein; provided that Owner may at any time prior to the Final Completion Date, reject or require amendment of Work that is not in accordance with Project Requirements notwithstanding its failure to object to the Detailed Plans.  Neither review, comment upon, approval, rejection or amendment of, nor the failure of Owner or the Independent Engineer to review, comment upon, approve, reject or amend all or any part of the Detailed Plans relieves Contractor of any of its obligations under this Agreement or imposes any liability upon Owner or the Independent Engineer.

12.1.2 After submitting Detailed Plans in accordance with **Section 12.1.1**, Contractor may, at its own risk, commence Work described in such Detailed Plans prior to the end of the thirty (30) day period described in **Section 12.1.1**.  If, prior to the end of the thirty (30) day period following submission of the Detailed Plans, Owner reasonably rejects or requires amendment of the Work described in such Detailed Plans in order to comply with the Project Requirements, (i) Contractor shall, at its sole cost, remove Work implementing the rejected portion of the Detailed Plans and repair the Work to its condition immediately before commencing the rejected Work or, in the case of an amendment, alter the work to conform to the amendment, and (ii) the Scheduled Substantial Completion Date will not be adjusted to reflect construction delay resulting from this remedial Work.  Contractor shall not commence or perform Work for which Detailed Plans are required to be submitted to Owner if the Detailed Plans have not been so submitted.

12.1.3 If Contractor disputes Owner's rejection or amendment of Work described in the Detailed Plans because the Work does not conform to the Project Requirements, and this dispute is resolved in favor of Contractor, then the Scheduled Substantial Completion Date will be adjusted to reflect the delay caused by Owner's rejection or amendment of these Detailed Plans, and Contractor will be entitled to recover its reasonable

47

out of pocket expenses resulting from this Owner rejection or amendment of the proposed Detailed Plans.

  12.1.4 Contractor shall maintain at the Facility Site for inspection by Owner and the Independent Engineer a copy of all Detailed Plans in good order and marked to show all changes made during construction.

  12.1.5 Contractor acknowledges the material interest of Owner in the Scope of Work and Specifications, and notwithstanding Contractor's obligation to satisfy the Performance Guarantees and associated damages for failing to perform this obligation, Contractor agrees that no change to the Scope of Work and Specifications will be made without the prior written approval of Owner which approval shall not be unreasonably withheld or delayed. In addition, Contractor, after consulting with Owner and the Independent Engineer and subject to the approval of Owner, which approval shall not be unreasonably withheld or delayed, shall make any change in the Scope of Work and Specifications necessary to comply with Law or as a result of Force Majeure. Contractor shall be reimbursed for the cost of the changes described in this Section only to the extent they are required by a Change In Law or Force Majeure. Contractor shall provide written copies of all changes to the Scope of Work and Specifications to Owner and the Independent Engineer as soon as the written changes are available.

12.2  Inspection

  12.2.1 Contractor shall provide Owner and Independent Engineer with equipment production schedules, which include major design and fabrication milestone dates, for the suppliers of equipment for which major equipment suppliers are designated in **Exhibit E.**

  12.2.2 Owner and Independent Engineer shall have the right to reasonably inspect any item of design, equipment, material, service or workmanship to be provided hereunder, and Contractor shall arrange such inspection, at the point of fabrication, or elsewhere at the request of Owner. Owner shall have the right to reject, at any time, any portion of the Work, including, but not limited to, design, engineering, materials, equipment, installation, tools or supplies, that does not conform to this Agreement, is of improper or inferior quality, design or workmanship or does not comply with the Project Requirements. Upon such rejection, Contractor shall promptly remedy at its sole cost and expense any condition identified by Owner giving rise to such rejection.

  12.2.3 If Owner or Independent Engineer suspects any Work already performed by Contractor does not meet the Project Requirements, or is defective, Owner may direct Contractor to inspect or test such Work. If that portion of the Work is found to be defective or not in accordance with the Project Requirements, Contractor will remedy such defective Work in accordance with the Project Requirements and such remedy shall not constitute a Change In Work for which Contractor is entitled to payment. If that portion of the Work is found to be in accordance with the Project Requirements, the Contractor will be entitled to reimbursement for its reasonable third party costs and Contractor field labor incurred in connection with such inspecting or testing.

48

12.3    Owner, Independent Engineer and Financing Agent shall have the right, from time to time or on a full time basis (as applicable), to observe and inspect the Work, the Facility or the Facility Site and to observe all tests of the Work and the Facility.  Contractor will provide Owner, Independent Engineer and Financing Agent reasonable access to the Work, the Facility and the Facility Site, and the documents outlined in **Section 12.5** as reasonably requested by Owner, Independent Engineer or Financing Agent.  Owner shall use reasonable commercial efforts to provide prior notice of any visit to the Facility Site by Independent Engineer or Financing Agent.  Such visits and inspection shall not materially interfere with Contractor's performance of the Work.  Notwithstanding any other provision of this Agreement to the contrary, neither the Financing Agent nor the Independent Engineer have the authority to direct or order any Change In Work nor shall the Financing Agent or Independent Engineer be considered or deemed the agent or representative of Owner in connection with any activity undertaken thereby with respect to the Work or in connection with this Agreement.  Contractor shall promptly provide Notice to Owner of any activity by the Financing Agent or Independent Engineer which Contractor believes constitutes a request for or approval of a Change In Work or action as the agent or representative of Owner.

12.4    Subject to Contractor's right to dispute directives by Owner, inspection, review, and/or comment by Owner of any drawing, document, or any other Work or services performed by Contractor or any Subcontractor shall not in any way affect or reduce Contractor's obligations to complete the Work in accordance with the provisions of this Agreement.  Except as otherwise specifically provided herein, Owner will use reasonable commercial efforts to complete its review and/or comments concerning any document or other material submitted by Contractor for such purpose within fourteen (14) days of its receipt of such document or other submission.  In the absence of any response from Owner within fourteen (14) days, Contractor may proceed without Owner's review and/or comments.  Contractor shall notify Owner in the event of a change in a reviewed specification or a technical change reflected in a purchase order that is not incorporated into the specification.

12.5    The "**Detailed Plans**" shall include the items listed on **Exhibits A and X** provided that the listed items on **Exhibits A and X** represent Owner's basic requirements and Owner reserves the right to reasonably request to review any additional specific drawing or technical data generated for the Facility, subject to the provisions of **Article 31**.

            In addition to the listed items on **Exhibits A and X**, Detailed Plans shall include foundations, structural steel, underground utility drawings, general arrangements and elevations, plot plans, piping layouts (larger than 2 and 1/2 inches), P&IDs, single line drawings, layout, and control schematic drawings.  The Detailed Plans shall include suggested modifications so as to improve performance, reduce costs, raise efficiencies or otherwise improve the functionality of the Facility, if any.  All Detailed Plans listed on **Exhibit X** will be updated to reflect "as built" conditions for the Work but shall not include work to be accomplished by Owner or the utility.  All such documents, lists, drawings, warranties, schematics and written material of any kind furnished by Contractor hereunder shall be in English and any undefined terms therein shall have their usual and customary meaning in the United States.

12.6    All drawings submitted shall be identified with the following data:

49

- Owner's Name;
- Facility designation;
- Agreement number;
- Specification or Drawing number, if applicable;
- Contractor's name;
- Contractor's drawing number; and
- Revision Number and Date.

12.7    Contractor shall provide to Owner all procedures, specifications, Detailed Plans, Contractor's field copy of each of its Subcontractor's drawings maintained on site and one (1) reproducible copy of the final revision of all engineering drawings prepared by Contractor for the Facility.  This data must be submitted to Owner sorted, assembled, categorized and in a condition that can easily be used by Owner's engineering, operations and maintenance staff.  In addition, Contractor shall provide to Owner one (1) reproducible copy of all Detailed Plans on disk with drawings in AutoCad or InterGraph format and data and lists in a commercially available computer database system reasonably acceptable to Owner.  Submittal of all data under this Section shall be a requirement of Contractor prior to Owner releasing Retainage For Punch List as described in **Section 8.1.9**.

## 13.    DELIVERY OF FEEDSTOCK MSW

13.1    Prior to the Substantial Completion Date or the date when care, custody and control of the Facility transfers to Owner in accordance with **Section 17.4.7**, Owner shall provide Feedstock MSW at the times and in the quantities reflected in the Feedstock MSW Schedule. No more than twelve (12) months after Contractor receives the Notice to Proceed, Contractor shall provide the Owner with a proposed schedule setting forth the amount of Feedstock MSW and the schedule for delivery thereof required between the initial date of such requirement and Final Completion.  Within thirty (30) days after receipt of such proposed Feedstock MSW Schedule Owner shall provide Contractor with its written comments thereto and all reasonable changes shall be included in such schedule (the "**Feedstock MSW Schedule**").

13.2    Contractor and Owner shall communicate and cooperate regarding the Feedstock MSW Schedule, which shall be updated as necessary to reflect the Parties' reasonable expectations regarding Feedstock MSW requirements. Owner shall be obligated to satisfy any change in the Feedstock MSW Schedule provided it receives at least fourteen (14) days' prior Notice of such change. Owner shall use commercially reasonable efforts to satisfy changes to the Feedstock MSW Schedule on less than fourteen (14) days' prior Notice, provided that Owner shall not be obligated to deliver more than 120% or less than 80% of the Feedstock MSW requirements for any day if it has not received at least 14 days' prior Notice of such change. Contractor and Owner shall equally share any premiums for deliveries of Feedstock MSW or costs to deposit the excess Feedstock MSW resulting from Contractor's changes to the Feedstock MSW Schedule on less than fourteen (14) days' prior Notice. Contractor shall not be entitled to Force Majeure relief if Owner does not comply with changes to the Feedstock MSW Schedule on less than fourteen (14) days' prior Notice to the Owner.

Confidential                                                                                    FUL_0204368

13.3     If at any time the Feedstock MSW receiving, handling and storage facilities are not complete, functional or capable of receiving, handling and storing Feedstock MSW in accordance with the Detailed Plans, Scope of Work and Specifications and the other requirements of this Agreement, then Owner shall not be required to make Feedstock MSW available to Contractor and shall not be required to have available for unloading and transport to the Facility any Feedstock MSW until such deficiencies have been corrected or completed to its reasonable satisfaction.

## 14.     START-UP

14.1     Start-Up

14.1.1 Prior to Mechanical Completion, Contractor shall start-up and checkout the Facility on a system by system basis. Within ninety (90) days prior to the date of initial start-up of the Facility, as set forth in the Progress Schedule, Contractor shall submit to Owner and Independent Engineer a detailed plan for the start-up and operation of the Facility by Contractor (the "**Start-up Plan**"). The Start-up Plan shall include, without limitation, (i) a plan for the start-up of the Facility and a reasonable proposed schedule of activities during start-up; (ii) a plan for use of Operating Personnel during start-up; (iii) system checkout procedures; and (iv) a start-up schedule and a list of System Checkout Packages and a Feedstock MSW Schedule as provided in **Article 13**.

14.1.2 As Contractor checks-out systems, "**System Checkout Packages**" will be prepared by Contractor and provided to Owner and Independent Engineer for review. System Checkout Packages will include all necessary checkout and operation information including, but not limited to, the following (as applicable):

-     Instrumentation checkout and calibration data sheets
-     Factory test reports
-     "Marked Up" process and instrumentation diagrams (P&ID's)
-     List of all Punch List items remaining on the system
-     Vendor field reports, if available

14.1.3 Contractor shall provide System Checkout Packages intermittently throughout start-up rather than all at once at the end of start-up. As a general guideline, Contractor shall submit no more than four (4) System Checkout Packages during any given week.

14.1.4 After submittal of each System Checkout Package, Owner will have ten (10) Business Days to review and comment on such package. Owner will submit a list of (A) missing information required on Punch List items, and (B) any discrepancies between (1) installed equipment or materials and workmanship of such equipment, and (2) installed equipment, materials and workmanship required by this Agreement, in each case, of which Owner then has knowledge, provided such discrepancies do not materially affect the performance, operation and maintenance of the Facility and/or (3) incomplete items required for Mechanical Completion, if any. Contractor shall supply to Owner such missing information and shall undertake to remedy any deficiencies identified by Owner with which

51

Contractor agrees at Contractor's cost, and Contractor shall perform disputed corrective work, subject to Contractor's right to dispute resolution pursuant to **Article 37**. Owner's comments or failure to comment on any System Checkout Packages shall not operate to waive any of Contractor's responsibilities under this Agreement or prevent Contractor from proceeding with the Work. If any dispute resolution award concludes that corrective work performed under protest by Contractor was not required in order to satisfy its obligations under this Section or was not otherwise required under this Agreement, then a Change In Work shall be issued by Owner to compensate Contractor for additional costs incurred by it and to appropriately extend the Scheduled Substantial Completion Date on account thereof.

### 14.2    Mechanical Completion

14.2.1 Contractor shall provide Notice to Owner and Independent Engineer when (A) Contractor has complied with all provisions of this Agreement relating to the installation of all necessary components and systems of the Work (except for completion of insulation, painting, final cleanup, final grading and any other portion of the Work that in Owner's reasonable opinion does not affect the operability, safety and mechanical and electrical integrity of the Facility); (B) the Work has been built in accordance with all Project Requirements, subject to issuance of a Change In Work as provided in **Article 19** as and to the extent required by **Section 3.1.3** , the Detailed Plans and Scope of Work and Specifications and is mechanically and electrically complete and sound; (C) all equipment and systems included in the Work have been inspected, cleaned, aligned, filled, functionally checked,  cold commissioned and may be operated and safely placed in service in accordance with all Project Requirements, without damage to the Facility or any other property and without injury to any Person; and (D) Contractor has provided Owner and the Independent Engineer with copies of the Operation and Maintenance Manual pursuant to **Section 3.1.33.**

14.2.2 Within ten (10) Business Days after Owner's receipt of Contractor's Notice pursuant to **Section 14.2.1**, Owner (after consultation with Independent Engineer) shall either (a) advise Contractor in writing of any dispute with the representations set forth in Contractor's Notice, including, without limitation, (A) any known defects, deficiencies and/or discrepancies that interfere with the safe operations of the Facility, and (B) any discrepancies between (1) installed equipment, or materials and workmanship of such equipment and (2) installed equipment, materials and workmanship as required by this Agreement of which Owner then has knowledge that materially affects the operation and maintenance of the Facility or (b) issue the Notice of Mechanical Completion pursuant to **Section 14.2.3**.  In the event that Owner advises Contractor of any dispute with the representations set forth in Contractor's Notice provided pursuant to **Section 14.2.1**, Contractor shall then perform corrective measures to remove such defects, deficiencies and/or discrepancies with which Contractor agrees at Contractor's costs and Contractor shall perform disputed deficiencies, subject to Contractor's right to dispute resolution pursuant to **Article 37**.  Upon completion of such corrective measures, Contractor shall provide Notice to Owner that it has satisfied the requirements of **Section 14.2.1**.  Owner will have five (5) Business Days after each subsequent notification to advise Contractor, in writing, of any remaining defects, deficiencies and/or discrepancies which must be corrected by Contractor prior to Mechanical Completion.  If any dispute resolution award concludes that corrective Work performed under protest by Contractor was not required in order to achieve Mechanical Completion or was not otherwise required under

this Agreement, then a Change In Work shall be issued by Owner to compensate Contractor for additional costs incurred by it and to appropriately extend the Scheduled Substantial Completion Date on account thereof. Owner's review, verification and issue of the Notice of Mechanical Completion shall not prevent Contractor from performing Work to start-up, operate and perform any Performance Test as long as there are no known defects, deficiencies and/or discrepancies that would interfere with the safe operation of the Facility.

14.2.3 Promptly after verification by Owner (following consultation with the Independent Engineer) that Contractor has satisfied all of the requirements of **Sections 14.2.1** and **14.2.2** for the achievement of Mechanical Completion, Owner will issue a "**Notice of Mechanical Completion**" in the form set forth in **Exhibit LL** that shall specify the Mechanical Completion Date is the date on which the last of the requirements of **Section 14.2.1** or **Section 14.2.2** (as the case may be) for the achievement of Mechanical Completion were satisfied.

14.2.4 Except as provided under **Section 14.2.2** regarding adjustments to the Scheduled Substantial Completion Date determined pursuant to a dispute resolution award, no action properly taken by Contractor, Owner or Independent Engineer pursuant to this **Section 14.2** shall affect the Scheduled Substantial Completion Date.

## 15.    [RESERVED]

## 16.    PERFORMANCE TESTS; SUBSTANTIAL COMPLETION

16.1    Performance Tests.

16.1.1 Contractor shall perform the Performance Tests necessary for the occurrence of Substantial Completion pursuant to the provisions of **Exhibit F** and shall provide Owner and Independent Engineer at least thirty (30) days' prior Notice of the date of the first conduct of a Performance Test, and at least seven (7) days prior Notice of a change in the Performance Test schedule. If additional Performance Tests are required, Contractor shall provide Owner and Independent Engineer at least five (5) Business Days' prior Notice of the date of such subsequent Performance Tests unless the Independent Engineer has not left the Facility Site following the last Performance Test, in which case Contractor shall provide Owner and Independent Engineer with one (1) Business Day's prior Notice of the date of such subsequent Performance Tests. Contractor shall permit representatives of Owner and Independent Engineer to attend and observe the conduct of all Performance Tests. The cost of all Performance Tests is included in the Fixed Construction Price whether or not such test is successful (except if such additional testing is required by Owner or Independent Engineer pursuant to a Change In Work due to no fault of Contractor). Owner shall provide Operating Personnel as described in **Exhibit P** to conduct all Performance Tests as described in **Section 3.1.25.** Contractor may utilize personnel in addition to the Operating Personnel to monitor and supervise the Performance Tests, provided that Contractor may only utilize Operating Personnel to operate the Facility during Performance Tests. Except as provided in **Section 3.1.25**, Contractor shall be solely responsible for the direction and utilization of such Operating Personnel and in no event shall the action or inaction of such Operating Personnel constitute Force Majeure or otherwise relieve Contractor of its obligations hereunder.

53

16.1.2 Contractor shall deliver to Owner (in quadruplicate) and to Independent Engineer a preliminary written test report, including the test data sheets and calculated results for each Performance Test or retest (each a "**Preliminary Performance Test Report**"), within five (5) Business Days after completion of each Performance Test, together with a Notice to Owner and Independent Engineer certifying completion of all of the Performance Tests in accordance with this Agreement and the results of such Performance Test that demonstrate satisfaction of the Performance Guarantees.  Promptly after receipt of a Preliminary Performance Test Report, Owner, Contractor and Independent Engineer shall consult concerning the results of such test and within five (5) Business Days thereafter, Owner (after consultation with Independent Engineer) shall advise Contractor in writing of any flaws in the Performance Test or any defects or deficiencies discovered during the Performance Test. Contractor may challenge the finding of such flaws, defects or deficiencies in accordance with the dispute resolution procedures described in **Article 37**. Contractor shall immediately commence and promptly complete corrective measures to remove such defects or deficiencies (including replacement of any defective parts at Contractor's sole cost and expense); provided, however that if any dispute resolution award concludes that corrective Work performed under protest by Contractor was not required in order to correct defects or deficiencies in the Work or was not otherwise required pursuant to this Agreement, then a Change In Work shall be issued by Owner to compensate Contractor for additional costs incurred by it and to appropriately extend the Scheduled Substantial Completion Date on account thereof.  Contractor shall then provide Notice to Owner and Independent Engineer that such corrective measures have been completed and shall specify in such Notice the date and time on which the Performance Test is to be rerun where said defects or deficiencies are of such a nature as to warrant retesting. Contractor shall re-perform the Performance Test on such date in accordance with the procedures described in **Exhibit F** and other applicable provisions of this Agreement.

16.1.3 Within fourteen (14) days following completion of the Performance Tests, Contractor shall provide to Owner and Independent Engineer a final Performance Test report (the "**Performance Test Report**") (in quadruplicate) and a final Notice to Owner and Independent Engineer certifying completion of the Performance Tests and satisfaction of all of the Performance Guarantees.  Within fourteen (14) days of receipt of such materials from Contractor, Owner (after consultation with Independent Engineer) either accepts or object to such certifications, in whole or in part.  If Owner objects to such certifications, then Contractor shall either (A) re-perform the applicable Performance Test in accordance with the procedures described in **Exhibit F** and **Section 16.1** until Owner (after consultation with Independent Engineer) determine that all applicable Performance Guarantees have been satisfied in accordance with this **Section**, or (B) deem the Substantial Completion Date to have occurred as and to the extent provided in **Section 17.4.7**, and comply with the provisions relating thereto.

16.2    Contractor shall provide Notice to Owner and Independent Engineer when it believes that it has satisfied conditions for the achievement of Substantial Completion.  The following are the conditions precedent for the achievement of Substantial Completion:

(A)    The Facility is substantially and materially complete in accordance with this Agreement (except as provided in the Punch List) and all interconnection, testing and other requirements necessary to

54

interconnect and operate the Facility have been successfully completed;

(B)     Mechanical Completion has occurred;

(C)     The results of the Performance Tests demonstrate successful completion of the Performance Tests and satisfaction of the Performance Guarantees (including all Primary Performance Guarantees and Secondary Performance Guarantees) as described in **Section 16.1** and **Exhibit F**; provided that, the Substantial Completion Date shall be initially deemed to occur based on the Performance Test results set out in the Preliminary Performance Test Report that have been accepted by Owner pursuant to **Section 16.1.2** demonstrating satisfaction of the requirements of this **Section 16.2(C)** but if the final Performance Test Report accepted by Owner pursuant to **Section 16.1.3** does not confirm such Preliminary Performance Test Report then the Substantial Completion Date will be deemed not to have occurred based on such Preliminary Performance Test Report;

(D)     Receipt by Owner and Independent Engineer of all Contractor Permits;

(E)     All Facility equipment and systems are operational in accordance with this Agreement;

(F)     All special tools required pursuant to **Section 3.1.27** to operate and maintain the Facility have been acquired by Contractor and delivered to Owner and all Primary Spare Parts and Additional Spare Parts have been delivered to Owner except as otherwise provided in **Section 6.1**;

(G)     Contractor has provided Notice to Owner and Independent Engineer that Contractor has satisfied all of the conditions for Substantial Completion as described in this **Section 16.2**;

(H)     Contractor has provided Owner and the Independent Engineer with copies of the final Operation and Maintenance Manual delivered in connection with Mechanical Completion pursuant to **Section 3.1.33** reflecting any changes required following Mechanical Completion;

(I)     Contractor has provided Owner with all data, drawings, materials, reports, documents and information relating to the Facility to be provided to Owner on or before the Substantial Completion Date pursuant to this Agreement;

55

FUL_0204373

(J)    Contractor has provided Owner with all Lien releases required for payments made to Contractor;

(K)    No Contractor Event of Default has occurred and is continuing;

(L)    The Punch List has been approved by Owner; and

(M)    In addition to the foregoing, only for the purpose of earning the Early Completion Bonus as provided in **Section 17.5** or receiving the release of Retainage For Punch List provided in **Section 8.1.9**, receipt by Owner of the financial information required by **Section 3.1.7**.

