## Exhibit B

**Project Equity Reimbursement Agreement**

Execution Version

**PROJECT EQUITY AND REIMBURSEMENT AGREEMENT**

by and among

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

and

**FULCRUM BIOENERGY, INC.**

dated as of

October 18, 2017

## PROJECT EQUITY AND REIMBURSEMENT AGREEMENT

THIS PROJECT EQUITY AND REIMBURSEMENT AGREEMENT (this "**Agreement**") is entered into as of October 18, 2017 (the "**Effective Date**"), by and among Abeinsa Abener Teyma General Partnership, a general partnership formed under the laws of Delaware (the "**EPC Contractor**"), and Fulcrum BioEnergy, Inc., a Delaware corporation ("**Fulcrum**").  EPC Contractor and Fulcrum are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, EPC Contractor and Fulcrum Sierra BioFuels, LLC, a Delaware limited liability company (the "**Project Company**"), a wholly-owned ultimate subsidiary of Fulcrum, have entered into an Engineering, Procurement and Construction Contract (as amended, restated, or otherwise modified, the "**EPC Contract**") and will enter into the associated Purchasing Agent Agreement, pursuant to which EPC Contractor will design, engineer, procure materials, construct, start-up, commission and conduct performance tests for the Feedstock MSW to Syncrude Product processing facility (the "**Facility**") to be owned and operated by the Project Company;

WHEREAS, pursuant to the EPC Contract, the final Fifteen Million Dollars ($15,000,000.00) owed to EPC Contractor upon achievement of Substantial Completion or Deemed Substantial Completion will be paid by issuance to EPC Contractor of an "Equity Amount" as an equity ownership position in the Project Company  (the "**Project Equity**");

WHEREAS, Fulcrum will have the obligation to repurchase fifty percent (50%) of the Project Equity on or before 89 days following Substantial Completion or the expiration of the Cure Period in the case of Deemed Substantial Completion and will have the right  to repurchase all of the remaining Project Equity as hereinafter provided;

WHEREAS, pursuant to the EPC Contract, EPC Contractor will be reimbursed for the Reimbursable Cost (defined below);

WHEREAS, Fulcrum desires to cause the Project Equity to be issued and reimburse the Reimbursable Cost to EPC Contractor, on the terms and subject to the conditions set forth herein; and

WHEREAS, the execution and delivery of this Agreement is a condition precedent to EPC Contractor's and Project Company's obligations under the EPC Contract.

NOW, THEREFORE, in consideration of the premises and the agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1. DEFINITIONS AND RULES OF USAGE

1.1    <u>Definitions</u>.  As used herein, the following terms shall have the following meanings:

"**EPC Contractor**" has the meaning set forth in the Preamble.

"**Act**" has the meaning set forth in Section 6.4.

"**Affiliate**" means, for any Person, any other Person directly or indirectly controlling, directly or indirectly controlled by, or under direct or indirect common control with, such Person. As used in this definition, the term "control," "controlling" or "controlled by" shall mean the possession, directly or indirectly, of the power either to (a) vote fifty percent (50%) or more of the securities or interests having ordinary voting power for the election of directors (or other comparable controlling body) of such Person; or (b) direct or cause the direction of the actions, management or policies of such Person; whether through the ownership of voting securities or interests, by contract or otherwise.

"**Applicable Law**" means any applicable federal, state or local law, statute, act, enactment, ordinance, rule, regulation.

"**Agreement**" has the meaning set forth in the Preamble.

"**Business Day**" means any day other than Saturday or Sunday or any other day on which banks in the State of Nevada are permitted or required to close.

"**Buy-back Date**" has the meaning set forth in Section 2.4.

"**Buydown Amounts**" has the meaning set forth in the EPC Contract.

"**Cure Period**" means the period that is the earlier of (a) ninety (90) days following the date of Deemed Substantial Completion, (b) ninety (90) days following the Scheduled Substantial Completion Date or (c) the date on which EPC Contractor ceases full efforts to achieve Full Performance Guarantees under the EPC Contract due to its liability cap.

"**Debt**" means the notes, bonds or other evidence of indebtedness issued by lenders to Fulcrum or any of its Affiliates that have provided funds that (a) will be used to pay part of the Total Project Costs and (b) are entitled to repayment before distributions to the holders of Project Company equity.

"**Deemed Substantial Completion**" has the meaning set forth in the EPC Contract.

"**Dispute**" means any claim, controversy, disagreement or other matter in question between the Parties that arise out of or relate to the terms and conditions of this Agreement or with respect to the performance by the Parties of their respective obligations under this Agreement, including any claim for breach or repudiation thereof.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Encumbrances**" means any and all options, warrants, pledges, security interests, Liens (statutory or otherwise), possessory interests, charges, Tax liens, rights of first refusal, rights to acquire, restrictions on transfer or other encumbrances of any kind or nature.

"**EPC Contract**" has the meaning set forth in the Preamble.

"**Equity Amount**" means the Fifteen Million Dollars ($15,000,000) owed to EPC Contractor upon the occurrence of Substantial Completion or Deemed Substantial Completion under the EPC Contract in accordance with the Final Milestone Payment.

"**Facility**" means the Feedstock MSW to Syncrude Product processing facility in McCarren, Nevada.

"**Facility Site**" means the real property owned by the Project Company and located in the Tahoe-Reno Industrial Center in McCarren, Nevada, on which the Facility is to be located, together with other property rights affixed, connected or associated with such real property.

"**Feedstock MSW**" has the meaning set forth in the EPC Contract.

"**Financing**" means the initial issuance of the Debt to pay the costs of acquiring, designing and constructing the Facility and the Facility Site upon terms and conditions that are satisfactory to the Project Company, and the initial availability of all, or a portion of, the proceeds thereof to the Project Company for such purposes.

"**First Arbiter**" has the meaning set forth in Section 9.4.

"**Fulcrum**" has the meaning set forth in the Preamble.

"**Governmental Approvals**" means all governmental licenses, permits, approvals and other authorizations of, and all required registrations or filings with, any Governmental Authority.

"**Governmental Authority**" means the government of the United States of America, any state, or any political subdivision, instrumentality, ministry, department, agency, court, tribunal, authority, corporation, commission or other body or entity of, or under the direct or indirect control of, any of the foregoing.  The term "Government Authority" includes any arbitral organization or tribunal.

"**ICC**" has the meaning set forth in Section 9.2.

"**Issuance Conditions**" means the conditions that must be satisfied by EPC Contractor in order for the Project Equity to be issued, as more specifically described in Section 2.2.

"**Late Payment Rate**" means the interest rate, calculated and capitalized on a semi-monthly (twice each month) basis, equal to the higher of (a) one and one-half per cent per month or fraction of a month, and (b) the three-month LIBOR rate plus a margin of 400 basis points (4.00%), but in no event greater than the maximum rate allowed by Applicable Law.

3

"**Lenders**" means the holders from time to time of the Debt or the agents or trustees representing them.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, mandatory deposit arrangement, encumbrance, security interest, charge, lien (statutory or other), preference, priority or other collateral agency agreement of any kind or nature whatsoever which has the effect of constituting a security interest, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same effect as any of the foregoing and the filing of any financing statement or similar instrument under the United States Federal Uniform Commercial Code or comparable law of any jurisdiction, domestic or foreign.

"**Mechanical Completion**" has the meaning set forth in the EPC Contract.

"**Membership Unit**" means each one of the fifteen million (15,000,000) of membership units of the Project Company comprising the Project Equity which will be issued to EPC Contractor in accordance with the terms and conditions of this Agreement. Membership Units are the result of a fraction, of the Equity Amount (numerator) divided by the Membership Unit Price (denominator).

"**Membership Unit Price**" means the value in United States Dollars of each Membership Unit, which for the purposes of this Agreement shall be $1.00 per Membership Unit.

"**Notice**" means a written communication between the Parties that is required or permitted by this Agreement and conforms to the requirements of Section 10.3 of this Agreement.

"**Party**" or "**Parties**" has the meaning set forth in the Preamble.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization, Governmental Authority or any other form of entity.

"**Project**" means the Facility, the feedstock processing facility, and all other assets of the Project Company.

"**Project Company**" means Fulcrum Sierra BioFuels, LLC, a Delaware limited liability company.

"**Project Equity**" means the equity ownership interest in the Project Company issued to EPC Contractor in accordance with the terms and conditions of this Agreement

"**Purchasing Agent Agreement**" means the agreement between the EPC Contractor and the Project Company as described in Section 2.2.17 of the EPC Contract.

