**<u>Exhibit F</u>**

**Washoe County Litigation First Amended Verified Complaint**

F I L E D
Electronically
CV20-00636
2020-05-06 05:00:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 7865617 : sacordag

**1090**

Alex L. Fugazzi (Nevada Bar No. 9022)
V.R. Bohman (Nevada Bar No. 13075)
Michael Paretti (Nevada Bar No. 13926)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
Telephone:  702.784.5200
Facsimile:  702.784.5252
afugazzi@swlaw.com
vbohman@swlaw.com
mparetti@swlaw.com

Leon F. Mead, II (Nevada Bar No. 5719)
Mead Law Group
7201 W. Lake Mead Blvd., Suite 550
Las Vegas, Nevada 89128
(702) 745-4800
leon@meadlawgroup.com

*Attorneys for Plaintiffs Abengoa, S.A., and*
*Abeinsa Abener Teyma General Partnership*

## IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR THE COUNTY OF WASHOE

|  |  |
|---|---|
| Abengoa, S.A., and Abeinsa Abener Teyma General Partnership | CASE NO.:  CV20-00636 |
| Plaintiffs, | DEPT. NO.:  15 |
| vs. |  |
| Fulcrum Sierra Biofuels, LLC, and Fulcrum Bioenergy, Inc. |  |
| Defendants. |  |

### FIRST AMENDED
### VERIFIED COMPLAINT

### BUSINESS COURT REQUESTED PURSUANT TO WDCR 2.1(1)

EXEMPT FROM ARBITRATION UNDER N.A.R. 3(A): SEEKS DECLARATORY RELIEF
AND DAMAGES IN EXCESS OF $50,000

1

**FIRST AMENDED VERIFIED COMPLAINT**

2

ABENGOA, S.A. and ABEINSA ABENER TEYMA GENERAL PARTNERSHIP, the

3

above-named Plaintiffs, by and through their counsel, the law firm of Snell & Wilmer L.L.P.,

4

hereby file their First Amended Verified Complaint against FULCRUM SIERRA BIOFUELS,

5

LLC and FULCRUM BIOENERGY, INC. as follows:

6

**I.      PARTIES, JURISDICTION, AND VENUE**

7

1.      Plaintiff Abengoa, S.A. ("Abengoa") is an international company organized to do

8

business under the laws of Spain.

9

2.      Plaintiff Abeinsa Abener Teyma General Partnership ("AATGP," and collectively

10

with Abengoa, "Plaintiffs") is a general partnership formed under the laws of Delaware.

11

3.      Defendant Fulcrum Sierra Biofuels, LLC ("Biofuels") is a limited liability company

12

formed under the laws of the State of Delaware and conducts business in Nevada.

13

4.      Defendant Fulcrum Bioenergy, Inc. ("Bioenergy" and together with Biofuels

14

"Fulcrum" or "Defendants") is a Delaware corporation and conducts business in Nevada.

15

5.      The amount in controversy is in excess of $15,000.

16

6.      This Court has personal jurisdiction over Fulcrum pursuant to NRS 14.065; subject

17

matter jurisdiction over this dispute; and the Second Judicial District Court is the appropriate venue.

18

7.      Furthermore, the primary agreement between the parties that is subject of this

19

litigation provides that "The parties hereby irrevocably submit to the non-exclusive jurisdiction of

20

any state or federal court in the County of Washoe in the State of Nevada with respect to any action

21

or proceeding arising out of or relating to this agreement[.]"

22

**II.      GENERAL ALLEGATIONS**

23

**A.      Background and the Underlying Agreements Between the Parties**

24

8.      On October 18, 2017, Biofuels entered into an Engineering, Procurement and

25

Construction Contract (the "EPC") with AATGP to construct a Feedstock MSW to Syncrude

26

Produce processing facility in McCarran, Nevada (the "Project").

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

9.      Under Section 2.1 of the EPC, Biofuels is required to "reasonably cooperate with Contractor [AATGP] during the performance of this Agreement . . . [including] the timely supply of all materials, services and information . . . ."

10.     Under Section 2.2.6 of the EPC, Biofuels is required to "[m]ake payments to Contractor in respect of the Fixed Construction Price, all Fixed Construction Price Adjustments and Documented Costs in accordance with applicable provisions of this Agreement."

11.     Biofuels also has the right to make changes in work under Section 19 of the EPC provided it agrees to pay for those changes based on, among other things, third-party direct costs and Contractor's fully-loaded, internal costs.

12.     If a dispute arises among the parties regarding the change in work, Section 19.4 of the EPC provides that Fulcrum is required to pay the undisputed costs for such change in work. If the matter is not resolved within fifteen days, either party may submit the matter for dispute resolution as contemplated in Section 37 of the EPC.

13.     Section 19.8 of the EPC likewise allows AATGP to propose, and the parties to agree to, a change in the work.

14.     Section 26.2 of the EPC, titled "Force Majeure" provides that "Force Majeure events may include, <u>but are not limited to</u>, the following: . . . (D) with respect to Contractor only, the failure by Owner to perform its obligations hereunder (it being understood that a payment failure by Owner may also constitute an Event of Default by Owner under this Agreement)."

15.     As part of the EPC, on October 18, 2017, Biofuels and AATGP also entered into a Purchasing Agent Agreement (the "<u>PAA</u>"), the form of which was attached as Exhibit HH to the EPC.

16.     Section 4(b) of the PAA required Biofuels to establish an escrow account and Subcontractor Direct Payment Account for payment directly to suppliers of milestone payments.

17.     Likewise, on October 18, 2017, AATGP also entered into a Project Equity and Reimbursement Agreement (the "<u>PERA</u>") with Bioenergy, Biofuels' parent company.

18.     The PERA was put in place as a supplemental payment structure to ensure timely payments for certain equipment, material, and labor costs (**above** the designated baselines and later was amended to include certain change variation orders).

19.     The PERA also created an obligation for Bioenergy, subject to various terms and conditions, to provide AATGP with $15,000,000 of Project Equity evidenced by Membership Units.

20.     AATGP received its notice to proceed with the Project on October 31, 2017 and subsequently broke ground on the Project in May 2018.

21.     Biofuels was to pay AATGP $208,441,341 (the "Fixed Construction Price"), which consisted of the original Fixed Construction Price of $202,380,221 plus a Fixed Construction Price Adjustment of $6,064,120 reflecting those Change in Work Forms that Biofuels does not dispute, to perform its obligations under the EPC.

22.     The PERA and its First Amendment contemplates more than $50 million of additional funding for the benefit of the Project. Under the PERA, Bioenergy (Biofuels' parent company) shall reimburse AATGP up to $21,000,000 for costs in excess of the labor and material baseline, as well as $5,100,000 for costs in excess of the equipment baseline.