16.3    Within five (5) Business Days after receipt of Contractor's Notice that the Facility has satisfied the requirements of **Section 16.2**, Owner (after consultation with Independent Engineer) shall advise Contractor in writing of any dispute with the representations set forth in Contractor's Notice. Contractor shall then perform corrective measures necessary to satisfy the conditions of **Section 16.2** in order to achieve Substantial Completion and upon completion of such corrective measures shall again notify Owner and Independent Engineer in writing that it has satisfied the requirements of **Section 16.2**. Owner will have five (5) Business Days after each subsequent notification to advise Contractor, in writing, of any remaining defects, deficiencies and/or discrepancies which must be corrected by Contractor. If any dispute resolution award concludes that corrective work performed under protest by Contractor was not required in order to satisfy Contractor's obligations under this Section or was not otherwise required under this Agreement, then a Change In Work shall be issued by Owner to compensate Contractor for additional costs incurred by it and to appropriately extend the Scheduled Substantial Completion Date on account thereof.

16.4    Within five (5) Business Days after verification by Owner that Contractor has satisfied all of the requirements of **Section 16.2,** Owner (after consultation with Independent Engineer) will issue a "**Notice of Substantial Completion**" in the form set forth in **Exhibit LL** that shall specify that such Substantial Completion Date is the date on which the last of the conditions for the achievement of Substantial Completion was achieved. Issuance of a Notice of Substantial Completion by Owner shall in no way relieve Contractor of any of its obligations under this Agreement.

16.5    No action properly taken by Contractor, Owner or Independent Engineer pursuant to this **Article 16** shall affect the Scheduled Substantial Completion Date.

16.6    Care, custody and control of the Facility will be turned over to Owner upon receipt by Contractor and Owner of the Notice of Substantial Completion.

16.7    Expected Performance Tests.

16.7.1 Immediately following the completion of the Performance Tests Contractor shall perform additional performance tests to demonstrate the Facility's ability to achieve the expected Syncrude Product production capability of Thirty Four Thousand Three Hundred Fifteen (34,315) gallons per day of Syngas Fuel (the "**Expected Production**

56

**Capability**"). The additional expected performance tests to be conducted pursuant to this **Section 16.7** (the "**Expected Performance Tests**") shall be conducted in accordance with provisions of **Exhibit F** and shall be conducted within five (5) days of the completion of the Performance Tests described in **Section 16.1.1** above.  The cost of all Expected Performance Testing is included in the Fixed Construction Price.  Owner shall provide Operating Personnel as described in **Exhibit P** to conduct the Expected Performance Tests**.**  Contractor may only utilize Operating Personnel to operate the Facility during the Expected Performance Tests.  Contractor shall be solely responsible for the direction and utilization of such Operating Personnel and in no event shall the action or inaction of such Operating Personnel constitute Force Majeure or otherwise relieve Contractor of its obligations hereunder.

16.7.2 Contractor shall deliver to Owner (in quadruplicate) a written test report, including the test data sheets and calculated results for the Expected Performance Tests, within three (3) Business Days after completion of the Expected Performance Tests, together with a Notice to Owner and Independent Engineer certifying completion of all of the Expected Performance Tests in accordance with this Agreement and the results of the Expected Performance Tests.  There are no damage, adverse consequences or bonuses due with respected to the results of the Expected Performance Tests or any shortfall in achieving the Expected Production Capability, such Expected Performance Tests being conducted solely to demonstrate the ability of the Facility to perform in relation to the Expected Production Capability.

## 17.    DELAY LIQUIDATED DAMAGES; EARLY COMPLETION BONUS

17.1    Contractor understands that if Substantial Completion is not achieved by the Scheduled Substantial Completion Date, Owner will suffer substantial damages, including additional interest and financing charges on funds received by Owner to finance the Work, supervision, and other costs which are difficult or impossible to ascertain or measure.  Therefore, Contractor specifically agrees that if the Facility has not achieved Substantial Completion, due to any reason other than Force Majeure or Owner's unexcused non-performance  or Contractor has not elected that Deemed Substantial Completion has occurred in accordance with **Section 17.4.7**, by the Scheduled Substantial Completion Date, Contractor shall pay delay liquidated damages to Owner in an amount determined in accordance with **Section 17.2** for each day or part thereof until the Facility achieves Substantial Completion or Contractor elects that Deemed Substantial Completion has occurred in accordance with **Section 17.4.7**.  It is expressly agreed that these delay liquidated damages do not constitute a penalty and together with Owner's right to withhold Retainage For Punch List in accordance with **Section 8.1.9**, are Owner's sole monetary remedy for delay in achieving Substantial Completion by the Scheduled Substantial Completion Date.

17.2    The amount of daily delay liquidated damages payable pursuant to **Section 17.1** will be an amount equal to Twenty-Two Thousand Dollars ($22,000.00) for every day or partial day after the Scheduled Substantial Completion Date that the Facility fails to achieve Substantial Completion or Deemed Substantial Completion.

17.2.1 Owner shall have the right to request payment by Contractor for delay liquidated damages accrued under **Section 17.1** as they accrue by delivery of a Notice

57

specifying the amount of such damages, and Contractor shall pay the amount so specified within thirty (30) days of such request. Late payments of such amounts will bear interest at Late Payment Rate. Owner shall have the right to offset any liability of Contractor under this **Section 17.2** in accordance with **Section 8.4**.

17.3    If Contractor is required to pay delay liquidated damages under **Sections 17.1** and **17.2**, Contractor's obligation to pay further delay liquidated damages (other than damages accrued) shall cease upon the occurrence of Substantial Completion or Deemed Substantial Completion has occurred as more fully provided in **Section 17.4.7** hereof or upon the termination of this Agreement by Owner pursuant to **Section 23.2**, as the case may be. All delay liquidated damages accrued prior to the events in the preceding sentence shall be due and payable without regard to the occurrence of either event.

17.4    <u>Buydown Amount.</u>  As Owner's sole and exclusive remedy for the failure of the Facility to achieve the Full Performance Guarantees, as demonstrated by the results of Performance Tests conducted in accordance with **Section 16.1** and **Exhibit F**, Contractor shall pay the following liquidated damages (the "**Buydown Amount**") based on the results of the most recently completed Performance Test.

17.4.1 If the Facility fails to achieve the Product Production Guarantee on Design Basis Feedstock, then Contractor shall pay to Owner, as liquidated damages, the following amount:  $3,409.00 per gallon/ per day multiplied by an amount equal to the difference between (A) the actual average daily Syncrude Product production achieved and (B) the daily Product Production Guarantee of 29,332 gallons per day. Liquidated damages for fractions of gallons below the Product Production Guarantee amounts shall be prorated, and such fractions shall be rounded to the nearest one-tenth of a gallon; plus

17.4.2 If the Facility fails to achieve the Oxygen Consumption Guarantee and Electricity Consumption Guarantee on Design Basis Feedstock, then Contractor shall pay to Owner, as liquidated damages, $50,000.00 per ton per day for each ton per day above the Oxygen Consumption Guarantee and $1,400.00 per kW for each kW above the Electricity Consumption Guarantee; plus

17.4.3 If the Facility fails to achieve the Natural Gas Consumption Guarantee on Design Basis Feedstock, then Contractor shall pay to Owner, as liquidated damages, $150,000.00 per million Btu for each million Btu above the Natural Gas Consumption Guarantee; plus

17.4.4 If the Facility fails to achieve the Reliability Guarantee on Design Basis Feedstock, then Contractor shall pay to Owner, as liquidated damages, $1,000,000.00 for each percentage point (rounded to the nearest tenth of a percentage point) below 95% (As determined by the percentage that the actual production during the Facility Reliability Guarantee test is to twenty-one times the actual average daily Syncrude Product production achieved during the Product Production Guarantee test)

17.4.5 The Buydown Amounts shall not be reduced by any revenues received by Owner from the operation of the Facility (including the sale of materials or products

Confidential

generated by the Facility).  Owner and Contractor hereby acknowledge and agree that the terms, conditions and amounts fixed pursuant to this **Section 17.4** for the Buydown Amount are reasonable, considering the damages that Owner would sustain in the event of Contractor's failure to achieve the Performance Guarantees.  These amounts are agreed upon and fixed as liquidated damages because of the difficulty of ascertaining as of the date hereof the exact amount of damages that would be sustained in such event and are Owner's sole remedy for Contractor's failure to achieve the Performance Guarantees.

17.4.6 Contractor shall pay the Buydown Amount required under this **Section 17.4**, on or before the thirtieth (30th) day after the cessation or termination of the Cure Period or of the Work as provided in **Section 17.4.7** with the amount based on the level of performance demonstrated at such time. If Contractor fails to make timely payment of the Buydown Amount, interest on any unpaid amount shall accrue from the due date at the Late Payment Rate.  To the extent that Owner is holding Retainage For Punch List owed to Contractor pursuant to **Section 8.1.9,** such amount shall be applied to reduce the amount of the Buydown Amount on a dollar for dollar basis.

17.4.7 If, on or after the Scheduled Substantial Completion Date and following the achievement of Mechanical Completion, the results of the most recent Performance Test accepted by the Owner demonstrate the Facility has achieved (A) at least 85% of the Product Production Guarantee and full satisfaction of the Emissions, Effluent and Noise Guarantee, and (B) full satisfaction of the conditions precedent to achieving Substantial Completion set forth in **Section 16.2** (except those related to achievement of 100% of the Primary and Secondary Performance Guarantees) (collectively, the "**Minimum Performance Requirements**"), then Contractor may elect to either (i) continue to be liable for delay liquidated damages pursuant to **Section 17.2** and continue to perform Work at the Facility in an effort to improve the level of performance of the Facility (for so long as the cap on such damages has not been met or exceeded) or (ii) by Notice to Owner deem Substantial Completion to have occurred for the sole purpose of ending the requirement to pay delay liquidated damages ("**Deemed Substantial Completion**"). **Sections 16.3** and **16.4** shall apply to Contractor's Notice of Deemed Substantial Completion substituting the words "Deemed Substantial Completion" for the words "Substantial Completion" in each place they appear.  If Contractor elects that Deemed Substantial Completion has occurred and Owner issues a Notice of Deemed Substantial Completion pursuant to **Section 16.4**, care, custody and control of, and risk of loss to, the Facility shall remain with Contractor and Contractor shall continue to work to satisfy 100% of the Performance Guarantees and continue to conduct Performance Tests to demonstrate each Performance Guarantee. Subject to achievement of the Minimum Performance Requirements, if after the earlier of (a) ninety (90) days following the date of Deemed Substantial Completion, (b) ninety (90) days following the Scheduled Substantial Completion Date or (c) the date on which Contractor ceases full efforts to achieve Full Performance Guarantees due to its liability cap ("**Cure Period**"), the Facility still has not achieved the Full Performance Guarantees, Contractor or Owner may elect by Notice to the other Party to terminate further efforts to achieve the Full Performance Guarantees and care, custody and control of the Facility shall be promptly (but in no event more than five (5) Business Days) be turned over to Owner and Contractor shall pay the Buydown Amounts (up to the limit of liability stated in  **Section 40.13**) for any and all failures to achieve the Full Performance Guarantees (such amounts to be based on the level of performance demonstrated

59

FUL_0204377

by the Performance Test conducted most recently before the end of the Cure Period). If Contractor has elected Deemed Substantial Completion to have occurred then at any time during or after the Cure Period (provided that, Owner has not elected to terminate further efforts to achieve the Full Performance Guarantees upon expiration of the Cure Period) and for any reason Owner may prohibit Contractor from performing further Work to achieve the Full Performance Guarantees, care, custody and control of, and risk of loss to, the Facility shall be promptly (but in no event more than five (5) Business Days) turned over to Owner and Contractor shall pay the Buydown Amounts (subject to the limit of liability herein) for any and all failures to achieve the Full Performance Guarantees (such amounts to be based on the level of performance demonstrated by the Performance Test conducted most recently before the time Owner has prohibited Contractor from continuing work or Contractor has elected to cease work, as applicable) but without limiting Contractor's obligation to satisfy all other conditions and requirements to achieve Substantial Completion.

17.4.8 If after sixty (60) days following the Scheduled Substantial Completion Date (as such date may be extended by Force Majeure) and following the achievement of Mechanical Completion, Contractor has not been able to achieve at least eighty-five percent (85%) of the Product Production Guarantee and Owner reasonably believes that Contractor will not be able to achieve at least eighty-five percent (85%) of the Product Production Guarantee, then Owner may by Notice to Contractor require that Contractor cease work and pay the Buydown Amounts based on the level of performance demonstrated by the Performance Test conducted most recently before the time of the cessation of Work (up to the limit of liability stated in **Section 40.13)** and Contractor will have no further obligation to demonstrate the Performance Guarantees but without limiting Contractor's obligation to satisfy all other conditions and requirements to achieve Substantial Completion. If, within five (5) Business Days' following Owner's Notice to Contractor pursuant to this **Section 17.4.8**, Contractor elects by Notice to Owner, Contractor may continue performing further Work to achieve Deemed Substantial Completion or Substantial Completion for an additional thirty (30) days following Owner's Notice pursuant to this **Section 17.4.8** but if the Contractor has not been able to achieve Deemed Substantial Completion or Substantial Completion by the end of such additional thirty (30) day period, then the cost of all Work during such additional thirty (30) day period will not be considered in determining whether Contractor has reached its limit of liability stated in **Section 40.13** (and all efforts during such additional thirty (30) day period will be at Contractor's expense) and the Buydown Amount will be based on the level of performance demonstrated by the Performance Test conducted most recently before the time of the cessation of Work at the end of such additional thirty (30) days. The standards for performance of the Work by Contractor applicable prior to the Deemed Substantial Completion Date shall be equally applicable to the performance of the Work by Contractor during the Cure Period and otherwise after the Deemed Substantial Completion Date.

17.5    Early Completion Bonus. If Substantial Completion is achieved (by satisfying all of the conditions of **Section 16.2**) prior to the Scheduled Substantial Completion Date (excluding any extension thereof for Force Majeure or the nonperformance of Contractor or otherwise except any extension for any Change In Work requested by Owner that are not due to Force Majeure or the nonperformance of Contractor), then Contractor shall be paid an early completion bonus (the "**Early Completion Bonus**") which shall be an amount equal to

60

FUL_0204378

Twenty-Two Thousand Dollars ($22,000.00) per day for each day prior to the Scheduled Substantial Completion Date that Substantial Completion has occurred.

17.5.1 Any Early Completion Bonus shall be paid within thirty (30) days after issuance of the Notice of Substantial Completion. Late payments shall accrue interest at a rate of interest equal to the Late Payment Rate. Owner has the right to set-off amounts owed to it by Contractor under this Agreement against any amounts owed to Contractor pursuant to this **Section 17.5** or any other provision of this Agreement.

17.5.2 For purposes of determining the Early Completion Bonus the applicable Scheduled Substantial Completion Date will not be adjusted for any reason, including Force Majeure or the nonperformance of Contractor, but will be adjusted for Changes in Work requested by Owner that are not due to Force Majeure or the nonperformance of Contractor.

17.5.3 In addition, if the Contractor requests Owner, the Independent Engineer, Financing Agent or other consultants or agents (but not including Owner's Operating Personnel) to perform activities outside Normal Business Hours, Contractor shall reimburse Owner for all additional costs incurred to respond to, and comply with, such request, except that such reimbursement shall not apply to activities during commissioning, start-up, testing or operations.

17.5.4 Owner may, at its discretion, transfer to Contractor an equity interest in Owner with a value equal to the Early Completion Bonus, in lieu of cash payment. The value of the equity interest shall be determined as provided in the Project Equity and Reimbursement Agreement and such Owner equity shall be subject to the terms and conditions, including the Owner's right to buy back such Owner equity as set forth in the Project Equity and Reimbursement Agreement but excluding the obligation of Fulcrum to re-purchase any such Owner equity. Any dispute regarding such equity interest shall be resolved as provided by **Article 37**.

## 18.    FINAL COMPLETION

18.1    Within five (5) Business Days after the Substantial Completion Date, Contractor shall submit to Owner and Independent Engineer a list of Work to be completed to achieve Final Completion. Owner shall have ten (10) Business Days to review and approve the list of requirements for Final Completion.

18.2    Final Completion of the Facility shall be deemed to have occurred when all of the following have occurred:

      (A)    The Facility has achieved Substantial Completion;

      (B)    Contractor has completed all Punch List items as required by this Agreement, or has been released from completing Punch List items by Owner pursuant to **Section 8.1.10**;

61

(C)     Owner receives all final (as built) data, drawings, materials, reports and information in accordance with **Section 12.7**, which shall be within sixty (60) days of the Substantial Completion Date;

(D)     All Contractor's and its Subcontractors' personnel, supplies, equipment, waste materials, rubbish and temporary facilities have been removed from the Facility Site;

(E)     Owner has received from Contractor and Subcontractors a final waiver of Liens in the form set forth in **Exhibit J-2** or Contractor has provided a bond for any Subcontractor Lien waivers not received to the extent permitted pursuant to **Section 8.2**, in an amount equal to 150% of the payment amount that would have been covered by such Lien waiver(s) not received (such bond to be at Contractor's sole cost and not a Documented Cost and shall otherwise meet the requirements of **Section 8.2**) and a certificate of Contractor to the effect that all payrolls, material bills and other costs and expenses connected with, or related to, the Work have been paid or otherwise satisfied;

(F)     Owner has received from Contractor all final reports and information to be provided to it as described in **Section 12.7;**

(G)     Owner has received from Contractor the financial information required by **Section 3.1.7**;

(H)     Contractor has delivered any amendments or updates to the Operation and Maintenance Manual to be delivered after Substantial Completion as agreed upon by Owner and Contractor;

(I)     All Buydown Amounts, liquidated damages and any other amounts owed by Contractor to Owner pursuant to this Agreement have been paid by Contractor; and

(J)     Contractor has performed all other provisions of and delivered all items required by this Agreement in accordance with the terms hereof.

18.3    Contractor shall provide Notice to Owner and Independent Engineer when Contractor has satisfied all of the conditions for Final Completion as described in **Section 18.2**.

18.4    Within five (5) Business Days after receipt of Contractor's Notice that the Facility has satisfied the requirements of **Section 18.2**, Owner (after consultation with Independent Engineer) shall advise Contractor in writing of any dispute with the representations set forth in Contractor's Notice.  Contractor shall then perform corrective measures necessary to satisfy the conditions of **Section 18.2** in order to achieve Final Completion and upon completion of such corrective measures shall again provide Notice to Owner and

Confidential

Independent Engineer that it has satisfied the requirements of **Section 18.2**.  Owner and Independent Engineer will have five (5) Business Days after each subsequent notification to provide Notice to Contractor of any remaining defects, deficiencies and/or discrepancies which shall thereafter be promptly corrected by Contractor.  If any dispute resolution award concludes that corrective Work performed under protest by Contractor was not required in order to satisfy its obligations under this Section was not otherwise required under this Agreement, then a Change In Work shall be issued by Owner to compensate Contractor for additional costs incurred by it.

18.5    Promptly after verification by Owner (after consultation with Independent Engineer) that Contractor has satisfied all of the requirements of **Sections 18.1** to **18.4**, Owner will issue a "**Notice of Final Completion**" in the form set forth in **Exhibit LL** which shall specify the Final Completion Date as the date of the final notice of Contractor to Owner and Independent Engineer issued pursuant to **Section 18.3** or **18.4** (as the case may be).

18.6    No action properly taken by Contractor, Owner or Independent Engineer pursuant to this **Article 18** shall affect the Scheduled Final Completion Date for the Facility.

## 19.    CHANGES IN WORK

19.1    Owner shall have the right to make changes in Work, whether such changes be modifications, alterations, additions or deletions (including requiring Contractor to continue to perform Work to complete the Facility when any of the limitations on Contractor's liability set forth in this Agreement (including in **Section 40.13**) have been met)  (a "**Change In Work**").  Changes In Work will be developed on an "open book" approach and will be priced based on third party direct costs, plus, in the case that Contractor's or its Affiliates' employees perform work, Contractor's or its Affiliates' fully loaded internal cost (with overhead) at the rates set forth in **Exhibit N**, plus a fixed fee set at five percent (5%) (which includes profit) of the sum of the estimated costs of such Change In Work.  Contractor shall provide Owner with a detailed estimate.  The estimate shall include capital costs for equipment and materials, field labor, expenses and engineering costs.

19.2    Owner shall advise Contractor of any proposed Change In Work and Owner and Contractor shall then promptly consult with each other concerning the cost and impact, if any, on the Progress Schedule of implementing the proposed change.  Following such consultation, Owner may request and Contractor shall thereupon promptly prepare, at its own cost and expense, a detailed estimate relating to the contemplated change in the form set forth in **Exhibit KK** (a "**Change In Work Form**"), which shall include (A) any projected increase or decrease of the Fixed Construction Price and the applicable Payment Milestone amount occasioned by such change, (B) the projected effect on the Progress Schedule (including, but not limited to the Scheduled Mechanical Completion Date, the Scheduled Substantial Completion Date and the Scheduled Final Completion Date) or any other schedule, and (C) the potential effect on Contractor's ability to comply with any of its obligations hereunder, including Warranties and the Performance Guarantees.

19.3    Upon agreement and execution of a Change In Work Form by Contractor and Owner, Owner shall promptly adjust (in consultation with Contractor and Independent

Confidential                                                                                   FUL_0204381

Engineer) the Fixed Construction Price as provided in **Sections 19.1** and **19.2** above and the Progress Payment Schedule, the Progress Schedule and any other schedules requiring adjustment to reflect the change agreed upon.

19.4    If Owner and Contractor cannot promptly reach agreement on the matters listed in the Change In Work Form, or cannot agree that the matters under discussion constitute a Change In Work, Owner may, at its sole discretion, order Contractor in writing to promptly proceed to complete the Change In Work in accordance with Owner's interpretation of the matter under dispute and Owner shall pay Contractor for the undisputed costs of such Change In Work.  In the event that Owner and Contractor cannot reach agreement on the estimated cost, then the difference between Owner's estimate of the Change In Work and Contractor's estimate of the Change In Work, or the entire amount if Owner disputes that such proposed change constitutes a Change In Work, shall remain undrawn under the Financing Documents. In the event Owner and Contractor cannot reach agreement on the schedule change or estimated cost of the Change In Work within fifteen (15) days after Contractor is ordered to proceed under protest, either Party may submit the matter for dispute resolution as contemplated in **Article 37**.