"**Reimbursable Cost**" has the meaning set forth in Section 3.1.

4

"**Reimbursable Cost Invoice**" has the meaning set forth in Section 4.1.

"**Scheduled Substantial Completion Date**" has the meaning set forth in the EPC Contract.

"**Scheduled Final Completion Date**" has the meaning set forth in the EPC Contract.

"**Second Arbiter**" has the meaning set forth in Section 9.4.

"**Subcontractors**" means suppliers, vendors, consultants, subcontractors and other persons engaged as independent contractors by EPC Contractor that perform on behalf of EPC Contractor under the EPC Contract or the Purchasing Agent Agreement.

"**Substantial Completion**" has the meaning set forth in the EPC Contract.

"**Syncrude Product**" has the meaning set forth in the EPC Contract.

"**Tax**" means any tax, levy, imposition, impost, fee, assessment, deduction, charge or withholding imposed by any Governmental Authority, as well as any interest, penalty or assessment payable or imposed with respect to any of the foregoing.

"**Third Arbiter**" has the meaning set forth in Section 9.4.

"**Total Project Costs**" means all costs paid by the Project Company or its Affiliates in order to obtain, develop, engineer, construct equip, start-up and test the Project to the date the Facility achieves Substantial Completion pursuant to the EPC Contract and the Purchase Agent Agreement, including (without limitation) the Financing.

1.2    Rules of Usage

(a)    The rules of usage for this Agreement are as follows: (i) the terms defined above in Section 1.1 have the meanings set forth above for all purposes, and such meanings are equally applicable to both the singular and plural forms of the terms defined; (ii) "include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (ii) "writing," "written" and comparable terms refer to printing, typing, and other means of reproducing in a visible form; (iv) any agreement, instrument or Applicable Law defined or referred to means such agreement or instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Law) by succession of comparable successor Applicable Law and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; (v) references to a Person are also to its successors and permitted assigns; (vi) any term defined in this Agreement by reference to any agreement or instrument has such meaning whether or not such agreement or instrument is in effect; (vii) "hereof," "herein," "hereunder" and comparable terms refer, unless otherwise expressly indicated, to this entire

5

Agreement and not to any particular article, section or other subdivision hereof or attachment hereto; (viii) references in an instrument to "Article," "Section," "Subsection" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, subsection or subdivision of or attachment to such agreement or instrument; (ix) pronouns, whenever used in this Agreement regardless of the referenced gender, shall include Persons of every kind and character; (x) references to any gender include, unless the context otherwise requires, references to all genders; (xi) the word "or" will have the inclusive meaning represented by the phrase "and/or"; (xii) "shall" and "will" mean "must", and shall and will have equal force and effect and express an obligation; and (xiii) references to "$" or to "dollars" shall mean the lawful currency of the United States of America.

(b)     Except as otherwise provided, whenever the consent or approval of a Party is specifically required hereunder for as to any matter, such consent or approval (i) shall be in writing, and (ii) shall not be unreasonably withheld, delayed or conditioned.

## 2. ISSUANCE OF PROJECT EQUITY

2.1     <u>Equity Issuance</u>.   Subject to the terms and conditions of this Agreement and the satisfaction of the Issuance Conditions set forth in <u>Section 2.2</u> of this Agreement, Fulcrum hereby agrees to cause to be issued to EPC Contractor and EPC Contractor hereby agrees to accept as payment in full for the last $15,000,000 owed to EPC Contractor under the EPC Contract, the Project Equity evidenced by Membership Units, free and clear of all taxes and Encumbrances (other than restrictions on transfer under any applicable federal or state securities laws).

2.2     <u>Issuance Conditions</u>.   Fulcrum's obligation to cause the Project Equity to be issued to EPC Contractor is conditioned upon EPC Contractor satisfying the following obligations (collectively, the "**Issuance Conditions**"):

(a)     EPC Contractor shall either (i) have achieved Substantial Completion in accordance with the EPC Contract or (ii) achieved Deemed Substantial Completion in accordance with the EPC Contract and the applicable Cure Period under the EPC Contract has expired, and, in each case, all the other EPC Contract requirements to achieve Substantial Completion or Deemed Substantial Completion, as applicable, have been satisfied; and

(b)     EPC Contractor shall have paid all Buydown Amounts required in connection with the achievement of Deemed Substantial Completion under the EPC Contract, however a Factoring Agreement as referred to in Section 2.4 can be put in place by EPC Contractor as to discount funds otherwise due to EPC Contractor as provided in Section 2.4 from the issue and subsequent purchase of the first 50% of the Equity Amount for the Final Milestone Payment, in which case any funds received shall be primarily used to pay Buydown Amounts; and

(c)     EPC Contractor shall have paid all undisputed amounts owed by EPC Contractor to the Project Company under the EPC Contract.

2.3    <u>Calculation of Project Equity</u>.    In terms of the dividend rights and percentage of shareholding over the total equity issued for the Project, the Project Equity to be issued to EPC Contractor shall be equal to a fraction, the numerator of which is the Equity Amount and the denominator of which is (a) Total Project Costs paid or payable from all sources <u>*less*</u> (b) the total principal amount of the Debt. For purposes of this Agreement, this Project Equity shall be evidenced by Fifteen Million (15,000,000) Membership Units.

2.4    <u>Buy-back Obligation and Right</u>.    Fulcrum and EPC Contractor acknowledge and agree that on or before the date that is the 89th day following the Substantial Completion Date or the expiration of the Cure Period in the case that only Deemed Substantial Completion is achieved (Fulcrum shall pay in cash to EPC Contractor Seven Million Five Hundred Thousand Dollars ($7,500,000.00) as the purchase price for fifty percent (50%) of the Equity Amount (evidenced by Seven Million Five Hundred Thousand (7,500,000) Membership Units). EPC Contractor shall have the right to "factor", assign and or sell Contractor´s credit rights to, or enter into a Factoring Agreement (which EPC Contractor will preferably negotiate to be without recourse to the EPC Contractor) with, a financial institution (subject to the satisfaction of the conditions for issuing the equity) and Fulcrum shall reasonably assist with any documentation needed to do so at no cost or additional liability to Fulcrum (except that Fulcrum would need to agree to pay the financial institution directly) subject to the satisfaction of the conditions for issuing the equity. For the avoidance of doubt, any cash raised for the first 50% of the last payment from the "discounting " proceeds related to the Deemed Substantial Completion shall be used to pay Buydown Amounts, if any,  and Contractor shall only be entitled to any remaining funds after all Buydown Amounts have been paid in accordance to the EPC Contract. In addition to the first 50% of the Equity Amount to be purchased by Fulcrum, Fulcrum and EPC Contractor acknowledge and agree that at any time prior to the date that is the 365th day following the Substantial Completion Date or the expiration of  the Cure Period following  the Deemed Substantial Completion Date (the "Buyback Date") Fulcrum shall have the right to purchase the remaining fifty percent (50%) of the Equity Amount (evidenced by Seven Million Five Hundred Thousand (7,500,000) Membership Units) from EPC Contractor for Seven Million Five Hundred Thousand Dollars ($7,500,000.00 ). Notwithstanding the above, EPC Contractor shall have the right to sell the second 50% of its Membership Units to any third Party that is a qualified investor and is not a person or entity engaged in the ownership or development of municipal waste to syncrude projects or facilities in the United States ("Fulcrum Competitors"), provided Fulcrum shall have the option (or right of first refusal) to purchase such membership units at the price offered by the third party (except that prior to the Buyback Date such amount shall not be in excess of Seven Million Five Hundred Thousand Dollars ($7,500,000.00).  Prior to selling Membership Units to a third party, EPC Contractor shall give Fulcrum notice of the sale and price and Fulcrum shall have  ten (10) Business Days to notify EPC Contractor of Fulcrum's intent to purchase the Membership Units and shall have an additional ten (10) Business Days to complete the sale.  If Fulcrum notifies EPC Contractor that it intends to purchase the Membership Units but for any reason the sale to Fulcrum is not completed, EPC Contractor shall have no further obligation to provide notice and give Fulcrum the opportunity to purchase the Membership Units.  In the event that Fulcrum sells any of its ownership interests, EPC Contractor shall have no "tag along" rights in connection with such sale.