**B.      Biofuels' Requested Changes in Work and Corresponding Amendments to the Underlying Agreements**

23.     In early 2018, AATGP and Fulcrum began discussions and negotiations regarding certain Changes in Work and Change Variation Orders ("CVOs") that impacted both the cost and schedule of the Project.

24.     These CVOs are documented through extensive correspondence between AATGP and Fulcrum.

25.     As a result of the requested CVOs and related negotiations between the parties, AATGP and Bioenergy entered into the First Amendment to the PERA on July 3, 2019 (the "First Amendment to the PERA").

- 4 -

26.     As a further result of the requested CVOs and related negotiations between the parties, AATGP and Biofuels entered into the First Amendment to the Purchasing Agent Agreement (the "First Amendment to the PAA") on July 3, 2019.

27.     The First Amendment to the PERA provides, among other things, that "The work associated with those costs listed in Exhibit A as 'Change in Material Cost from PAA' and 'Change in Equipment Cost from PAA' shall be subject to the same terms and conditions as if such work was included under the Purchasing Agent Agreement and the work associated with those costs listed in Exhibit A as 'Change in Labor and Indirect Costs and Fees from EPC Contract' **shall be subject to the same terms and conditions as if such work was included under the EPC Contract except in both cases that the payment for such costs will be made by Fulcrum [Bioenergy] pursuant to this Agreement** and not by the Project Company [Biofuels]." Section 3.3(c) of the PERA, per the First Amendment to PERA at Section 1.01(b).

28.     Because Bioenergy was stepping in under the PERA to assist with payments related to Biofuels' Project, Bioenergy promised to make payments to AATGP and to subject itself to the EPC Contract, and committed to providing AATGP with $15,000,000 in equity evidenced by Membership Units, Bioenergy and Biofuels owed enhanced duties to AATGP.

29.     AATGP justifiably relied on Fulcrum's representations that they would uphold these duties.

30.     Unfortunately, it is now clear that Bioenergy and Biofuels structured the PERA and EPC with the intent of underfunding the Project by obfuscating and underpaying CVOs and milestone payments, while simultaneously forcing AATGP to continue work on the Project and to continue funding the Project or else face the catastrophic consequence of Biofuels drawing down on an $18,200,000 Letter of Credit that committed AATGP as the Applicant and Abengoa as the Parent Guarantor.

31.     In recognition of the increased Project costs caused by, among other things, the CVOs, the First Amendment to the PERA increased payments in excess of the EPC to $50,000,000. The First Amendment also contains "open book" CVOs that increase the reimbursement cap to more than $60,000,000.

32.    The PERA and the First Amendment to the PERA provide that Bioenergy will make reimbursement payments as needed by AATGP and/or as AATGP incurs the excess cost or CVO cost.

33.    Under Section 4.1(d) of the PERA, Bioenergy has 15 days after receipt of a reimbursable cost to inform AATGP as to whether it disputes any portion of the reimbursable cost invoice. Payment of the invoice, less any disputed amount, is due no later than 30 days after Bioenergy's receipt of the Invoice.

34.    Bioenergy is likewise required to advise AATGP within 15 days of receipt of a reimbursable cost invoice "of any evidence leading to a possible delayed payment of any disputed portion of a Reimbursable Cost Invoice."

35.    Bioenergy may withhold portions of any reimbursable cost invoice if AATGP fails to make payments to suppliers and subcontractors under the invoices submitted "to the extent such Reimbursable Costs have been paid to Contractor by Fulcrum [Bioenergy] previously."

36.    The PERA mandates that "If Fulcrum [Bioenergy] fails to transfer or improperly delays payment of funds for Reimbursement Costs as provided herein or fails or improperly delays in approval of Reimbursable Costs, Fulcrum [Bioenergy] shall be responsible to EPC Contractor [AATGP] for any additional costs or schedule delay, and any delay damages under the EPC Contract that EPC Contractor incurs as a result of such payment not being made or available, including costs and damages payable by EPC Contractor for termination or suspension of the EPC Contract or the Purchasing Agent Agreement by Owner and suppliers and Subcontractors of their agreements that results directly and exclusively as a result of such non-payment, and such liability shall be the sole remedy of EPC Contractor for such payment default without prejudice of any right or remedy under any applicable federal or state laws that cannot be excluded or waived by agreement of the Parties."

C.    **Fulcrum's Failure to Pay AATGP for its Work**

37.    AATGP executed the CVOs (specifically, CVOs 2b, 3b, 5, 6, 8, 9, 10a, 10b, 13, 18, 21, 22, 23, 25, and 32) pursuant to the First Amendment to the PERA with the understanding that Biofuels and its parent, Bioenergy, would honor their payment obligations.

- 6 -

38.     On August 15, 2019, AATGP provided Bioenergy a chart of its costs and the corresponding invoices, including the new PERA Costs for Labor and Material, through August 1, 2019. AATGP indicated $87,078,457 in total PAA Supplies and EPC Assembly costs were committed to the Project through August 1, 2019.

39.     On September 13, 2019, Bioenergy approved of AATGP's costs through August 1, 2019.

40.      On October 28, 2019, AATGP provided Bioenergy a chart of its costs and the corresponding invoices, including Reimbursable Agreement (Supplies, Assembly, and Equipment) and the approved Change Variation Orders (CVOs) through October 1, 2019. AATGP indicated $175,788,437 in total costs committed to the Project through October 1, 2019.

41.     On December 2, 2019, Bioenergy approved of AATGP's costs through October 1, 2019.

42.     On December 17, 2019, AATGP provided Bioenergy a chart of its costs and the corresponding invoices, including PERA (Supplies, Assembly, and Equipment) and the approved Change Variation Orders (CVOs) through December 1, 2019. AATGP indicated $164,831,589 in total costs committed to the Project through December 1, 2019.

43.     In December 2019, Fulcrum had preliminarily approved, but not executed, an additional seven CVOs with a total expected amount of $1,473,586.

44.     On January 9, 2020, Bioenergy approved of AATGP's costs through December 1, 2019.

45.     On January 13, 2020, Fulcrum indicated that it wanted to reopen some of the outstanding CVOs, rejected/revised some of the previously-approved CVOs, and reaffirmed its approval of the other outstanding CVOs without formally executing the CVOs or providing payment.

46.     On January 31, 2020, AATGP provided Bioenergy a chart of its costs and the corresponding invoices, including Reimbursable Agreement (Supplies, Assembly, and Equipment) and the approved Change Variation Orders (CVOs) through January 1, 2020. AATGP indicated $178,090,878 in total costs committed to the Project through January 1, 2020.

47.     On February 25, 2020, Bioenergy approved of AATGP's costs through January 1, 2020, with the exception of a limited number of costs contained in "Folder 034" that AATGP provided to Bioenergy, which Bioenergy disputed.