19.5    In no event shall Contractor undertake a Change In Work until (A) a Change In Work Form has been approved and signed by Owner, and (B) if a disagreement exists as described in **Section 19.4**, Contractor has received Notice from Owner to proceed under protest.  In no event shall changes to the Work necessary to cause the Facility to perform as specified in this Agreement constitute a Change In Work unless such changes are caused by a Force Majeure or approved by Owner in its sole discretion.

19.6    Owner may notify Contractor in writing to suspend Work, for a maximum of fifteen (15) days, on that portion of the Work affected by a contemplated Change In Work, (whether or not such change will require a modification to the Work), pending Owner's decision on such change.  The terms of this suspension shall be in accordance with **Article 25**.  It is understood that such suspension shall result in an extension of the Progress Schedule and the Scheduled Mechanical Completion Date and Scheduled Substantial Completion Date, as necessary and that compensation will be in accordance with **Article 25** if such suspension affects the Work's critical path as shown in the Progress Schedule, as more fully described in **Section 40.12**.

19.7    After the Effective Date, Contractor may propose any addition, deletion, modification or amplification to this Agreement which in Contractor's opinion does not constitute a Change In Work by giving Owner and Independent Engineer prior Notice thereof.  Owner shall promptly review Contractor's proposed addition, deletion, modification or amplification and accept or reject same.  Owner may, at its sole discretion and verification by Independent Engineer, determine that the proposed addition, deletion, modification or amplification be deemed a Change In Work, to be handled accordingly.

19.7.1 If after the Effective Date there is any change in any Project Requirements, Contractor shall promptly submit a Change In Work Form to Owner. Contractor shall not be responsible for compliance with any such change in Project

64

Requirements unless and until a Change In Work Form is accepted by Owner or is ordered by Owner to proceed under protest.

19.8    Contractor may propose a change in the Work to Owner and associated adjustments of the Fixed Construction Price, Scheduled Substantial Completion Date and Scheduled Final Completion Date on account of (1) additions, modifications, deletions or enhancements to the Facility; (2) changes to the cost of the Work or time of performance of the Work caused by the unexcused failure of performance by Owner or anyone under Owner's control (excluding Contractor and any Subcontractor); (3) Force Majeure (including adjustments of the Fixed Construction Price for events included in **Section 26.2 (C), (D), (F) and (G)**); (4) Unexpected Costs incurred prior to achievement of Mechanical Completion as described in **Section 40.13.2 (iv)** and **(v)** that exceed Eight Million Two Hundred Thousand Dollars ($8,200,000.00); and (5) modifications to the Air Permit specified in the "Owner Responsibilities" in **Exhibit C** not being approved by NDEP-BAPC by the time needed for performance of the Work by Contractor or if the modifications to the Air Permit approved by NDEP-BAPC requires Contractor to incur extra costs to perform the Work or results in a delay in Contractor's ability to achieve Substantial Completion by the Scheduled Substantial Completion Date; however, Contractor shall not make any change to the Work pursuant to this **Section 19.8** (including changes that have no net cost effect on the Fixed Construction Price) without a Change In Work Form signed by Owner and Contractor or a decision of the arbitrators pursuant to the provisions of **Article 37**.

19.9    Without limiting the foregoing provisions of this **Article 19**, in any case where the limits of liability set forth in this Agreement (including **Section 40.13**) have been met and in the opinion of Owner acting reasonably the requirement to implement any Change In Work is too urgent to permit the operation of the procedure described in **Sections 19.1** and **19.2**, Owner shall be entitled to issue a Change In Work Form signed by Owner, describing the Change In Work required by Owner for Contractor to continue performance of the Work and shall increase the Fixed Construction Price based on the pricing set forth in **Section 19.1** for all such additional Work, and shall adjust the Scheduled Mechanical Completion Date, the Scheduled Substantial Completion Date and the Scheduled Final Completion Date and as necessary, the Progress Schedule and the Progress Payment Schedule which are consequential on the said Change In Work. Contractor shall comply forthwith with any such Change In Work Form and carry out the ordered Change In Work; provided, however that, except to the extent arising out of gross negligence or willful misconduct of Contractor or any Subcontractor, Contractor shall not owe additional damages based on delay or performance shortfalls to the same extent as if Owner did not provide Contractor with such Change In Work; provided further however, Contractor's warranty obligations under **Article 21** and **Article 22** shall apply to such work.  The Parties shall be bound by the above-mentioned determination of Owner in relation to the consequences of the Change In Work unless and until the terms of such determination are revised by the agreement of the Parties or by a determination of a Dispute in respect thereof as contemplated in **Article 37**.

65

20.    [RESERVED]

21.    **WARRANTIES CONCERNING THE WORK**

21.1    As its "**Warranties**", Contractor warrants the Work as follows:

21.1.1 The Work shall conform to all aspects of the final drawings and specifications and all equipment and materials incorporated into the Work shall be new and perform in accordance with the Scope of Work and Specifications. Owner's rights under this **Section 21.1.1** shall extend from the Effective Date until the later of (i) twelve (12) months from the Substantial Completion Date (ii) if only Deemed Substantial Completion occurs, then twelve (12) months from the date that Contractor has paid the associated Buydown Amount (subject to the limit of liability herein) and (iii) twelve (12) months following corrective action on the Work.

21.1.2 The Work shall be free from defects in design, engineering, materials, construction and workmanship. Owner's rights under this **Section 21.1.2** shall extend from the Effective Date until the later of (i) twelve (12) months from the Substantial Completion Date and (ii) if Contractor elects only Deemed Substantial Completion to have occurred twelve (12) months from the date that Contractor has paid the associated Buydown Amount (subject to the limit of liability herein) and (iii) twelve (12) months following corrective action on the Work.

21.1.3 Without in any way derogating Contractor's representations and warranties (including Warranties) and its Performance Guarantees with respect to all of the Work, Contractor shall use commercially reasonable efforts to obtain warranties from its Subcontractors with a duration at least as long as those warranties which Contractor is required to provide under this Agreement; provided that Contractor's inability to obtain such warranties from its Subcontractors shall not release Contractor from its obligations to provide the warranties required under this Agreement. The Contractor will use commercially reasonable effort to obtain extended warranties for major equipment to be agreed upon by the Parties as an optional addition to the Fixed Construction Price. Neither the acceptance nor the rejection of such extended warranty shall negate, modify or otherwise impact Contractor's obligations under this Agreement, including its Warranty obligations. For the purpose of this Agreement, the periods described in **Sections 21.1.1** and **21.1.2** are the "**Warranty Period**".

21.1.4 The Warranties provided for an additional twelve (12) month period following corrective action or replacement are Warranties solely for the corrective action taken or items replaced and the work necessary to make such corrections or replacements.

21.1.5 Notwithstanding the foregoing, all of Contractor's obligations with respect to the Warranties shall expire on the sooner of (i) twenty-four (24) months after the Substantial Completion Date or the Deemed Substantial Completion Date, (ii) Thirty (30) months after the date of commencement of the first Performance Test to be conducted on the Facility or (iii) Thirty-five (35) months from the Mechanical Completion Date if Performance Tests are not commenced within one hundred and twenty (120) days following Mechanical Completion due to reasons not attributable to Contractor; provided, however, such thirty-five (35) month period shall be extended day for day for any delay attributable to Contractor or its

66

Subcontractors failure to perform in accordance with the terms of this Agreement (the "**Outside Warranty Date**"), except for unresolved, incomplete or outstanding Warranty claims properly raised prior to the end of the Outside Warranty Date in accordance with this Agreement.

       21.1.6 The Warranties are exclusive and expressly in lieu of all other warranties (except those expressly set forth in this Agreement), including, but not limited to, any warranty whether statutory, oral or written, express or implied. Contractor specifically disclaims any and all implied warranties, including, without limitation, warranties of merchantability, fitness for a particular purpose or otherwise. Contractor shall have no responsibility for damage caused to the Work by ordinary wear and tear, or for damage caused by Owner Indemnified Parties or by any other person (other than Contractor or its Subcontractors) at the Facility Site performing the obligations of Owner hereunder or on behalf of Owner.

    21.2    Owner shall promptly give Notice to Contractor upon discovery of any breach of Contractor's Warranties under **Section 21.1** during the Warranty Period. In the event of any such breach, Contractor shall thereupon, and at its own cost and expense, re-perform any necessary Work and provide (at no expense to Owner) such design, engineering, equipment, material, labor, shipping and services necessary to cause the Work to conform to said Warranties. Owner shall provide, at no cost to Contractor, the reasonable assistance of then present Operating Personnel in performing such Work. Contractor shall use commercially reasonable efforts to extend equipment manufacturers warranties to twelve (12) months from any date of rework, provided that such extensions are available without significant additional cost to Contractor. The Contractor's Warranty Period for any rework of design, engineering, materials, construction or workmanship shall commence upon the completion of such rework. Contractor's Warranties shall be assignable to the Owner, or at Owner's request, to the Financing Agent, the Lenders and any holders of the Debt or any of their designees without additional approval by Contractor.

    21.3    Upon receipt from Owner of a Notice of a breach of any vendor warranty, representation or guarantee obtained by Contractor under **Section 21.1.2**, Contractor shall be responsible for enforcing any such representation, warranty or guarantee. Owner's rights under this **Section 21.3** shall commence at the time such representation, warranty or guarantee is furnished and shall continue until the expiration of the Warranty Period. Until such expiration, the cost of any equipment, material, labor (including re-engineering) or shipping shall be for the account of Contractor if such cost is (A) covered by the Warranty, (B) required to replace or repair defective equipment, materials or workmanship furnished by Contractor's Subcontractors and (C) not recovered by Owner under any representation, warranty or guarantee received from a Contractor Subcontractor; provided, however, that under clause (C), should Subcontractor seek to defend against or challenge it's warranty obligations or fail to pay or perform its warranty obligations, Owner may enforce the warranty against Contractor and Contractor shall resolve such issues with its Subcontractor.

    21.4    Commencing on the expiration of the Warranty Period, Contractor shall provide reasonable assistance to Owner, at no cost to Owner, in enforcing all representations, warranties and guarantees from Subcontractors that are still in effect, when requested in writing by Owner.

Confidential

FUL_0204385

21.5    Except in cases of emergency requiring immediate curative action by Contractor or Owner, within five (5) Business Days of receipt by Contractor of a Notice from Owner under **Section 21.2** hereof specifying a breach of Contractor's Warranties or of any of its Subcontractors' representations, warranties or guarantees that Contractor is responsible to enforce, Contractor and Owner shall mutually agree when and how Contractor shall remedy said breach; provided, however, that in cases of emergency (such as unplanned Facility outages requiring immediate curative action), Contractor and Owner shall so agree on such remedy immediately upon Notice by Owner of such emergency.  If Contractor does not begin and diligently proceed to complete said remedy within the time agreed to, or should Contractor unreasonably fail to reach such an agreement with Owner within such period (or immediately, in the case of emergency conditions, in which case Contractor's right to institute Dispute resolution proceedings pursuant to this Agreement shall be preserved), Owner, after Notice to Contractor, shall have the right to perform or have performed by third parties the necessary remedy, and the costs thereof shall be paid by Contractor.

21.6    Approvals given by Owner or Independent Engineer represent consent to the action proposed by Contractor, but shall not be considered representations concerning the propriety, fitness or usefulness of the proposed action, and shall not affect Contractor's obligation to strictly comply with the terms of this Agreement or in any way negate, modify or otherwise impact Contractor's obligations under this Agreement.

## 22.    TITLE

22.1    Contractor warrants good title, free and clear of all Liens, to all materials, equipment, tools and supplies furnished by it, or its Subcontractors that become part of the Facility or are purchased for or on behalf of Owner in accordance with this Agreement.  Title to all or a portion of said materials, equipment, tools and supplies shall pass to Owner upon the date Contractor receives payment for said material, equipment, tools and supplies. However, Contractor shall retain care, custody and control of said materials, equipment, tools and supplies and exercise due care with respect thereto until the earlier of Substantial Completion or termination of this Agreement.  Said transfer of title shall in no way adversely affect Owner's rights as set forth in other provisions of this Agreement.

22.2    For the purpose of protecting the interest of Owner in all materials, equipment, tools and supplies with respect to which title has passed to Owner but which remain in the possession of Contractor or another Person, Contractor shall take or cause to be taken all steps necessary under the Law of the appropriate jurisdiction(s) to protect Owner's title and to protect Owner against claims by other Persons with respect thereto.  In the event of any such claim, Contractor shall defend and hold harmless Owner if such claims are instituted against Owner or its property.

22.3    All drawings, engineering and other documents (including specifications) furnished or to be furnished by Contractor in performing the Work will become the property of Owner to be used by Owner as it may desire (subject to the provisions of **Article 31** regarding Proprietary Information) for purposes of use, operation, maintenance, repair and alteration of the Facility and for any other purposes permitted by applicable Law.  All Proprietary Information contained in documents reflecting and specifically marked as

68

FUL_0204386

containing Proprietary Information of Contractor shall remain the property of Contractor; provided, however, that Contractor hereby grants to Owner an irrevocable, perpetual and royalty free license to use such Proprietary Information in connection with the use, operation, maintenance, repair and alteration of the Facility.

22.4    All documents, including drawings and specifications prepared by Contractor pursuant to this Agreement, shall be the property of Owner (except as provided in **Section 22.3** with respect to Proprietary Information).  Any reuse or any adaptation by Owner with respect to any other project will be at Owner's sole risk, and without liability or legal exposure to Contractor.

## 23.    DEFAULT AND TERMINATION UPON DEFAULT

23.1    <u>Contractor Events of Default.</u>  Each of the following constitutes an "Event of Default" on the part of Contractor unless excused pursuant to the provisions of **Article 26**:

23.1.1 If any of the Signing Parties (other than Owner) or any of its Affiliates makes an assignment for the benefit of creditors, or fails, or admits in writing an inability, to pay debts generally as they become due, or consents to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of either any of the Signing Parties, any of its Affiliates or of a major part of Contractor's or any of its Affiliates' property; or

23.1.2 If, by order of a court of competent jurisdiction, a receiver or liquidator or custodian or trustee of any of the Signing Parties or of a major part of its property is appointed and is not discharged within sixty (60) days, or if, by decree of such a court,  any of the Signing Parties is adjudicated insolvent, or a major part of its property is sequestered, and such decree has continued undischarged and unstayed for sixty (60) days after the entry of such decree, or if a petition to reorganize  any of the Signing Parties pursuant to any applicable bankruptcy or insolvency laws or any other similar statute applicable to any of the Signing Parties, as now or hereinafter in effect, is filed against  any of the Signing Parties and is not dismissed within sixty (60) days after such filing, or if any of the Signing Parties is adjudicated bankrupt or files a petition in voluntary bankruptcy under any provision of any bankruptcy law or consents to the filing of any bankruptcy or reorganization petition against any of the Signing Parties under any such law, or (without limitation of the generality of the foregoing) files a petition to reorganize any of the Signing Parties pursuant to any applicable bankruptcy or insolvency laws or any other similar statute applicable to any of the Signing Parties, as now or hereafter in effect; or

23.1.3 Contractor or any of its Subcontractors consistently fails to make prompt payment when due for labor, equipment or materials, or unreasonably disregards Laws or the lawful requirements of any competent authority or the instructions of Owner consistent with this Agreement except to the extent such failure results from default by Owner in its obligations to make payment under **Article 8**; or

23.1.4 Contractor or any of its Subcontractors fails or refuses to design, engineer, construct, operate, repair and maintain any part of the Facility in accordance with this

69

FUL_0204387

Agreement or to fulfill any of its obligations to Owner in accordance with this Agreement or any such subcontract (as applicable) notwithstanding the payment by Contractor of any damages or other amounts provided for under this Agreement, provided that failure of the Facility to perform at or above the Full Performance Guarantees will not constitute an Event of Default so long as no other Event of Default described in this **Section 23.1** shall have occurred, the Facility continues to perform at or above Performance Guarantees already met, and Contractor pays nonperformance damages for such failure as and when due under this Agreement; or

23.1.5 Any representation or warranty made by Contractor herein is false or misleading in any material respect when made; or

23.1.6 Contractor fails to pay any amount that Contractor is required to pay to Owner under this Agreement within thirty (30) days after receipt by Contractor of written demand from Owner accompanied by a Notice stating that unless the delinquent amount is paid within thirty (30) days after this demand the failure will constitute an Event of Default;

23.1.7 Contractor is not required to pay any amount to Owner as a result of the limitation of liability provisions of this Agreement including but not limited to Section 40.13;

23.1.8 Contractor abandons or suspends progress of the Work for thirty (30) days or more, except as permitted pursuant to **Section 23.5, Article 26** or otherwise under this Agreement;

23.1.9 Contractor fails to achieve Mechanical Completion by the Scheduled Mechanical Completion Date and such delay is continuing for one hundred eighty (180) days beyond the Scheduled Mechanical Completion Date;

23.1.10    Contractor or any of its Subcontractors fails to perform any of its other obligations applicable to Contractor or any of its Subcontractors contained in the Financing Documents, as more particularly described in **Exhibit W**;

23.1.11    A guarantor or issuer, as applicable, is in default (after the expiration of all applicable cure periods) under the Performance Security provided to Owner pursuant to **Article 39** or the Performance Security is invalid, no longer in effect or unenforceable for any reason or a Security Replacement Event occurs and Contractor fails within thirty (30) days of the occurrence of such Security Replacement Event (or twenty (20) days, if the Security Replacement Event is a matter equivalent to those described in **Section 23.1.2** occurring to the issuer of the Payment and Performance Bond or the Letter of Credit, as applicable , to deliver to Owner a Payment and Performance Bond or a Letter of Credit duly executed by a new issuer, which satisfies the applicable requirements under this Agreement; and

23.1.12    No failure or refusal on the part of Contractor or any of its Subcontractors described in **Sections 23.1.4** or **23.1.5** shall constitute an "Event of Default" unless and until: (A) Owner has given Notice to Contractor specifying with particularity the existence of such default that, unless corrected, constitutes an Event of Default that gives Owner a right to terminate its obligations to Contractor for cause under this Section, unless

70

actions reasonably likely to cure such default are commenced within a reasonable period of time, but in no event later than five (5) Business Days after receipt of such Notice and diligently and aggressively pursued; and (B) Contractor has failed to cure such default within thirty (30) days after receipt of such Notice, or in the case of a default which cannot be cured within thirty (30) days, has within thirty (30) days initiated actions reasonably likely to cure such default and is diligently pursuing such cure, provided however, such period shall not extend beyond sixty (60) days after Owner's initial Notice to Contractor concerning such default.

23.2    In the case of one or more Events of Default on the part of Contractor or any of its Subcontractors pursuant to **Section 23.1**, Owner shall have the following rights and remedies, in addition to those rights and remedies that may be available to Owner at law or in equity and Contractor shall have the following obligations:

23.2.1 Owner, without prejudice to any of its other rights or remedies, may upon five (5) Business Days' Notice to Contractor (A) suspend payment and performance of its other obligations hereunder and/or (B) terminate this Agreement on the date specified in a written or facsimile Notice of termination to Contractor.

23.2.2 Upon termination of this Agreement by Owner in accordance with **Section 23.2.1(B)**, **Section 24.1** or by either Party pursuant to **Section 26.7** and Owner's determination, in its sole discretion, to complete the Work hereunder, Contractor shall, if requested by Owner (A) withdraw from the Facility Site, (B) assign one or more of its contracts, subcontracts, purchase orders or other agreements (including any agreements entered into with Subcontractors) to Owner or any designee of Owner; provided, however, that such assignee assumes the obligations of Contractor thereunder and (C) shall turn over to Owner complete possession of any or all designs, materials, equipment, tools, purchase orders, inquiries, letters, magnetic media, schedules, and drawings of Contractor that Owner deems necessary for completion of the Work; provided, however, that the provisions of **Section 22.3** shall be applicable to any such documents so turned over to Owner.  Furthermore, if so directed by Owner, Owner may employ any other person, firm or corporation (hereinafter, a "**Replacement Contractor**") to finish the Work in accordance with the terms of this Agreement by whatever method that Owner may deem expedient.  In addition, Contractor shall not remove any equipment, materials or tools that (W) have been fabricated especially for or are unique to the Facility, (X) are incorporated in or are attached to, or are intended to be incorporated in or attached to, the Facility, (Y) constitute temporary or permanent scaffolding or supporting elements for the construction of the Facility or (Z) the removal of which could damage the Facility or any portion thereof then constructed or otherwise materially adversely affect or delay the construction, use or maintenance of the Facility, and Contractor shall take all steps necessary to ensure that Owner has the right to take possession of all such construction equipment for the purpose of completing the Work.  After the termination of this Agreement, Owner shall be responsible for the care, custody, and control of all equipment, materials, tools and other items used in completion of the Work subsequent to such termination and shall be responsible for any damage resulting from such use.

23.2.3 Owner, without incurring any liability to Contractor, shall have the right to have the Work finished by the Replacement Contractor subject to **Section 23.3**.

71

FUL_0204389

23.3    If this Agreement is terminated by Owner in accordance with **Section 23.2** for cause as a result of an Event of Default by Contractor under **Section 23.1** (except **Section 23.1.7**), Contractor shall be liable to reimburse Owner for any costs in excess of the Fixed Construction Price, as adjusted, incurred by Owner or any Person acting on Owner's behalf in completing the Work or having the Work completed; provided, however, that Owner shall use its reasonable commercial efforts to mitigate such costs. Owner shall be entitled to withhold payments Contractor determines are due to it prior to the date of termination until Substantial Completion and determination by Owner that Contractor is entitled to such payments. Upon completion of the Work by Owner or third parties, the total cost of the Work shall be determined, and Owner shall notify Contractor in writing of the amount, if any, that Contractor shall pay Owner or Owner shall pay Contractor. If at any time the total expense incurred by Owner in completing the Work exceeds the portion of the Fixed Construction Price not paid to Contractor as of the date of termination, then Contractor shall pay the amount of any such excess, as limited in **Section 40.13**, as applicable, from time to time existing within thirty (30) days of written demand therefor by Owner. Any amounts not paid hereunder when due shall bear interest at the Late Payment Rate. Owner may in its discretion employ such other Person to finish the Work by whatever method or means as Owner in its sole discretion may deem expeditious, provided that the balance of Work will be completed utilizing cost effective methods of construction management and construction consistent with the Progress Schedule and as otherwise provided herein. In the event that any termination of this Agreement by Owner due to a Contractor Event of Default pursuant to **Section 23.2** is later adjudicated to have been improper, then Contractor shall be entitled to recover such amounts as Contractor is entitled to under **Section 24.2** In addition to the foregoing, all Contractor Warranties for the Work performed by Contractor shall survive such termination provided, however, that if such termination occurs prior to the Substantial Completion Date or the Deemed Substantial Completion Date (as applicable) the Warranty Period shall commence on the date of termination.