2.5     Membership Unit Price. For the avoidance of doubt, except in the case of the right of first refusal as provided above, the price that EPC Contractor shall receive for each Membership Unit of Project Equity that Fulcrum purchases from EPC Contractor shall be equal to the Membership Unit Price, without adjustment for any reason

2.6     Transfer Taxes. Fulcrum be responsible for and pay any  transfer or similar Taxes that may be payable with respect to the transactions contemplated hereby between Fulcrum and EPC Contractor and the Parties shall cooperate to reduce the amount of such Taxes to the extent permitted by Applicable Law.

2.7     Membership Units. The Membership Units issued to EPC Contractor shall be a special class of equity in the Project Company that provides for economic participation of the Membership Unit holder on a *pari passu* basis with all other Project Company equity holders; provided, however, that such Membership Units shall not have and any control or voting rights before the Buyback Date other than the right to vote on an action of the Project Company to change the method of distributing amounts available for distribution to Project Company equity holders from a *pari passu* basis and the Project Company operating agreement and any equity or shareholder agreement must require the unanimous consent of  the class of Membership Units issued to EPC Contractor for any change from a *pari passu* basis.  After the Buyback Date, if the remaining Membership Units have not been purchased by Fulcrum, the Membership Units shall have the same rights on a *pari passu* basis as the other equity. The interest of EPC Contractor in the Membership Units shall not be certificated and registered. Except as provided in this Article 2 and Section 10.2(d), EPC Contractor shall not assign or transfer its Membership Units without the prior written consent of Fulcrum, which may be withheld at Fulcrum's sole discretion and any assignment or transfer of the Membership Units by EPC Contractor without Fulcrum's prior written consent shall be null and void. In no event shall EPC Contractor allow any Encumbrance or Lien (other than as required pursuant to Section 2.7 below or required by the factoring permitted) to be established on or against its Membership Units and at the time of re-purchase of the Membership Units by Fulcrum, EPC Contractor shall provide Fulcrum with the same representations and warranties regarding the Membership Units that Fulcrum provided to EPC Contractor upon initial delivery of such Membership Units.

2.8     Lender Requirements. EPC Contractor shall collaterally assign and pledge its Membership Units to the Project Company lenders and grant the lenders such rights and benefits as and to the same extent required of the other holders of Project Company equity.

2.9     Subordination. EPC Contractor hereby subordinates its right to dividend equity distributions from the Project Company in accordance with the Project Equity held by EPC Contractor to the payment of amounts owed in respect of the Debt as and to the same extent required (either directly or indirectly) of the other holders of Project Company equity.

2.10     Project Company Operating Agreement.  On or before the date of issuance of its Membership Units, EPC Contractor shall subject to its review execute and deliver an amendment to the Project Company operating agreement reflecting the provisions of this Agreement together with such other terms and conditions as are acceptable to EPC Contractor and the other holders of Project Company equity.

2.11    Dilution.    EPC Contractor agrees that after it has received its Membership Units EPC Contractor's economic interests in the Project Company may be diluted as a result of additional loan or equity funding required by the Project Company that is not provided (in whole or in part) by EPC Contractor.  Such dilution shall be on a *pari passu* basis as and to the extent required (either directly or indirectly) of the other holders of Project Company equity that also do not provide such additional loan or equity funding.  Notwithstanding the foregoing, such dilution, if any, shall not change the amounts to be paid for the Membership Units as provided in Section 2.4.

3.    **REIMBURSEMENT**

3.1    Reimbursable Cost. Fulcrum shall reimburse EPC Contractor for an amount (the "**Reimbursable Cost**") up to USD Twenty-Six Million One Hundred Thousand Dollars ($26,100,000.00) (the sum of  (a) costs incurred by EPC Contractor under the EPC Contract and as Purchasing Agent under the Purchasing Agent Agreement for labor and material prior to Mechanical Completion that are in excess of the labor and material baseline (exclusive of civil, buildings and building structural which are the following categories in **Table One** of **Exhibit II**: (01) Equipment, (09) Building, (14) Site Preparation, (15) Sewers, (16) Underground mains and (17) Yards, Roads, Fences) in Table One of Exhibit II to the EPC Contract, (b) costs incurred by EPC Contractor as Purchasing Agent under the Purchasing Agent Agreement for equipment listed in Table Two of Exhibit II to the EPC Contract prior to Mechanical Completion that are in excess of the equipment baseline in Table Two of Exhibit II to the EPC Contract.t, provided, however, that Fulcrum shall not reimburse EPC Contractor for any Reimbursable Cost that (i) with respect to labor and material Reimbursable Costs described in Section 3.1(a) above, is in excess of Twenty One Million Dollars ($21,000,000), (ii) with respect to equipment Reimbursable Costs described in Section 3.1(b) above, is in excess of Five Million One Hundred Thousand Dollars ($5,100,000) or (iii)  arises as a result of the failure by EPC Contractor to perform its obligations in accordance with the EPC Contract or the Purchasing Agent Agreement. Such "incurred" costs to be submitted as provided in Section 4.1(a) shall include invoices from suppliers and subcontractors that will become due and payable during the current month and estimates of the cost of self-performed labor for the current month that will be Reimbursable Costs. To the extent that EPC Contractor (x) has satisfied all of its obligations under the EPC Contract or the Purchasing Agent Agreement, as applicable, with respect to the Reimbursable Cost and (y) has satisfied all its obligations under this Agreement for Reimbursable Costs, including all the obligations with respect to invoicing and submission of all required documentation as provided in Article 4 of this Agreement, then Fulcrum shall pay EPC Contractor in accordance with Section 4.1(d) of this Agreement.  As provided in Section 4.1 EPC Contractor may require that some of this reimbursement be provided as an additional payment to the special subcontractor escrow or security account for disbursement of specific amounts to suppliers and subcontractors as designated by EPC Contractor.

3.2    No Claim Against Project Company. In no event nor under any circumstances shall EPC Contractor, or any person claiming by or through EPC Contractor, seek from, or make any claim against, the Project Company for any Reimbursable Cost for which reimbursement may be claimed under this Agreement, or for any amounts owed by Fulcrum or actions to be undertaken by Fulcrum pursuant to this Agreement, EPC Contractor's sole remedy for which (as provided in

Section 4.4) shall be actions against Fulcrum or Fulcrum's property in which the Project Company has no interest or entitlement.

## 4. INVOICING AND DOCUMENTATION AND TERMINATION PAYMENT

4.1    <u>Invoicing</u>.

(a)    The EPC Contractor shall track costs incurred, committed and intended to be committed and paid that are included in the labor and material baseline in Exhibit II of the EPC Contract and as Purchasing Agent shall track costs incurred, committed and intended to be committed and paid that are included in the labor and material baseline and the equipment baseline in Exhibit II of the EPC Contract and shall share such information with Owner on an "open book" basis. To the extent feasible, the EPC Contractor shall inform Fulcrum of costs included in the baselines in Exhibit II of the EPC Contract that exceed the amounts in the cost estimate and could result in the total baseline amounts being exceeded.  If such costs included in the baseline that are in addition to the amounts in the estimate would result in the amounts from the milestone payment for the EPC Contract and/or for the Purchasing Agent Agreement to be insufficient to pay such additional costs during any period, the EPC Contractor shall be able to request that Fulcrum fund the Escrow Account or payment account or provide funds to the EPC Contractor (such funding being a "Supplemental Payment" and such shall be included in the maximum amount of Reimbursable Costs as stated in Section 3.1).  Fulcrum shall have the right to review and request additional information with regard to such cost increases or the basis for any Supplemental Payment.  Once the costs incurred, and costs committed exceed the total of the baseline amounts, all costs for labor and materials and equipment included within the baselines that are expended or committed will be Reimbursable Costs up to the maximum amount provided in Section 3.1.  The labor and material cost and equipment cost components included in the baseline amounts are set forth in Exhibit II to the EPC Contract.

(b)    On or shortly after the first day of each month, EPC Contractor may submit an invoice to Fulcrum, in form and substance to be agreed by the Parties (the "**Reimbursable Cost Invoice**"), for payment of its Reimbursable Cost as provided in Section 3.1. The Reimbursable Cost Invoice shall properly represent the Reimbursable Costs that have been invoiced during the preceding months and will include the estimate of costs qualifying as Reimbursable Costs which have not been the subject of a Reimbursable Cost Invoice including: (i) costs that were paid in previous months; (ii) costs which will be paid or incurred during the current month (the month of the date of the invoice);  (iii) any Supplemental Payments as provided above and (iv) any credit adjustment for any amounts previously invoiced which were in excess of the actual amounts paid.   The invoice shall contain supporting documentation that would be required in connection with an invoice for payment of such costs under the EPC Contract or Purchasing Agent Agreement, as applicable for expended costs and reasonable supporting documentation for estimated costs with the requirement that the invoice documentation be provided when amounts are received and disbursed.  EPC Contractor shall indicate which Reimbursable Costs will be paid to the special subcontractor escrow or security account for disbursement as instructed by EPC Contractor and which will be reimbursed to EPC Contractor directly.