48.     As discussed above, Fulcrum did not formally object within 30 days to many of the submitted change order requests, and thus the change order requests are considered an accepted and integrated part of the EPC.

49.     However, when Fulcrum did not release the funds it approved, as required, AATGP was forced into a deeply cashflow negative position because it expended the funds it received in payment for EPC milestones on *uncompensated* CVO work.

50.     On January 20, 2020, AATGP provided Biofuels with its formal notice of dispute under EPC Section 37, initiating Level I of the dispute resolution process.

51.     In its January 20, 2020 correspondence, AATGP listed the specific CVOs that were currently unresolved between the parties, including the disputed and undisputed amounts related to each of those CVOs:

     a.     CVO 10a—Fischer Tropsch system modification (Undisputed costs $2,763,428; Disputed Costs $197,784) (included for payment by Bioenergy under the PERA)

     b.     CVO 10b—FT System Modification (Undisputed costs $3,067,548; Disputed Costs $39,908) (included for payment by Bioenergy under the PERA)

     c.     CVO 11—Analyzers (Undisputed costs $0; Disputed Costs $209,965)

     d.     CVO 19—Auxiliary Flare (Undisputed costs $0; Disputed Costs $478,863)

     e.     CVO 26—Arc Flash Protection (Undisputed costs $0; Disputed Costs $22,044)

     f.     CVO 28—Engineering, Extraworks and Reworks (Undisputed costs $0; Disputed Costs $21,559)

     g.     CVO 30—VFD for Pox (HOB) coolant pumps (Undisputed costs $0; Disputed Costs $117,874)

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

h.   CVO 34—Scrubber pumps seals (Undisputed costs $0; Disputed Costs $205,569)

i.   CVO 35—DMZ for DCS (Undisputed costs $0; Disputed Costs $68,398)

j.   CVO 36—Substation (Undisputed costs $0; Disputed Costs $560,869)

k.   CVO 39—Shift Reactor Outlet Flange (Undisputed costs $0; Disputed Costs $47,695)

l.   CVO 42—Change of firefighting pumps house (Undisputed costs $0; Disputed Costs $59,259)

m.   CVO 47—SRU materials (Undisputed costs $0; Disputed Costs $340,208)

n.   CVO 49—Extraworks FAT DCS (Undisputed costs $24,887; Disputed Costs $22,516)

o.   Operating Personnel (to be estimated)

p.   Operating Consumables (to be estimated)

52.   The undisputed, but unpaid, costs totaled $24,887. The disputed, but unpaid, costs totaled $2,392,511, plus the cost for the Operating Personnel and Operating Consumables. To date, these costs, both disputed and undisputed, remain unpaid.

53.   Similarly, on February 11, 2020, AATGP provided Bioenergy with its formal notice of dispute under PERA Section 9, initiating Level I of the dispute resolution process.

54.   In its February 11, 2020 correspondence, AATGP listed the specific CVOs that were currently unresolved between the parties under the PERA, including the disputed and undisputed amounts related to each of those CVOs:

a.   CVO 10a—Fischer Tropsch system modification (Undisputed costs $2,763,428; Disputed Costs $197,784)

b.   CVO 10b—FT System Modification (Undisputed costs $3,067,548; Disputed Costs $39,908)

55.   The disputed, but unpaid, costs totaled only $237,692. To date, these costs remain unpaid, as does $23,853,575 of the undisputed amounts from CVOs 2b, 3b, 5, 6, 8, 9, 10a, 10b, 13, 18, 21, 22, 23, 25 and 32.

Snell & Wilmer

L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

56.     On February 13, 2020, AATGP provided Biofuels with a reminder for setting the Level II dispute resolution process under EPC Section 37 after not reaching an agreement in Level I and not receiving a formal answer from Biofuels.

57.     On February 15, 2020, Biofuels and Bioenergy provided AATGP with its formal notice to proceed to Level II to of the dispute resolution process under EPC Section 37 and PERA Section 9.

58.     AATGP held several telephonic meetings with Fulcrum to discuss Fulcrum's payment obligations under the EPC, PAA, and the PERA. The parties also conducted a formal in-person meeting on February 27, 2020.

59.     During those meetings, Fulcrum took the position that it would continue to review the invoices and related documentation provided by AATGP in support of reimbursement.

60.     Ultimately, Fulcrum remained unwilling to pay AATGP for these Project costs and refused to approve the check list of documents supporting AATGP's request for payment related to the PERA.

61.     Fulcrum refused to release funds under the PERA despite AATGP incurring substantial costs related to that work and providing all requested documentation.

62.     AATGP is not able or responsible to sustain the deeply negative cashflow that the Project is facing as a result of Fulcrum's refusal to pay AATGP.

63.     Fulcrum's failure to pay AATGP forced AATGP into a deeply cashflow negative position, which has led directly to a sizable reduction in AATGP's workforce and inhibited the Project's progress.

**D.     Fulcrum's Fraudulent Attempt to Draw on a Standby Letter of Credit related to the EPC**

64.     Pursuant to the terms of the EPC, on October 31, 2017, Wells Fargo issued an Irrevocable Standby Letter of Credit in the amount of $18,200,000 on behalf of AATGP in favor of Fulcrum.

65.     As noted in the Letter of Credit, its purpose is to secure AATGP's obligations as the contractor for the construction of the biofuel facility Project for Biofuels.

66.     The Letter of Credit provides that, among other things, it is subject to judicial orders of the United States.

67.     On or around April 13, 2020, Fulcrum demanded payment from Wells Fargo under the Letter of Credit, claiming it "intend[s] to apply the proceeds to the excess costs required to complete the Facility" but admitting that it has not declared a default event against AATGP.

68.     Specifically, Fulcrum informed AATGP: "This is not a notice of termination or a formal declaration of a Contractor Event of Default."

69.     The Letter of Credit expressly requires that in order to demand payment, Fulcrum is required to represent to Wells Fargo that it "made a demand against the parent guarantee from Abengoa at least fifteen (15) business days prior to the [demand] and have not received a satisfactory response."

70.     In an attempt to defraud AATGP and Abengoa, Fulcrum did not make any demand against Abengoa prior to its demand to Wells Fargo.

71.     As a result, Abengoa never had the opportunity to provide any response at all, and yet Fulcrum demanded payment under the Letter of Credit.

72.     Wells Fargo rejected Fulcrum's demand on the Letter of Credit for failure to comply with its terms:  namely, Fulcrum's failure to make a demand against Abengoa at least fifteen days prior to the demand to draw on the Letter of Credit.