Notwithstanding anything herein to the contrary, the Contractor bankruptcy and Abengoa, S.A. restructuring proceedings commenced prior to the Notice to Proceed shall not constitute an Event of Default on the part of Contractor under this Agreement.

23.4    <u>Owner Events of Default.</u> Each of the following constitutes an Event of Default on the part of Owner, provided that none of the following shall constitute an Event of Default if caused directly and substantially by the failure of Contractor to perform its obligations hereunder:

23.4.1 If Owner makes an assignment for the benefit of creditors, or fails, or admits in writing an inability, to pay debts generally as they become due, or consents to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of either Owner or of a major part of its property; or

23.4.2 If, by order of a court of competent jurisdiction, a receiver or liquidator or custodian or trustee of Owner or of a major part of its property is appointed and is not discharged within sixty (60) days, or if, by decree of such a court, Owner is adjudicated insolvent, or a major part of its property is sequestered, and such decree has continued undischarged and unstayed for sixty (60) days after the entry of such decree, or if a petition to

72

reorganize Owner pursuant to any applicable bankruptcy or insolvency laws or any other similar statute applicable to Owner, as now or hereinafter in effect, is filed against Owner and is not dismissed within sixty (60) days after such filing, or if Owner is adjudicated bankrupt or files a petition in voluntary bankruptcy under any provision of any bankruptcy law or consents to the filing of any bankruptcy or reorganization petition against Owner under any such law, or (without limitation of the generality of the foregoing) files a petition to reorganize Owner pursuant to any applicable bankruptcy or insolvency laws or any other similar statute applicable to Owner, as now or hereafter in effect; or

23.4.3 Owner fails to pay any amount that Owner is required to pay to Contractor under this Agreement (or to any Subcontractor pursuant to **Section 2.2.18**) within thirty (30) days after receipt by Owner of written demand from Contractor accompanied by a Notice stating that unless the delinquent amount is paid within thirty (30) days after this demand the failure will constitute an Event of Default, unless Owner or Contractor has reasonably and in good faith requested that arbitration be commenced pursuant to **Article 37** hereof with respect to such failure to pay.

23.4.4 No failure or refusal on the part of Owner described in **Sections 23.4.1** or **23.4.2** shall constitute an "Event of Default" unless and until: (A)  Contractor has given Notice to Owner specifying with particularity the existence of such default that, unless corrected, constitutes an Event of Default that gives Contractor a right to terminate its obligations to Owner for cause under this Section, unless actions reasonably likely to cure such default are commenced within a reasonable period of time and are diligently and aggressively pursued; and (B) Owner has neither corrected such default nor initiated actions reasonably likely to cure such default within fifteen (15) days after receipt of such Notice.

23.5    If Contractor has issued Owner a written demand pursuant to **Section 23.4.3** hereof, Contractor may suspend work if the demanded payment is not made within five (5) days following delivery of such written demand until the day such payment is made, and the Progress Schedule and Scheduled Substantial Completion Date will be delayed by a number of days equal to the time of the suspension plus an additional five (5) days to account for remobilization.

23.6    If Contractor elects to terminate this Agreement for cause as a result of an Event of Default by Owner under **Section 23.4**, Contractor shall deliver a Notice of termination to Owner, and Contractor shall have the right to compensation set forth in **Section 24.2** which right to such compensation shall constitute Contractor's sole remedy for such Event of Default by Owner.

## 24.    TERMINATION FOR CONVENIENCE

24.1    Owner shall have the right to terminate the Agreement upon no less than five (5) Business Days' prior Notice, without cause and for convenience, if Owner determines that it is in its own best interest to so terminate the Agreement.  If this Agreement is terminated (A) by Owner without cause, for convenience, and Contractor has complied with all of Owner's termination instructions, or (B) by Contractor for cause in accordance with **Section  23.6**, then Contractor shall be entitled to receive payment for Work actually performed plus

73

reasonable demobilization and close out out-of-pocket costs (including, without limitation, Subcontractor's termination costs); provided, however, that in neither case shall Contractor be entitled to any recovery of profit or unabsorbed overhead in connection with Work not actually performed or future Work.

24.2    In the event that Owner terminates this Agreement for convenience, then in addition to the above amounts due to Contractor, Owner shall pay to Contractor without duplication of any amounts payable pursuant to **Section 24.1** a termination amount calculated on the date of termination as follows: the sum of (A) the portion of the Fixed Construction Price which would have been due on or before the end of the calendar month during which the date of termination occurred, minus any portion of the Fixed Construction Price already paid to Contractor, (B) all Retainage For Punch List withheld and not yet paid to Contractor, and (C) all Contractor's reasonably documented costs and expenses incurred as a result of such termination, including without limitation all cancellation charges and demobilization costs.

## 25.    SUSPENSION

25.1    Owner may at any time and for any reason suspend performance of the Work or portion thereof for up to one hundred eighty (180) days by giving Notice to Contractor.  Such suspension shall continue for the period specified in the suspension Notice.  At any time after the effective date of the suspension, Owner may require Contractor to resume performance of the Work or portion thereof.  On or before the end of the specified suspension period, Owner will advise Contractor in writing that (A) the suspension period will be extended (up to the aggregate one hundred eighty (180) days), (B) Work will resume, or (C) this Agreement will be terminated (for convenience or for cause) on a specific date.  If no such Notice is received from Owner prior to expiration of the suspension period, Contractor shall give Notice to Owner and Independent Engineer stating that, unless such Notice is given within ten (10) Business Days, this Agreement shall be deemed terminated for convenience as of the commencement date of the suspension period, and if such suspension is due to reasons other than the actions, or failure to act by Contractor or its Subcontractors, then Owner shall pay Contractor pursuant to the provisions of **Section 24.2**.  In addition and in either case (so long as such suspension is due to reasons other than the actions, or failure to act by Contractor or its Subcontractors), Owner shall compensate Contractor (without duplication) as a Change In Work for those costs of Contractor (excluding home office overhead and profit) incurred during the suspension period that are documented by Contractor to the reasonable satisfaction of Owner, attributable solely to the suspension, and are:

25.1.1 for the purpose of safeguarding the Work and the materials and equipment in transit or at the Facility Site and the cost of maintaining personnel at the Facility Site, and

25.1.2 for personnel, Subcontractors or rented equipment the payment of which, with Owner's prior written concurrence, is continued during the suspension period and/or for de-mobilization or remobilization of personnel, Subcontractors or equipment, demobilization, penalties for cancellation of contracts, or other costs incurred due to the suspension. If the cumulative suspension period of the Work is longer than sixty (60) days, and the Agreement is

74

not terminated as described in **Section 25.1** then Contractor shall also be entitled to any actual escalation costs resulting from such suspension and the Progress Schedule shall be adjusted upon mutual agreement between Owner and Contractor, to account for same.

25.2    In the case of any suspension of the entire Work under this **Article 25**, the Scheduled Substantial Completion Date shall be extended by a period equal to the suspension period plus any time required for mobilization, demonstrated weather effects on construction, rework or any other delay associated with the suspension in the Work that is beyond the reasonable control of Contractor.

25.3    In the case of any suspension of a portion of the Work under this **Article 25**, the Scheduled Substantial Completion Date shall be extended only to the extent the suspension can be shown on the Progress Schedule to affect said dates. This analysis shall be based on the most current Progress Schedule in effect on the day of suspension and take into account the critical path for project completion set forth in the CPM schedule and any Float available for the activities suspended.

25.4    The provisions of this **Article 25** shall not apply to any suspension of Work resulting from the occurrence of a Force Majeure.

25.5    All claims by Contractor for compensation under this **Article 25** must be made within forty-five (45) Days after the suspension period has ended or such claim shall be deemed to have been waived.

## 26.    FORCE MAJEURE

26.1    A Party to this Agreement shall not be in default hereunder or liable to the other Party for its failure to perform obligations under this Agreement, to the extent such failure results from a Force Majeure or from the failure of the other Party to perform its obligations hereunder. Each Party shall undertake normal and customary commercially reasonable steps to diligently overcome or remove such Force Majeure. A Party claiming the benefit of this Section (the "**Affected Party**") shall Notice of such claim to the other Party and Financing Agent within five (5) Business Days of becoming aware of the occurrence of the Force Majeure, and such Party shall provide the other Party and Financing Agent with reasonably requested information concerning the nature of such event, its effect on the Work and the Affected Party's efforts to overcome or remove the Force Majeure. If the Affected Party fails to notify the other Party and Financing Agent within fifteen (15) days of the inception of the event of a Force Majeure, the Affected Party shall not be entitled to the benefits of this **Article 26**.

26.2    **Force Majeure** means any event or condition, whether affecting the Facility, the Facility Site, Contractor, Owner, Financing Agent, Independent Engineer or the Work that occurs after the Effective Date and that has, or may reasonably be deemed to have, a material adverse effect on the Facility, the Facility Site, the Work or on the ability of Contractor or Owner to perform any of their respective obligations under this Agreement or for delay in such performance or compliance, in each case if such event or condition is beyond the reasonable control of, could not reasonably have been foreseen and protected against using

75

customary and normal commercial means, and is not the result of willful or negligent action of the nonperforming Party or its agents or Subcontractors relying thereon as justification for not performing any obligation or complying with any condition required of such Party hereunder.  Force Majeure events may include, but are not limited to, the following:

(A)     an act of God (but not including reasonably anticipated weather conditions for the geographic area of the Facility), landslide, earthquake or similar occurrence, fire, explosion or other casualty, an act of the public enemy, war, blockade, insurrection, riot, general arrest or restraint of government and people, civil disturbance or similar occurrence, or sabotage; or

(B)     the order or judgment of any federal, state or local court, administrative agency or governmental officer or body, if it is not also the result of willful or negligent action or a lack of reasonable diligence of the non-performing Party or breach of this Agreement by the non-performing Party, provided that the diligent contest in good faith of any such order or judgment shall not constitute or be construed as a willful or negligent action or a lack of reasonable diligence of such nonperforming Party; or

(C)     the failure to issue, termination, suspension, denial or failure of renewal of any Project Permit, license, consent or approval necessary for the performance of the nonperforming Party's obligations under this Agreement or, after the Effective Date, the imposition of any new condition in or other change to such a Project Permit, license, consent or approval to the extent such condition or change requires Contractor to incur additional costs in excess of such costs required to be incurred by Contractor to comply with the requirements of the Project Permits; or

(D)     with respect to Contractor only, the failure by Owner to perform its obligations hereunder (it being understood that a payment failure by Owner may also constitute an Event of Default by Owner under this Agreement); or

(E)     with respect to Owner only, the failure by Contractor to perform its obligations hereunder (it being understood that such failure by Contractor may also constitute an Event of Default by Contractor under this Agreement); or

(F)     the discovery of Hazardous Materials, archeological materials or endangered species at, on or beneath the Facility Site; or

(G)     geotechnical conditions at the Facility Site that are not disclosed in, or reasonably inferable or predictable from (i) Contractor's Site

76

Inspection and (ii) the reports and information regarding the Facility Site provided to Contractor prior to the Effective Date.

26.3   "Force Majeure" shall not include the following:

(A)   reasonably anticipated weather conditions for the geographic area of the Facility; or

(B)   the imposition of any new condition in or other change to a Project Permit to the extent such condition or change does not require Contractor to incur additional costs or delay costs in excess of the costs or delay costs required to be incurred by Contractor to comply with the requirements of Project Permits as described in **Exhibit C**; or

(C)   the failure of a Subcontractor or any other counterparty to any agreement with Contractor to perform its obligations under such subcontract or agreement or undertaking unless the failure of such Subcontractor or counterparty to perform is caused by a Force Majeure affecting such Subcontractor or counterparty; or

(D)   with respect to Contractor only, any error or defect in the design or construction or equipping of the Facility; or

(E)   any labor strike or work stoppage that is limited to the Facility or Contractor or any Subcontractor or that is caused by Contractor or any Subcontractor; or

(F)   general economic or industry conditions or increased costs of equipment, material, labor or other components of the Work.

26.4   If, within five (5) Days after a Force Majeure occurrence  that has caused Contractor to suspend or delay performance of the Work, Contractor has failed to take commercially reasonable action to overcome or cure the Force Majeure occurrence or its direct or indirect effects on the performance of its obligations hereunder, Owner may, in its sole discretion and after Notice to Contractor, at Contractor's expense, initiate commercially reasonable measures to overcome or cure such Force Majeure occurrence or its direct or indirect effects on the performance of Contractor's obligations hereunder and thereafter require Contractor to resume full or partial performance of the Work (unless it is commercially unreasonable for Contractor to do so); provided, however, that no such action of Owner shall relieve Contractor of its obligations under this Agreement.

26.5   If a delay results from an occurrence which constitutes a Force Majeure under this **Article 26**, the Scheduled Substantial Completion Date shall be extended only to the extent Contractor demonstrates to the reasonable satisfaction of Owner and Independent Engineer that such delay is shown on the Progress Schedule to affect said date in accordance with **Section 40.12**.  This analysis shall be based on the most current Progress Schedule in effect at the start of the Force Majeure occurrence and take into account the critical path as set forth

77

FUL_0204395

in the Progress Schedule and any Float available for the activity affected by the Force Majeure occurrence in accordance with **Section 40.12**.  The Progress Schedule and any other schedule affected by such delay shall be adjusted, if appropriate, to reflect the new Scheduled Substantial Completion Dates.  Adjustment of the Fixed Construction Price in accordance with **Section 7.2**, the Scheduled Substantial Completion Date and adjustment of the Progress Schedule and other affected schedules shall be Contractor's sole remedies in the event of a delay covered by this **Article 26.**

26.6    Notwithstanding the provisions of **Section 26.1,** Contractor assumes full responsibility for completion of the Work without adjustment to the Scheduled Substantial Completion Date, the Fixed Construction Price or the Progress Schedule regardless of weather conditions, unless weather severity is substantially in excess of the data accepted for the norm established and substantiated for the Facility Site.

26.7    If Force Majeure prevents either Party from performing its obligations under this Agreement for more than one (1) year, or if Owner earlier notifies Contractor that it is abandoning efforts to overcome Force Majeure, then either Party may, but shall not be obligated to, terminate this Agreement and, if so terminated by either Party the provisions of **Section 24.2** shall apply to such termination.

## 27.    INSURANCE

27.1        Owner Provided Insurance

27.1.1 Builder's Risk.  No later than the Notice to Proceed Date, Owner shall obtain and thereafter maintain until the Substantial Completion Date or the date when care, custody and control of the Facility transfers to Owner in accordance with **Section 17.4.7**, Builders Risk Insurance (with a limit of not less than the full replacement value of the Work written on an "all risk" form that shall at least include insurance for physical loss or damage to the Work, temporary buildings, false work, and materials and equipment in inland transit or in temporary storage or off-site in the contiguous 48 United States, and shall insure against at least the following perils or causes of loss: fire, lightning, theft, vandalism and malicious mischief, earthquake, collapse, debris removal, demolition occasioned by enforcement of laws and regulations, water damage) insuring Owner, Contractor, and their contractors and subcontractors, as their interests may appear, against all physical loss or damage to the Facility, the Work, or any part thereof, and to all labor, material, equipment and other items incorporated into or intended for incorporation into any part of the Facility, or to be used in the course of the Work, while in inland transit to the Facility Site, while at the Facility Site or in temporary storage or off-site in the contiguous 48 United States, during erection and until  the Substantial Completion Date (except as otherwise excluded or limited via the concept of all-risk perils or other policy terms and conditions deemed appropriate by Owner).  Owner and Contractor waive all rights against each other and their respective officers, managers, directors, partners, employees, agents, and other consultants and subcontractors of each and any of them for all losses and damages caused by, arising out of or resulting from any of the perils or causes of loss covered by such Builders Risk Insurance to the extent insurance proceeds are received in respect of such loss or damage but excluding any loss or damage covered under warranty or guaranty . Notwithstanding the foregoing, without limiting Contractor's obligations hereunder,

78

to the extent loss or damage covered under Builders Risk Insurance required to be maintained by this **Section 27.1.1** is caused by the negligence or willful misconduct of the Contractor, any Contractor's Affiliate or any of their consultants or subcontractors or breach by Contractor of the terms of this Agreement, Contractor shall be responsible for any deductible under such policy up to limits of $100,000 for each and every loss, $150,000 for hot commissioning. Contractor's responsibility for delay costs shall not be affected by any deductible amounts in the Builders Risk insurance but shall be as otherwise provided in this Agreement without regard to this **Article 27**.

27.1.2 From and after the Substantial Completion Date or the date when care, custody and control of the Facility transfers to Owner in accordance with **Section 17.4.7**, Owner shall maintain reasonable and customary property insurance covering loss and damage to the Facility until the Outside Warranty Date, on an all-risk perils basis (except as otherwise excluded or limited via the concept of all-risk perils or other policy terms and conditions deemed appropriate by Owner), and shall provide a waiver of subrogation in favor of Contractor under any such insurance; provided that, such waiver of subrogation shall exclude loss or damage covered under warranty or guaranty . Owner agrees that any such insurance policy covering said property will be suitably endorsed to provide for this waiver of right of recovery. Notwithstanding the foregoing, without limiting Contractor's obligations hereunder, Contractor shall be liable for any deductible associated with insurance coverage to the extent loss or damage covered under any such insurance coverage is caused by the negligence or willful misconduct of Contractor or Contractor's Affiliate or any of their consultants or subcontractors or breach by Contractor of the terms of this Agreement up to limits of $100,000 for each and every loss, $150,000 for hot commissioning. Contractor's responsibility for delay costs shall not be affected by any deductible amounts in the Builders Risk insurance but shall be as otherwise provided in this Agreement without regard to this **Article 27**.

27.1.3 Owner and Contractor (and Contractor shall cause each of its Subcontractors to) waive all rights against each other and the Lenders (including the Financing Agent) for damage to the Work or any other real or personal property of Owner, Contractor, or its Subcontractors, including the existing structures, buildings and their contents, furniture and fixtures caused by fire and other perils and for the loss of use of such property, in each case, to the extent covered by property insurance obtained pursuant to this **Section 27.1** and insurance proceeds are received under such coverage in respect of such damage. Any such waivers in favor of Contractor or its Subcontractors shall not be effective with respect to loss or damage covered under warranty or guaranty or the deductible portion of any loss that is caused by the negligence or willful misconduct of the Contractor, any Contractor's Affiliate or any of their consultants or subcontractors or breach by Contractor of the terms of this Agreement.

27.2    Contractor Provided Insurance

27.2.1 Contractor shall provide and maintain, at its sole expense (to the extent coverage is reasonably and customarily available in the commercial insurance market), and shall require each of its Subcontractors to obtain and maintain (unless covered by Contractor's insurance) during the progress of the Work and performance of its obligations under this Agreement the insurance set forth below, at its sole expense from financially sound and reputable insurance companies. Contractor will furnish certificates evidencing that such

Confidential

insurance is in force and will provide that at least thirty (30) days' prior Notice be given to Owner in the event of material change in, or cancellation of, any such insurance. Contractor shall cover Subcontractors under such insurance or shall require its subcontractors to obtain and maintain insurance in accordance with the following requirements (except the requirements in clauses (E) and (F) below which shall be in accordance with the Contractor's normal business practices for similar work):

(A) <u>Worker's Compensation Insurance</u>: Worker's compensation insurance in an amount equal to the limit of liability and in the form prescribed by the laws of each state where any portion of the Work is performed, for all of Contractor's and its Subcontractors' employees employed in performance of the Work.

(B) <u>Employer's Liability Insurance</u>: Employer's liability insurance in the amount of One Million Dollars ($1,000,000.00) for bodily injury by accident or disease, including death at any time resulting therefrom, on account of any one occurrence and as an annual aggregate.

(C) <u>Commercial General Liability Insurance</u>: Such insurance shall cover claims resulting from bodily injury and from property damage, including premises/operations, products liability, contractual liability, personal and advertising injury, and including loss of use, to existing property or property being installed by others than Contractor or its Subcontractors. Coverage shall be in place for the duration of the Work plus completed operations for the applicable statute of repose, or six (6) years (whichever is greater) following the earlier of Substantial Completion or the assumption of care, custody and control of the Facility by Owner in accordance with **Section 17.4.7**. Coverage shall be in a form providing coverage no less broad than the current ISO Commercial General Liability Insurance policy (Occurrence Form, number CG 00 01). in amounts no less than Two Million Dollars ($2,000,000.00) each occurrence; Two Million Dollars ($2,000,000.00) each occurrence personal/advertising injury; Four Million Dollars ($4,000,000.00) general aggregate (reinstating annually); and Four Million Dollars ($4,000,000.00) products/completed operations aggregate.

The policy shall not contain any of the following exclusions:
a. Cross Suits exclusion
b. Subsidence or earth movement exclusion

Further the policy shall not contain any exclusions directed toward any types of projects, materials or processes involved in

80

the Work.  Coverage shall include but not be limited to the following and shall not include any endorsements restricting these coverages:

    a.  Contractual Liability to cover liability assumed under the agreement;

    b.  Products/Completed Operations Extension

    c.  Broad Form Property Damage

    d.  Explosion, collapse and underground hazards, if such exposure exists

    e.  Independent Subcontractors

    f.  Severability of interests

    g.  Cross Liability

    h.  Limited Pollution exclusion with Building Heating, Cooling and Hostile Fire exception

    i.  Limited Professional Liability - contractor means and methods exception - CG 2279 or equivalent

(D)   <u>Automobile Liability Insurance</u>: Automobile liability insurance covering all owned, non-owned, hired and rented automotive equipment used in the performance of the Work.  It shall include bodily injury coverage in an amount not less than Two Million Dollars ($2,000,000.00) for injury to, or for the death of, any one person and, subject to the same limitation for each person, in an amount not less than Two Million Dollars ($2,000,000.00) for each occurrence.  Property damage coverage shall be in an amount not less than Two Million Dollars ($2,000,000.00), on account of any one occurrence and as an annual aggregate.

(E)   <u>Professional Liability Insurance:</u> Contractors, Subcontractors and consultants with design responsibility shall provide Professional liability errors and omissions insurance  with limits of not less than Five Million Dollars ($5,000,000.00), per claim and annual aggregate, with coverage maintained for at least six (6)  years following the earlier of Substantial Completion or the assumption of care, custody and control of the Facility by Owner in accordance with **Section 17.4.7**. Such policy shall not contain any exclusions directed toward any types of projects, materials, services or processes involved in the Work.  Coverage shall include, but not be limited to:

    a.  Insured's interest in joint ventures, if applicable;

    b.  Construction Management must be listed as a Professional Service covered by the policy without being subject to limitation by a specific definition;

81

Confidential         FUL_0204399

      c. Technology Services must be listed as a covered service with respect to BIM hosting and management responsibilities;

      d. Limited contractual liability; and

      e. The retroactive date for coverage will be no later than the commencement date of design and the policy will, in the event of cancellation or non-renewal, include the option to purchase an extended discovery period for insurance claims of at least five (5) years and the Contractor shall purchase (and provide evidence of) such extended discovery period for insurance claims or otherwise as by agreement with Owner.