(c)     For each Reimbursable Cost Invoice, EPC Contractor shall submit a Lien waiver in the form set forth in Exhibit J-1 of the EPC Contract for all Reimbursable Cost labor materials, and equipment provided for which Reimbursable Costs are requested, contingent upon receipt by EPC Contractor or the special subcontractor escrow or security  account of the Reimbursable Cost Invoice amount from Fulcrum, and representing that EPC Contractor has made or arranged for  all payments due to all its Subcontractors for Reimbursable Costs for which Fulcrum has previously made payment to EPC Contractor or the special subcontractor escrow or security  account.  If any Dispute arises with respect to the payment of any such Subcontractors, EPC Contractor shall provide to Fulcrum evidence of the payments that EPC Contractor or the special subcontractor escrow or security  account has made, or has represented it has made, to such Subcontractors.  If EPC Contractor is unable to provide the Lien waiver with respect to any amount, EPC Contractor shall substitute evidence that a bond has been posted or other appropriate action taken so as to vacate any such Lien against the Facility, Facility Site, Project Company or Fulcrum.

(d)     Fulcrum shall, within fifteen (15) days after receipt of a Reimbursable Cost Invoice from EPC Contractor, determine whether (i) the Reimbursable Costs covered by the Reimbursable Cost Invoice have been provided or will need to be provided by EPC Contractor or the Purchasing Agent in accordance with this Agreement; (ii) the Reimbursable Costs provided conform with the requirements of this Agreement; (iii) the Reimbursable Cost Invoice and any reasonably required backup information that would be required under the EPC Contract if such Reimbursable Cost had been invoiced thereunder have been properly submitted and are accompanied by the appropriate waiver of Lien or evidence that other appropriate action has been taken so as to vacate any Lien; and (iv) the amount of the Reimbursable Cost Invoice reflects the payment due under the provisions of this Agreement and the EPC Contract or Purchasing Agent Agreement (as applicable) and shall inform EPC Contractor as to whether Fulcrum disputes any portion of the Reimbursable Cost Invoice.  Notwithstanding the foregoing, in no event shall Fulcrum's determination or payment of any amount hereunder constitute or be deemed a waiver of any provision of this Agreement or the EPC Contract or the Purchase Agreement, and Fulcrum shall have the right to enforce this Agreement against EPC Contractor notwithstanding any such determination or payment if Fulcrum subsequently determines and proves that any determination or payment of a Reimbursable Cost Invoice was erroneous.  Subject to such determination by Fulcrum, and except for disputed portions of any Reimbursable Cost Invoice, Fulcrum shall  thereafter  pay EPC Contractor and or the Purchasing Agent  (and/or the Escrow Agent if EPC Contractor so designates),and no later than   thirty (30) days after receipt by Fulcrum of the Reimbursable Cost Invoice, one hundred percent (100%) of the amount of the Reimbursable Cost Invoice minus any disputed portion of such Reimbursable Cost Invoice and minus any amounts due from EPC Contractor to Fulcrum that are outstanding hereunder under this Agreement.  Late payments not resulting from any of the items listed in Section 4.1(e) shall accrue interest at the Late Payment Rate from the date due until paid.  Late payments resulting from any of the items listed in Section 4.1(e) shall not accrue interest until the event described in Section 4.1(e) has been remedied.

(e)     Fulcrum, based on its estimate in Section 4.1(d) above, may withhold such portion of any Reimbursable Cost Invoice payment invoiced to such extent as may be necessary

to protect Fulcrum from loss due to EPC Contractor's failure to comply with Section 4.1(e) and in respect of the following:

(i)     Reimbursable Costs that do not conform with the requirements of this Agreement or the EPC Contract;

(ii)     Claims filed against Fulcrum, the Project Company, the Facility or the Facility Site,  arising from EPC Contractor's or its Subcontractor's actions or inactions, other than claims for which Liens have been filed against the Facility, Facility Site, Owner or Project Company that EPC Contractor has bonded or otherwise secured (at EPC Contractor's sole cost) or caused to be vacated in accordance with this Agreement or the EPC Contract;

(iii)     Failure of EPC Contractor to make payments that are due and owing in respect of Reimbursable Costs Invoices for material, labor or equipment or other obligations incurred as a result of activities subject to Reimbursable Cost Invoices covered by this Agreement or the EPC Contract, to the extent such Reimbursable Costs have been paid to Contractor by Fulcrum previously, and  unless EPC Contractor has disputed such payments and, if any Lien is filed with respect thereto, EPC Contractor has posted a bond or other security (at EPC Contractor's sole cost) against such Lien or otherwise caused such Lien to be vacated in accordance with this Agreement or the EPC Contract;

(iv)     Evidence that the Reimbursable Cost Invoice (together with previously invoiced amounts) exceeds (1) the amount payable with respect to the total USD 21,000,000of labor and material Reimbursable Costs; and (2) the amount payable with respect to the total USD 5,100,000 of equipment Reimbursable Costs and

(v)     Damages or any other undisputed amounts owed by EPC Contractor to Fulcrum under this Agreement for which Fulcrum has not been paid.

(f)     Fulcrum shall advise EPC Contractor in writing within fifteen (15) days after receipt of the Reimbursable Cost Invoice of any reasonable evidence leading to a possible delayed payment of any disputed portion of a Reimbursable Cost Invoice.  Upon receipt of such Notice, EPC Contractor shall promptly take any and all steps available to remedy any condition identified by Fulcrum leading to such claims.  Subject to a mutually agreed upon resolution of Fulcrum's claims or, in the absence thereof, of an arbitration award as provided in Article 9 payment of the disputed portion of the Reimbursable Cost Invoice shall be made by Fulcrum within ten (10) days following the date of such agreement or award.

(g)     No action properly taken by either Party in compliance with this Section 4.1 shall affect the Scheduled Substantial Completion Date or the Scheduled Final Completion Date unless specifically agreed to in writing by the Project Company.

4.2     Offset. Either Party may offset any liability of the other Party under this Agreement against any amount due from the Party implementing the offset under this Agreement; provided that the failure of a Party to offset such liability against amounts due to it shall in no way limit or restrict the right of such Party to recover such amounts due to it from the other Party. Neither Party may exercise its offset right pursuant to this Section with respect to any disputed amount

until the dispute is resolved.  Notwithstanding the foregoing, in no event shall any amount owed by Fulcrum under this Agreement be off-set against amounts owed by EPC Contractor to the Project Company under the EPC Contract.

4.3     Termination Payment.    In the event that EPC Contractor is terminated under the EPC Contract without cause and for convenience and thereafter Project Company chooses to complete the facility by itself or using other contractors and achieves production output equivalent to the performance required for Deemed Substantial Completion or Substantial Completion  under the EPC Contract, then Fulcrum shall owe a proportional share of what would have been the amount of the Final Milestone payment under the EPC Contract such proportion being the percent of the project completed by EPC Contractor prior to termination for convenience.

4.4     Default in Payment or Delay in Approval. If Fulcrum fails to transfer or improperly delays payment of funds for Reimbursement Costs as provided herein or fails or improperly delays in approval of Reimbursable Costs ,  Fulcrum shall be responsible to EPC Contractor for any additional costs or schedule delay, and any  delay liquidated damages under the EPC Contract that EPC Contractor incurs as a result of such payment not being made or available, including costs and damages payable by EPC Contractor for termination or suspension of the EPC Contract or the Purchasing Agent Agreement by Owner and suppliers and Subcontractors of their agreements that results directly and exclusively as a result of such non-payment, and such liability shall be the sole remedy of EPC Contractor for such payment default without prejudice of any right or remedy under any applicable federal or state laws that cannot be excluded or waived by agreement of the Parties.

## 5.  REPRESENTATIONS AND WARRANTIES OF FULCRUM

Fulcrum represents and warrants to EPC Contractor as follows:

5.1      Organization and Good Standing.  Fulcrum is a corporation duly formed, validly existing and in good standing under the laws of the state of its formation, and has all requisite power and authority to operate and to carry on its business as currently conducted.