73.     On April 17, 2020, Fulcrum provided notice to AATGP and Abengoa of its intent to submit a new demand on the Letter of Credit to Wells Fargo in fifteen business days. Therefore, upon information and belief, Fulcrum intends to submit a second demand on the Letter of Credit to Wells Fargo as early as May 8, 2020, unless otherwise enjoined by the Court.

74.     Fulcrum has repeatedly expanded the scope of the Project and agreed to pay for it or led AATGP to believe that it was going to pay for it.  But now, rather than paying for the Project it asked for, it wants to use AATGP's Letter of Credit.

75.     Fulcrum's own misconduct gives rise to Fulcrum's unjustifiable demand against the Letter of Credit.

76.     If Fulcrum is not enjoined from submitting its renewed demand on the Letter of Credit, Wells Fargo will transfer the funds as early as May 8, 2020, and no later than May 15, 2020.

77.     If the funds are transferred, the impact on Plaintiffs will be catastrophic and irreparable, and absent unforeseen intervention by third-parties or the Spanish government, the result will be bankruptcy of not only AATGP, but also Abengoa and its group of companies, along with the potential loss of jobs for their roughly 15,000 employees. There is a significant probability that the chain of events will be as follows:

    a.     If the Letter of Credit funds are transferred, the various banks underwriting Wells Fargo's Letter of Credit will immediately look to Abengoa as AATGP's parent guarantor for repayment of the funds. Like most other businesses facing the challenges posed by the global pandemic, neither AATGP nor Abengoa has sufficient liquidity to repay those funds in the near term.

    b.     Abengoa has substantial existing loans with these banks, and a default related to the Letter of Credit will trigger a series of cross-defaults across Abengoa's corporate debts amounting to approximately $1.9 Billion. Simply put, Abengoa may not recover.

    c.     Compounding matters, AATGP is a guarantor across virtually all of Abengoa's corporate debts. AATGP is unable to repay these amounts.

78.     If the Letter of Credit's proceeds are released to Fulcrum, AATGP's and Abengoa's corporate debt load of approximately $1.9 Billion would be immediately due and payable, likely forcing them into bankruptcy and almost certainly resulting in the wholesale destruction of these companies absent unforeseen third-party intervention.

79.     However, even if release of these funds to Fulcrum did not substantially risk AATGP's and Abengoa's destruction based on its existing corporate debt, it would likely do so prospectively.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

80.     Release of the funds from the Letter of Credit will substantially impede and likely foreclose Abengoa's and AATGP's ability to negotiate future bonds and lines of credit necessary for their continued operations.

81.     Release of the funds from the Letter of Credit will also substantially impede and perhaps destroy Abengoa's and AATGP's ability to obtain assistance through the various stimulus packages available to assist businesses to endure this global pandemic.

82.     Without these future sources of funding, AATGP and Abengoa will almost certainly be unable to continue their operations in the near-term, and therefore unable to meet their corporate debt obligations, resulting in the same wholesale destruction addressed above.

**E.     Fulcrum's Current Insolvent Position and Indebtedness to Plaintiffs**

83.     Fulcrum is drawing on the Letter of Credit in an effort to improperly obtain funds to pay obligations of the parent, Bioenergy, for work on the Project.

84.     Fulcrum's demand against the Letter of Credit suggests that Defendants are at, or near, the point of insolvency, which aligns with information Plaintiffs have obtained on Biofuels' finances:

a.     As of May 1, 2020, Fulcrum has failed to make payments to suppliers and subcontractors in an amount of no less than $12,200,000.

b.     Fulcrum is responsible for milestone payments and costs of $1,292,900.15 and AATGP is entitled to over $50,000,000 under the EPC and PERA.

c.     Fulcrum owes $175,000,000 in bonds held by the State of Nevada.

85.     Regarding amounts owed to Plaintiff related to the Project, as of May 4, 2020, Biofuels has paid $176,773,563 of the amount owing under the EPC and no less than $31,670,778 (including $15M Final Milestone in equity from Bioenergy) remains to be paid.

86.     Fulcrum has paid $40,970,748  (purported to be from Biofuels rather than Bioenergy) for other CVO's or payments due from Bioenergy under the PERA and no less than $19,029,252 remains to be paid.

87.     At a minimum, Plaintiffs are entitled to no less than $50,700,030 from Fulcrum for their work on the Project.

Snell & Wilmer

L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

### III.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### *Breach of Fiduciary Duty*

88.   Plaintiffs incorporate every allegation contained in the preceding paragraphs.

89.   A fiduciary relationship exists between Bioenergy and AATGP.

90.   Under Section 2.1 of the PERA, Bioenergy has an obligation, subject to various terms and conditions, to provide AATGP with $15,000,000 of Project Equity evidenced by Membership Units.

91.   The purpose of the PERA was to provide an alternate source of payments for the Project when Biofuels became unable to make such payments.

92.   AATGP's equity interest in the Project and the origin of the PERA creates a relationship beyond one that is arms-length and contractual in nature.

93.   As AATGP's fiduciary, Bioenergy owed heightened duties to AATGP.

94.   Bioenergy breached its duty to AATGP and proximately caused AATGP's damages by, among other misconduct:

    a.   Inducing AATGP to proceed with the Project, knowing that Fulcrum was unable and did not intend to comply with its related duties, resulting in a deeply negative cashflow that effectively prevents AATGP from continuing substantial work on the Project;

    b.   Attempting to force completion of the project solely at AATGP's expense;

    c.   Attempting to destroy AATGP's equity interest in the Project;

    d.   Damaging AATGP's reputation and interests with its subcontractors, vendors, corporate creditors, and others who remain unpaid because Fulcrum has not paid AATGP, and incurring related liability;

    e.   Misrepresenting to Wells Fargo and others that AATGP's inability to proceed under the contract was a breach by AATGP and not by Bioenergy;

    f.   Attempting to draw on AATGP's Letter of Credit on fraudulent grounds;

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

g.    Attempting to draw on AATGP's Letter of Credit, damaging Plaintiffs' ability to service their corporate debt, obtain future credit, and generally remain a going concern;

h.    Attempting to avoid Fulcrum's obligations to AATGP; and

i.    Forcing emergency legal action, including retaining legal counsel and related fees and costs.

95.    Bioenergy and Biofuels acted in concert to defraud and otherwise harm Plaintiffs.

96.    As a direct and proximate result of Defendants' breaches, Plaintiffs have been damaged, and/or will be further deprived of their rights and protections afforded to them under the EPC, the PAA, and PERA, in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

## SECOND CAUSE OF ACTION

### *Civil Conspiracy and Material Fraud, Constructive Fraud, Fraudulent Concealment, and Fraud in the Inducement*

97.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

98.    Bioenergy and Biofuels acted in concert to defraud and otherwise harm Plaintiffs.

99.    Upon information and belief, Biofuels lacked and lacks the financial resources to continue funding the Project.

100.    Upon information and belief, Bioenergy and Biofuels structured the PERA and EPC with the fraudulent intent of underfunding the Project by obfuscating and underpaying CVOs and milestone payments, while simultaneously forcing AATGP to continue work on the Project and to continue funding the Project or else face the catastrophic consequence of Biofuels drawing down on the Letter of Credit that committed AATGP as the Applicant and Abengoa as the Parent Guarantor.