(F) <u>Pollution Liability Coverage</u>: pollution liability insurance coverage on a claims made form with a limit of not less than Five Million Dollars ($5,000,000.00) each occurrence and in the annual aggregate. Such insurance shall include coverage for bodily injury including death and mental anguish and property damage including the resulting loss of use thereof, including cleanup costs and defense costs, resulting from sudden, accidental and gradual pollution conditions, including the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hydrocarbons, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water. The definition of pollution conditions shall include damage to natural resources damage within the definition of property damage resulting from the Contractor's and Subcontractors' work/operations. Coverage shall also include coverage for disposal and transportation of pollutants with coverage maintained for a period of three (3) years after the earlier of Substantial Completion or the assumption of care, custody and control of the Facility by Owner in accordance with **Section 17.4.7**. If such coverage is maintained on a claims-made basis, the retroactive date for coverage will be no later than the commencement date of Work at the Facility Site and the policy will, in the event of cancellation or non-renewal, include the option to purchase an extended discovery period for insurance claims of at least three (3) years and the Contractor shall purchase (and provide evidence of) such extended discovery period for insurance claims or otherwise as by agreement with Owner.

(G) <u>Excess Liability Coverage</u>: Excess liability coverage in the amount of Twenty-Five Million Dollars ($25,000,000.00) providing excess coverage on a following form and drop down basis above the primary policies required to be obtained and maintained in (B) through (D) and (F) above.

Confidential

(H)    <u>Marine Cargo Insurance</u>:  No later than thirty (30) days prior to the loading for shipment of any machinery or equipment intended to become part of the Facility, Contractor shall obtain and thereafter at all times during performance of the Work until the Substantial Completion Date, maintain, or cause to be maintained, ocean marine/cargo insurance in an amount sufficient to cover claims on a replacement cost basis against physical loss of or damage to any and all machinery and equipment intended to become part of the Facility (including the Purchased Equipment and Materials), including primary cost of such machinery and equipment plus freight.  Said insurance shall commence with the loading of the machinery and equipment, prior to dispatch to the Facility Site from the originating factory, warehouse, or place of storage, and remain in force until completion of unloading within the legal boundaries of the Facility Site.  Such insurance shall cover all risks of loss or damage including war risk, strikes, riots and civil commotion.  Such insurance shall include extra/expediting expense coverage and, if requested by Owner or the Lenders and the cost of such insurance paid to Contractor as a Documented Cost, advance loss of profits insurance for the sole benefit of the Owner and the Lenders and shall insure as additional insureds Owner, the Lenders (including the Financing Agent) and all Subcontractors.  The Financing Agent (or another Lender designated by the Financing Agent) will be named sole loss payee in respect of claims.  Any required payments of the deductibles for ocean marine/cargo insurance shall be the responsibility of Contractor.  Such insurance shall provide for a waiver of the underwriters' right to subrogation against Owner, Contractor, Lenders and all Subcontractors.

(I)    <u>Contractor's Equipment</u>**:** Contractor will maintain All Risk Equipment Insurance covering all risk of physical damage to equipment provided for use at the Facility Site by the Contractor, whether owned, leased, rented, borrowed or used at the Facility Site.  Contractor agrees to waive and does hereby waive its rights of recovery against Owner and each of its officers, employees, consultants and agents including, but not limited to each Owner Indemnified Party, as to any damage or loss which may occur to its equipment to the extent covered by insurance.  Contractor will have the insurance company specifically agree to this waiver.  If uninsured, Contractor will hold harmless Owner and each of its officers, employees, consultants and agents including, but not limited to each Owner Indemnified Party, for loss or damage to its tools and equipment.

83

27.3 <u>General</u>:  All insurance described in **Section 27.2** must be subject to the following provisions:

27.3.1 Only "occurrence" type coverages with no "sunset clause" ("claims made" coverages are not acceptable except with respect to professional liability insurance and pollution liability insurance; and

27.3.2 Coverages must be with A.M. Best's "A", "X" (or better) rated carriers that are reasonably acceptable to Owner.

27.3.3 (Except for professional liability and workers' compensation/employers liability) Owner and Lenders (including the Financing Agent), their subsidiaries and Affiliates, and their directors, officers, employees, representatives, consultants, and agents, shall be additional insureds on all insurance provided by Contractor pursuant to **Section 27.2** and shall respond on a primary and non-contributory basis with other insurance maintained by Owner or Lenders (including the Financing Agent). Such additional insured endorsement for Commercial General Liability and Excess/Umbrella coverages shall be equivalent to ISO form CG 20 10 (or CG 20 26 for Lenders including the Financing Agent), together with ISO form CG 20 37. The additional insured requirement for Commercial General Liability and Excess/Umbrella coverages is for the duration of the Contract and the applicable statute of repose or an additional six (6) years following the earlier of Substantial Completion or the assumption of care, custody and control of the Facility by Owner in accordance with **Section 17.4.7** (whichever is greater).

27.3.4 <u>Waiver of Right to Recovery including Subrogation</u>:  Contractor hereby waives all its rights of recovery, under subrogation or otherwise, against Owner and Lenders (including the Financing Agent), including their subsidiaries and Affiliates, and their directors, officers, employees, representatives, consultants, and agents, and all tiers of contractors, vendors and suppliers engaged directly by Owner with respect to the Facility, to the extent covered by insurance required to be provided by Contractor and its Subcontractors of whatever tier under this Agreement and further waives all rights of recovery which are not covered by insurance because of deductible or self-insurance obligations or exclusions relating to such insurance.  These waivers do not apply to Contractor's rights of recovery (if any) against its own Subcontractors, vendors and suppliers of whatever tier, nor against Owner's architects, engineers or other design professionals.  Contractor will require all tiers of its Subcontractors, vendors and suppliers, by appropriate written agreements, to provide similar waivers each in favor of all parties enumerated in this paragraph.  Contractor will require all insurance policies in any way related to the Work secured and maintained by the Contractor to include clauses stating each insurer will waive all rights of recovery consistent with this paragraph.  All waivers of subrogation provided in this **Section 27.3.4** shall be effective as to any individual or entity even if such individual or entity (a) would otherwise have a duty of indemnification, contractual or otherwise, (b) did not pay the insurance premium directly or indirectly, and (c) whether or not such individual or entity has an insurable interest in any property damaged.

27.3.5 Coverages shall include all Work, including (without limitation) all major equipment purchased by Contractor.

84

27.3.6 <u>Insurance Primary</u>:  All limits and coverages required of the Contractor shall be primary over any insurance or self-insurance program carried by Owner and the additional insureds.

27.4      All certificates of insurance for the insurance described in **Section 27.2** shall (i) evidence Owner and Lenders (including the Financing Agent) as additional insureds (except for professional liability and workers' compensation/employers liability) and (ii) expressly reference the Facility.  Owner shall not be obligated to issue payment to Contractor of any portion of the Fixed Construction Price unless Contractor's current certificates of insurance are on file and acceptable to Owner.

27.5      In no event shall any failure of Owner to receive Contractor's certificates of insurance required hereof or to demand receipt of such certificates of insurance be construed as a waiver of Contractor's obligations to obtain insurance pursuant to these insurance requirements.  The obligation of Contractor to procure and maintain any insurance required by the provisions of **Section 27.2** is a separate responsibility of Contractor and independent of the duty to  request or furnish a certificate of insurance of any such insurance policies.

27.6      Neither Party shall amend the insurance policies so as to reduce or limit coverages below the requirements set forth in this **Article 27**, increase deductibles or otherwise adversely affect the rights and coverages of the insured under such policies or allow the required insurance coverages to lapse without the other Party's prior written approval thereto.

27.7      Should a notice of insurance cancellation be issued for non-payment of premiums or any part thereof with respect to insurance to be provided by Contractor hereunder, or should Contractor fail to provide and maintain certificates for such insurance as set forth herein, Owner shall have the right, but shall not be obligated, to pay such coverage and to deduct such payment from any sums that may be due or become due to the Contractor, or to seek reimbursement for said payments from Contractor, which sums shall be due and payable immediately upon receipt by Contractor of an invoice therefor from Owner.

27.8      Should a notice of insurance cancellation be issued for non-payment of premiums or any part thereof with respect to insurance to be provided by Owner hereunder, or should Owner fail to provide and maintain certificates for such insurance as set forth herein, Contractor shall pay such coverage and Owner shall not be entitled to a reduction in the Fixed Construction Price for the amount so paid by Contractor.

27.9      Contractor shall by appropriate written agreements flow down the requirements for (a) the waiver of subrogation for all required insurance, and (b) additional insured coverage for all required insurance policies, except professional liability and workers compensation and (c) other requirements of this **Article 27** to all tiers of Subcontractors for all insurance required of such Subcontractors by Contractor for the Work.

27.10     All Contractor's certificates of insurance required pursuant to this Agreement must be sent to the attention of the Owner.

Confidential                                                                                    FUL_0204403

27.11      All Owner's certificates of insurance required pursuant to this Agreement must be sent to the attention of Contractor.

27.12      In the event of failure of Contractor to furnish and maintain the insurance required of it pursuant to **Section 27.2** and to furnish satisfactory evidence thereof, Owner shall have the right to secure and maintain the same for all parties on behalf of Contractor who agrees to furnish all necessary information to place the insurance coverage and to pay the cost thereof to Owner immediately upon presentation of an invoice and reasonable cost substantiation therefor.

27.13      Each Party further agrees to cooperate fully with the other Party's insurance representatives and/or risk manager in providing any necessary insurance data and information as requested by Owner and to complete any associated documents furnished by Owner throughout the duration of the project or until this Agreement is terminated.

27.14      A Party entitled to or desiring recovery of insurance proceeds under any insurance policy required to be maintained pursuant to this **Article 27** shall be solely responsible for initiating and pursuing such claim.

27.15      Notwithstanding any provision in this Agreement to the contrary, the Fixed Construction Price shall not be increased to cover Contractor's obligation to pay any insurance deductible in connection with an insurance claim by Contractor, and Contractor shall not be entitled to any adjustment, modification or relief of or from its obligations under this Agreement as a result of Contractor's obligation to pay or bear the cost of any insurance deductible in connection with an insurance claim by Contractor or by Owner with respect to loss or damage covered under warranty or guaranty or the deductible portion of any loss that is caused by the negligence or willful misconduct of the Contractor, any Contractor's Affiliate or any of their consultants or subcontractors or breach by Contractor of the terms of this Agreement.

27.16      Contractor's liability and indemnification of Owner, as defined within this Agreement, shall not be relieved or diminished by securing insurance coverage in accordance with the requirements herein or by Owner's approval of certificates of insurance or policies. Any acceptance of insurance coverage by Owner shall not be construed as accepting in any way deficiencies in the insurance.

27.17      The requirements as set forth herein are the minimum limits and coverages to be maintained.  In the event Contractor or any of its Subcontractors has in force any insurance coverage in limits higher than the minimum required hereunder, such insurance shall insure and be available to Owner and the Lenders (including the Financing Agent)  as additional insureds.

## 28.    LOSS OR DAMAGE.

28.1    Prior to the Substantial Completion Date or the date when care, custody and control of the Facility transfers to Owner in accordance with **Section 17.4.7**, Contractor assumes full responsibility for the cost of replacing the loss or repairing the damage to the Facility and all materials, equipment, supplies and maintenance equipment (including

86

FUL_0204404

temporary materials, equipment and supplies) which are purchased for permanent installation in or for use during construction of the Facility, regardless of whether Owner has title thereto under this Agreement, excepting only loss or damage caused by the negligence or willful misconduct of Owner or its subcontractors. Contractor shall be responsible to assure safe delivery of all materials, equipment, supplies, and other items to the Facility Site and the safe storage thereof prior to and following delivery thereof to the Facility Site.

28.2    After the Substantial Completion Date or the date when care, custody and control of the Facility  transfers to Owner in accordance with **Section 17.4.7**, Owner assumes full responsibility for the cost of replacing the loss or repairing the damage to the Facility and all materials, equipment, supplies and maintenance equipment (including temporary materials, equipment and supplies) which are purchased for permanent installation in or for use during construction of the Facility, regardless of whether Owner has title thereto under this Agreement, excepting only loss or damage caused by the negligence or willful misconduct of Contractor or its Subcontractors, or loss or damage that is caused by defects that are covered by the warranty provisions set forth in **Article 21**.

## 29.    INDEMNIFICATION

29.1    Without limiting Contractor's obligations pursuant to **Article 28**, to fullest extent permitted by Law, Contractor shall defend, indemnify and hold harmless Owner, its Related Persons, the Lenders (including the Financing Agent) and Independent Engineer and their respective, assigns, employees, agents, officers and directors (the "**Owner Indemnified Parties**") from and against all third party or uninsured claims, damages, losses, and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of Contractor's or any of its Related Persons' acts or omissions in the performance of the Work, provided that such claims, damages, losses or expenses are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, excluding loss of use resulting therefrom, but only to the extent caused by negligent acts or omissions or willful misconduct of Contractor, its Related Persons or anyone directly or indirectly employed by them or anyone for whose acts they may be liable.  The above indemnification shall not apply to any claim, damage, loss or expense caused by the negligence or willful misconduct of an Owner Indemnified Party.

29.2    To fullest extent permitted by Law, Owner shall defend, indemnify and hold harmless Contractor, its Related Persons, and anyone else acting for or on behalf of Contractor and its Related Persons (the "**Contractor Indemnified Parties**") from and against all third party or uninsured claims, damages, losses, and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of Owner's or Owner's Subcontractors' acts or omissions in the performance of the Work, provided that such claims, damages, losses or expenses are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, excluding loss of use resulting therefrom, but only to the extent caused by negligent acts or omissions or willful misconduct of Owner or its Related Persons (other than Contractor or any of its Subcontractors) or anyone for whose acts they may be liable.  The above indemnification shall not apply to any claim, damage, loss or expense caused by the negligence or willful misconduct of a Contractor Indemnified Party.

87

Hereinafter the Party having the obligation to indemnify is referred to as the "**Indemnifying Party**."

29.3    In any and all claims against an Owner Indemnified Party or a Contractor Indemnified Party (hereinafter, an "**Indemnified Party**"), by any employee of Owner, in the case of a Contractor Indemnified Party, or Contractor or any of its Subcontractors, in the case of an Owner Indemnified Party, or by anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation stated above shall not be limited in any way on the amount or type of damages, compensation or benefits payable by or for the Indemnifying Party under the applicable workers' compensation act, disability acts, or other employee benefit acts.

29.4    Contractor shall defend, indemnify and hold Owner Indemnified Parties harmless from and against all claims by any governmental or taxing authority claiming (i) taxes based on gross receipts or on income of Contractor or any of its Subcontractors or any of their respective agents or employees with respect to any payment for the Work made to or earned by Contractor or any of its Subcontractors or any of their respective agents or employees under this Agreement, or (ii) Contractor Taxes.

29.5    When required to indemnify an Indemnified Party in accordance with this Agreement, the Indemnifying Party shall assume on behalf of such Indemnified Party, and conduct with due diligence and in good faith, the defense of any such suit against such person, whether or not the Indemnifying Party is joined therein; provided, however, that, without relieving the Indemnifying Party of its obligations hereunder, the Indemnified Party may elect to participate, at its expense, in the defense of any such suit.

29.6    The Indemnified Party shall give the Indemnifying Party notice of such claim or action upon the receipt of actual knowledge or information by the Indemnified Party of any possible claim or of the commencement of such claim or action, which period shall in no event be later than the lesser of (A) fifteen days (15) prior to the last day for responding to such claim or action or (B) one half of the period allowed for responding to such claim or action.  The Indemnifying Party shall have no liability under this **Article 29** for any claim or action for which such Notice is not provided to the extent that such failure to give Notice actually and materially prejudices the Indemnifying Party's ability to defend against such claim.  The Indemnifying Party shall have the right to assume the defense of any such claim or action with counsel designated by the Indemnifying Party and reasonably satisfactory to the Indemnified Party, provided, however, that if the defendants in any such action include both Indemnifying Party and the Indemnified Party, and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to those available to the Indemnifying Party, the Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party, the cost of which shall be subject to indemnification under this **Article 29.**  Should any Indemnified Party be entitled to indemnification under this **Article 29** as a result of a claim or action by a third party, and should the Indemnifying Party fail to assume the defense of such claim or action, the Indemnified Party may, at the expense of the Indemnifying Party contest (or, with the prior consent of the Indemnifying Party, settle) such claim or action.  Except to the extent

88

expressly provided herein, no Indemnified Party shall settle any claim or action with respect to which it has sought or intends to seek indemnification pursuant to this **Article 29** without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

29.7    To the fullest extent permitted by Law, Owner shall defend, indemnify and hold harmless the Contractor Indemnified Parties from and against all claims, damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of the presence of Hazardous Materials on the Facility Site existing on or prior to the Notice to Proceed Date or that is brought or released onto the Facility Site by Owner or its Subcontractors; provided, however that such indemnification shall not apply to (i) gross negligence or willful acts or omissions of Contractor Indemnified Parties with respect to the initial disturbance of or encounter with such existing Hazardous Materials on the Facility Site other than as provided in clause (v), (ii) gross negligence or willful acts or omissions of Contractor Indemnified Parties with respect to such Hazardous Materials on the Facility Site after the initial disturbance of or encounter with such Hazardous Materials and once they have been identified as Hazardous Materials other than as provided in clause (v), (iii) failure of Contractor Indemnified Parties to follow any instructions of Owner to cease working or instructions relating to such Hazardous Materials, (iv) Contractor Indemnified Parties taking actions that violate any law relating to such Hazardous Materials or taking actions that a reputable construction  contractor for a project like the Facility should have known would violate prudent industry practices relating to such Hazardous Materials, or (v) any Hazardous Materials brought to the Facility Site by or used by a Contractor Indemnified Party or any employee or agent thereof (whether or not action within or outside of the scope of such persons employment or agency).   This indemnification shall be subject to the provisions of **Sections 29.5** and **29.6**.   To the fullest extent permitted by Law, Contractor shall defend, indemnify and hold harmless the Owner Indemnified Parties from and against all claims, damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of (i) gross negligence or willful acts or omissions of Contractor Indemnified Parties with respect to the initial disturbance of or encounter with further disturbance of existing Hazardous Materials on the Facility Site. (ii) gross negligence or willful acts or omissions of Contractor Indemnified Parties with respect Hazardous Materials on the Facility Site after the initial disturbance of or encounter with such Hazardous Materials and once they have been identified as Hazardous Materials, (iii) failure of Contractor Indemnified Parties to follow any instructions of Owner to cease working or instructions relating to such Hazardous Materials, (iv) Contractor Indemnified Parties taking actions that violate any law relating to such Hazardous Materials or taking actions that a reputable construction contractor for a project like the Facility should have known would violate prudent industry practices relating to such Hazardous Materials, or (v) any Hazardous Materials brought to the Facility Site by or used by a Contractor Indemnified Party or any employee or agent thereof (whether or not action within or outside of the scope of such persons employment or agency).   This indemnification shall be subject to the provisions of **Sections 29.5** and **29.6**.

29.8    The indemnification set forth in this **Article 29** shall survive completion of the Work and/or termination of this Agreement for a period of six (6) years.

Confidential

## 30.    PATENT INFRINGEMENT AND OTHER INDEMNIFICATION RIGHTS

30.1    Contractor shall defend, indemnify and hold harmless Owner against all loss, damage and expense (including court costs and reasonable attorneys' fees) arising from any claim or legal action for unauthorized disclosure or use of any trade secrets or of patent, copyright, license or trademark infringement arising from Contractor's performance or that of its Subcontractors under this Agreement and/or asserted against Owner that either (A) concerns any equipment, materials, supplies, or other items provided by Contractor or any of its Subcontractors under this Agreement; or (B) is based upon the performance of the Work by Contractor or any of its Subcontractors, including the use of any tools, implements or construction by Contractor or any of its Subcontractors; or (C) is based upon the design or construction of any item or unit specified by Contractor under this Agreement or the operation of any item or unit according to directions embodied in Contractor's final process design, or any revision thereof, prepared or approved by Contractor; provided, however, that such indemnification shall exclude any claim based upon uses by Owner in violation of vendor's manuals supplied to Owner by Contractor, or changes in the equipment, materials, supplies, or other items made by Owner, or any item or unit installed by Owner.

30.2    If such claim or legal action for such infringement results in a suit against Owner, Contractor shall, at its election and in the absence of a waiver of this indemnity by Owner, have sole charge and direction thereof in Owner's behalf so long as Contractor diligently prosecutes said suit.  Owner shall give Contractor Notice of such claim or action upon the receipt of actual knowledge or information by Owner of any possible claim or of the commencement of such claim or action, which period shall in no event be later than the lesser of (A) fifteen (15) days prior to the last day for responding to such claim or action or (B) one half of the period allowed for responding to such claim or action.  Contractor shall have no liability under this **Article 30** for any claim or action for which such Notice is not provided to the extent that such failure to give Notice actually and materially prejudices Contractor's ability to defend against such claim.

30.3    If Contractor has charge of a suit brought against Owner by a third party, Owner shall render such assistance as Contractor may reasonably require in the defense of such suit except that Owner shall have the right to be represented therein by counsel of its own choice and at its own expense.

30.4    If Owner is enjoined from completion of the Facility or any part thereof, or from the use, operation or enjoyment of the Facility or any part thereof as a result of any claim, legal action or litigation of the type described in **Article 30**, requiring indemnification by Contractor, Contractor shall promptly arrange to have such injunction removed at no cost to Owner, and Owner may, at its option and without thereby limiting any other right it may have hereunder or at law or in equity, require Contractor to supply, temporarily or permanently, facilities meeting the requirements of this Agreement and not subject to such injunction and not infringing any patent or to remove all such facilities and refund the cost thereof to Owner or to take such steps as may be necessary to ensure compliance by Owner with such injunction, all to the satisfaction of Owner and all without cost or expense to Owner.

Confidential                                                                           FUL_0204408

30.5    Owner's acceptance of Contractor's engineering designs and/or proposed or supplied materials and equipment shall not be construed to relieve Contractor of any obligation hereunder.