5.2      Legal and Authorized Transactions.   The execution and delivery by Fulcrum of this Agreement, and the consummation of the transactions contemplated to be performed by it hereunder, have been duly authorized by all necessary action by Fulcrum.  This Agreement constitutes a legal, valid and binding obligation of Fulcrum (assuming the due authorization, execution and delivery of this Agreement by EPC Contractor), enforceable against Fulcrum in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and by the application of the general principles of equity.

5.3      No Conflict.  Fulcrum's execution and delivery of, and performance of its obligations under, this Agreement do not and will not (a) violate or constitute a default under any indenture, mortgage, deed of trust, instrument or other contract to which Fulcrum is a party or by which Fulcrum or its assets may be bound; (b) violate any provisions of any law, rule, regulation, order, judgment or decree applicable to Fulcrum or its assets; or (c) result in the creation of any Encumbrance on the Membership Units.

13

5.4     Authority and Capacity.  Fulcrum has full legal right, capacity, power and authority to execute this Agreement and to consummate the transactions contemplated hereby, and all Governmental Approvals required to permit Fulcrum to enter into this Agreement, and to transfer the Membership Units to EPC Contractor pursuant to this Agreement, have been obtained.

5.5     Consents.  No consent of, or notice to, any Person is required for the valid execution, delivery and performance of this Agreement by Fulcrum, or for the valid sale and transfer of the Membership Units to EPC Contractor that has not been obtained.

5.6     Title to the Membership Units.  Fulcrum holds of record, owns and has good and valid title to the Membership Units.  EPC Contractor are acquiring good and valid title to the Membership Units, free and clear of all Encumbrances (other than pursuant to the restrictions on transfer under any applicable federal or state securities laws).

5.7     Litigation.    No suit, action, litigation, administrative hearing, arbitration, labor controversy or negotiation, or other proceeding or governmental inquiry or investigation is pending or, to Fulcrum's knowledge, threatened which would have a material adverse effect on Fulcrum's ability to consummate the transactions contemplated by this Agreement.

## 6.   REPRESENTATIONS AND WARRANTIES OF EPC CONTRACTOR

To the extent applicable, EPC Contractor represents and warrants to Fulcrum as follows:

6.1     Legal and Authorized Transactions.  The execution and delivery by EPC Contractor of this Agreement, and the consummation of the transactions contemplated to be performed by it hereunder, have been duly authorized by all necessary action by EPC Contractor.   This Agreement constitutes a legal, valid and binding obligation of EPC Contractor (assuming the due authorization, execution and delivery of this Agreement by Fulcrum), enforceable against EPC Contractor in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and by the application of the general principles of equity.

6.2     No Conflict.  EPC Contractor's execution and delivery of, and performance of its obligations under, this Agreement do not and will not (a) violate or constitute a default under any indenture, mortgage, deed of trust, instrument or other contract to which EPC Contractor is a party or by which EPC Contractor or its assets may be bound; or (b) violate any provisions of any law, rule, regulation, order, judgment or decree applicable to EPC Contractor or its assets.

6.3     Authority and Capacity.  EPC Contractor has full legal right, capacity, power and authority to execute this Agreement, and to consummate the transactions contemplated hereby, and all Governmental Approvals to permit EPC Contractor to enter into this Agreement have been obtained.

6.4     Acquiring for Own Account.  EPC Contractor is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "**Act**"), and is acquiring the Membership Units for its own account, for investment, and not with a view to the distribution in violation of the Act thereof.

7. **FURTHER ASSURANCES.** Each Party shall (at its own cost and expense) at any time and from time to time, upon reasonable request of the other Party, do, execute, acknowledge and deliver, and cause to be done, executed, acknowledged and delivered, all such further acts, transfers or assignments as may be reasonably required to consummate the transactions contemplated hereby in accordance with the terms hereof, and to take such other actions as may be reasonably required in order to carry out the intent of this Agreement.

8. **LIMITATION OF LIABILITY.** NO PARTY SHALL BE LIABLE FOR ANY LOST OR PROSPECTIVE PROFITS AND IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY OTHER SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, INCIDENTAL OR INDIRECT LOSSES OR DAMAGES (IN TORT, CONTRACT OR OTHERWISE) UNDER OR IN RESPECT TO THIS AGREEMENT.

9. **DISPUTE RESOLUTION AND ARBITRATION**

9.1 Dispute Resolution Procedure.

      (a)    Initiation:    Either Party may initiate the Dispute resolution by giving Notice of its claim to the other Party.

      (b)    Level I:    Within five (5) Business Days of the receipt of a Notice of Dispute, a representative of Fulcrum and a representative of EPC Contractor shall meet, confer, and attempt to resolve the Dispute within the next five (5) Business Days.

      (c)    Level II:    If the Dispute is not resolved within two (2) Business Days of the close of the Level I meeting, an officer with authority to resolve such Dispute of Fulcrum and EPC Contractor shall meet, confer and attempt to resolve the Dispute within the next ten (10) Business Days.

      (d)    Resolution:    The terms of the resolution of all Disputes concluded in Level I or Level II meetings shall be memorialized in writing and signed by each Party.

      (e)    Arbitration:    No Dispute may be pursued through arbitration unless such Dispute has been raised and considered in the above Dispute resolution procedure, unless specified otherwise.

9.2    Arbitration.    Any Dispute not resolved by the Level I or Level II procedures shall, upon the request of either Party (and without regard to whether or not any provision of this Agreement expressly provides for arbitration), be submitted to and settled by arbitration in Reno, Nevada or such other location as may be mutually agreed by the Parties, in conformance with Rules of Conciliation and Arbitration of the International Chamber of Commerce ("**ICC**").  Judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof.  The provisions of this Article 9 shall be governed by the laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction.  The Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the state of Nevada with respect to any such award and consent to the service of process in any manner permitted by law.  Each Party irrevocably and unconditionally waives trial by jury in any

action, suit or proceeding relating to such award and for any counterclaim with respect thereto.

9.3    Costs.  The expenses of the arbitration shall be borne by the losing Party (or apportioned if there is no clear winning or losing Party), as determined by the arbiters, provided that each Party shall pay for and bear the cost of its own experts, evidence and counsel, provided further that, if the arbiters determine that a Party's dispute, controversy, or claim submitted to arbitration is frivolous or non-meritorious, such Party shall pay all costs of experts, evidence and counsel incurred by the other Party.

9.4    Selection of Arbiters.  EPC Contractor shall nominate and appoint the first arbiter (the "**First Arbiter**"), and Fulcrum or its legal representative shall nominate and appoint the second arbiter (the "**Second Arbiter**").  The First and Second Arbiters shall agree upon the appointment of the third arbiter (the "**Third Arbiter**"), and if such first two arbiters cannot agree on the appointment of a third, the Third Arbiter shall be selected in accordance with the ICC.  The three arbiters shall resolve the dispute, controversy, or claim and report that decision in writing to EPC Contractor and Fulcrum.  Fulcrum and EPC Contractor agree to require that the three arbiters meet to resolve the dispute a minimum of fifteen (15) days per month until the written decision is issued.

9.5    Other.  In any arbitration under this Section 9.5, both Parties shall be entitled to request the other Party to produce documents or things in accordance with the limitations and procedures set forth in Rule 34 of the Federal Rule of Civil Procedure, and serve upon the other Party written interrogatories to be answered by the Party served, in accordance with the limitations and procedures set forth in Rule 33 of the Federal Rules of Civil Procedure.  Upon timely objection or request by a Party, the arbitrator(s) shall determine the extent to which propounded interrogatories shall be permitted and answered and upon notice and a showing of good cause therefor, order a Party to produce documents and things and to permit the inspection and copying or photographing of any designated documents or objects, provided such documents or objects have been specifically identified, are not privileged, their relevance and materiality to the issue(s) in arbitration have been explained and are reasonably calculated to lead to the discovery of admissible evidence.  In the event the Parties cannot themselves agree thereon, the arbitrators may also specify just terms and conditions in making the inspection and taking the copies and photographs.

## 10. MISCELLANEOUS

10.1    No Brokers.  Each Party represents and warrants to the other Party that the representing Party has not engaged any broker, finder or agent in connection with the transactions contemplated by this Agreement and has not incurred (and will not incur) any unpaid liability to any broker, finder or agent for any brokerage fees, finders' fees or commissions, with respect to the transactions contemplated by this Agreement.