101.    Upon information and belief, rather than accept the consequences of their illiquidity and attempt to find a good-faith solution, Bioenergy and Biofuels colluded to either force AATGP to complete the project without meaningful payment, or to force it to cease operations so that

Biofuels could improperly assert a breach under the EPC, fraudulently draw on the Letter of Credit, and complete the Project using AATGP's funds rather than Fulcrum's.

102.    Specifically, Bioenergy agreed via the PERA to promptly pay the Project expenses Biofuels could not, but attempted to limit AATGP to seeking relief for nonpayment of these amounts against Bioenergy alone, leaving in place Biofuels' and AATGP's other obligations, including for payment, under the EPC.

103.    Under Section 3.1 of the PERA, Bioenergy is required to reimburse AATGP up to $26,100,000.00 (the sum of (a) costs incurred by AATGP under the EPC and as Purchasing Agent under the PAA for labor and material prior to Mechanical Completion that are in excess of the labor and material baseline, and (b) costs incurred by AATGP as Purchasing Agent under the PAA for equipment listed in the EPC prior to Mechanical Completion that are in excess of the equipment baseline in the EPC).

104.    Under Section 3.1 of the PERA (as amended by Section 1.01(a) of the First Amendment to the PERA), Bioenergy is required to reimburse AATGP $10,304,007.47 for the costs indicated in CVO 2b, CVO 3b, CVO 5, CVO 6, CVO 10a, CVO 13, CVO 18, CVO 21, CVO 22, and CVO 23, plus costs arising under CVO 8, CVO 9, CVO 10b, CVO 25 and CVO 32, measured on an open-book basis and subject to an indirect fee of 17.45% and an additional fee of 5%, which the Parties estimated to be $13,549,567.68, plus the lesser of $26,100,000 or the sum of costs incurred by AATGP under the EPC and as Purchasing Agent under the PAA for labor and material costs in the Tracked Cost Categories (as defined in the EPC) prior to Mechanical Completion that are in excess of the aggregate labor and material baseline for the Tracked Cost Categories in the EPC, which amount is $66,885,373 and costs incurred by AATGP as Purchasing Agent under the PAA for the specified equipment listed in the EPC Contract prior to Mechanical Completion in excess of the equipment baseline in the EPC, which amount is $25,205,930.

105.    The aggregate costs of the scope of work set forth in the CVOs associated with the First Amendment to the PERA are set forth in Exhibit A to the First Amendment to the PERA.

Snell & Wilmer

L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 16 -

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

106.    Exhibit A to the First Amendment to the PERA demonstrates that the total change in material cost from the PAA and labor and indirect costs and fees from the EPC is $16,579,307.31 (using an "estimate" for the open-book CVOs).

107.    Exhibit A to the First Amendment to the PERA demonstrates that the total change in equipment cost from the PAA is $7,274,267.84 (using an "estimate" for the open-book CVOs).

108.    Bioenergy agreed to subject itself to the EPC.

109.    AATGP relied on Bioenergy's material representations, including the fact that AATGP would be paid at least $24,000,000 (based on the open-book estimates) in reimbursable CVO expenses under the First Amendment to the PERA, in order to enter into the First Amendment to the PERA and begin additional work on the Project related to the CVOs.

110.    AATGP likewise relied on Bioenergy's representation that it would provide AATGP with $15,000,000 of Project Equity evidenced by Membership Units.

111.    As a result of Bioenergy's representations that it would reimburse AATGP for costs expended under the PERA, AATGP performed work related to the CVOs and began incurring the following costs:

a.    CVO 10a—Fischer Tropsch system modification (Undisputed costs $2,763,428; Disputed Costs $197,784)

b.    CVO 10b—FT System Modification (Estimated Undisputed costs $3,067,548; Disputed Costs $39,908)

c.    CVO 2b—Auxiliary Boiler Modification Installation (Cost $185,669.82)

d.    CVO 3b—Syngas Compressor Installation (Cost $1,602,552.40)

e.    CVO 5—ASU and Water Treatment Foundations (Credit $838,329.09)

f.    CVO 6—Micro Steam Turbine Generator (Cost $534,404.39)

g.    CVO 8—Modification from Pelletized MSW to Shredded MSW Feedstock (Estimated Cost $6,159,421.48)

h.    CVO 9—Increase height and width of the Reformer Structure (Estimated Cost $3,673,926.73)

i.    CVO 13—Guard Beds (Cost $4,336,429.39)

j.    CVO 18—CO2 Compressor (Credit $815,690.54)

k.    CVO 21—Demin Water Tank (Cost $143,052.56)

l.    CVO 22—Pilings (Credit $687,405.78)

m.    CVO 23—Flare (Cost $3,079,896.70)

n.    CVO 25—Seal Gas Boosters System (Estimated Cost $565,491.38)

o.    CVO 32—Change to Guard Bed Nozzles (Estimated Cost $83,179.79)

112.    Upon information and belief, at the time Bioenergy entered into the First Amendment to the PERA it knew that it could not or would not reimburse AATGP for the expenses AATGP would incur.

113.    Upon information and belief, Bioenergy lacked and lacks the financial resources to meaningfully assist its subsidiary in making these payments.

114.    AATGP was unaware and had no reason to be aware of Bioenergy's lack of liquid or other financial resources prior to the last few months.

115.    In the intervening months Bioenergy has failed to make more than token payments, while Biofuels insists that AATGP is obligated to continue and complete the Project despite AATGP receiving no meaningful payments and therefore being unable to pay its subcontractors, suppliers, and vendors, or even make payroll.

116.    Fulcrum's delayed and missing payments threatened and threaten to substantially delay and perhaps prevent completion of the Project as AATGP was and is unable to pay its subcontractors or vendors, or even make its own payroll without these payments.

117.    Accordingly, Fulcrum has prevented AATGP's performance under the relevant agreements, and is attempting to force Plaintiffs to fund Fulcrum's Project.

118.    Additional facts that may be necessary for pleading Fulcrum's frauds with particularity are peculiarly within Fulcrum's knowledge and are readily obtainable by Fulcrum, relaxing NRCP 9(b)'s pleading requirements.