## 31.    TREATMENT OF PROPRIETARY INFORMATION

31.1    The Owner and Contractor have a proprietary interest in information that will be furnished pursuant to this Agreement.  The Parties shall keep in confidence and will not disclose any such information which in good faith is proprietary and which is specifically designated in writing as being proprietary ("**Proprietary Information**") without the prior written permission of the disclosing Person (the "**Disclosing Party**") or use any such information for other than the purpose for which it is supplied, except as provided herein.  Information relating to commercial terms of this Agreement shall also be treated as Proprietary Information.  Each Party agrees that (i) either Party may disclose any Proprietary Information to its employees, Affiliates, directors, officers, consultants, accountants, lawyers, subcontractors or other agents ("**Representatives**") as well as Governmental Entities, fuel purchasers and potential Owners, and (ii) Owner may disclose any Proprietary Information to its Parent and their Representatives, the Lenders and potential investors and their agents (including the Financing Agent), and their members, partners, investors, and potential investors, in each case, as may be reasonably necessary to perform its obligations under this Agreement or by Owner for purposes of owning, operating and maintaining the Facility, including pursuant to the license set forth in **Article 32**, or by Owner for the financing of the Facility, Owner or an affiliate of Owner, or for the sale or potential sale of the Facility or any direct or indirect interest in Owner.  Each Party shall be responsible for requiring any third party to which such Party wishes to disclose Proprietary Information (excluding such Party's (or its Affiliates) officers, directors, employees, subcontractors and counsel and with respect to the Owner and its Parent, their Affiliates, investors, members, partners, potential investors, Lenders or potential lenders) who, in each case, will be informed of the requirement to comply with the terms of this **Section 31.1** and will be required to enter into a confidentiality agreement designating Contractor as a third party beneficiary thereunder with respect to any of its Proprietary Information on substantially the terms of **Sections 31.1 – 31.7** (collectively, the "**Confidentiality Provisions**").  Each Party agrees with respect to Proprietary Information, to hold the same confidential information for the shorter of a period of three (3) years from receipt or, for confidential information of third parties for which a Party has a confidentiality obligation, the expiration of such obligation (but in no event longer than ten (10 ) years).

The Confidentiality Provisions shall not apply (a) to information which the receiving Person (the "**Receiving Party**") can substantiate (i) was in the possession of the Receiving Party at the time it was initially furnished, without a breach of the Confidentiality Provisions, (ii) is or becomes part of the public domain without a breach of the Confidentiality Provisions, (iii) is received from a third party who is, as far as reasonably can be determined, under no limitation or restriction regarding disclosure, or (iv) information the Disclosing Party authorizes the Receiving Party to describe; provided, however, that such information shall not be deemed to be within one of the foregoing exceptions if it is merely embraced by more general information available on a non-confidential basis to the Receiving Party; (b) to the extent that a Receiving Party is required to disclose Proprietary Information pursuant to

91

applicable Law (including in connection with a Financing), or uses information in connection with any legal proceeding or Dispute; provided, however, promptly upon a Receiving Party becoming aware that Proprietary Information may be required to be disclosed pursuant to applicable Law, the Receiving Party shall give notice to the other Party and, in consultation with the Disclosing Party, take reasonable steps to make the Disclosing Party's Proprietary Information subject to reasonably available procedures for maintaining its confidentiality; or (c) to any Detailed Plans or other submittals related to the Facility to the extent disclosure thereof is reasonably necessary in connection with the design, engineering, construction, operation, maintenance, improvement, modification, expansion or other activity related to the Facility; provided, however, the Disclosing Party shall require the recipient of Proprietary Information contained therein to maintain the confidentiality of such Proprietary Information on terms substantially similar to the terms of this **Article 31** and to limit use of such Proprietary Information to the Facility.

31.2    Contractor agrees that all public relation matters arising out of or in connection with the Work will be the sole responsibility of Owner.  Therefore, Contractor shall obtain Owner's prior written approval of the text of any announcement, publication, technical report, article, photograph or any other media release, or general public communication concerning the Work that specifically mentions Owner or any of its Affiliates or the Facility or the Facility Site or any of the Lenders which Contractor or its Subcontractors or any of their respective Affiliates wish to release for publication.  Contractor shall include in each subcontract a provision requiring each of its Subcontractors to adhere to the requirements of this **Section 31.2**.

31.3    Contractor and Owner each also agrees to safeguard all documents containing Proprietary Information that each may supply to the other hereunder and all other documents containing Proprietary Information whether prepared by Contractor or another.  Contractor, in the case of Owner-supplied Proprietary Information, and Owner, in the case of Contractor-supplied Proprietary Information, may make copies of such documents only to the extent necessary for the performance of the Work.  Except as otherwise provided in this **Article 31** Contractor, in the case of Owner supplied Proprietary Information, and Owner, in the case of Contractor supplied Proprietary Information, shall prevent access to all such documents by third parties.  On completion of the Work, Contractor, in the case of Owner supplied Proprietary Information, and Owner, in the case of Contractor supplied Proprietary Information, agrees to return to the other all such documents containing Proprietary Information and to destroy all copies thereof.  However, should Contractor or Owner desire to retain certain documents and receives Owner's or Contractor's written approval therefor, as the case may be, Contractor, in the case of Owner supplied Proprietary Information, and Owner, in the case of Contractor supplied Proprietary Information, shall continue to treat said documents in accordance with the terms of this **Section 31.3**.

31.4    Contractor and Owner each also agrees to enter into confidentiality agreements with third parties at Owner's or Contractor's request, as the case may be, and to keep in force confidentiality agreements concerning third parties' proprietary information, which agreements shall permit Contractor and Owner to use such parties' Proprietary Information in the Work.  Such agreements are to be consistent with current industry practices and will not

92

contain provisions that preclude Contractor's or Owner's participation in other projects or work.

31.5    To the fullest extent permitted by Law, Contractor shall defend, indemnify and hold harmless Owner Indemnified Parties from and against all claims, damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of a breach of the Confidentiality Provisions by Contractor, its Subcontractors or any Person having access to Proprietary Information provided by Owner. In addition, Contractor shall be liable for all damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may be incurred by Owner as a result of the breach of the Confidentiality Provisions by Contractor, its Subcontractors or any Person having access to Proprietary Information provided by Owner. Owner shall be entitled to any relief, including injunctive relief, available at law or in equity.

31.6    To the fullest extent permitted by Law, Owner shall defend, indemnify and hold harmless the Contractor Indemnified Parties from and against all claims, damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may arise as a result of a breach of Confidentiality Provisions by Owner, Independent Engineer, Financing Agent or any Person having access to Proprietary Information provided by Contractor.   In addition, Owner shall be liable for all damages, losses and expenses (including but not limited to court costs and reasonable attorneys' fees) which may be incurred by Contractor as a result of the breach of the Confidentiality Provisions by Owner, Independent Engineer, Financing Agent or any Person having access to Proprietary Information provided by Contractor.   Contractor shall be entitled to any relief, including injunctive relief, available at law or in equity.

31.7    The Confidentiality Provisions supersede all prior agreements between Owner and its Affiliates on the one hand, and Contractor and its Affiliates on the other regarding the confidentiality of any information or documents regarding the Facility or the matters described in this Agreement. Any such prior agreements between either of the Parties or their respective predecessors or Affiliates shall have no force or effect on or after the Effective Date.

## 32.    INVENTIONS AND LICENSES

32.1    Contractor agrees that Owner, Financing Agent and any other owner or lessee of the Facility and their respective successors, assigns and designees shall at all times have the right to use, either by license or otherwise, any and all patented or Proprietary Information relative to the Facility that is included in the Work, whether now existing or hereinafter developed or otherwise acquired, (but only to the extent necessary in connection with the ownership and operation of the Facility and not for any other purpose) and Contractor further agrees that it shall, upon request, provide aforementioned persons and parties with such information in a timely fashion and subject only to the confidentiality restrictions provided in **Article 31**. Contractor agrees to grant and hereby grants to Owner an irrevocable, royalty-free, non-exclusive perpetual license, to use all patents now or hereafter owned or controlled by Contractor or its Subcontractors, vendors or suppliers, that in any way relate to the use or enjoyment of all or any part of the Work, in each case, to the extent necessary for the

93

operation, maintenance or repair of the Facility or any unit or component thereof designed, specified or constructed by Contractor under this Agreement.

32.2    Contractor shall obtain the same rights and/or licenses with respect to inventions and/or patents as stated in **Section 32.1** from any of its Subcontractors from whom Owner requires these rights and/or licenses.  Owner shall advise Contractor of such requirements in writing.

32.3    The provisions of this **Article 32** shall survive termination of this Agreement.

## 33.    ASSIGNMENT BY OWNER

Without the prior consent of Contractor, Owner may assign all or part of its rights, title, and interest in this Agreement to Lenders, Financing Agent or provider of funds or credit or their respective designees in connection with the Financing of the Facility and the Facility Site, or any guarantor of any such provider of funds, any Affiliate of Owner or any successor to Owner's business (whether by merger, acquisition or otherwise).  In addition, Owner may assign all or part of its right, title and interest in this Agreement to any other Person with the prior written consent of Contractor, which consent shall not be unreasonably withheld or delayed.   Any assignment effected without Contractor's consent, whether required hereunder or not, shall not relieve Owner from any of its obligations hereunder.

## 34.    ASSIGNMENT BY CONTRACTOR

Contractor may not, without Owner's prior written consent (which consent may be withheld for any reason in the sole discretion of Owner), assign this Agreement or any partial or total interest herein; provided that, Contractor may, with Owner's prior written consent not to be unreasonably withheld, assign this Agreement to a successor entity or new partnership, as applicable, in connection with the sale or transfer of all or substantially all of the assets of Contractor to any successor entity reasonably satisfactory to Owner; provided that, Owner receives Performance Security from the assignee and it ultimate parent entity at least equivalent to the Performance Security provided to Owner by Contractor and Contractor Guarantor and Owner is satisfied with the technical capabilities and resources of any such assignee to perform the Work and Contractor's other obligations under this Agreement.   Except as otherwise provided in this **Article 34**, any assignment by Contractor of this Agreement or any partial or total interest herein including, but not limited to, any monies due or to become due Contractor hereunder, without Owner's prior written consent, shall be null and void ab initio.

## 35.    INDEPENDENT CONTRACTOR

35.1    Contractor is an independent contractor and nothing contained herein shall be construed as constituting any relationship with Owner other than that of Owner and independent contractor, nor shall it be construed as creating any relationship whatsoever between Owner and Contractor's employees.  Neither Contractor, nor any of its employees, are or shall be deemed to be employees of Owner.  Neither Owner, nor any of its employees, are or shall be deemed to be employees of Contractor.

94

FUL_0204412

35.2    Subject to the provisions of this Agreement, Contractor has sole authority and responsibility to employ, discharge and otherwise control its employees.

35.3    Contractor shall accept complete responsibility for its employees, agents, Subcontractors, and all others it hires to perform or assist in performing the Work.  Owner will not undertake to settle any differences or disputes between or among Contractor, its Subcontractors, nor, except as set forth in this Agreement, shall Owner direct any portion of the Work.

## 36.    LIENS AND CLAIMS

Contractor shall indemnify and hold harmless Owner and defend it from any and all Liens filed in connection with the Work, including all expenses and attorneys' fees incurred in discharging any Liens or similar encumbrances provided that such Liens did not result from Owner's wrongful action or wrongful failure to pay Contractor.  If Contractor shall default in discharging any Lien(s) or claims(s) upon the Facility, Facility Site to the extent such Liens or claims are filed in connection with the performance of the Work hereunder or upon any materials, equipment or structures encompassed therein, or upon the premises upon which they are located, Owner shall promptly notify Contractor in writing and Contractor shall then satisfy or defend any such Lien(s) or claims(s).  If Contractor either does not promptly satisfy such Lien(s) or claim(s) or does not post a bond against, such Lien(s) and claim(s), then Owner shall have the right to satisfy such Lien(s) and claim(s) or post a bond against such Lien(s) and claim(s), and Contractor shall, within five (5) days of request by Owner, reimburse Owner for all costs incurred by Owner to discharge or bond such Lien(s) or claim(s) including administrative costs, attorneys' fees and other expenses.

## 37.    DISPUTE RESOLUTION AND ARBITRATION

37.1    Dispute Resolution Procedure.

37.1.1 Initiation:   Either Party may initiate the Dispute resolution by giving Notice of its claim to the other Party.

37.1.2 Level I:   Within five (5) Business Days of the receipt of a Notice of Dispute, the Project Director and the Project Manager shall meet, confer, and attempt to resolve the Dispute within the next five (5) Business Days.

37.1.3 Level II:   If the Dispute is not resolved within two (2) Business Days of the close of the Level I meeting as provided in **Section 37.1.2**, an officer with authority to resolve such Dispute of Owner and Contractor shall meet, confer and attempt to resolve the Dispute within the next ten (10) Business Days.

37.1.4 Resolution:   The terms of the resolution of all Disputes concluded in Level I or Level II meetings held pursuant to **Sections 37.1.2** and **37.1.3** shall be memorialized in writing and signed by each Party.

37.1.5 Arbitration:   No Dispute may be pursued through arbitration unless such Dispute has been raised and considered in the Dispute resolution procedures specified in

95

FUL_0204413

**Sections 37.1.2** and **37.1.3** or either Party fails to meet with the other Party within the time periods specified in **Section 37.1.2** or **37.1.3**, as applicable, unless specified otherwise.

37.2    Any Dispute not resolved by the Level I or Level II procedures specified in **Sections 37.1.2** and **37.1.3** shall, upon the request of either Party (and without regard to whether or not any provision of this Agreement expressly provides for arbitration), be submitted to and settled by arbitration in Reno, Nevada or such other location as may be mutually agreed by the Parties, in conformance with Rules of Conciliation and Arbitration of the International Chamber of Commerce ("**ICC**").  The decision and award of the arbitral panel shall be final and binding on the Parties and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.  The provisions of this **Article 37** shall be governed by the Laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction.  The Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the state of Nevada with respect to any such award and consent to the service of process in any manner permitted by law.  Each Party irrevocably and unconditionally waives trial by jury in any action, suit or proceeding relating to such award and for any counterclaim with respect thereto.

37.3    The expenses of the arbitration shall be borne by the losing Party (or apportioned if there is no clear winning or losing Party), as determined by the arbiters, provided that:

37.3.1 Each Party shall pay for and bear the cost of its own experts, evidence and counsel; provided, however if the arbiters determine that a Party's dispute, controversy, or claim submitted to arbitration is frivolous or non-meritorious, such Party shall pay all costs of experts, evidence and counsel incurred by the other Party; and

37.4    Selection of arbiters shall be as follows:

37.4.1 Contractor shall nominate and appoint the first arbiter (the "**First Arbiter**"), and Owner or its legal representative shall nominate and appoint the second arbiter (the "**Second Arbiter**").  The First and Second Arbiters shall agree upon the appointment of the third arbiter (the "**Third Arbiter**"), and if such first two arbiters cannot agree on the appointment of a third, the Third Arbiter shall be selected in accordance with the Rules of Conciliation and Arbitration of the ICC.  The three arbiters shall resolve the dispute, controversy, or claim and report that decision in writing to Contractor and Owner.

37.4.2 Owner and Contractor agree to require that the three arbiters meet to resolve the dispute a minimum of fifteen (15) days per month until the written decision is issued.

37.5    In any arbitration under this **Article 37** both Parties shall be entitled to:

37.5.1 Request the other Party to produce documents or things in accordance with the limitations and procedures set forth in Rule 34 of the Federal Rule of Civil Procedure, and

96

37.5.2 Serve upon the other Party written interrogatories to be answered by the Party served, in accordance with the limitations and procedures set forth in Rule 33 of the Federal Rules of Civil Procedure.

37.6    Upon timely objection or request by a Party, the arbitrator(s) shall:

37.6.1 Determine the extent to which propounded interrogatories shall be permitted and answered; and

37.6.2 Upon notice and a showing of good cause therefor, order a Party to produce documents and things and to permit the inspection and copying or photographing of any designated documents or objects, provided such documents or objects have been specifically identified, are not privileged, their relevance and materiality to the issue(s) in arbitration have been explained and are reasonably calculated to lead to the discovery of admissible evidence.  In the event the Parties cannot themselves agree thereon, the arbitrators may also specify just terms and conditions in making the inspection and taking the copies and photographs.

## 38.    NOTICES AND COMMUNICATIONS

38.1    Any notice pursuant to the terms and conditions of this Agreement shall be in writing and (A) delivered personally, or (B) sent by certified mail, return receipt requested, facsimile or (C) sent by a recognized overnight mail or courier service, with delivery receipt requested, to the following addresses or such other address as any such person shall specify to the other such persons:

| | |
|---|---|
| If to Contractor: | Abeinsa Abener Teyma General Partnership<br>c/o Abeinsa EPC, LLC<br>3030 N. Central Ave, Suite 808<br>Phoenix, Arizona 85012<br>Attention: Maria Eliset Techera, Legal Director |
| If to Owner: | Fulcrum Sierra BioFuels, LLC<br>c/o Fulcrum Bioenergy, Inc.<br>4900 Hopyard Rd, Suite 220<br>Pleasanton, CA 94588<br>Attention: Richard D. Barraza<br>Telephone:  (925) 224-8244<br>Email: rbarraza@fulcrum-bioenergy.com |
| With a copy to: | Fulcrum Sierra BioFuels, LLC<br>3600 Peru Drive<br>McCarran, Storey County, NV 89434<br>Attention: Project Director |
| If to Project Director: | Fulcrum Sierra BioFuels, LLC |

97

FUL_0204415

3600 Peru Drive
McCarran, Storey County, NV 89434
Attention: Project Direrctor

If to Independent Engineer:    Leidos Engineering
550 Cochituate Road
Framingham, MA 01701
Attention: Herbert M. Kosstrin

To the address for Independent Engineer set forth in a Notice from Owner that is delivered to Contractor on or before the date of the Notice to Proceed or in the absence of receipt of such Notice from Owner, to Owner marked "Attention:  Independent Engineer."

38.2    Notices shall be deemed served when delivered; provided, however, that notice given by facsimile shall be deemed served as of the date of confirmed delivery if delivered before 5:00 p.m. Eastern Time on any Business Day or the next succeeding Business Day if confirmed delivery is after 5:00 p.m. Eastern Time on any Business Day or during and non-Business Day.

38.3    Unless otherwise provided herein or in a Notice between the Parties, any technical or other communications pertaining to the Work between Owner and Contractor shall be between the Project Director and Project Manager who shall both be available at all reasonable times for consultation.  Any such communication by any other means shall be of no effect unless receipt thereof is acknowledged by the Project Director or Project Manager, as the case may be.

38.4    Except as provided in **Section 38.3,** all notices (other than routine correspondence in the ordinary course of business) sent by Contractor or Owner to the other shall, concurrently therewith, be sent by the same means to Independent Engineer.

## 39.    PERFORMANCE SECURITY AND PAYMENT ACCOUNT

39.1    On or before the Effective Date, Contractor shall deliver to Owner a Parent Guaranty issued by Contractor Guarantor as security for the payment and performance of Contractor's obligations under this Agreement and the Purchasing Agreement, in the form attached hereto as **Exhibit K** or otherwise acceptable to Owner in its sole reasonable discretion (the "**Parent Guaranty**"). If required by Financing Agent, Financing Agent shall, at any time, be named as an additional obligee under the Parent Guaranty.  The cost of the Parent Guaranty shall be paid by Contractor.  The Parent Guaranty shall expire no earlier than the Outside Warranty Date except that such period is extended for unresolved, incomplete or outstanding claims raised in accordance with this Agreement prior to the Outside Warranty Date until such claims are irrevocably discharged in full.

39.2    On or before the issuance of the Notice to Proceed, Contractor shall obtain and deliver to Owner a duly executed Letter of Credit issued by a Qualified Financial Institution approved in writing by Owner substantially in the form of Exhibit MM and acceptable to Owner and the Lenders. Notwithstanding any other provision herein to the contrary, if the

98

FUL_0204416

Notice to Proceed is to be issued on or after February 15, 2017 or before March 31, 2017, Owner must give Contractor at least fourteen (14) Day prior written Notice before Owner issues the Notice to Proceed, and if Contractor reasonably determines that it cannot provide the Letter of Credit on or before the intended Notice to Proceed Date, then Contractor shall provide Owner with a written Notice within such fourteen (14) day period, and the Notice to Proceed shall be delayed for the period reasonably necessary for Contractor to provide the Letter of Credit but in no event later than March 31, 2017. If after using commercially reasonable efforts Contractor is not able to provide the Letter of Credit by March 31, 2017 then Contractor may terminate this Agreement by Notice to Owner delivered on or before April 14, 2017 and such termination shall be without any liability of either Party under this Agreement as a result of such termination. The Letter of Credit shall be in an amount equal to Eighteen Million Two Hundred Thousand Dollars ($18,200,000.00). Following the Notice to Proceed Date Contractor may propose to replace the Letter of Credit with a Payment and Performance Bond equal to One Hundred Eighty Seven Million, Three Hundred Eighty Thousand Two Hundred Twenty One Dollars ($187,380,221.00) subject to consent by Owner and the Lenders, which consent may be reasonably withheld by Owner and withheld for any reason in the sole discretion of the Lenders. The cost incurred by the Contractor for the Letter of Credit (or, if applicable, the Payment and Performance Bond) shall be paid in accordance with Exhibit Z. Contractor shall be entitled to reduce the Letter of Credit (or, if applicable, the Payment and Performance Bond) to the amount of Contractor's limit of liability obligation then in effect as provided in Section 40.13 below (provided that such amount shall in no event equal an amount less than Ten Million Dollars ($10,000,000.00)) plus the maximum amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) for Punch List items plus an amount equal to the amount of any potential Subcontractor Lien amount resulting from Work that has been the basis of a payment made in respect of a Payment Milestone but for which a final, unconditional Lien release has not been received from such Subcontractor. Promptly, but in no event later than five (5) Business Days, following Contractor's request following achievement of Mechanical Completion, Owner shall deliver a certificate to the issuer of the Letter of Credit (or, if applicable, the Payment and Performance Bond) signed and dated by Owner stating that Mechanical Completion has been achieved and requesting that the amount of the Letter of Credit (or, if applicable, the Payment and Performance Bond) be reduced as provided in this Section 39.2. The Letter of Credit (or, if applicable, the Payment and Performance Bond) shall be provided to Owner to secure the performance by Contractor of its obligations under this Agreement and the Purchasing Agreement. Within five (5) Business Days following any drawing under the Letter of Credit, Owner shall provide Contractor with a brief description of the nature of the default giving rise to such drawing and a non-binding estimated calculation of applicable damages and (to the extent they are not the same) the amount so drawn. For the avoidance of doubt, the post demand notice to be provided by Owner described in the preceding sentence is not a condition to a demand for payment or drawing under the Letter of Credit.