10.2    Entire Agreement; Modification; Benefit; Assignment.

(a)    This Agreement (including the Schedules hereto) constitute the entire agreement of the Parties with respect to the matters contemplated herein and supersede all prior oral and written agreements with respect to the matters contemplated herein.

16

(b)      This Agreement may not be modified, deleted or amended except by written instrument executed by each of the Parties.

(c)      All terms of this Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by, the Parties and their respective successors and permitted assigns.  It is the explicit intention of the Parties that no Person other than the Parties is or shall be entitled to bring any action to enforce any provision of this Agreement against any of the Parties, and that the covenants, undertakings, and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by the Parties or their respective successors and assigns.

(d)      No Party may assign its rights or obligations under this Agreement to any Person without the consent of the other Party, except that either Party may assign its rights and obligations hereunder to any Affiliate or to any Person which succeeds to all or substantially all of its business by way of merger, sale of assets of otherwise, as applicable, upon notice to, but without obtaining the consent of, the other Parties and except without the prior consent of Fulcrum, EPC Contractor may factor its right to payments as provided in this Agreement and EPC Contractor shall assign all of its rights, title and interest in this Agreement to an entity that is the successor to the EPC Contract and Purchasing Agent Agreement.

10.3     Notices.    All notices and other communications given or made pursuant to this Agreement (a "**Notice**") shall be in writing and shall be deemed to have been duly given or made as of the date delivered, mailed or transmitted, and shall be effective (i) upon receipt, if delivered personally, (ii) three Business Days after mailing by registered or certified mail (postage prepaid, return receipt requested), or (iii) sent by electronic transmission to the facsimile number (with printed confirmation of receipt) specified below, to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to EPC Contractor:

Abeinsa Abener Teyma General Partnership
c/o Abengoa North America, LLC
3030 N. Central Ave, Suite 807
Phoenix, Arizona 85012
Attention: Ignacio Arabeity, Vice President -- Project Control
Telephone: (602) 282-8948
Email: iag@abengoa.com

with a copy to:
Jeffrey Bland, General Counsel
Telephone: (314) 200-5821
Email: jeffrey.bland@abengoa.com

If to Fulcrum:

Fulcrum BioEnergy, Inc.
4900 Hopyard Road, Suite 220

17

Pleasanton, CA 94588
Attention:  Richard D. Barraza, Vice President
Telephone:  (925) 224-8244
Facsimile:  (925) 730-0157
Email:  rbarraza@fulcrum-bioenergy.com

10.4    Governing Law.  This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without reference to the conflict of laws rules thereof.

10.5    Severability.  If any part of any provision of this Agreement shall be invalid or unenforceable under Applicable Law, said part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of said provision or the remaining provisions of this Agreement.

10.6    Waiver.  Neither the waiver by a Party of a breach of or a default under any of the provisions of this Agreement, nor the failure of a Party, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

10.7    Headings.  Section and subsection headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

10.8    Counterparts.  This Agreement may be executed in separate counterparts, each of which shall be deemed to be an original, and all of which taken together constitute one and the same instrument.

[signature page follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

OWNER:

**FULCRUM BIOENERGY, INC.**

By: _E. James Macias_ (signature)
Name: E. James Macias
Title: President and Chief Executive Officer

CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC

By: _____
Name:    Craig Windram
Title:    Chief Executive Officer

[Project Equity and Reimbursement Agreement Signature Page]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

OWNER:

**FULCRUM BIOENERGY, INC.**


By: _____
Name: E. James Macias
Title: President and Chief Executive Officer


CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP**

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC


By: _____
Name:    Craig Windram
Title:    Chief Executive Officer


[Project Equity and Reimbursement Agreement Signature Page]

## FIRST AMENDMENT TO THE PROJECT EQUITY
## AND REIMBURSEMENT AGREEMENT

THIS FIRST AMENDMENT TO THE PROJECT EQUITY AND REIMBURSEMENT AGREEMENT (this "Amendment"), is made on this 3 day of July, 2019 (the "Effective Date"), between ABEINSA ABENER TEYMA GENERAL PARTNERSHIP, a Delaware general partnership (the "EPC Contractor"), and FULCRUM BIOENERGY, INC., a Delaware corporation ("Fulcrum"). Fulcrum and the EPC Contractor are referred to herein, collectively, as the "Parties" and each, individually, as a "Party."

### RECITALS

WHEREAS, the EPC Contractor and Fulcrum Sierra BioFuels, LLC, a Delaware limited liability company (the "Project Company"), an ultimate subsidiary of Fulcrum, entered into an Engineering, Procurement and Construction Contract (as amended, restated, or otherwise modified, the "EPC Contract") pursuant to which the EPC Contractor is responsible for the design, engineering, procurement of materials, construction, start-up, commissioning and performance testing of the Feedstock MSW to Syncrude Product processing facility (the "Facility") to be owned and operated by the Project Company;

WHEREAS, the Parties entered into a Project Equity and Reimbursement Agreement (as amended, restated, or otherwise modified, the "Agreement") which sets forth the terms and conditions under which, among other matters, a specified Reimbursable Cost (as defined therein) that may be incurred by EPC Contractor in performing its obligations under the EPC Contract will be reimbursed by Fulcrum;

WHEREAS, the execution and delivery of the Agreement was a condition precedent to EPC Contractor's and Project Company's obligations under the EPC Contract;

WHEREAS, the Project Company and the EPC Contractor are entering into the July 2019 Change in Work (as defined in the EPC Contract) relating to certain work as described in CVO 2b, CVO 3b, CVO 5, CVO, 6, CVO 8, CVO 9, CVO 10a, CVO 10b, CVO 13, CVO 18, CVO 21, CVO 22, CVO 23, CVO 25 and CVO 32 as defined therein and attached thereto;

WHEREAS, the Parties have agreed that there will be no change in the Fixed Construction Price pursuant to the July 2019 Change in Work, but EPC Contractor will be compensated by Fulcrum hereunder with respect thereto; and

WHEREAS, the Parties have agreed to revise certain other provisions of the Agreement as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.01    Amendments to Agreement.

(a)    Section 3.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

1

\\BA - 034613/000007 - 798558 v11

    AATGP00174064

3.1     Reimbursable Cost. Fulcrum shall reimburse EPC Contractor for an amount (the "**Reimbursable Cost**") equal to the sum of (a) USD Ten Million Three Hundred Four Thousand Seven Dollars and Forty-Seven Cents ($10,304,007.47) for the costs indicated in CVO 2b, CVO 3b, CVO 5, CVO, 6, CVO 10a CVO 13, CVO 18, CVO 21, CVO 22, and CVO 23 (the "**July 2019 CVO Fixed Cost**"), plus (b) costs arising under CVO 8, CVO 9, CVO 10b, CVO 25 and CVO 32 (as defined in the July 2019 Change in Work), measured on an open book basis and subject to an indirect fee of 17.45% and an additional fee of 5%, (the "**July 2019 CVO Open Book Costs**") which the Parties have currently estimated to be Thirteen Million Five Hundred Forty Nine Thousand Five Hundred Sixty-Seven and Sixty-Eight  Cents ($13,549,567.68), plus (c) the lesser of (i) USD Twenty Six Million One Hundred Thousand Dollars ($26,100,000) or (ii) the sum of (A) costs incurred by EPC Contractor under the EPC Contract and as Purchasing Agent under the Purchasing Agent Agreement for labor and material costs in the Tracked Cost Categories (as defined in the EPC Contract) prior to Mechanical Completion that are in excess of the aggregate labor and material baseline for the Tracked Cost Categories in Table One of Exhibit II to the EPC Contract, which amount is USD Sixty-Five Million Eight Hundred Eighty-Five Thousand Three Hundred Seventy-Three Dollars ($66,885,373), (such aggregate baseline the "**Labor and Material Baseline**" and all such excess costs, the "**Labor and Material Reimbursable Costs**"), and (B) costs incurred by EPC Contractor as Purchasing Agent under the Purchasing Agent Agreement for the specified equipment listed in Table Two of Exhibit II to the EPC Contract prior to Mechanical Completion, that are in excess of the equipment baseline in Table Two of Exhibit II to the EPC Contract, which amount is USD Twenty-Five Million Two Hundred Five Thousand Nine Hundred Thirty Dollars ($25,205,930), (such aggregate baseline the "**Equipment Baseline**" and all such excess costs, the "**Equipment Reimbursable Costs**"); provided, however, Fulcrum shall not reimburse EPC Contractor for any Reimbursable Cost that (i) with respect to the Labor and Material Reimbursable Costs described in Section 3.1(c)(ii)(A) above, is in excess of USD Twenty One Million Dollars ($21,000,000), (ii) with respect to Equipment Reimbursable Costs described in Section 3.1(c)(ii)(B) above, is in excess of USD Five Million One Hundred Thousand Dollars or (iii) arises as a result of the failure by EPC Contractor to perform its obligations in accordance with the EPC Contract or the Purchasing Agent Agreement.