119.    As a direct and proximate result of Defendants' breaches, Plaintiffs have been damaged, and/or will be further deprived of their rights and protections afforded to them under the

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

EPC, the PAA, and PERA, in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

120.    As a further direct and proximate result of Defendants' breaches of the EPC and PERA, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from Defendants, with interest.

### THIRD CAUSE OF ACTION

### *Breach of the Covenant of Good Faith and Fair Dealing*

121.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

122.    The EPC, PAA, and PERA are valid, existing, and enforceable contracts.

123.    It is well established in Nevada that every contract imposes upon the contracting parties the duty of good faith and fair dealing.

124.    Under the EPC, PAA, and PERA, Fulcrum owed a duty of good faith and fair dealing to Plaintiffs.

125.    Fulcrum breached its duty by performing in a manner unfaithful to the purpose of the EPC, PAA, and PERA by, among other things, refusing to pay and/or timely reimburse Plaintiffs for work performed on the Project, forcing Plaintiffs into a deeply cashflow negative position, demanding that AATGP continue work on the Project despite this misconduct, demanding to draw on the Letter of Credit, and attempting to eliminate AATGP's equity interest in the Project.

126.    Fulcrum has prevented AATGP's performance under the relevant agreements.

127.    Defendants' actions are contrary to the purpose and intent of the EPC, PAA, PERA, and the Letter of Credit.

128.    Defendants denied Plaintiffs' justified expectations under the EPC, PAA, PERA, the Letter of Credit, and various related agreements.

129.    As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

130.    As a further direct and proximate result of Defendants' breaches of the EPC, PAA, PERA, and the Letter of Credit, Plaintiffs have been compelled to retain counsel and have incurred

attorneys' fees and costs to enforce their rights and are entitled to recover the same from Defendants, with interest.

### FOURTH CAUSE OF ACTION

***Material Fraud, Constructive Fraud, and Fraudulent Concealment in the Draw Demand***

131.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

132.    Biofuels' April 17, 2020 notice of its intent to make a draw demand is materially fraudulent, and honor of the presentation of the draw demand would facilitate a material fraud by Fulcrum on Wells Fargo, under three independent theories.

133.    The EPC provides that the Letter of Credit is drawable "if and to the extent [AATGP] fails to perform its obligations under [the EPC]," and is intended "to secure the performance by [AATGP] of its obligations under [the EPC and PAA]."

134.    Bioenergy and Biofuels conspired to fraudulently induce AATGP into the PERA in order to attempt to either force AATGP to complete the Project despite Bioenergy's and Biofuels' nonpayment, or to open the door for Biofuels to fraudulently draw on the Letter of Credit, in either event seeking to force Plaintiffs to pay for Fulcrum's Project and perform additional work on the Project at Plaintiffs' expense.

135.    Biofuels is the party that has failed to perform under the EPC, and its conspiracy with Bioenergy to cut off AATGP's receipt of the necessary and critical payment streams is the direct and intended result of that conspiracy.

136.    Biofuels cannot assert AATGP's inability to continue the Project as grounds to draw on the Letter of Credit because this circumstance is the direct and intended result of Fulcrums' own misconduct.

137.    The Letter of Credit requires Biofuels to "state and declare" that:

    a.    AATGP is in breach of its obligations under the EPC or the PAA;

    b.    Biofuels made a demand against Abengoa at least fifteen days prior to the date of the draw demand and no satisfactory response was received; and

    c.    Biofuels is entitled under the terms of the EPC or PPA to payment of the requested amount.

138.    For the reasons addressed above, Biofuels' assertions in the statements above are materially fraudulent, as Fulcrum has manufactured the purported breach in an attempt to force AATGP to fund Fulcrum's Project and to mask its own inability to do so.

139.    Nevada law codified at NRS 104.5110 requires Biofuels to also **warrant** the following:

    a.    To Wells Fargo that there is no fraud in the draw letter;

    b.    To AATGP that the draw does not violate any agreement between Biofuels and AATGP, or any other agreement intended to be augmented by the Letter of Credit.

140.    For the reasons addressed above, the proposed draw letter referenced in the April 17, 2020, letter is fraudulent.

141.    For the reasons addressed above, the proposed draw letter referenced in the April 17, 2020, letter violates the EPC and PERA.

142.    Additional facts that may be necessary for pleading Fulcrum's frauds with particularity are peculiarly within Fulcrum's knowledge and are readily obtainable by Fulcrum, relaxing NRCP 9(b)'s pleading requirements.

143.    As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

144.    As a further direct and proximate result of Defendants' breaches of the EPC, PERA, and the Letter of Credit, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from Defendants, with interest.

**FIFTH CAUSE OF ACTION**

*Breach of Contract*

145.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

146.    The EPC and PERA are valid, existing, and enforceable contracts.

147.    Plaintiffs performed their obligations under the EPC and PERA by performing work on the Project and requesting reimbursement in compliance with the terms of the EPC, PAA, and

PERA. Fulcrum has breached numerous provisions under these agreements including but not limited to the following.

148. Under Section 2.1 of the EPC, Biofuels is required to "reasonably cooperate with Contractor [AATGP] during the performance of this Agreement . . . [including] the timely supply of all materials, services and information."

149. Under Section 2.2.6 of the EPC, Biofuels is required to make payments to AATGP in respect of the Fixed Construction Price, all Fixed Construction Price Adjustments and Documented Costs in accordance with the applicable provisions of the EPC.

150. Under Section 7.1 of the EPC, as compensation for the Work and the performance of all of AATGP's obligations under the EPC and PAA, Biofuels is required to pay $202,380,221 to AATGP, of which (a) $118,060,730 is to be paid to suppliers and subcontractors by Biofuels under the PAA; and (b) $84,319,491 of which is paid under the EPC.

151. Under Section 3.1 of the PERA, Bioenergy shall reimburse AATGP up to $26,100,000 for costs in excess of the Fixed Construction Price, as discussed above.

152. Under Section 3.1 of the EPC (as amended in First Amendment to the PERA), and its Exhibit A, Bioenergy shall reimburse AATGP approximately $24,000,000 (as adjusted for open-book CVO costs) related to specific changes in work, incorporated into the Project at Biofuels' request.

153. Defendants have materially breached the EPC, PAA, and PERA by, including, but not limited to, failing to reimburse Plaintiffs monies Plaintiffs advanced for work on the Project, or otherwise make payments due and owing for work on the Project.

154. Moreover, under Section 8.1 of the EPC, Biofuels shall, within fifteen (15) days after receipt of an invoice from AATGP, determine whether (A) the Payment Milestones covered by the invoice have been met; (B) the Work performed conforms with the requirements of the EPC; (C) the invoice and any required backup information have been properly submitted and are accompanied by the appropriate waiver of Liens; and (D) the invoiced amount reflects the payment due under the Progress Payment Schedule and Biofuels shall inform AATGP as to whether Biofuels disputes any portion of the invoice.