39.3    The Letter of Credit (or, if applicable, the Payment and Performance Bond) shall expire no earlier than the Outside Warranty Date except that such period is extended for unresolved, incomplete or outstanding claims raised in accordance with this Agreement prior to the Outside Warranty Date until such claims are irrevocably discharged in full. Except as provided in **Section 39.4**, all renewals or replacements of the Letter of Credit shall be made, in the case of a replacement, no later than thirty (30) days following written notice from

99

Owner requiring such a replacement, and in the case of renewals, no later than fifteen (15) Business Days prior to the expiration date. Should Contractor fail to timely comply with the foregoing sentence following written notice from Owner, the Owner may cash the letter of credit and keep, use, and where applicable return to Contractor such proceeds (or part thereof) to the extent not applied or used as permitted under the Agreement upon subsequent receipt of a letter of credit meeting the requirements set out in this Agreement.

39.4    In the event a Security Replacement Event occurs in respect of the  Letter of Credit (or, if applicable, the Payment and Performance Bond) during any period that the Letter of Credit (or, if applicable, the Payment and Performance Bond) remains outstanding, Contractor shall procure that a Qualified Financial Institution approved in writing by Owner shall, prior to the date falling thirty (30) days following occurrence of such Security Replacement Event (or fifteen (15) Days, if the Security Replacement Event is a matter equivalent to those described in **Section 23.1.2** occurring to the issuer of the Letter of Credit), provide a replacement Letter of Credit (or, if applicable, the Payment and Performance Bond) in an amount equal to the then unused portion of the Payment and Performance Bond or Letter of Credit to which the Security Replacement Event applies. If Contractor breaches its obligation to provide Owner with a replacement Letter of Credit (or, if applicable, the Payment and Performance Bond) where required under this **Section 39.4**, such breach shall be deemed to be an Event of Default of Contractor.

39.5    No later than five (5) days after issuance of the Notice to Proceed, Owner shall deposit into the Payment Account (or provide binding commitments from the Lenders and equity providers to provide) an amount equal to or greater than the anticipated Payment Milestone amounts for the first two (2) monthly invoices following the Notice to Proceed or binding commitments from the Lenders and equity providers to make such amounts available to the Payment Account as needed.  The Owner shall increase the amount (or binding commitments for such amount) in the Payment Account as necessary from time to time to ensure that such amount is at all times equal to or greater than the current months Payment Milestone plus the succeeding two months' anticipated Payment Milestone.  In any case the amount on deposit in the Payment Account or the amount of binding commitments binding commitments from the Lenders and equity providers shall in no event be less than Seven Million Five Hundred Thousand Dollars ($7,500,000.00) until Mechanical Completion. The obligations under this **Section 39.5** shall expire on Mechanical Completion Date. In the event of termination for convenience or Owner's Event of Default, prior to the Mechanical Completion Date, the Payment Account shall nevertheless be available to pay Contractor's termination costs in accordance with this Agreement. The Payment Account shall be one or more accounts established by the Lenders into which loan or equity proceeds will be deposited for use in the payment of costs of the Facility, including payments to be made to Contractor pursuant to this Agreement.  The availability of such amounts to pay Contractor's termination or other costs shall be subject and subordinate to the full exercise of collateral rights of the Lender, including the right to use all of such amounts to pay costs associated with the Lender's loans to the Owner.

100

FUL_0204418

## 40.    MISCELLANEOUS PROVISIONS

40.1    The invalidity or unenforceability of any portion or provision of this Agreement shall in no way affect the validity or enforceability of any other portion or provision hereof. Any invalid or unenforceable portion or provision shall be deemed severed from this Agreement and the balance of this Agreement shall be construed and enforced as if the Agreement did not contain such invalid or unenforceable portion or provision.

40.2    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEVADA OTHER THAN CONFLICT OF LAWS PRINCIPLES THAT WOULD APPLY THE LAWS OF ANOTHER JURISDICTION.  THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE COUNTY OF WASHOE IN THE STATE OF NEVADA WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND CONSENT TO THE SERVICE OF PROCESS IN ANY MANNER PERMITTED BY LAW.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO A DISPUTE AND FOR ANY COUNTERCLAIM WITH RESPECT THERETO.

40.3    The Contractor hereby designates, appoints and empowers National Corporate Research, Ltd. (the "**Process Agent**") with offices as of the date of this Agreement at 10 E. 40th Street, 10th floor, New York, New York 1001, as its authorized agent to receive for an on its behalf services of summons or other legal process in any such action or proceeding in the State of Nevada. Any such service shall be done by mailing or delivering to the Process Agent at the Process Agent's above address, and Contractor hereby irrevocable authorizes and directs its Process Agent to accept such services on its behalf. Contractor covenants and agrees that, for so long as it shall be bound under this Agreement, it shall maintain its Process Agent for the services of summons and other legal process in Nevada, for the purposes of any legal action, suit or proceeding brought by any party in respect of this Agreement.

40.4    The Parties shall not directly or indirectly do business with: (i) an entity formed in a country prohibited by the Department of State of the United States of America, the Office of Foreign Assets Control (OFAC), or the Treasury Department of the United States of America ("**Prohibited Country**"); (ii) an entity in which more than twenty percent (20%) of the shares are held by an entity or entities formed in a Prohibited Country; or (iii) an entity in which a citizen of a Prohibited Country, or a noncitizen who owes permanent allegiance to a Prohibited Country, is a member of the managing board.

40.5    Termination of this Agreement shall not relieve Contractor or Owner of any obligation hereunder that expressly survives termination herein. All obligations under and provisions of Articles 21, 22, 23, 29, 30, 31, 32, 36, 37, Sections 40.6, 40.13, and 40.16 and any other provisions of this Agreement that are required to insure the Parties may fully exercise their rights and perform their obligations under this Agreement shall survive termination of this Agreement.

101

40.6    This Agreement, as executed by authorized representatives of Owner and Contractor, and the Project Equity and Reimbursement Agreement constitute the entire agreement between the Parties with respect to the matters dealt with herein and therein, and there are no oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set forth herein. Any representations, warranties, statements or inferences therefrom by either Party or its representatives, whether made orally or in writing, prior to the Effective Date shall have no legal effect and shall not be binding on either Party unless incorporated herein or in documents or agreements mutually agreeable to the Parties provided after the Effective Date.    This Agreement supersedes all previous agreements, negotiations and commitments, including the prior draft of this Agreement that was dated on or about April 29, 2015, and which was rejected pursuant to an order of the U.S. Bankruptcy Court on February 15, 2017 (the "**Rejected Contract**").    The Parties hereby waive any claims arising out of the Rejected Contract or related to the Rejected Contract that Owner and Contractor may have against each other, or their respective partners, affiliates, agents, officers, directors, representatives, owners, lenders or investors.    For the avoidance of doubt, (i) it is agreed that neither Abeinsa Business Development, LLC nor Abengoa, S.A shall have any liability to Owner, or any other party affiliated with Owner, arising out of, or in connection with the Rejected Contract, or any previous writing, statements or actions relating thereto and (ii) it is agreed that neither Owner nor any other party affiliated with Owner shall have any liability to Abeinsa Business Development, LLC, Abengoa, S.A. or any other party affiliated with Abeinsa Business Development, LLC or Abengoa, S.A., arising out of, or in connection with the Rejected Contract, or any previous writing, statements or actions relating thereto.

40.7    No oral or written modification of this Agreement by any officer, agent or employee of Contractor or Owner, either before or after execution of this Agreement, shall be of any force or effect.    All modifications, amendments and supplements to this Agreement must be in writing and is signed by both Parties.

40.8    Either Party's waiver of any breach or failure to enforce any of the terms, covenants, conditions or other provisions of this Agreement at any time shall not in any way affect, limit, modify or waive that Party's right thereafter to enforce or compel strict compliance with every term, covenant, condition or other provision hereof, any course of dealing or custom of the trade notwithstanding.

40.9    Contractor agrees to cooperate with Owner in connection with any reasonable amendment or addition to this Agreement required by Financing Agent on behalf of any Lenders.

40.10    By their execution hereof, the Parties warrant that they are authorized to enter into this Agreement, that it does not conflict with any contract, lease, instrument or other obligation to which either is a party or by which either is bound, and that it represents their valid and binding obligation, enforceable according to its terms.

40.11    The headings contained herein are not part of this Agreement and are included solely for the convenience of the Parties.

Confidential                                                                                                                    FUL_0204420

40.12   Except with respect to a delay to items on the critical path in accordance with the Progress Schedule for which Contractor would be entitled to an extension of time, any extensions of time or adjustment of the Scheduled Mechanical Completion Date, Scheduled Substantial Completion Date or Scheduled Final Completion Date will be granted only to the extent such extension is warranted as a result of a Change In Work or a Force Majeure as provided in this Agreement and then only to the period of time which an activity is delayed, suspended or otherwise extended exceeds the total Float or slack along the channels involved at the time Contractor was directed to proceed with a change, to suspend Work or was otherwise delayed, as shown on the most current Progress Schedule.

40.13   <u>Contractor's Limitation of Liability</u>.

40.13.1    Except as provided in **Section 40.13.5**, prior to achievement of Mechanical Completion, Contractor's aggregate liability to Owner under this Agreement shall be capped at one hundred percent (100%) of the Fixed Construction Price (except for Unexpected Costs incurred prior to achievement of Mechanical Completion as described in **Section 40.13.2(iv)** and **(v)** below, which shall be subject to a limitation of liability in the amount of Eight Million Two Hundred Thousand Dollars ($8,200,000)).  No amounts spent by Contractor to achieve Mechanical Completion shall count toward the Post MC Liability Cap except that amounts up to Eight Million Two Hundred Thousand Dollars ($8,200,000) spent on Unexpected Costs described in **Sections 40.13.2(iv)** and **(v)** prior to Mechanical Completion shall count toward the Post MC Liability Cap.

40.13.2    Except as provided in **Section 40.13.1**, **Section 40.13.5** and the last sentence of this **Section 40.13.2**, for the period from and following achievement of Mechanical Completion, Contractor's combined aggregate obligation and liability to Owner hereunder or arising in connection with Unexpected Costs relating to the construction and completion of the Work, the achievement of Substantial Completion or Deemed Substantial Completion (as applicable), payment of any Buydown Amount and Final Completion, or any other Unexpected Costs shall not exceed Eighteen Million Two Hundred Thousand Dollars ($18,200,000) (without regard to any other amounts spent prior to Mechanical Completion except as provided in **Section 40.13.1**) (the "**Post MC Liability Cap**").  "**Unexpected Costs**" means: (i) Contractor's total liability for all damage payments to Owner based on facts or events occurring after the Mechanical Completion Date, including delay liquidated damages and Buydown Amounts for shortfalls in Performance Guarantees; (ii) costs for additional labor, materials and equipment expended on performance of Contractor's obligations after the Mechanical Completion Date to achieve all Performance Guarantees that are in excess of the amounts scheduled to be paid by Contractor during such period; (iii) amounts spent by TRI and EFT for additional labor, materials, and equipment against their respective limits of liability after the Mechanical Completion Date to achieve their performance guarantees or their scheduled completion dates, including amounts reimbursed to Contractor for Work, paid to or withheld by Contractor or Owner/Fulcrum as liquidated damages or otherwise for failure to achieve performance guarantees not to exceed in the aggregate Seven Million Four Hundred Forty-Five Thousand Six Hundred Twenty Eight Dollars ($7,445,628) (as such amount may be increased by any approved Change in Works issued in accordance with Article 19 that increases the TRI limit of liability) for all such amounts spent, reimbursed, paid or withheld; (iv) costs for additional unexpected labor, material or equipment costs expended on

103

performance of Contractor's obligations prior to the Mechanical Completion Date to implement changes in design required by TRI or EFT that Owner and Contractor agree are required in order to achieve the Performance Guarantees (such changes shall be from the design basis prepared by TRI and or EFT on which the Contractor's proposal was based and shall be reviewed and approved by Owner and a Change In Work delivered to Contractor from Owner prior to implementation by Contractor) and that are not required to be paid by EFT or TRI pursuant to their subcontracts with Contractor (either directly or as part of performance damages); and (v) costs for labor and material expended on performance of Contractor's obligations prior to Mechanical Completion that are in excess of the labor and material baseline (exclusive of civil, buildings and building structural) in **Exhibit II** plus costs for labor and material expended on performance of Contractor's obligations prior to Mechanical Completion that are in excess of the labor and field material baseline (exclusive of civil, buildings and building structural) in **Schedule 2** of the Purchasing Agreement but only to the extent the sum of such costs exceeds Seventeen Million Dollars ($17,000,000.00).   The schedule of values set forth in **Exhibit V** shall be the basis for determining whether Contractor costs and expenditures are of the type referred to in clauses (i)-(iv) of the definition of Unexpected Cost set forth in this **Section 40.13.2**. The foregoing provisions of this **Section 40.13.2** do not apply to Contractor's warranty obligations and Contractor's liability for warranty costs in each case pursuant to **Article 21** and **Article 22**.

40.13.3    If Deemed Substantial Completion has been achieved pursuant to **Section 17.4.7**, Contractor's liability for additional Unexpected Costs expended on reasonable commercial efforts by Contractor to achieve all the Primary and Secondary Performance Guarantees (including any Buydown Amount(s) for failure to meet all the  Secondary Performance Guarantees) will be limited to an aggregate of Nine Million One Hundred Thousand Dollars ($9,100,000) and any such costs and Buydown Amounts will be included in and subject to the limit of liability for Unexpected Costs in **Section 40.13.2**.

40.13.4    After a successful Performance Test demonstrates satisfaction of the full Primary Performance Guarantees and there is full compliance with emissions and other environmental guarantees and the Project Permits, Contractor's liability for additional Unexpected Costs expended on reasonable commercial efforts by Contractor to meet 100% of the Secondary Performance Guarantees (including Buydown Amounts for failure to meet Secondary Performance Guarantees) is limited to an aggregate of Three Million Six Hundred Forty Thousand Dollars ($3,640,000) and any such costs and Buydown Amounts will be included in and subject to the limits of liability for Unexpected Costs in **Sections 40.13.2 and 40.13.3**.

40.13.5    Contractor's liability under this Agreement is unlimited and shall not be capped for (i) payments to third parties for claims of third parties, (ii) indemnification payments to Owner or other Owner Indemnified Parties for claims of third parties or uninsured damage to the Facility or Operating Personnel to the extent caused by the negligent acts or omissions or willful misconduct of or breach of this Agreement by Contractor or any of its Related Persons.

40.13.6    Except for (i) liquidated damages for delay as expressly set forth in this Agreement, (ii) liability for payment of any portion of the Buydown Amount, (iii) gross

Confidential

FUL_0204422

negligence or intentional misconduct, (iv) damages related to indemnification of Owner by Contractor for claims of third parties for patent infringement as a result of the use of material, equipment or processes furnished by Contractor and operated by Owner in compliance with Contractor's instructions, willful use of the confidential information of the other party or its licensors and affiliates on other projects, and (v) indemnification of third parties for which Contractor or Owner has a duty to indemnify hereunder as expressly provided in this Agreement, neither Party shall be obligated or liable to the other Party under this Agreement (including, without limitation, any guarantees or remedies hereunder) or otherwise for loss of use, loss of actual or anticipated profits, business interruption, loss of revenues, or product, loss by reason of shutdown, non-operation, or increased expense of manufacturing or operation, increased expenses of borrowing, financing, manufacturing or operation, loss of productivity, loss of shop space, or other consequential, indirect, special, incidental or punitive damages, however the same may be caused.

40.13.7    All releases, waivers, limitation on liability, hold harmless and indemnity provisions in this Agreement which apply for the benefit of the Contractor shall also apply (to the same extent as they apply in the contract between Owner and Contractor) for the benefit of the Contractor's Related Persons, in each case with respect to any actions under or related to this Agreement or the Work contemplated thereunder. All releases, waivers, limitation on liability, hold harmless and indemnity provisions in this Agreement which apply for the benefit of Owner shall also apply for the benefit of Owner's Related Persons, in each case with respect to any actions under or related to this Agreement or Owner's responsibilities and activities contemplated thereunder.

40.13.8    The combined total liability of the Abeinsa Abener Teyma General Partnership acting as Contractor under this Agreement and acting as Purchasing Agent under the Purchasing Agreement shall not exceed the limits in this **Section 40.13**.

40.14    Contractor represents and warrants that it has identified any and all conflicts between the body of this Agreement on the one hand and the Exhibits hereto on the other, and such conflicts have been resolved to Contractor's satisfaction prior to the execution of this Agreement.  In the event of a conflict in the provisions of this Agreement, the following priority of documents shall control the resolution of such conflict:

1.    The provisions of the Agreement situated between the Recitals and the signature page;

2.    **Exhibit F** - Performance Tests and Contractor Performance Guarantees;

3.    **Exhibit G** - Progress Schedule

4.    **Exhibit A** - Scope of Work and Specifications;

5.    Other provisions and Exhibits of this Agreement; and

6.    Detailed Plans, specifications and other materials approved by or on behalf of Owner during prosecution of the Work; provided, however, that in no event shall a conflict be deemed to exist if the provisions of the Exhibits or materials approved by or on behalf

105

of Owner during the prosecution of the Work are more specific or require more activity or Work than the terms of the main body of this Agreement.

40.15   Each Party intends that this Agreement shall not benefit, or create any right or cause of action in or on behalf of, any Person other than the Parties, except for any Lenders.

40.16   Contractor agrees to retain for a period of five (5) years from the Final Completion Date all records relating to its performance of the Work or Contractor's warranty obligations herein, and to cause all Subcontractors engaged in connection with the Work or the performance by Contractor of its warranty obligations herein to retain for the same period all their records relating to the Work.

40.17   Each Party shall take such further actions, execute such documents and furnish such information as may be reasonably requested by the other Party, and shall reasonably cooperate with the other Party in order to carry out the purposes and intent of this Agreement and in order to enable them to perform their respective obligations hereunder.  Such activity or cooperation shall be provided by each Party at no additional cost to the other Party, unless otherwise provided herein. Each Party shall pay its own costs and expenses in relation to the negotiation, preparation, execution and carrying into effect of this Agreement.

40.18   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Any facsimile or electronically transmitted copies hereof or signature hereon shall, for all purposes, be deemed originals.

40.19   The following rules shall apply in interpreting this Agreement unless otherwise expressly provided herein or the context otherwise requires:

40.19.1     All reference in this Agreement to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Agreement.

40.19.2     Words of the masculine gender include correlative words of the feminine and neuter genders and words expressed in the singular shall include the plural and the plural and singular.

40.20   Except for Contractor's rights in the event Lender becomes a "Subsequent Owner" under the terms of the collateral assignment agreement, Contractor's only recourse, if at all, with respect to the actions or inactions or any determinations or exercise of rights or remedies of the Lenders or the Independent Engineer shall be solely against the Owner (subject to Contractor's rights and remedies in the event Lender becomes a "Subsequent Owner" under the terms of the collateral assignment agreement),  and Contractor hereby irrevocably waives any and all rights it has or may have with respect to such actions or inactions, determinations or exercise of rights of the Lenders or the Independent Engineer. Under no circumstances shall the Lenders or the Independent Engineer have any liability to Contractor under or in connection with this Agreement.

106

40.20.1    The table of contents and the headings or captions used in this Agreement are for convenience of reference only and do not define, limit or describe any of the provisions hereof or the scope or intent hereof.

40.20.2    References to agreements or contracts include all amendments, modifications and supplements thereto.

40.20.3    All terms and phrases used in this Agreement shall be interpreted in accordance with common usage and meaning in the United States.    All documents, warranties, Notices, instructions and other written materials to be provided to the Parties hereunder shall be provided in English.

[SIGNATURES ON NEXT PAGE]

107

Confidential

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

OWNER:

**FULCRUM SIERRA BIOFUELS, LLC**

By: _____

Name: E. James Macias

Title: President

CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC

By:      _____

Name:      Craig Windram

Title:      Chief Executive Officer

[Engineering, Procurement and Construction Contract Signature Page]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

OWNER:

**FULCRUM SIERRA BIOFUELS, LLC**


By: _____
Name: E. James Macias
Title: President


CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC


By: _____
Name:    Craig Windram
Title:    Chief Executive Officer


[Engineering, Procurement and Construction Contract Signature Page]

FUL_0204427

## FIRST AMENDMENT TO THE ENGINEERING, PROCUREMENT
## AND CONSTRUCTION CONTRACT

THIS FIRST AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "Amendment"), is made on this _3_ day of July, 2019 (the "Effective Date"), between ABEINSA ABENER TEYMA GENERAL PARTNERSHIP, a Delaware general partnership (the "Contractor"), and FULCRUM SIERRA BIOFUELS, LLC, a Delaware limited liability company (the "Owner"). Owner and Contractor are referred to herein, collectively, as the "Parties" and each, individually, as a "Party."

### RECITALS

WHEREAS, Contractor is responsible for the design, engineering, procurement of materials, construction, start-up, commissioning and performance testing of a Feedstock MSW to Syncrude Product processing facility (the "Facility") on a site located in McCarran, Nevada (the "Facility Site") under an Engineering, Procurement and Construction Contract, dated as of October 18, 2017, as amended by that certain Change in Work Form #1 dated as of October 18, 2017, Change in Work Form #2 dated as of March 7, 2018, Change in Work Form #3 dated as of June 6, 2018, Change in Work Form #4a dated as of February 8, 2019, Change in Work Form #12 dated as of February 12, 2019, Change in Work Form #14 dated as of January 25, 2019, Change in Work Form #16 dated as of August 8, 2018, Change in Work Form #17 dated as of January 30, 2019, Change in Work Form #27 dated as of June 14, 2019, and Change in Work Form #2(b), 3(b), 5, 6, 8, 9, 10(a), 10(b), 13, 18, 21, 22, 23, 25 & 32 dated as of the date hereof (as the same may be further amended, the "EPC Contract"); and

WHEREAS, the Parties have agreed to revise certain provisions of the EPC Contract as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.01        Contractor's Limitation of Liability. Section 40.13 of the EPC Contract as amended is hereby further amended by:

(a)        Deleting the phrase "as described in **Section 40.13.2(iv)** and **(v)** below" in Section 40.13.1 and replacing it with "as described in **Section 40.13.2(iv),(v)(A), and (v)(B)** below".