Such "incurred" costs to be submitted as provided in Section 4.1(a) shall include invoices from suppliers and subcontractors that will become due and payable during the current month and estimates of the cost of self-performed labor for the current month that will be Reimbursable Costs. To the extent that EPC Contractor (x) has satisfied all of its obligations under the EPC Contract or the Purchasing Agent Agreement, as applicable, with respect to the Reimbursable Cost and (y) has satisfied all its obligations under this Agreement for Reimbursable Costs, including all the obligations with respect to invoicing and submission of all required documentation as provided in Article 4 of this Agreement, then Fulcrum shall pay EPC Contractor in accordance with Section 4.1(d) of this Agreement.  As provided in Section 4.1 EPC Contractor may require that some of this reimbursement be provided as an additional payment to the special subcontractor escrow or security account for disbursement of specific amounts to suppliers and subcontractors as designated by EPC Contractor.

(b)     A new Section 3.3 is added to the Agreement as follows:

3.3     Reimbursable Cost CVOs.  For purposes of clarification:

        (a) The Parties acknowledge that the aggregate costs of the scope of work set forth in the CVOs associated with the July 2019 Change in Work are as set forth on Exhibit A hereto, provided that the amounts set forth on Exhibit A with respect to CVO 8, CVO 9, CVO 10b, CVO 25 and CVO 32 are estimates, and the actual costs for such work will be paid on an open book basis as provided in Section 3.1(b).

2

\\BA - 034613/000007 - 798558 v11

                                                                    AATGP00174065

(b) The Parties further acknowledge and agree that the July 2019 Change in Work does not provide for any adjustment in the Fixed Construction Price to be paid by Project Company in connection with the July 2019 Change in Work, and Fulcrum agrees that its obligation to pay the Reimbursable Cost pursuant to this Agreement includes the July 2019 CVO Fixed Cost and the July 2019 CVO Open Book Costs with respect to costs incurred pursuant to the scope of work under the July 2019 Change in Work, subject to the terms of the applicable CVOs and the caps and other conditions of payment otherwise set forth in this Agreement.

(c) The work associated with those costs listed in <u>Exhibit A</u> as "Change in Material Cost from PAA" and "Change in Equipment Cost from PAA" shall be subject to the same terms and conditions as if such work was included under the Purchase Agent Agreement and the work associated with those costs listed in Exhibit A as "Change in Labor and Indirect Costs and Fees from EPC Contract" shall be subject to the same terms and conditions as if such work was included under the EPC Contract except in both cases that the payment for such costs will be made by Fulcrum pursuant to this Agreement and not by the Project Company.

(c)    Section 4.1(e)(iv) of the Agreement is hereby deleted in its entirety and replaced with the following:

(iv)    Evidence that the Reimbursable Cost Invoice (together with previously invoiced amounts) exceeds (1) with respect to the Labor and Material Reimbursable Costs described in Section 3.1(c)(ii)(A) above, Twenty One Million Dollars ($21,000,000); (2) with respect to the Equipment Reimbursable Costs described in Section 3.1(c)(ii)(B) above, Five Million One Hundred Thousand Dollars ($5,100,000); and (3) with respect to the July 2019 CVO Fixed Cost described in Section 3.1(a) above, USD Ten Million Three Hundred Four Thousand Seven Dollars and Forty-Seven Cents ($10,304,007.47), and

(d)    Section 4.1(a) of the Agreement is hereby deleted in its entirety and replaced with the following:

(a)    The EPC Contractor shall track costs incurred, committed and intended to be committed and paid that arise from the July 2019 Change in Work or are included in the labor and material baseline in Exhibit II of the EPC Contract and as Purchasing Agent shall track costs incurred, committed and intended to be committed and paid that arise from the July 2019 Change in Work or are included in the labor and material baseline and the equipment baseline in Exhibit II of the EPC Contract and shall share such information with Owner on an "open book" basis. To the extent feasible, the EPC Contractor shall inform Fulcrum of costs arising from the July 2019 Change in Work or that are included in the baselines in Exhibit II of the EPC Contract that exceed the amounts in the cost estimate and could result in the total baseline amounts being exceeded. If such costs included in the baseline that are in addition to the amounts in the estimate would result in the amounts from the milestone payment for the EPC Contract and/or for the Purchasing Agent Agreement to be insufficient to pay such additional costs for any period, the EPC Contractor shall be able to request that Fulcrum fund the Escrow Account or payment account or provide funds to the EPC Contractor (such funding being a "Supplemental Payment" and such shall be included in the maximum amount of Reimbursable Costs as stated in Section 3.1). Fulcrum shall have the right to review and request additional information with regard to such cost increases or the basis for any Supplemental Payment. Costs that arise from the Tracked Cost Categories included in the Labor and Material Baseline or the Equipment Costs in the Equipment Baseline in Exhibit II of the EPC Contract or costs that arise from the July

3

WBA - 034613/000007 - 798558 v11

2019 Change in Work (as allocated in Exhibit A) shall be "Eligible Costs". Once the Eligible Costs incurred and committed exceed the individual respective totals of the Labor and Material Baseline and the Equipment Baseline, all Eligible Costs that are expended or committed will be able to be invoiced as provided in Section 4.1(b). The labor and material cost and equipment cost components included in the baseline amounts are set forth in Exhibit II to the EPC Contract.

(b) On or shortly after the first day of each month, EPC Contractor may submit an invoice to Fulcrum, in form and substance to be agreed by the Parties (the "**Reimbursable Cost Invoice**"), for payment of its Eligible Costs subject to the maximum amounts as provided in Section 3.1. The Reimbursable Cost Invoice shall properly represent the Eligible Costs that have been included in meeting the baselines or invoiced during the preceding months and will include the estimate of costs qualifying as Eligible Costs which have not been the subject of a Reimbursable Cost Invoice including: (i) costs that were paid in previous months; (ii) costs which will be paid or incurred during the current month (the month of the date of the invoice); (iii) any Supplemental Payments as provided above, and (iv) any credit adjustment for any amounts previously invoiced which were in excess of the actual amounts paid (provided that no such credit will be owed with the respect to the July 2019 CVO Fixed Cost). The invoice shall contain supporting documentation that would be required in connection with an invoice for payment of such costs under the EPC Contract or Purchasing Agent Agreement, as applicable for expended costs and reasonable supporting documentation for estimated costs with the requirement that the invoice documentation be provided when amounts are received and disbursed. EPC Contractor shall indicate which Reimbursable Costs will be paid to the special subcontractor escrow or security account for disbursement as instructed by EPC Contractor and which will be reimbursed to EPC Contractor directly. If, when EPC Contractor is issuing its final invoice for costs relating to the July 2019 Change in Work, EPC Contractor has not yet submitted invoices (or included in the costs to meet the baselines) for costs relating to CVO 2b, CVO 3b, CVO 5, CVO, 6, CVO 10a CVO 13, CVO 18, CVO 21, CVO 22, and CVO 23 equal to the full amount of the May 2019 CVO Fixed Cost, then EPC Contractor may adjust such final invoice to reflect payment of the remainder of the July 2019 CVO Fixed Cost.

<u>Defined Terms</u>. Any capitalized words which are not defined in this Amendment will have the meanings ascribed to them in the Agreement.

Section 1.02    <u>Amendment</u>.    The amendment to the Agreement set forth in Section 1.01 shall be construed in connection with and as part of the Agreement, and except as amended hereby, all of the terms and conditions of the Agreement are in full force and effect.

Section 1.03    <u>Governing Law</u>. This Amendment shall be governed by the Laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction. For the avoidance of doubt, this Section 1.04 does not change the provisions in Article 9 of the Project Equity and Reimbursement Agreement requiring resolution of disputes under the EPC Contract by arbitration

Section 1.04    <u>Venue</u>.    With respect to any disputes arising out of or related to this Amendment, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the State of Nevada with respect to any such award and consent to the service of process in any manner permitted by law.