155.    Under Section 8.1 of the EPC, Biofuels is required to (i) pay AATGP, within thirty days after receipt by Biofuels of AATGP's invoice, the portion of the invoiced amount for Self-Performed Costs payable to AATGP minus any disputed portion of such invoice.

156.    Biofuels breached the EPC and PAA by disputing portions of AATGP's invoices more than fifteen days after receipt.

157.    Biofuels breached the EPC and PAA by failing to pay AATGP the undisputed portions of AATGP's invoices within thirty days of receipt.

158.    Under Section 4.1(d) of the PERA, Bioenergy is required to, within fifteen days after receipt of a Reimbursable Cost Invoice from AATGP, determine whether (i) the Reimbursable Costs covered by the Reimbursable Cost Invoice have been provided or will need to be provided by AATGP in accordance with the PERA; (ii) the Reimbursable Costs provided conform with the requirements of the PERA; (iii) the Reimbursable Cost Invoice and any reasonably required backup information that would be required under the EPC if such Reimbursable Cost had been invoiced thereunder have been properly submitted and are accompanied by the appropriate waiver of Lien or evidence that other appropriate action has been taken so as to vacate any Lien; and (iv) the amount of the Reimbursable Cost Invoice reflects the payment due under the provisions of the PERA and the EPC or PAA and shall inform AATGP as to whether Bioenergy disputes any portion of the Reimbursable Cost Invoice.

159.    Under Section 4.1(d), Bioenergy is required to pay AATGP 100% of the Reimbursable Cost Invoice, less any disputed portions, no later than thirty days after receipt by Bioenergy.

160.    Bioenergy breached the PERA by disputing portions of AATGP's invoices more than fifteen days after receipt.

161.    Bioenergy breached the PERA by failing to pay AATGP the undisputed portions of AATGP's invoices within thirty days of receipt.

162.    Biofuels also materially breached the EPC by attempting to draw the Irrevocable Standby Letter of Credit, attached and incorporated into the EPC as Exhibit MM.

- 23 -

163.   Under Sections 23.4.3 and 37 of the EPC, Biofuels is required to act reasonably and in good faith to resolve disputes regarding the EPC.

164.   Biofuels breached its obligations under the EPC by failing to engage in the dispute resolution process promptly and in good faith.

165.   Under Section 9 of the PERA, Bioenergy is required to act reasonably and in good faith to resolve disputes regarding the PERA.

166.   Bioenergy breached its obligations under the PERA by failing to engage in the dispute resolution process promptly and in good faith.

167.   As a direct and proximate result of Defendants' breaches, Plaintiffs have been damaged, and/or will be further deprived of their rights and protections afforded to them under the EPC and PERA, in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

168.   As a further direct and proximate result of Defendants' breaches of the EPC and PERA, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from Defendants, with interest.

### SIXTH CAUSE OF ACTION

#### *Promissory Estoppel*

#### **(In the Alternative)**

169.   Plaintiffs incorporate every allegation contained in the preceding paragraphs.

170.   Fulcrum promised to reimburse AATGP for its costs related to the Project, including costs incurred related to the CVOs that were completed at Biofuels' request.

171.   Fulcrum promised to reimburse AATGP for costs related to the CVOs, including, but not limited to, the costs specifically delineated in Exhibit A to the First Amendment to the PERA, even if the CVOs were not formally executed.

172.   AATGP relied on Fulcrum's promises to pay for work related to the CVOs and completed work related to the CVOs based on Fulcrum's promises of repayment.

173.   Fulcrum was apprised of the fact that AATGP would complete work related to the CVOs based on its representations that AATGP would be reimbursed for that work.

174.    Fulcrum intended for AATGP to act upon its representations by performing additional work related to the Project under the assumption that AATGP would be reimbursed for its costs and expenses.

175.    AATGP was ignorant of the fact that Fulcrum could not or would not reimburse AATGP for its costs and expenses.

176.    As a direct and proximate result of Fulcrum's conduct, AATGP has been damaged in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000.00).

177.    As a further direct and proximate result of Fulcrum's conduct, AATGP has been compelled to retain counsel and have incurred attorneys' fees and costs to enforce its rights and is entitled to recover the same from Fulcrum, with interest.

## SEVENTH CAUSE OF ACTION

### *Unjust Enrichment, Quasi Contract, Conversion, and/or Quantum Meruit*

### (In the Alternative)

178.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

179.    If for any reason the trier of fact fails to identify or recognize that Defendants have contractual obligations to Plaintiffs under the EPC and PERA to reimburse Plaintiffs for the costs of work and related obligations, Plaintiffs in the alternative assert claims for quasi contract, unjust enrichment, conversion, and/or quantum meruit.

180.    Plaintiffs have conferred a benefit on Defendants by performing work and expending funds to advance the project.

181.    Defendants have failed to reimburse Plaintiffs for the additional work they have performed and/or contracted and paid for the Project due to Defendants' changes to the scope of the work.

182.    Based upon Defendants' representations, Plaintiffs reasonably believed Defendants would accept the change of work and reimburse Plaintiffs for the work performed on the Project.

183.    Defendants have been well aware at all relevant times of the benefits they have received at Plaintiffs' expense, as Plaintiffs have submitted numerous reimbursement requests with

supporting documentation and invoices, and Defendants have either approved or failed to dispute Plaintiffs' documentation.

184.    Defendants have retained the benefits conferred by Plaintiffs, but refused to perform their duties and obligations in return.

185.    To permit Defendants to continue to retain the benefits related to the work Plaintiffs performed, but for which Defendants have not paid, would violate the principles of justice, equity, and good conscience.

186.    Plaintiffs have not acted like an intermeddler, but rather performed the scope of work specifically requested by Defendants.

187.    Accordingly, Plaintiffs have suffered damages in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000).

188.    As a further direct and proximate result of Defendants' misconduct, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from the Defendants, with interest.

## EIGHTH CAUSE OF ACTION

### *Business Disparagement and Defamation*

189.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

190.    Biofuels' assertions of AATGP's breach and Biofuels' entitlement to draw on the Letter of Credit in the draw letter are false, defamatory, and disparage AATGP, interfering with its ability to do business.

191.    Biofuels knows that these assertions are materially false, and are intended to improperly fund the Project using Plaintiffs' resources.

192.    Biofuels' publication of these assertions is not privileged.

193.    Plaintiffs' damages include the full amount of the Letter of Credit and the resulting losses from the acceleration of Plaintiffs' corporate debt as a result of the draw on the Letter of Credit.

194.    Accordingly, Plaintiffs have suffered damages in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000).

195.    As a further direct and proximate result of Defendants' misconduct, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from the Defendants, with interest.