(b)        Deleting subsection (v) of the definition of Unexpected Costs in Section 40.13.2, and replacing it in its entirety with the following:

(v) each of:

1

WBA - 034613/000007 - 798557 v10

Confidential                                                                    AATGP00172218

(A) costs for labor and material in the direct cost categories set forth on Table One of Exhibit II (not including costs for labor and materials in the direct cost categories for Equipment, Building, Site Preparation, Sewers, Underground Mains and Yards, Roads, Fences) (the "**Tracked Cost Categories**") expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**Labor and Material Costs**") that are in excess of the total aggregate labor and material baselines (for this Agreement and the Purchasing Agreement) for the Tracked Cost Categories in **Table One** of **Exhibit II** but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Twenty-One Million Dollars ($21,000,000);

(B) costs for the equipment purchased under the Purchasing Agreement and listed in **Table Two** of **Exhibit II** expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**Equipment Costs**") that are in excess of the total aggregate equipment baseline in **Table Two** of **Exhibit II** but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Five Million One Hundred Thousand Dollars ($5,100,000.00); and

(C) costs for the work performed pursuant to CVO2b, CVO3b, CVO5, CVO6, CVO10a, CVO13, CVO18, CVO21, CVO22 and CVO23 as described in Change in Work #2(b), 3(b), 5, 6, 8, 9, 10(a), 10(b), 13, 18, 21, 22, 23, 25 & 32 dated as of July __, 2019 (the "**July 2019 Change in Work**"), expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**July 2019 CVO Tracked Costs**") but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Ten Million Three Hundred Four Thousand Seven Dollars and Forty-Seven Cents ($10,304,007.47).

The schedule of values set forth in **Exhibit V** shall be the basis for determining whether Contractor costs and expenditures are of the type referred to in clauses (i)-(iv) of the definition of Unexpected Cost set forth in this **Section 40.13.2**. Commencing on the Effective Date and continuing monthly until Notice to Proceed and thereafter attached to each monthly invoice submitted by Contractor to Owner in accordance with **Section 8.1.1**, Contractor shall provide an itemized accounting of all Labor and Material Costs (including all costs under this Agreement and the Purchasing Agreement up to and exceeding the labor and material baselines described in **Section 40.13.2(v)(A)** above), Equipment Costs (including all costs under the Purchasing Agreement up to and exceeding the equipment baselines described in **Section 40.13.2(v)(B)** above), and July 2019 CVO Tracked Costs (including all costs under this Agreement and the Purchasing Agreement up to and exceeding the threshold described in **Section 40.13.2(v)(C)** above) Contractor incurred during the previous month (such accounting shall include an aggregate total of all Labor and Material Costs, Equipment Costs and July 2019 CVO Tracked Costs incurred by Contractor and Purchasing Agent as of the date of such accounting) with reasonable supporting documentation. The foregoing provisions of this **Section 40.13.2** do not apply to Contractor's material and workmanship warranty obligations and Contractor's liability for material and workmanship warranty costs in

2

\\BA - 034613/000007 - 798557 v10

each case pursuant to **Article 21** and **Article 22**. Contractor's total aggregate liability expenditures and other damages associated with its design and engineering warranty obligations shall not exceed Eighteen Million Two Hundred Thousand Dollars ($18,200,000) minus amounts applied against the Post MC Liability Cap described in this **Section 40.13.2**.

For purposes of clarification, a restated version of Section 40.13, reflecting these changes and prior changes pursuant to Change in Work #1 is attached hereto as Annex A.

Section 1.02        Exhibit II. Exhibit II to the EPC Contract is hereby deleted in its entirety and replaced with the new Exhibit II attached hereto as Annex B.

Section 1.03        Defined Terms. Any capitalized words which are not defined in this Amendment will have the meanings ascribed to them in the EPC Contract.

Section 1.04        Amendment. The amendments to the EPC Contract set forth in Section 1.01 and Section 1.02 shall be construed in connection with and as part of the EPC Contract, and except as amended hereby, all of the terms and conditions of the EPC Contract are in full force and effect.

Section 1.05        Governing Law. This Amendment shall be governed by the Laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction.

Section 1.06        Venue. With respect to any disputes arising out of or related to this Amendment, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the State of Nevada with respect to any such award and consent to the service of process in any manner permitted by law. For the avoidance of doubt, this Section 1.06 does not change the provisions in Article 37 of the EPC Contract requiring resolution of disputes under the EPC Contract by arbitration.

Section 1.07        Electronic Signature; Counterparts. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Any facsimile or electronically transmitted copies hereof or signature hereon shall, for all purposes, be deemed originals.

*[The remainder of the page left intentionally blank]*

3

WBA - 034613/000007 - 798557 v10

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amendment as of the date first written above.

OWNER:

**FULCRUM SIERRA BIOFUELS, LLC,**
a Delaware limited liability company

By: _____
Name: ERIC PRYOR
Title: VP and CFO

CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP,**
a Delaware general partnership

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC

By: _____
Name: Craig Windram
Title: CEO

\\BA - 034613/000007 - 798557 v10

## Annex A

### Restated Section 40.13

40.13                    Contractor's Limitation of Liability.

40.13.1          Except as provided in **Section 40.13.5**, prior to achievement of Mechanical Completion, Contractor's aggregate liability to Owner under this Agreement shall be capped at one hundred percent (100%) of the Fixed Construction Price (except for Unexpected Costs incurred prior to achievement of Mechanical Completion as described in **Section 40.13.2(iv),(v)(A), and (v)(B)** below, which shall be subject to a limitation of liability in the amount of Eight Million Two Hundred Thousand Dollars ($8,200,000)).  No amounts spent by Contractor to achieve Mechanical Completion shall count toward the Post MC Liability Cap except that amounts up to Eight Million Two Hundred Thousand Dollars ($8,200,000) spent on Unexpected Costs described in **Sections 40.13.2(iv)** and **(v)** prior to Mechanical Completion shall count toward the Post MC Liability Cap.

40.13.2          Except as provided in **Section 40.13.1**, **Section 40.13.5** and the last sentence of this **Section 40.13.2**, for the period from and following achievement of Mechanical Completion, Contractor's combined aggregate obligation and liability to Owner hereunder or arising in connection with Unexpected Costs relating to the construction and completion of the Work, the achievement of Substantial Completion or Deemed Substantial Completion (as applicable), payment of any Buydown Amount and Final Completion, or any other Unexpected Costs shall not exceed Eighteen Million Two Hundred Thousand Dollars ($18,200,000) (without regard to any other amounts spent prior to Mechanical Completion except as provided in **Section 40.13.1**) (the "**Post MC Liability Cap**").

"**Unexpected Costs**" means:

(i) Contractor's total liability for all damage payments to Owner based on facts or events occurring after the Mechanical Completion Date, including delay liquidated damages and Buydown Amounts for shortfalls in Performance Guarantees;

(ii) costs for additional labor, materials and equipment expended on performance of Contractor's obligations after the Mechanical Completion Date to achieve all Performance Guarantees that are in excess of the amounts scheduled to be paid by Contractor during such period;

(iii) amounts spent by TRI and JM Davey for additional labor, materials, and equipment against their respective limits of liability after the Mechanical Completion Date to achieve their performance guarantees or their scheduled completion dates, including amounts reimbursed to Contractor for Work, paid to or withheld by Contractor or Owner/Fulcrum as liquidated damages or otherwise for failure to achieve performance guarantees not to exceed in the aggregate Seven Million Four Hundred Forty-Five Thousand Six Hundred Twenty Eight Dollars ($7,445,628) (as such amount may be increased by any approved Change in Works issued in accordance with

Confidential

Article 19 that increases the TRI limit of liability) for all such amounts spent, reimbursed, paid or withheld;

(iv) costs for additional unexpected labor, material or equipment costs expended on performance of Contractor's obligations prior to the Mechanical Completion Date to implement changes in design required by TRI or JM Davey that Owner and Contractor agree are required in order to achieve the Performance Guarantees (such changes shall be from the design basis prepared by TRI and or JM Davey on which the Contractor's proposal was based and shall be reviewed and approved by Owner and a Change In Work delivered to Contractor from Owner prior to implementation by Contractor) and that are not required to be paid by JM Davey or TRI pursuant to their subcontracts with Contractor (either directly or as part of performance damages); and

(v) each of:

(A) costs for labor and material in the direct cost categories set forth on Table One of Exhibit II (not including costs for labor and materials in the direct cost categories for Equipment, Building, Site Preparation, Sewers, Underground Mains and Yards, Roads, Fences) (the "**Tracked Cost Categories**") expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**Labor and Material Costs**") that are in excess of the total aggregate labor and material baselines (for this Agreement and the Purchasing Agreement) for the Tracked Cost Categories in **Table One** of **Exhibit II** but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Twenty-One Million Dollars ($21,000,000);

(B) costs for the equipment purchased under the Purchasing Agreement and listed in **Table Two** of **Exhibit II** expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**Equipment Costs**") that are in excess of the total aggregate equipment baseline in **Table Two** of **Exhibit II** but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Five Million One Hundred Thousand Dollars ($5,100,000.00); and

(C) costs for the work performed pursuant to CVO2b, CVO3b, CVO5, CVO6, CVO10a, CVO13, CVO18, CVO21, CVO22 and CVO23 as described in Change in Work #2(b), 3(b), 5, 6, 8, 9, 10(a), 10(b), 13, 18, 21, 22, 23, 25 & 32 dated as of July __, 2019 (the "**July 2019 Change in Work**"), expended on performance of Contractor's obligations prior to Mechanical Completion (such costs, the "**July 2019 CVO Tracked Costs**") but only to the extent the sum of such costs under this Agreement and the Purchasing Agreement exceeds Ten Million Three Hundred Four Thousand Seven Dollars and Forty-Seven Cents ($10,304,007.47).

The schedule of values set forth in **Exhibit V** shall be the basis for determining whether Contractor costs and expenditures are of the type referred to in clauses (i)-(iv) of the definition of Unexpected Cost set forth in this **Section 40.13.2**. Commencing on the Effective Date and continuing monthly until Notice to Proceed and thereafter attached to each monthly invoice submitted by Contractor to Owner in accordance with **Section 8.1.1,** Contractor shall provide an itemized accounting of all Labor and Material Costs (including all costs under this Agreement and the Purchasing Agreement up to and exceeding the labor and material baselines described in

\\BA - 034613/000007 - 798557 v10

**Section 40.13.2(v)(A)** above), Equipment Costs (including all costs under the Purchasing Agreement up to and exceeding the equipment baselines described in **Section 40.13.2(v)(B)** above), and July 2019 CVO Tracked Costs (including all costs under this Agreement and the Purchasing Agreement up to and exceeding the threshold described in **Section 40.13.2(v)(C)** above) Contractor incurred during the previous month (such accounting shall include an aggregate total of all Labor and Material Costs, Equipment Costs and July 2019 CVO Tracked Costs incurred by Contractor and Purchasing Agent as of the date of such accounting) with reasonable supporting documentation. The foregoing provisions of this **Section 40.13.2** do not apply to Contractor's material and workmanship warranty obligations and Contractor's liability for material and workmanship warranty costs in each case pursuant to **Article 21** and **Article 22**. Contractor's total aggregate liability expenditures and other damages associated with its design and engineering warranty obligations shall not exceed Eighteen Million Two Hundred Thousand Dollars ($18,200,000) minus amounts applied against the Post MC Liability Cap described in this **Section 40.13.2**.

40.13.3    If Deemed Substantial Completion has been achieved pursuant to **Section 17.4.7**, Contractor's liability for additional Unexpected Costs expended on reasonable commercial efforts by Contractor to achieve all the Primary and Secondary Performance Guarantees (including any Buydown Amount(s) for failure to meet all the Secondary Performance Guarantees) will be limited to an aggregate of Nine Million One Hundred Thousand Dollars ($9,100,000) and any such costs and Buydown Amounts will be included in and subject to the limit of liability for Unexpected Costs in **Section 40.13.2**.

40.13.4    After a successful Performance Test demonstrates satisfaction of the full Primary Performance Guarantees and there is full compliance with emissions and other environmental guarantees and the Project Permits, Contractor's liability for additional Unexpected Costs expended on reasonable commercial efforts by Contractor to meet 100% of the Secondary Performance Guarantees (including Buydown Amounts for failure to meet Secondary Performance Guarantees) is limited to an aggregate of Three Million Six Hundred Forty Thousand Dollars ($3,640,000) and any such costs and Buydown Amounts will be included in and subject to the limits of liability for Unexpected Costs in **Sections 40.13.2** and **40.13.3**.

40.13.5    Contractor's liability under this Agreement is unlimited and shall not be capped for (i) payments to third parties for claims of third parties, (ii) indemnification payments to Owner or other Owner Indemnified Parties for claims of third parties or uninsured damage to the Facility or Operating Personnel to the extent caused by the negligent acts or omissions or willful misconduct of or breach of this Agreement by Contractor or any of its Related Persons.

40.13.6    Except for (i) liquidated damages for delay as expressly set forth in this Agreement, (ii) liability for payment of any portion of the Buydown Amount, (iii) gross negligence or intentional misconduct, (iv) damages related to indemnification of Owner by Contractor for claims of third parties for patent infringement as a result of the use of material, equipment or processes furnished by Contractor and operated by Owner in compliance with Contractor's instructions, willful use of the confidential information of the other party or its

\\BA - 034613/000007 - 798557 v10

licensors and affiliates on other projects, and (v) indemnification of third parties for which Contractor or Owner has a duty to indemnify hereunder as expressly provided in this Agreement, neither Party shall be obligated or liable to the other Party under this Agreement (including, without limitation, any guarantees or remedies hereunder) or otherwise for loss of use, loss of actual or anticipated profits, business interruption, loss of revenues, or product, loss by reason of shutdown, non-operation, or increased expense of manufacturing or operation, increased expenses of borrowing, financing, manufacturing or operation, loss of productivity, loss of shop space, or other consequential, indirect, special, incidental or punitive damages, however the same may be caused.

40.13.7    All releases, waivers, limitation on liability, hold harmless and indemnity provisions in this Agreement which apply for the benefit of the Contractor shall also apply (to the same extent as they apply in the contract between Owner and Contractor) for the benefit of the Contractor's Related Persons, in each case with respect to any actions under or related to this Agreement or the Work contemplated thereunder. All releases, waivers, limitation on liability, hold harmless and indemnity provisions in this Agreement which apply for the benefit of Owner shall also apply for the benefit of Owner's Related Persons, in each case with respect to any actions under or related to this Agreement or Owner's responsibilities and activities contemplated thereunder.

40.13.8    The combined total liability of the Abeinsa Abener Teyma General Partnership acting as Contractor under this Agreement and acting as Purchasing Agent under the Purchasing Agreement shall not exceed the limits in this **Section 40.13**.

Confidential                                                                                          AATGP00172225



| | Exhibit II |
| Labor and Material Baseline |
| Fulcrum Sierra BioFuels, LLC |

ABENGOA
ABEINSA

The following is the Labor and Material baseline, to support excessive cost to Substantial Completion.

**Table One**

| Direct Cost Summary | Material From PAA | Labor From EPC Contract |
|---|---|---|
| Instrument | $6,375,565 | $3,808,978 |
| Piling | $389,911 | $160,000 |
| Foundations | $2,919,306 | $3,000,860 |
| Steel | $6,138,171 | $4,283,914 |
| Piping | $10,563,754 | $12,493,683 |
| Electrical | $6,865,480 | $3,881,307 |
| Insulation | $1,311,458 | $4,692,986 |
| Equipment | $0 | $0 |
| Building | $0 | $0 |
| Site Preparation | $0 | $0 |
| Sewers | $0 | $0 |
| Underground Mains | $0 | $0 |
| Yards, Roads, Fences | $0 | $0 |
| **Direct Cost Total** | **$34,563,645** | **$32,321,728** |

Table One does not include costs for labor and materials relating to Equipment (except as specifically set forth herein), Building, Site Preparation, Sewers, Underground Mains or Yards, Roads, and Fences.

Notice: This document is the Property of Fulcrum Sierra BioFuels, LLC and its affiliates and successors and shall be used only for the purpose for which it was supplied. It shall not be copied, reproduced or otherwise used, nor shall this document be furnished in whole or in part to others except in accordance with the terms of any agreement under which it was supplied or with the prior written consent of Fulcrum Sierra BioFuels, LLC or its successors and shall be returned upon request.

\\BA - 034613/000007 - 805655 v6

Confidential                                                                AATGP00172226



| Exhibit II |
| Labor and Material Baseline |
| Fulcrum Sierra BioFuels, LLC |

**ABENGOA**
ABEINSA

The following is the Specific Equipment baseline to support excessive cost to Substantial Completion.

**Table Two**

| Direct Cost Summary | Total PAA |
|---|---|
| HRSG 1/1A | $5,763,139 |
| Aux Boiler (CIW #2) | $2,420,196 |
| POx system | $2,232,880 |
| Ash and Slag handling | $2,202,765 |
| Guard beds | $1,286,009 |
| Shift Reactor | $1,122,397 |
| FT Reactor | $5,954,608 |
| Storage Tank | $1,245,637 |
| Amine $CO_2$ removal | $2,978,299 |
| Direct Cost Total | **$25,205,930** |

Notice: This document is the Property of Fulcrum Sierra BioFuels, LLC and its affiliates and successors and shall be used only for the purpose for which it was supplied. It shall not be copied, reproduced or otherwise used, nor shall this document be furnished in whole or in part to others except in accordance with the terms of any agreement under which it was supplied or with the prior written consent of Fulcrum Sierra BioFuels, LLC or its successors and shall be returned upon request.

\\BA - 034613/000007 - 805655 v6

## SECOND AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT

THIS SECOND AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "Amendment"), is made on this 20th day of September, 2019 (the "Effective Date"), between ABEINSA ABENER TEYMA GENERAL PARTNERSHIP, a Delaware general partnership (the "Contractor"), and FULCRUM SIERRA BIOFUELS, LLC, a Delaware limited liability company (the "Owner"). Owner and Contractor are referred to herein, collectively, as the "Parties" and each, individually, as a "Party."

### RECITALS

WHEREAS, Contractor is responsible for the design, engineering, procurement of materials, construction, start-up, commissioning and performance testing of a Feedstock MSW to Syncrude Product processing facility (the "Facility") on a site located in McCarran, Nevada (the "Facility Site") under an Engineering, Procurement and Construction Contract, dated as of October 18, 2017, as amended by that certain Change in Work Form #1 dated as of October 18, 2017, Change in Work Form #2 dated as of March 7, 2018, Change in Work Form #3 dated as of June 6, 2018, Change in Work Form #4a dated as of February 8, 2019, Change in Work Form #12 dated as of February 12, 2019, Change in Work Form #14 dated as of January 25, 2019, Change in Work Form #16 dated as of August 8, 2018, Change in Work Form #17 dated as of January 30, 2019, Change in Work Form #27 dated as of June 14, 2019, and Change in Work Form #2(b), 3(b), 5, 6, 8, 9, 10(a), 10(b), 13, 18, 21, 22, 23, 25 & 32 dated as of July 3, 2019, First Amendment to the Engineering, Procurement and Construction Contract dated as of July 3, 2019, and Change in Work Form #31 dated as of [July 18, 2019] (as the same may be further amended, the "EPC Contract"); and

WHEREAS, the Parties have agreed to revise certain provisions of the EPC Contract as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.01        Amendments to Agreement. A new Section 8.5 of the EPC Contract is added to Article 8 of the EPC Contract, and reads as follows:

1

WBA - 034613/000007 - 798557 v11

     AATGP00174077

8.5     Optional Prepayments.

Notwithstanding the foregoing, Owner may but is not obligated to make one or more partial payments of the Fixed Construction Price to pay Major Subcontractors and any other Subcontractors in amounts that exceed the amount of the Payment Milestones due and owing at such time (the "Optional Prepayments").

8.5.1    All Optional Prepayments will be deposited in the Escrow Account for the payment of Major Subcontractors and any other Subcontractors pursuant to this Agreement and the Purchasing Agent Agreement and will be credited against the remaining balance of the Fixed Construction Price as follows:

(a)     first, from the remaining amount of the Payment Milestone for Mechanical Completion, as reduced by the Retainage for Punch List pursuant to Section 8.19, until that Payment Milestone is reduced to zero,

(b)     then from the Payment Milestone for the milestone immediately preceding Mechanical Completion, until that Payment Milestone is reduced to zero,

(c)     and then from each successive immediately preceding Payment Milestone, until each such Payment Milestone is reduced to zero.

8.5.2    With respect to any such Optional Prepayment:

(a)     Upon Owners' request, in connection with any contemplated Optional Prepayment, (i) Contractor shall promptly provide any and all documentation required to be submitted with an invoice as provided in this Article 8, including (a) documentation of the amounts due to Major Subcontractors and any other Subcontractors that will be paid from such Optional Prepayment, and (b) a sworn statement and waiver of Liens in accordance with Section 8.1.3, and (ii) be subject to Owner's approval as an invoice in accordance with Article 8.

(b)     The full amount of any Optional Prepayment will be deposited in the Escrow Account and shall be used solely to pay the amounts due to Major Subcontractors and any other Subcontractors as identified by Contractor in the invoices accepted by Owner pursuant to Subsection 8.5.2(a), above.

2

\BA - 034613/000007 - 798557 v11

(c)    In no event shall Owner's payment of an Optional Prepayment hereunder constitute or be deemed a waiver of Contractor's obligations under any provision of this Agreement, including the obligation to achieve each Payment Milestone, and Owner shall have the right to enforce this Agreement against Contractor notwithstanding any such payment.

(d)    Any reduction in the amount of a Payment Milestone (including any reduction to $0), will not constitute or be deemed a waiver of Contractor's obligations under any provision of this Agreement, including pursuant to Article 8 with respect to providing invoices with supporting documentation showing the Payment Milestones achieved for the applicable month and providing sworn statements and waivers of Lien in connection therewith.

Section 1.02        Defined Terms.  Any capitalized words which are not defined in this Amendment will have the meanings ascribed to them in the EPC Contract.

Section 1.03        Amendment.  The amendments to the EPC Contract set forth in Section 1.01 shall be construed in connection with and as part of the EPC Contract, and except as amended hereby, all of the terms and conditions of the EPC Contract are in full force and effect.

Section 1.04        Governing Law. This Amendment shall be governed by the Laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction.

Section 1.05        Venue.  With respect to any disputes arising out of or related to this Amendment, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the State of Nevada with respect to any such award and consent to the service of process in any manner permitted by law.  For the avoidance of doubt, this Section 1.05 does not change the provisions in Article 37 of the EPC Contract requiring resolution of disputes under the EPC Contract by arbitration.

Section 1.06        Electronic Signature; Counterparts.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Any facsimile or electronically transmitted copies hereof or signature hereon shall, for all purposes, be deemed originals.

*[The remainder of the page left intentionally blank]*

3

\\BA - 034613/000007 - 798557 v11

Confidential

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amendment as of the date first written above.

OWNER:

**FULCRUM SIERRA BIOFUELS, LLC,**
a Delaware limited liability company

By: _____
Name: RICHARD D. BARRAZA
Title: VICE PRESIDENT & SECRETARY

CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP,**
a Delaware general partnership

> By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership
>
>> By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC
>>
>>> By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC
>>>
>>>> By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC
>>>>
>>>> By: _____
>>>> Name: Javier Ramírez
>>>> Title: Vice President

NRA - 034643/00000? - 798557 v11