4

Section 1.05    <u>Electronic Signature; Counterparts</u>. This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

*[The remainder of the page left intentionally blank]*

5

WBA - 034613/000007 - 798558 v11

Confidential                                          AATGP00174068

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amendment as of the date first written above.

FULCRUM:

**FULCRUM BIOENERGY, INC.,**
a Delaware corporation

By: _____
Name: ERIC PRYOR
Title: VP and CFO

EPC CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP,**
a Delaware general partnership

By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abener Construction Services, LLC, as the general partners of Abeinsa Abener Teyma General Partnership

By: Abeinsa Business Development, LLC, as the sole member and manager of Abener Construction Services, LLC

By: Abeinsa LLC, as the sole member and manager of Abeinsa EPC, LLC, Teyma Construction USA, LLC and Abeinsa Business Development, LLC

By: Abengoa North America, LLC, as the sole member and manager of Abeinsa LLC

By: _____
Name: Craig Windram
Title: CEO

\\BA - 034613/000007 - 798558 v11

Exhibit A

**July 2019 Change in Work**
**Labor, Material and Equipment Costs**

| | Change in Material Cost from PAA | Change in Labor and Indirect Costs and Fees from EPC Contract | Change in Equipment Cost from PAA |
|---|---|---|---|
| CVO2b - Auxiliary Boiler Modification - Installation | $0.00 | $131,478.82 | $54,191.00 |
| CVO3b – Syngas Compressor Installation | $0.00 | $1,602,552.40 | $0.00 |
| CVO5 - ASU and Water Treatment Foundations | ($679,786.00) | ($158,543.09) | $0.00 |
| CVO6 - Micro Steam Turbine Generator | $0.00 | $240,216.39 | $294,188.00 |
| CVO8 - Modification from Pelletized MSW to Shredded MSW Feedstock (open book estimate) | $4,501,663.56 | $1,540,488.92 | $117,269.00 |
| CVO9 – Increase height and width of the Reformer Structure (open book estimate) | $2,235,964.69 | $1,437,962.04 | $0.00 |
| CVO10a - Fisher-Tropsch system modification | $0.00 | $788,479.51 | $1,974,948.11 |
| CVO10b – FT System Installation (open book estimate) | $0.00 | $3,067,548.31 | $0.00 |
| CVO13 – Guard Beds | $0.00 | $1,206,696.58 | $3,129,732.81 |
| CVO18 – CO$_2$ Compressor | $0.00 | ($366,655.37) | ($449,035.17) |
| CVO21 – Demin Water tank | $0.00 | $64,302.56 | $78,750.00 |
| CVO22 – Pilings | ($557,405.00) | ($130,000.78) | $0.00 |
| CVO23 – Flare | $0.00 | $1,384,422.90 | $1,695,473.80 |

\\BA - 034613/000007 - 798558 v11

AATGP00174070

| | | | |
|---|---|---|---|
| CVO 25 – Seal Gas Boosters System (open book estimate) | | $254,190.09 | $311,301.29 |
| CVO 32 – Change to Guard Bed Nozzles (open book estimate) | | $15,730.79 | $67,449.00 |
| Total | | $16,579,307.31 | $7,274,267.84 |

\\BA - 034613/000007 - 798558 v11

Confidential

## SECOND AMENDMENT TO THE PROJECT EQUITY
## AND REIMBURSEMENT AGREEMENT

THIS SECOND AMENDMENT TO THE PROJECT EQUITY AND REIMBURSEMENT AGREEMENT (this "Amendment"), is made on this 20th day of September, 2019 (the "Effective Date"), between ABEINSA ABENER TEYMA GENERAL PARTNERSHIP, a Delaware general partnership (the "EPC Contractor"), and FULCRUM BIOENERGY, INC., a Delaware corporation ("Fulcrum"). Fulcrum and the EPC Contractor are referred to herein, collectively, as the "Parties" and each, individually, as a "Party."

### RECITALS

WHEREAS, the EPC Contractor and Fulcrum Sierra BioFuels, LLC, a Delaware limited liability company (the "Project Company"), an ultimate subsidiary of Fulcrum, entered into an Engineering, Procurement and Construction Contract (as amended, restated, or otherwise modified, the "EPC Contract") pursuant to which the EPC Contractor is responsible for the design, engineering, procurement of materials, construction, start-up, commissioning and performance testing of the Feedstock MSW to Syncrude Product processing facility (the "Facility") to be owned and operated by the Project Company;

WHEREAS, the Parties entered into a Project Equity and Reimbursement Agreement, as amended by that First Amendment to the Project Equity and Reimbursement Agreement dated as of July 3, 2019 (as amended, restated, or otherwise modified, the "Agreement") which sets forth the terms and conditions under which, among other matters, a specified Reimbursable Cost (as defined therein) that may be incurred by EPC Contractor in performing its obligations under the EPC Contract will be reimbursed by Fulcrum;

WHEREAS, the execution and delivery of the Agreement was a condition precedent to EPC Contractor's and Project Company's obligations under the EPC Contract;

WHEREAS, the Project Company and the EPC Contractor are entering into a Second Amendment to the Engineering, Procurement and Construction Contract dated as of the date hereof, pursuant to which the Project Company may at its option make certain Optional Prepayments, as defined therein;

WHEREAS, such Optional Prepayments would reduce the amount of subsequent Payment Milestones due under the EPC Contract;

WHEREAS, the Parties have agreed that to the extent such Optional Prepayments are used for costs that would otherwise give rise to a payment obligation for Fulcrum hereunder, the amount of the resulting reduction in any Payment Milestone will be an Eligible Cost (as defined in the Agreement) when due; and

WHEREAS, the Parties desire to revise the Agreement as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1

RBA - 034613/000007 - 798558 v13

Confidential    AATGP00174081

Section 1.01    Amendments to Agreement.

(a)    The following sentence is added to the end of Section 4.1(a) of the Agreement, as previously amended:

> Notwithstanding the foregoing, the Parties acknowledge that at any time Project Company may elect to make an Optional Prepayment (as defined in the EPC Agreement), resulting in a reduction in the amount of one or more Payment Milestones that would otherwise be due under the EPC Agreement or the Purchasing Agent Agreement. To the extent any such Optional Prepayment is made in order to pay Subcontractor or Vendor invoices that would otherwise give rise to a Supplemental Payment or would otherwise be an Eligible Cost hereunder, then at the time the applicable Payment Milestone is or would be due, the amount of such reduction will be an Eligible Cost hereunder and may be invoiced pursuant to Section 4.1(b).

Defined Terms.  Any capitalized words which are not defined in this Amendment will have the meanings ascribed to them in the Agreement.

Section 1.02    Amendment.  The amendment to the Agreement set forth in Section 1.01 shall be construed in connection with and as part of the Agreement, and except as amended hereby, all of the terms and conditions of the Agreement are in full force and effect.

Section 1.03    Governing Law.  This Amendment shall be governed by the Laws of the State of Nevada other than conflict of laws principles that would apply the laws of another jurisdiction.  For the avoidance of doubt, this Section 1.03 does not change the provisions in Article 9 of the Project Equity and Reimbursement Agreement requiring resolution of disputes under the EPC Contract by arbitration

Section 1.04    Venue.  With respect to any disputes arising out of or related to this Amendment, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any state or federal court in the State of Nevada with respect to any such award and consent to the service of process in any manner permitted by law.

Section 1.05    Electronic Signature; Counterparts.  This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

*[The remainder of the page left intentionally blank]*

2

WBA - 034613/000007 - 799558 v13

Confidential

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amendment as of the date first written above.

FULCRUM:

**FULCRUM BIOENERGY, INC.,**
a Delaware corporation

By: _____
Name:  RICHARD B. BARRAZA
Title:  VICE PRESIDENT & SECRETARY


EPC CONTRACTOR:

**ABEINSA ABENER TEYMA GENERAL PARTNERSHIP,**
a Delaware general partnership

    By: Abeinsa EPC, LLC, Teyma Construction USA, LLC and
    Abener Construction Services, LLC, as the general partners of
    Abeinsa Abener Teyma General Partnership

      By: Abeinsa Business Development, LLC, as the sole member
      and manager of Abener Construction Services, LLC

        By: Abeinsa LLC, as the sole member and manager of
        Abeinsa EPC, LLC, Teyma Construction USA, LLC and
        Abeinsa Business Development, LLC

          By: Abengoa North America, LLC, as the sole
          member and manager of Abeinsa LLC

          By: _____
          Name:  Javier Ramirez
          Title:   Vice President

Confidential