## NINTH CAUSE OF ACTION

### *Constructive Trust*

196.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

197.    A confidential relationship exists between Plaintiffs and Fulcrum.

198.    Allowing Fulcrum to retain the funds drawn from the Letter of Credit and the uncompensated improvements in the Project would be inequitable.

199.    Unless Fulcrum holds these assets in trust for AATGP until such time as appropriate reallocation or other resolution can occur, justice cannot be effected due to the necessary impact of the draw on the Letter of Credit across Plaintiffs' corporate debt.

200.    Accordingly, Plaintiffs have suffered damages in an amount to be proven at trial in excess of fifteen thousand dollars ($15,000).

201.    As a further direct and proximate result of Defendants' misconduct, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from the Defendants, with interest.

## TENTH CAUSE OF ACTION

### *Declaratory Relief*

202.    Plaintiffs incorporate every allegation contained in the preceding paragraphs.

203.    Pursuant to NRS 30.010 *et seq.*, this Court has authority to determine the rights of any person whose rights, status, or legal relations are affected by a contract.

204.    Plaintiffs and Fulcrum have rights, status, or legal relations under the EPC, the PERA, and the other incorporated related ancillary documents, including the Letter of Credit.

205.    Based on Plaintiffs' performance under the EPC and PERA, and Fulcrum's failure to perform in accordance with the EPC, PERA, and incorporated related ancillary documents including the Letter of Credit, an actual controversy exists as to the parties' rights, status, or legal relations, including as to payment for work performed.

206. Further, Fulcrum is fraudulently attempting to draw down the Letter of Credit, irreparably harming Plaintiffs.

207. Thus, Plaintiffs are entitled to an order of the Court declaring the they are entitled to payment for work performed.

208. Plaintiffs are further entitled to an order of the Court declaring that based on the circumstance, Fulcrum may not demand payment on the Letter of Credit.

## ELEVENTH CAUSE OF ACTION

### *For an Accounting*

209. Plaintiffs incorporate every allegation contained in the preceding paragraphs.

210. Plaintiffs are entitled to a full and complete accounting of all business activities conducted by Fulcrum that relate to the Project.

211. Fulcrum has a duty to render an accounting to Plaintiffs to determine damages resulting from their conduct.

212. As a direct and proximate result of Fulcrum's misconduct, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from the Fulcrum, with interest.

## TWELFTH CAUSE OF ACTION

### *For a Receiver*

213. Plaintiffs incorporate every allegation contained in the preceding paragraphs.

214. Plaintiffs are entitled to the appointment of a receiver pursuant to one or more Nevada statutes, including NRS 32.010 *et seq*., NRS 32.630, and NRS 86.5411, and if applicable NRCP 66.

215. Upon information and belief, as creditors of Biofuels, Plaintiffs hold at least ten percent of Biofuels' outstanding indebtedness, which Plaintiffs calculate as follows:

     a. Upon information and belief, Defendants' outstanding debt totals approximately $225,000,000.

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

b.      Based on amounts currently due to Plaintiffs, along with amounts coming due under the EPC and PERA, Plaintiffs hold over $50,000,000 outstanding indebtedness.

216.    Upon information and belief, Biofuels is at or near the point of insolvency, as set forth in the preceding paragraphs.

217.    Upon information and belief, Biofuels is being run at a great loss and in a manner that is grossly prejudicial to its creditors, including Plaintiffs, as set forth in the preceding paragraphs. Based on statements made by Fulcrum to Plaintiffs on April 24, 2020 it is unable or unwilling to pay outstanding and ongoing subcontractors and others for the necessary costs required to achieve Mechanical Completion without improperly drawing on the $18,200,000 letter of credit.

218.    Unless a receiver is appointed to prevent Biofuels from drawing down on the Letter of Credit, Plaintiffs will face irreparable harm.

219.    Upon information and belief, creditors of Biofuels are prejudiced because of Biofuels' failure to pay debts as they are coming due.

220.    There is no plain, adequate, or speedy remedy at law to compensate Plaintiffs for the damage or injury caused, or which may be caused, by the failure to appoint a receiver.

221.    As a further direct and proximate result of Defendants' misconduct, Plaintiffs have been compelled to retain counsel and have incurred attorneys' fees and costs to enforce their rights and are entitled to recover the same from the Defendants, with interest.

## IV.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.      For a declaration that Fulcrum is impermissibly and fraudulently seeking to draw on the Letter of Credit, and that Fulcrum may not demand payment on the Letter of Credit.

2.      For a declaration that Plaintiffs are entitled to payment in full under the existing agreements, or alternatively, in the amount of benefit conveyed to Fulcrum.

3.      For an order enjoining Fulcrum from demanding payment on the Letter of Credit and ordering that Fulcrum immediately withdraw its request to draw on the Letter of Credit.

4.      For an accounting.

1     5.     For the appointment of a Receiver suitable to this Court to oversee and/or manage

2    the business affairs of Fulcrum Sierra Biofuels, LLC.

3     6.     For judgment against Defendants and in favor of Plaintiffs in an amount to be proven

4    at trial in excess of fifteen thousand dollars ($15,000.00);

5     7.     For prejudgment interest, attorneys' fees, costs, and expenses, allowed under the

6    EPC, PAA, PERA, and applicable law;

7     8.     For any other relief the Court deems just and equitable under the circumstances.

8                    **AFFIRMATION**

9                **Pursuant to NRS 239B.030**

10     The undersigned does hereby affirm that the preceding document does not contain the social

11   security number of any person.

12

13    Dated:  May 6, 2020.             SNELL & WILMER L.L.P.

14

15                       By: /s/ Alex Fugazzi
                           Alex L. Fugazzi, Esq. (NV Bar No. 9022)

16                       V.R. Bohman (Nevada Bar No. 13075)
                           Michael Paretti (NV Bar No. 13926)

17                       3883 Howard Hughes Parkway, Suite 1100
                           Las Vegas, Nevada 89169

18                       Leon F. Mead, II (Nevada Bar No. 5719)

19                       Mead Law Group
                           7201 W. Lake Mead Blvd., Suite 550

20                       Las Vegas, Nevada 89128

21                       *Attorneys for Plaintiffs Abengoa, S.A., and*
                       *AATGP Abener Teyma General Partnership*

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1

2
3

4
5
6

7
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**<u>VERIFICATION</u>**

I, Joaquin Fernández de Piérola, state under penalty of perjury of the laws of the State of Nevada:

I am the Chief Executive Officer of Abengoa, S.A., Plaintiff in this First Amended Complaint. I know the contents thereof. The pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe them to be true.

<u>_____</u>
Signature

<u>Joaquin Fernández de Piérola</u>
Name

<u>Chief Executive Officer</u>
Title

4840-0139-5898