## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FULCRUM BIOENERGY, INC., *et al*., | Case No. 24-12008 (TMH) |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) APPROVING THE SALE OF THE DEBTORS' BIOREFINERY ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**") dated September 11, 2024 [D.I. 12], of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), for the entry of (i) an order (a) approving the bidding procedures (the "**Bidding Procedures**"), in connection with the sale of all or substantially all of the Debtors' assets; (b) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (c) authorizing the Debtors to enter into and perform under an asset purchase agreement attached to the Motion as Exhibit A (the "**Stalking Horse Agreement**")[2] between the Debtor Fulcrum Sierra BioFuels, LLC (the "**Seller**") and Switch, Ltd. (the "**Switch**" or "**Purchaser**"), subject to the solicitation of higher or otherwise better offers for the Debtors' assets (the "**Assets**"); (d) approving the Bid Protections granted to the Purchaser; (e) approving procedures for the assumption and assignment of certain designated executory contracts and unexpired leases; (f) scheduling an auction (the "**Auction**")

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with each debtor's federal tax identification numbers are: Fulcrum BioEnergy, Inc. (3733); Fulcrum Sierra BioFuels, LLC (1833); Fulcrum Sierra Finance Company, LLC (4287); and Fulcrum Sierra Holdings, LLC (8498). The Debtors' service address is: Fulcrum BioEnergy Inc., P.O. Box 220 Pleasanton, CA 94566.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms the Bidding Procedures Order (as defined below).

and the date and time of the hearing to approve the sale (the "**Sale Hearing**") of certain of the Debtors' assets and assumption of certain liabilities of the Debtors (the "**Assumed Liabilities**"); and (g) granting related relief; and (ii) an order (a) authorizing the sale (the "**Sale**") of certain assets to the Purchaser free and clear of all liens, claims, interest and other encumbrances; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief; and the Court having considered the Motion and entered the *Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner Of Notice Of Respective Dates, Times, and Places In Connection Therewith; and (F) Granting Related Relief* [D.I. 153] (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures attached thereto as Exhibit 1, authorizing the Debtors to designate Switch, Ltd. as the Stalking Horse Bidder, the Stalking Horse Agreement as the stalking horse bid for the certain of the Debtors' assets (the "**Stalking Horse Bid**"), the Bid Protections, all as more fully described in the Bidding Procedures Order; and the Debtors having held an Auction for the sale of certain of the Debtors' assets; and Purchaser having been selected as the Successful Bidder for the portion of the Debtors' assets constituting and relating to the biorefinery (as more fully described in the Biorefinery Purchase Agreement (defined below), collectively, the "**Biorefinery Assets**"); and this Court having conducted the Sale Hearing on November 12, 2024; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the amended and restated Stalking

Horse Purchase Agreement by and between Seller and Purchaser (the "**Biorefinery Purchase Agreement**"), the Sale and this order (the "**Sale Order**"); and this Court having reviewed and considered all objections and responses thereto, and the arguments of counsel made, and the evidence adduced, at the hearing with respect to the Bidding Procedures, held on October 9, 2024 (the "**Bidding Procedures Hearing**") and the Sale Hearing; and upon the entire record of the Bidding Procedures Hearing and the Sale Hearing, and after due deliberation thereon, and good cause appearing therefor:

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:[3]**

**Jurisdiction, Final Order and Statutory Predicates**

A.     This Court has jurisdiction to hear and determine the approval of the Sale under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.     The statutory predicates for the relief sought by the Motion are Sections 105(a), 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United State Bankruptcy Court for the District of Delaware (the "**Local Rules**").

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

**Notice of the Sale, Auction and the Cure Amounts**

D.       As evidenced by the *Declaration of Steven L. Victor in Support of Debtors' Motion for Entry of an Order Authorizing the Sale of Certain Assets Free and Clear of All Liens, Claims, Interest and Other Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [D.I. 245] (the "Victor Declaration") and the *Declaration of Mark J. Smith in Support of Debtors' Motion for Entry of an Order Authorizing the Sale of Certain Assets Free and Clear of All Liens, Claims, Interest and Other Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [D.I. 246] (the "Smith Declaration", together with the Victor Declaration, the "**Sale Declarations**") and the certificates of service filed with the Court [D.I. 42, 214] (collectively, the "**Certificates of Service**"), proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Stalking Horse Agreement, the Sale Hearing, the Sale, and transactions contemplated by the Stalking Horse Agreement, including the assumption, assignment and/or transfer of the Assigned Contracts, and a reasonable opportunity to object or be heard with respect thereto and to the entry of this Sale Order has been afforded to all known interested persons and entities entitled to receive such notice, including, but not limited to the Notice Parties set forth in the Bidding Procedures.

E.       In accordance with the provisions of the Bidding Procedures Order, the Debtors have served the *Notice of (I) Possible Treatment of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto* [D.I. 157] ("**Cure Notice**") and *Notice of Revised Notice of (I) Possible Treatment of Contracts and Leases, (II) Fixing of Cure Amounts, and (III) Deadline to Object Thereto* [D.I. 175] (the "**Revised Cure Notice**" and together with the Cure Notice, the "**Cure Notices**") upon all of the counterparties to the contracts and leases set forth on

the schedule attached as Exhibit A (the "**Contract and Lease Schedule**") to the Cure Notices, as the same may be subsequently modified pursuant to the terms of the Biorefinery Purchase Agreement (each, an "**Assigned Contract**," and, collectively, the "**Assigned Contracts**") setting forth: (i) the contract(s) and/or lease(s) that may be assumed by the Seller and assigned to Purchaser; (ii) the name of the counterparty thereto; (iii) notice of the right of the Seller and/or Purchaser to withdraw such request for assumption and assignment of the Assigned Contract(s) prior to the Closing; and (iv) the amount, if any, determined by the Seller to be necessary to be paid by the Seller to cure and compensate for any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "**Cure Amount**"). *See* Certificates of Service [D.I. 214, 215]. The deadline for a non-Debtor counterparty to file an objection regarding the ability of Purchaser to provide adequate assurance of future performance or to the stated Cure Amount in the Cure Notices (a "**Cure Notice Objection**") has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Notice Objections have been resolved, withdrawn, overruled or denied. To the extent that any non-Debtor counterparty did not timely file a Cure Notice Objection by the objection deadline listed in the Cure Notices (the "**Cure Notice Objection Deadline**"), such party shall be deemed to have consented to the (i) assumption and assignment of the Assigned Contract, (ii) proposed Cure Amount set forth on the Cure Notice, and (iii) adequate assurance of the Purchaser's future performance previously provided.

F.    The service of such Cure Notices (i) was good, sufficient and appropriate under the circumstances of these Chapter 11 Cases; (ii) provided such counterparties with a full and fair opportunity to object to such assumption, assignment, or transfer and to the proposed Cure Amount set forth in the Cure Notices; and (iii) was in compliance with the Bidding Procedures Order and applicable provisions of the Bankruptcy Court, the Bankruptcy Rules and Local Rules.

Accordingly, no other or further notice need be given in connection with such assumption, assignment, or transfer of the Assigned Contracts or with respect to the Cure Amounts with respect to the Assigned Contracts.

G.      As evidenced by the Certificates of Service previously filed with this Court and as approved under the Bidding Procedures Order: (i) due, proper, timely, adequate and sufficient notice of the Sale Hearing, the assumption and assignment of the Assigned Contracts, the entry of this Sale Order, and the Sale has been provided to all parties in interest; (ii) such notice was, and is, good, sufficient and appropriate under the circumstances of these Chapter 11 Cases, provided a fair and reasonable opportunity for parties in interest to object, and to be heard, with respect thereto, and was provided in accordance with the Bidding Procedures Order, Sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, and the applicable Local Rules; and (iii) no other or further notice of such matters is necessary or shall be required.

**Business Judgment**

H.      The Debtors have demonstrated good, sufficient and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale and other transactions contemplated by the Biorefinery Purchase Agreement and any additional or ancillary documents contemplated thereby (the "**Transaction Documents**"), including, without limitation, the assumption, assignment, and/or transfer of the Assigned Contracts (collectively, the "**Transactions**") pursuant to Sections 363 and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, and their creditors. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Biorefinery Assets if the Sale is not consummated promptly; (ii) the Biorefinery

Purchase Agreement constitutes the highest or otherwise best offer for the Biorefinery Assets; (iii) the Biorefinery Purchase Agreement and the Closing will present the best opportunity to realize the value of the Biorefinery Assets; and (iv) unless the Sale is concluded expeditiously as provided for in this Sale Order and pursuant to the Biorefinery Purchase Agreement, potential creditor recoveries may be substantially diminished.

<u>**Good Faith of the Purchaser; No Collusion**</u>

I.       The Purchaser is not an insider (as that term is defined in Section 101(31) of the Bankruptcy Code) of any of the Debtors or any of their Affiliates.

J.       The Purchaser is purchasing the Biorefinery Assets in good faith, and is a good faith Purchaser, within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to, and granted pursuant to <u>paragraph 31</u> below, the full rights, benefits, privileges, and protections of that provision, and the Purchaser and the Seller have each proceeded in good faith in all respects in connection with the Transactions in that, *inter alia*: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Biorefinery Assets; (ii) the Purchaser complied with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid as reflected in the Biorefinery Purchase Agreement to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (v) the Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction; (vi) no common identity of directors or controlling stockholders exists between the Purchaser on the one hand, and any of the Debtors, on the other hand; and (vii) the negotiation and execution of the Biorefinery Purchase Agreement and Transaction Documents were at arms' length and in good faith.

K.    None of the Debtors, the Purchaser, or any of their respective current and former officers, directors, managers, members, partners, managed funds, affiliates, agents, advisors, professionals, and representatives (collectively, the "**Representatives**"), have engaged in any conduct that would cause or permit the Biorefinery Purchase Agreement or any of the Transaction Documents, or the consummation of the Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

### Credit Bid[4]

L.    Pursuant to the Bidding Procedures Order, applicable law, including Bankruptcy Code sections 363(b) and 363(k), and in accordance with the *Amended Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Bondholders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 177] (the "**Final DIP Order**"), the Purchaser, as the DIP Lender, was authorized to credit bid the principal, interest, fees, expenses and other amounts payable to the DIP Lender pursuant to the DIP Loan Documents (such obligations, collectively, the "**DIP Obligations**"). The DIP Lender is authorized to credit bid the full amount of the DIP Obligations pursuant to the DIP Loan Documents as of the date of Closing[5] (the "**Credit Bid**"). No additional or further evidence of the Purchaser's ability to include the Credit Bid as consideration within the

---

[4]    Capitalized terms used in this paragraph but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Final DIP Order.

[5]    The DIP obligations were in the amount of $5,000,000 in principal plus interest and fees, which as of November 15, 2024 will be $5,073,551.95 in aggregate amount.

Biorefinery Purchase Agreement is required. The Credit Bid, plus the cash consideration and assumption of the Assumed Liabilities, is a valid and proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and 363(k). There is no cause to limit the amount of the Credit Bid pursuant to section 363(k) of the Bankruptcy Code.

### Highest and Best Offer

M.      As demonstrated by the Sale Declarations, the Motion, any evidence proffered or adduced at the Sale Hearing, and the representations of counsel made at the Sale Hearing, the Debtors and their advisors, along with advisors to the Official Committee of Unsecured Creditors (the "Committee"), engaged in a robust, diligent and extensive marketing and sale process, which was open and fair, in accordance with the Bidding Procedures Order and the sound exercise of the Debtors' business judgment. The sale process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Biorefinery Assets.

N.      In accordance with the Bidding Procedures Order, the Stalking Horse Agreement (and the Biorefinery Purchase Agreement) was deemed a Qualified Bid (as defined in the Bidding Procedures Order) and was eligible to participate at the Auction.

O.      The Biorefinery Purchase Agreement constitutes the highest and best offer for the Biorefinery Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination, in consultation with the Consultation Parties, that the Biorefinery Purchase Agreement constitutes the highest and best offer for the Biorefinery Assets constitutes a valid and sound exercise of the Debtors' fiduciary duties and business judgment.

P.     The Biorefinery Purchase Agreement represents a fair and reasonable offer to purchase the Biorefinery Assets under the circumstances of these Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the Biorefinery Assets for greater economic value to the Debtors' Estates than Purchaser.

Q.     Approval of the Biorefinery Purchase Agreement, and the prompt consummation of the Transactions contemplated thereby, is in the best interests of the Debtors, their creditors, their Estates and other parties-in-interest.

## No Fraudulent Transfer; Not a Successor

R.     The Biorefinery Purchase Agreement and Transaction Documents were not entered into, and the Transactions are not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under applicable Law, and none of the Parties to the Biorefinery Purchase Agreement or any of the Transaction Documents are consummating the Transactions with any fraudulent or otherwise improper purpose. The Purchase Price for the Biorefinery Assets constitutes, (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Voidable Transactions Act and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of any Governmental Authority.

S.     Except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Assumed Liabilities and payment of Cure Costs, to the greatest extent permitted by applicable Law after the Closing, the Purchaser shall not have any liability, responsibility, or obligations of any kind or nature whatsoever for any Encumbrance (as defined below) of or against the Debtors, or otherwise related to the Biorefinery Assets (except as expressly set forth in the Biorefinery Purchase Agreement with respect to the Permitted Encumbrances and Assumed Liabilities), and arising prior to the Closing, by reason of the transfer of the Biorefinery Assets to

Purchaser. Additionally, Purchaser shall not be liable for any acts or omissions of the Seller arising under or related to the Biorefinery Assets, other than as set forth in the Biorefinery Purchase Agreement. Purchaser shall not be deemed, as a result of any action taken in connection with the Transactions, to: (1) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Biorefinery Purchase Agreement and herein); (2) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors; or (3) be a mere continuation or substantial continuation of the Seller or its enterprise. To the greatest extent permitted by applicable Law, Purchaser is not acquiring or assuming any Encumbrance arising prior to the Closing, except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Assumed Liabilities and Cure Costs.

## Validity of Transfer

T.       Subject to the entry of this Sale Order, the Debtors have full corporate power and authority (i) to perform all of their obligations under the Biorefinery Purchase Agreement and the Transaction Documents, and the Seller's prior execution and delivery thereof and performance thereunder, is hereby ratified in full, and (ii) to consummate the Transactions. The Biorefinery Purchase Agreement and Transaction Documents, and the Transactions contemplated thereby, have been duly and validly authorized by all necessary corporate action. No further consents or approvals are required for the Debtors to consummate the Transactions or otherwise perform their respective obligations under the Biorefinery Purchase Agreement or the Transaction Documents, except in each case as otherwise expressly set forth in the Biorefinery Purchase Agreement or applicable Transaction Documents.

U.      At Closing, the transfer of the Biorefinery Assets to Purchaser including, without limitation, the assumption, assignment and transfer of the Assigned Contracts, will be a legal, valid, and effective transfer thereof, and vest Purchaser with all right, title, and interest of the Seller in and to the Biorefinery Assets, to the greatest extent permitted by applicable Law, free and clear of all Encumbrances (as defined in paragraph Y of this Sale Order) accruing or arising any time prior to the Closing Date, and except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Assumed Liabilities or Permitted Encumbrances; *provided* that all such Encumbrances shall attach to the proceeds of the sale with the same priority, validity, force, and effect as they now have in or against such Biorefinery Assets, subject to any rights, claims, defenses, causes of action or challenges by the Debtors and their estates and subject to the Final DIP Order or any other applicable order of this Court..

## Section 363(f) Is Satisfied

V.      The Purchaser would not have entered into the Biorefinery Purchase Agreement and would not consummate the Transactions if the sale of the Biorefinery Assets, including the assumption, assignment and transfer of the Assigned Contracts, to the Purchaser were not free and clear of all Encumbrances of any kind or nature whatsoever (except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Permitted Encumbrances and Assumed Liabilities), or if the Purchaser, any of its Affiliates or subsidiaries, or any of their respective Representatives, would, or in the future could, be liable for any of such Encumbrances of any kind or nature whatsoever (except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Permitted Encumbrances and Assumed Liabilities).

W.      The Seller may sell or otherwise transfer the Biorefinery Assets free and clear of all Encumbrances (except as expressly set forth herein and in the Biorefinery Purchase Agreement with respect to the Permitted Encumbrances and Assumed Liabilities) because, in each case, one

or more of the standards set forth in Section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances against the Debtors, their estates or any portion or subpart of the Biorefinery Assets who did not object, or who withdrew their objections, to the Sale are deemed to have consented thereto pursuant to Section 363(f)(2) of the Bankruptcy Code. Those holders of such Encumbrance who did object fall within one or more of the other subsections of Section 363(f) and are adequately protected by having their liens, claims, encumbrances, or other Encumbrances, if any, automatically attach to the proceeds of the Sale, ultimately attributable to that portion or subpart of the Biorefinery Assets in which such creditor alleges or asserts any Encumbrances, in the same order of priority, with the same validity, force and effect, that such Encumbrances had immediately prior to consummation of the Sale as against such portion or subpart of the Biorefinery Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

X.    As used in this Sale Order, the term "**Encumbrances**" includes, in addition to the types of claims described in paragraph Y below any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), including claims or Liability (as defined in the Biorefinery Purchase Agreement) based on successor liability theories or otherwise under any theory of Law (as defined in the Biorefinery Purchase Agreement) or equity, right, guarantees, actions, suits, deposits, credits, allowances, options, contractual commitments, liabilities, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecs, trusts or deemed trusts, community property interest, equitable interest, title defects, hypothecations, easements, rights of way, restrictive covenants, rights of first refusal, conditions, encroachments, preemptive rights, judgments, conditional sale or other title retention agreements and other similar impositions,

imperfections or defects of title or restrictions on transfer, voting or use or receipt of income or exercise of any attribute of ownership, whether secured or unsecured, noticed or unnoticed, perfected or unperfected, allowed or disallowed, matured or unmatured, liquidated or unliquidated, disputed or undisputed, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, whether existing in the United States or elsewhere, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (a) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date), rights of use or possession, subleases, leases, conditional sale arrangements, deferred purchase price obligations, or any similar rights; (b) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date), indemnity or contribution, demands, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (c) all debts, liabilities, contractual claims, and labor, employment, and pension claims; (d) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Purchaser's interest in the Biorefinery Assets, or any similar rights; (e) any rights under labor or

employment agreements; (f) any rights under pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "**ERISA**")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (g) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (h) any bulk sales or similar law; (i) any taxes arising under or out of, in connection with, or in any way relating to the operation of the Biorefinery Assets or business of the Debtors before the closing of the Sale; (j) any unexpired and executory contract or unexpired lease to which the Debtors are a party that is not assumed; (k) any other excluded liabilities under the Biorefinery Purchase Agreement; and (l) Encumbrances or other interests arising under or in connection with any acts, or failures to act, of the Debtors or any of their predecessors, affiliates, or subsidiaries,

including, but not limited to, Encumbrances or other interests arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act of 1933, the Securities Exchange Act of 1934, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under Contract, applicable Law, equity or otherwise.

Y.      Except as expressly set forth herein and in the Biorefinery Purchase Agreement with respect to the Assumed Liabilities or Permitted Encumbrances, and without limiting the nature or scope of paragraph X above, the transfer of the Biorefinery Assets, including the assumption, assignment and/or transfer of the Assigned Contracts, to the Purchaser, will not subject the Purchaser, or any of its Affiliates or subsidiaries, or any of their respective Representatives to, or subject any Biorefinery Assets to or provide recourse for, any liability or encumbrance whatsoever with respect to the operation or condition of the Biorefinery Assets prior to the Closing or with respect to any facts, acts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect thereto prior to the Closing Date, including, without limitation, any liability or encumbrance arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which any Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil rights Act of 1964, the Age Discrimination

and Employment Act of 1967, the Americans with Disabilities Act of 1990, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environment liabilities, debts, claims or obligations that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any Environmental Laws, (vi) products liability or warranties, (vii) any bulk sales or similar law, (viii) any litigation by or against the Debtors and (ix) the Laws of the United States, any state, territory or possession thereof, or the District of Columbia based in any theory of products liability, or successor, vicarious or transferee liability. For the avoidance of doubt, the liabilities and encumbrances set forth in this paragraph are included in the defined term "Encumbrances" for all purposes of this Sale Order.

### Assumption, Assignment and/or Transfer of the Assigned Contracts

Z.      The assumption, assignment and/or transfer of the Assigned Contracts to the Purchaser pursuant to the terms of this Sale Order is integral to the Biorefinery Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

AA.     To the extent necessary or required by applicable Law, the Purchaser has or will have as of the Closing Date: (i) cured, or provided adequate assurance of cure, of any default existing prior to the Closing Date with respect to the Assigned Contracts, within the meaning of Sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code.

Payment of the Cure Amount is the sole amount required under Sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code to cure all such monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.

BB.    The promise of the Purchaser to perform the obligations first arising under the Assigned Contracts after their assumption and assignment to the Purchaser, the Purchaser's financial wherewithal to consummate the transactions contemplated by the Biorefinery Purchase Agreement and the evidence presented at the Sale Hearing demonstrating the Purchaser's ability to perform the obligations under the Assigned Contracts after the Closing Date constitute adequate assurance of future performance within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts. Any objections, responses or requests with respect to the foregoing, whether formal or informal, the determination of any Cure Amount, or otherwise related to or in connection with the assumption, assignment or transfer of any of the Assigned Contracts to the Purchaser is hereby overruled on the merits or otherwise treated as set forth in paragraph 3 below. Those non-Debtor parties to Assigned Contracts who did not object to the assumption, assignment or transfer of their applicable Assigned Contract, or to their applicable Cure Amount, are deemed to have consented thereto for all purposes to the assumption and assignment of such Assigned Contract pursuant to this Sale Order.

CC.    Pursuant to Section 1.6(b) of the Biorefinery Purchase Agreement, the Purchaser shall maintain certain rights to modify the list of the Assigned Contracts, after the date of this Sale Order and prior to the Closing Date as set forth in such Section. Such modification rights include, but are not limited to, the right of the Purchaser, prior to the Closing Date, to designate a Contract for assumption by the Seller and assignment to the Purchaser as well as the right of the Purchaser

to re-designate any Assigned Contract as an Excluded Contract. The Purchaser would not have agreed to the Transactions without such modification rights.

DD.    The notice and opportunity to object provided to Counterparties to such Assigned Contracts and to other parties in interest, as set forth in the Assumption and Assignment Procedures contained in the Bidding Procedures Order, fairly and reasonably protects any rights that such counterparties and other parties in interest may have with respect to such Contracts.

<u>**Compelling Circumstances for an Immediate Sale**</u>

EE.    To preserve the value of the Biorefinery Assets and maximize the value of the Debtors' estates, it is essential that the Sale of the Biorefinery Assets occur within the time constraints set forth in the Biorefinery Purchase Agreement. Time is of the essence in consummating the Sale. The Court expressly finds that there is no just reason for delay in the implementation of this Sale Order. Accordingly, there is sufficient cause to waive the 14-day stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

FF.    Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Biorefinery Purchase Agreement, the proposed transfer of the Biorefinery Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved.

GG.    The consummation of the Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105, 363 and 365 of the Bankruptcy Code, and all of the applicable requirements of such Sections have been complied with in respect of the Transactions.

HH.    The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not and does not propose to: (i) impair or

19

restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in Sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

2.      All objections to the Sale that have not been withdrawn, waived, resolved, or otherwise settled as set forth herein, as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are hereby denied and overruled on the merits with prejudice. All persons and entities who did not object or withdrew their objections to the Motion are deemed to have consented to the Sale and entry of this Sale Order pursuant to section 363(f)(2) of the Bankruptcy Code.

**Approval of Biorefinery Purchase Agreement; Binding Nature**

3.      The Biorefinery Purchase Agreement and the other Transaction Documents, and all of the terms and conditions thereof as well as the Transactions contemplated therein, are hereby approved as set forth herein.

4.      The execution, delivery and performance by the Seller of the Biorefinery Purchase Agreement is approved pursuant to sections 105, 363, and 365 of the Bankruptcy Code.

5.      The consideration, including the Credit Bid, provided by the Purchaser for the Biorefinery Assets under the Biorefinery Purchase Agreement is fair and reasonable and shall be

deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable Law, and the Transactions may not be avoided, or costs or damages imposed or awarded, under Section 363(n) or any other provision of the Bankruptcy Code.

6.      Pursuant to Sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale and the other Transactions pursuant to and in accordance with the terms and conditions of the Biorefinery Purchase Agreement and the Transaction Documents, and (b) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their respective obligations as contemplated by the Biorefinery Purchase Agreement and the Transaction Documents, in each case without further notice to or order of this Court. The Transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack or purported lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

7.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of any claim(s) (whether known or unknown) against any Debtor, any holders of Encumbrances of any kind or nature whatsoever against, in or on all or any portion of the Biorefinery Assets, all non-Debtor parties to the Assigned Contracts, the Purchaser and all successors and assigns of the Purchaser, including, without limitation, any trustee, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to cases under chapter 7 under the Bankruptcy Code of any of these Chapter 11 Cases.

**Transfer of Biorefinery Assets Free and Clear of Encumbrances; Injunction**

8.      Pursuant to Sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Biorefinery Assets, including but not

limited to the Assigned Contracts, to the Purchaser on the Closing Date in accordance with the Biorefinery Purchase Agreement and Transaction Documents. Upon and as of the Closing Date, such transfer shall constitute a legal, valid, binding, effective and full and complete general assignment, conveyance and transfer of such Biorefinery Assets transferring good and marketable and indefeasible title and interest in the Biorefinery Assets to the Purchaser, and the Purchaser shall take title to and possession of such Biorefinery Assets free and clear of all Encumbrances of any kind or nature whatsoever to the greatest extent permitted by applicable Law, except as expressly set forth in the Biorefinery Purchase Agreement and herein with respect to the Permitted Encumbrances, Assumed Liabilities, and Cure Costs.

9.     Notwithstanding anything to the contrary contained herein or in the Transaction Documents, upon the Closing of the Transaction, the DIP Obligations in an amount equal to the Credit Bid shall be deemed fully and finally satisfied.

10.     All such Encumbrances shall automatically attach solely to the proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Biorefinery Assets, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto. This Sale Order shall be effective as a determination that, on and as of the Closing, all Encumbrances of any kind or nature whatsoever (except as expressly set forth herein and in the Biorefinery Purchase Agreement with respect to the Permitted Encumbrances, Assumed Liabilities, and Cure Costs) have to the greatest extent permitted by applicable Law been unconditionally released, discharged and terminated in, on or against the Biorefinery Assets. The provisions of this Sale Order authorizing and approving the transfer of the Biorefinery Assets free and clear of all Encumbrances shall be self-executing, and neither the Debtors nor the Purchaser

shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

11.    Except as expressly permitted by the Biorefinery Purchase Agreement or this Sale Order, all persons and entities holding Encumbrances of any kind or nature whatsoever (other than the Permitted Encumbrances, Assumed Liabilities, and Cure Costs) are hereby forever barred, estopped and permanently enjoined from asserting their respective Encumbrances against the Purchaser, any of their respective Affiliates and subsidiaries, and any of their respective Representatives, and each of their respective Biorefinery Assets and assets, including, without limitation, the Biorefinery Assets. On and after the Closing Date, to the extent the holder of an Encumbrance of which the Biorefinery Assets are free and clear pursuant to the terms hereof does not comply with paragraph 11 of this Sale Order, the Purchaser shall be authorized to execute and file such documents, and to take all other actions as may be necessary, on behalf of each holder of an Encumbrance to release, discharge and terminate such Encumbrances in, on and against the Biorefinery Assets as provided for herein, as such Encumbrances may have been recorded or may otherwise exist. On and after the Closing Date, and without limiting the foregoing, to the extent the holder of an Encumbrance (as to which the Biorefinery Assets are being sold free and clear of pursuant to the terms hereof) does not comply with paragraph 11 of this Sale Order, the Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any Encumbrance that is extinguished or otherwise released pursuant to this Sale Order. This Sale Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code for the Purchaser to file, in accordance with the terms of this Sale

Order, UCC termination statements with respect to all security interests in or liens on the Biorefinery Assets.

12.     Other than as specifically provided for in the Biorefinery Purchase Agreement or in this Sale Order, the transfer of the Biorefinery Assets to the Purchaser pursuant to the Biorefinery Purchase Agreement and Transaction Documents does not require any consents.

13.     On and after the Closing, the persons holding an Encumbrance (as to which the Biorefinery Assets are being sold free and clear of pursuant to the terms hereof) other than a Permitted Encumbrance or an Assumed Liability, including Cure Costs, hereby are required to execute such documents and take all other actions as may be reasonably necessary to release their respective Encumbrances in the Biorefinery Assets, as such Encumbrances may have been recorded or otherwise filed. The Purchaser may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county or other jurisdiction in which any Debtor is incorporated or has real or personal Biorefinery Assets, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be sufficient to release, discharge and terminate any of the Encumbrances as to which the Biorefinery Assets are being sold free and clear of pursuant to the terms hereof, as set forth in this Sale Order as of the Closing Date. All persons and entities that are in possession of any portion of the Biorefinery Assets on the Closing Date shall promptly surrender possession thereof to the Purchaser at the Closing.

14.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, and secretaries of state, federal and local officials) who may be

required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease. Each of the foregoing persons and entities are authorized to accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge and terminate any of the Encumbrances as to which the Biorefinery Assets are being sold free and clear of pursuant to the terms hereof, or to otherwise consummate the Transactions contemplated by this Sale Order, the Biorefinery Purchase Agreement or any Transaction Document.

## **Payment of Certain Indebtedness[6]**

15.     Notwithstanding anything to the contrary contained in this Order, the Final DIP Order, or the Biorefinery Purchase Agreement, cash proceeds of the Sale shall be, within one (1) Business Day of the Closing Date, deposited by wire transfer to the segregated bank account ending –5330 established and maintained by Kurtzman Carson Consultants, LLC dba Verita Global (the "**Escrow Agent**") for the exclusive purpose of holding such proceeds (the "**Segregated Account**") to satisfy, in full or in part, the Prepetition Biofuels Bond Obligations through and including the Biofuels Bond Payoff Date (as defined below) (the "**Biofuels Bond Payoff Amount**") subject to the terms and conditions of Paragraphs 16-17 herein.

16.     For the avoidance of doubt, the Prepetition Biofuels Bond Liens shall attach to the Segregated Account automatically without the need for any further action or Court order.

17.     Within one (1) Business Day after the later of the (i) Closing Date, or (ii) the expiration of the last-expiring Challenge Period, if no Challenge has been timely commenced in a

---

[6]     Capitalized terms used in paragraphs 15-17 but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Final DIP Order or the Bidding Procedures, as applicable.

procedurally appropriate manner in respect of the Prepetition Biofuels Bond Liens or the Prepetition Biofuels Bond Obligations, then the funds in the Segregated Account up to the amount of the Prepetition Biofuels Bond Obligations shall be free and clear of all liens, claims, encumbrances and interests other than the Prepetition Biofuels Bond Liens, and (a) (I) $15,000,000 less the Credit Bid (such amount, the "**Minimum Cash Sale Proceeds**"), plus (II) the product of any cash proceeds of the Biorefinery Assets Sale in the Segregated Account in excess of the Minimum Cash Sale Proceeds, plus the Feedstock Assets Sale Proceeds, less the DSI Success Fee[7] (such amount, the "**Excess Sale Proceeds**") and 0.84, less (III) the Professional Fee Carveout (as defined below) shall be indefeasibly paid from the Segregated Account to the Biofuels Collateral Agent on account of the Biofuels Bond Payoff Amount for further credit to the Biofuels Trustee for payment of its reasonable fees and expenses in accordance with the Biofuels Bond Documents, then to accrued interest of the Biofuels Bonds, then to outstanding principal of the Biofuels Bonds, and (b) the following amounts shall be indefeasibly paid, free and clear of all liens, claims, encumbrances and interests, including the Prepetition Biofuels Bond Liens, from the Segregated Account in the following manner: (I) $50,000 to Layer 7 Capital, LLC and (II) $92,500 to the Committee Professionals, in each case, subject to the terms of the applicable retention agreements and to Court approval of such fees and expenses, and the Layer 7 Retention Application filed at D.I. 190 (such amount, in the aggregate, the "**Professional Fee Carveout**"), and (c) the product of the Excess Sale Proceeds and 0.16 (such amount, the "**Excess Sale Proceeds Carveout**") shall be indefeasibly paid, free and clear of all liens, claims, encumbrances and interests, including the Prepetition Biofuels Bond Liens, from the Segregated Account to the Fulcrum Sierra BioFuels, LLC's estate to be distributed in accordance with the Bankruptcy Code

---

[7]   As defined in the DSI Retention Application filed at D.I. 87.

(the date the payments set forth in clauses (a), (b), and (c)) are made, the "**Biofuels Bond Payoff Date**"), *provided* Fulcrum Sierra BioFuels, LLC shall pay to Layer 7 Capital, LLC, from the Excess Sale Proceeds Carveout, an amount equal to its success fee not to exceed 25% of the Excess Sale Proceeds Carveout, subject to the terms of Layer 7 Capital LLC's retention and to Court approval of such fees and expenses and the Layer 7 Retention Application filed at D.I. 190.[89] For the avoidance of doubt, nothing in this paragraph 17 shall modify the obligations of the Purchaser under the Biorefinery Purchase Agreement or this Sale Order.

### Assigned Contracts; Cure Payments

18.    Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Seller's assumption, and assignment and transfer to the Purchaser of the Assigned Contracts are hereby authorized and approved in full subject to the terms set forth below. The Purchaser shall, and is directed to, on or prior to the Closing (or as soon thereafter as reasonably practicable), pay the Cure Amounts and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the Seller and assigned to the Purchaser as applicable, on the Closing Date in accordance with this Sale Order, the Biorefinery Purchase Agreement, and the Transaction Documents.

19.    Upon and as of the Closing, the Seller is authorized and empowered to, and shall, assume, assign and/or transfer each of the Assigned Contracts to the Purchaser free and clear of all Encumbrances, except as expressly set forth in the Biorefinery Purchase Agreement with

---

[8]    If the amount transferred to the Biofuels Trustee in accordance with this paragraph is insufficient to pay the Biofuels Bond Payoff Amount in full, then the Prepetition Biofuels Bond Liens shall remain attached to any Prepetition Biofuels Bonds Collateral not transferred to the Purchaser pursuant to the Sale; *provided* that, for the avoidance of doubt, the Prepetition Biofuels Bonds Collateral shall not, after the transfer, include the Professional Fee Carveout and the Excess Sale Proceeds Carveout.

[9]    Nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any professional person.

respect to the Permitted Encumbrances and Assumed Liabilities. The payment of the applicable Cure Amounts (if any), or the later payment of such counterparty after the Court's resolution of any dispute regarding the Cure Amount, shall, pursuant to Section 365 of the Bankruptcy Code and other applicable Law, (i) effect a cure, or provide adequate assurance of cure, of all defaults existing thereunder as of the Closing and (ii) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such non-Debtor party resulting from such default. Accordingly, on and as of the Closing Date, other than such payment, none of the Debtors nor the Purchaser, shall have any further liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from seeking, any additional amounts or claims (as defined in Section 101(5) of the Bankruptcy Code) as a result of any defaults that arose, accrued or were incurred at any time on or prior to the Closing. The Purchaser has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of Sections 365(b) and (f) of the Bankruptcy Code and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts. Upon the payment of the applicable Cure Amount, the Assigned Contracts will remain in full force and effect, and no default shall exist, or be deemed to exist, under the Assigned Contracts as of the Closing Date, including any event or condition that, with the passage of time or giving of notice, or both, would constitute such a default.

20.     To the extent any provision in any Assigned Contract assumed and assigned pursuant to this Sale Order (including, without limitation, any "change of control" provision) (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment, or (b) is modified, breached or terminated, or deemed modified, breached or

28

terminated by any of the following: (i) the commencement of these Chapter 11 Cases, (ii) the insolvency or financial condition of any Debtor at any time before the closing of these Chapter 11 Cases, (iii) any Seller's assumption or assumption and assignment (as applicable) of such Assigned Contract, or (iv) the consummation of the Transactions, then such provision shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify or terminate such Assigned Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Assigned Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith. All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to Sections 365(b), 365(e) and 365(f) of the Bankruptcy Code.

21.     All requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Seller and assignment to the Purchaser of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Seller in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by the Purchaser in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Sale Order. Upon and as of the Closing, the Purchaser shall be deemed to be substituted for the Seller as a party to the applicable Assigned Contracts and, accordingly, the Seller shall be relieved, pursuant to Section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

22.     Except as provided in the Biorefinery Purchase Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of Claims with respect to any Assumed Liabilities are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property, or their assets or estates.

23.     The rights of the Purchaser to modify the list of the Assigned Contracts after the date of this Sale Order and prior to the Closing Date as set forth in Section 1.6(b) (Excluding or Adding Assigned Contracts Prior to Closing) of the Biorefinery Purchase Agreement, are hereby approved. Notwithstanding anything herein to the contrary and subject to the Biorefinery Purchase Agreement, prior to Closing, the Purchaser may, pursuant to the procedures set forth in the Biorefinery Purchase Agreement notify Seller in writing of (x) any Assigned Contract that it does not wish to assume or (y) a Contract to which Seller is a party that the Purchaser wishes to add as an Assigned Contract up to the Closing Date, and (i) any such previously considered Assigned Contract that the Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that has not been rejected by Seller that the Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to the Purchaser, in each case, without any adjustment to the Purchase Price and with any Cure Costs associated therewith paid by Purchaser.

24.     To the extent that any counterparty to an Assigned Contract did not object to its Cure Amount or the assumption and assignment of the Assigned Contract, such counterparty to the Assigned Contracts shall be deemed to have consented to such assumption and assignment under Section 365(c)(1)(B) of the Bankruptcy Code and the Purchaser shall enjoy all the Seller's rights, benefits and privileges under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment thereof.

25.     Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors or the Purchaser that any Assigned Contract is an executory contract or unexpired lease under Section 365 of the Bankruptcy Code.

26.     The failure of the Debtors or the Purchaser, as applicable, to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of its respective rights to enforce every term and condition of the Assigned Contracts.

**Additional Injunction; No Successor Liability**

27.     Effective upon the Closing Date and except as expressly set forth in the Biorefinery Purchase Agreement, the Transaction Documents, and herein with respect to the Permitted Encumbrances, Assumed Liabilities and Cure Costs, all persons and entities are forever prohibited and permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral or other proceeding), to collect, recover or offset any Encumbrance of which the Biorefinery Assets are sold free and clear; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to an Encumbrance, (c) creating, perfecting or enforcing any Encumbrance, or (d) asserting any setoff (except for

31

setoffs validly exercised before the Closing) or right of subrogation of any kind with respect to an Encumbrance, in each case as against the Purchaser, any of its Affiliates or subsidiaries, or any of their respective Representatives, or any of their respective Biorefinery Assets or assets, including the Biorefinery Assets.

28.     The Transactions contemplated by the Biorefinery Purchase Agreement and the Transaction Documents do not cause there to be, and there is not (a) a consolidation, merger, or *de facto* merger of the Purchaser, on the one hand, with or into the Debtors or the Debtors' estates, on the other hand, or vice versa, (b) a substantial continuity between the Purchaser, on the one hand, and the Debtors or the Debtors' estates, on the other hand, (c) a common identity between the Purchaser, on the one hand, and the Debtors or the Debtors' estates, on the other hand, or (d) a mere continuation of the Debtors or their estates, on the one hand, with the Purchaser, on the other hand; *provided* that nothing in this paragraph enjoins an Encumbrance from attaching to the relevant sale proceeds, subject to any rights, claims, defenses, causes of action or challenges by the Debtors and their estates and subject to the Final DIP Order or any other applicable order of this Court.

29.     Except to the extent expressly set forth in the Biorefinery Purchase Agreement and herein, including with respect to the Permitted Encumbrances, Assumed Liabilities, and Cure Costs, the transfer of the Biorefinery Assets, including, without limitation, the assumption, assignment and transfer of any Assigned Contract, to the Purchaser shall not cause or result in, or be deemed to cause or result in, the Purchaser, any of its Affiliates or subsidiaries, or any of their respective Representatives, having any liability, obligation, or responsibility for, or any Biorefinery Assets being subject to or being recourse for, any Encumbrance arising prior to the Closing whatsoever, whether arising under any doctrines of successor, transferee or vicarious

liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment, setoff (except for setoffs validly exercised before the Closing), or otherwise.

30.    For the avoidance of doubt, notwithstanding the consummation of the Transactions and the employment by the Purchaser of certain persons previously employed by the Debtors, (a) except as set forth in the Biorefinery Purchase Agreement, the Purchaser shall not have any obligations or liabilities to any employee of the Debtors or in respect of any employee benefits owing to any employee of the Debtors by the Debtors or by any plan or program administered by the Debtors or for the benefit of the Debtors' employees, and (b) any obligations of the Purchaser to any such Person shall be expressly limited to (i) those obligations owing to any employee solely as a result of the Purchaser's employment of such employee following the Closing Date; (ii) those obligations expressly agreed upon by the Purchaser with such Person; and (iii) those obligations explicitly assumed by the Purchaser under the Biorefinery Purchase Agreement.

## **Good Faith**

31.    The Transactions contemplated by this Sale Order, the Biorefinery Purchase Agreement and Transaction Documents are undertaken by the Purchaser without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale and other Transactions shall not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions (including the assumption, assignment and/or transfer of the Assigned Contracts), unless such authorization and consummation are duly stayed pending such appeal. The Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code

and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges and protections of Section 363(m) of the Bankruptcy Code.

32.     Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. The consideration provided by the Purchaser for the Biorefinery Assets under the Biorefinery Purchase Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

**Resolution of Johnson Matthey's Objection**

33.     Notwithstanding any other provision in this Order to the contrary, the Purchaser and the Debtors have agreed with Johnson Matthey Davy Technologies Ltd. ("Johnson Matthey") to resolve Johnson Matthey's limited objection [Docket No. 235] to the sale, and the terms and conditions of these paragraphs 33 through 37 shall govern the sale of the Johnson Matthey equipment to the Purchaser.

34.     Within a reasonable amount of time after the Closing Date, the Purchaser agrees to return or destroy all documents (electronic or physical) at Johnson Matthey's sole cost and expense (with the Purchaser providing reasonable advance notice and an opportunity to object to Johnson Matthey, if the Purchaser intends to incur such cost and expense) relating to Johnson Matthey's design package, which includes a comprehensive package of drawings, manuals, and other papers, including copies of the Johnson Matthey agreements identified in Johnson Matthey's objection (the "Basic Engineering Package"), with Johnson Matthey confirming in writing whether it agrees that to-be-destroyed documents constitute the Basic Engineering Package; provided that Johnson Matthey will (a) permit the Purchaser and the Debtors (as applicable) to retain that portion of the Basic Engineering Package relevant to safely remove and dispose of the used FT catalyst that is

currently in the reactor at the Sierra Plant, and (b) will provide additional documents, information, and on-site technical assistance, as reasonably requested, at no additional cost to the Purchaser or the Debtors for the Purchaser to safely remove and dispose of the used FT catalyst that is currently in the reactor at the Sierra Plant.

35.     Johnson Matthey asserts that a FT Catalyst System was associated with its licensed process (which FT Catalyst System is comprised of equipment solely located in the area designated as "Area 51" in the facility, the "Associated Equipment"), which Johnson Matthey asserts was equipment used to convert the prepared syngas into a synthetic crude, including but not limited to the "FT converter."  Purchaser agrees to not sell the Associated Equipment other than as scrap materials without the prior written consent of Johnson Matthey, not to be unreasonably withheld. The Purchaser and Johnson Matthey agree that it would be reasonable for Johnson Matthey to withhold such consent if the Associated Equipment is to be sold to a competitor or other party with an interest in Johnson Matthey's asserted confidential and proprietary intellectual property.

36.     Any notice or certification provided to Johnson Matthey shall be provided to Johnson Matthey's counsel, Saul Ewing LLP, attention Lucian Murley, and may be provided via electronic mail.

37.     Notwithstanding its rights in the Biorefinery Purchase Agreement, Johnson Matthey's agreements with the Debtors may not be assumed and assigned to the Purchaser.

**Resolution of TRI's Objection**

38.     Notwithstanding any other provision in this Order to the contrary, the Purchaser and the Debtors have agreed with ThermoChem Recovery International, Inc. ("TRI") to resolve

TRI's objection [D.I. 202], and the terms and conditions of paragraphs 38 to 42 shall govern the sale of the TRI Equipment[10] to the Purchaser.

      39.     Prior to the disposition of any TRI Equipment by the Purchaser, the Purchaser will permit TRI to (i) observe or monitor removal of four TRI aerovalve assemblies, identified in **Exhibit A** attached hereto (the "Aerovalve Assemblies"), from the TRI Equipment and thereafter, at the Purchaser's option, (a) scrap or sell for scrap the Aerovalve Assemblies, provided that the assemblies have been cut up at TRI's sole costs and expense in a manner reasonably directed by TRI that prevents reverse engineering of the Aerovalve Assemblies, (b) permit TRI to remove the Aerovalve Assemblies from the Real Property (as defined in the Biorefinery Purchase Agreement) at TRI's sole cost and expense; and (ii) access at TRI's sole cost and expense (with the oversight of the Purchaser or its designee) the Feeder Programable Logic Controllers in the Motor Control Center, identified in **Exhibit B** hereto, and erase TRl's proprietary program contained therein; *provided* that if TRI fails to respond to Purchaser's reasonable attempt, to coordinate the foregoing with TRI then upon fifteen (15) business days' written notice (which may be via email), the obligations of the Purchaser under this paragraph shall be deemed satisfied. To assist the Purchaser or its designee in accomplishing the actions set forth in the foregoing sentence, the Purchaser will reasonably permit personnel from TRI to provide technical knowledge necessary to assist the Purchaser or its designee, including on location. TRI shall indemnify, defend, and hold harmless the Purchaser and its affiliates and representatives from and against any and all claims, liabilities, losses, damages, costs, and expenses (including reasonable attorneys' fees and expenses) caused by TRI's or its representatives' conduct in connection with the implementation of this paragraph.

---

[10]  "TRI Equipment" means (i) PC Heater PC-2101-04, (ii) CTC Heaters EX-2101-04 HT-2017, (iii) Feeder press frame (6), (iv) Feeder PLC's (6), (v) Feeder Injection Screws and (vi) PC Heater Cart.

40.    Purchaser agrees that it shall not sell the TRI Equipment to any of the following parties:

1.    MyRechemical, a subsidiary of NextChem S.p.A. which is owned by MARIE S.p.A.;

2.    Sungas Renewables, Inc.;

3.    Enerkem;

4.    Thyssenkrupp Uhde GMBH, a subsidiary of thyssenkrupp Industrial Solutions AG;

5.    Omni Conversion Technologies, Inc.;

6.    Gidara Energy Holdings B.V.;

7.    Sumitomo SHI/FW Energie GmbH; or

8.    People's Republic of China, any company that is ultimately majority owned by a Chinese citizen, a government of any country that is subject to sanctions by the Office of Foreign Assets Control of the U.S. Department of the Treasury or that is on the US Department of State economic sanctions list, or any company that is ultimately majority owned by a citizen of such country; *provided* that the following shall be sufficient to satisfy this requirement: either (i) TRI's consent, not to be unreasonably withheld, or (ii) (A) a written representation signed by a duly authorized officer or director of any buyer of any TRI Equipment that such buyer is not ultimately owned by a citizen of any of the foregoing and (B) the completion of customary Know Your Customer checks.

41.    Purchaser agrees to not sell the Pulse Heaters, identified in **Exhibit C** hereto, other than as scrap materials without the prior written consent of TRI, not to be unreasonably withheld.

42.    Prior to the Closing Date or within a reasonable amount of time thereafter, the Debtors and/or the Purchaser (as applicable) agree to (i) (A) return to TRI all of the TRI proprietary data and materials listed in **Exhibit D** hereto[11] (the "TRI Proprietary Data") and (B) certify that all TRI Proprietary Data has been returned; or (ii) permit TRI to access the Real Property and remove all hard copy and digital copies of the TRI Proprietary Data at TRI's sole cost and expense (with the oversight of the Debtors and/or Purchaser or its designee, as applicable); provided that if TRI

---

[11]    For the avoidance of doubt, only those items highlighted in yellow are subject to the obligations in paragraph 42.

fails to access the Real Property to conduct such removal after ten (10) business days' written notice (which may be via email), the obligations of the Debtors and Purchaser under this paragraph shall be deemed satisfied.

## Resolution of TRIGID's Objection

43.     Notwithstanding anything in this Order to the contrary, this section of the Order shall approve the assumption and assignment of that certain Water Supply Agreement (the "WSA"), dated as of June 29, 2009, by and between Tahoe-Reno Industrial Center, LLC, Tri General Improvement District ("TRIGID"), and Fulcrum Sierra BioFuels, LLC (as amended by this Order) to Purchaser, including without limitation the Process Water Allocation (as defined in the WSA).

44.     On or before the Closing Date (as defined in the Biorefinery Purchase Agreement), Purchaser shall pay TRIGID $271,912.61 (the "WSA Cure Cost").

45.     Upon or promptly following the Closing Date, the Purchaser shall complete and file with TRIGID an Assignment of Beneficial Interest in Water Rights.

46.     By this Order, Section 2 of the WSA will be amended and restated as follows: "The Purchaser and any subsequent assignee of Purchaser under the WSA shall (a) submit plans and designs to TRIGID pursuant to the TRI General Improvement District Water Service Rules, Regulations and Rates, revised as of October 7, 2021, as they are further amended from time to time (the "Water Rules") and the TRI General Improvement District Sewer Rules, Regulations and Rates, revised as of August 7, 2023 as they are further amended from time to time (the "Sewer Rules") regarding their use of water and sewer services, (b) if required by the Water Rules or Sewer Rules then-applicable, shall obtain new will-serve commitments from TRIGID before using the Process Water Allocation, which shall supersede any previous will-serve letters, and (c) shall, at the appropriate time and pursuant to the Water Rules and Sewer Rules, pay TRIGID any

38

connection fees required under the Water Rules and Sewer Rules. For the avoidance of doubt, Purchaser acknowledges and agrees to accept water and sewer service from TRIGID in compliance with the Water Rules and the Sewer Rules."

47.     The parties hereby acknowledge and agree that, except as specifically modified by this Order, each of the terms and conditions of the WSA shall remain in full force and effect and are enforceable in accordance with its respective terms.

## Resolution of Abengoa Entities' Objection

48.     Notwithstanding anything in the Biorefinery Purchase Agreement, any other document or agreement relating to the Sale (including, without limitation, the Transaction Documents), this Sale Order, or any documents or agreements relating to any of the foregoing (collectively, the "Sale Documents") to the contrary (i) the Biorefinery Assets do not include any claims, rights, actions or causes of action held by any of the Debtors against Abeinsa Abener Teyma General Partnership or Abengoa, S.A. (collectively, the "Abengoa Entities"), including the Abengoa Claims and Defenses (as defined in the Biorefinery Purchase Agreement), which are Excluded Claims and Defenses (as defined in the Biorefinery Purchase Agreement) that are not being transferred or sold to the Purchaser pursuant to the Sale Documents; (ii) all claims, rights, actions or causes of action of any of the Debtors against either (or both) of the Abengoa Entities, including, without limitation, the Abengoa Claims and Defenses, shall remain property of the Debtors' bankruptcy estates and shall be subject to and without prejudice to all available defenses that may be asserted by either of the Abengoa Entities, including, without limitation, any setoff or recoupment defenses; and (iii) nothing in the Sale Documents shall release, waive, discharge or adversely affect any claims of either of the Abengoa Entities against any of the Debtors, provided that any such claims shall not attach to the Biorefinery Assets. Any reference to "Abeinsa Abner Teyma General Partnership" in any of the Sale Documents shall be deemed a reference to Abeinsa

Abener Teyma General Partnership.  For the avoidance of doubt, Purchaser shall have no liability

whatsoever for any of the Abengoa Claims and Defenses.

### Other Provisions

49.     Nothing in this Order or the Biorefinery Purchase Agreement releases, nullifies,

precludes or enjoins the enforcement of any police or regulatory liability to a governmental

unit that any entity would be subject to as the post-sale owner, lessee, or operator of property after

the date of entry of this Order. Nothing in this Order or the Biorefinery Purchase Agreement

authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration,

(d) authorization, (e) certification, or (f) approval, or the discontinuation of any obligation

thereunder, without compliance with all applicable legal requirements and approvals under police

or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have

under police or regulatory law to interpret this Order or to adjudicate any defense asserted under

this Order.

50.     Notwithstanding anything to the contrary in the Biorefinery Purchase Agreement

or in this Sale Order, until the earlier of the closure of these cases and three (3) years after the

Closing Date, Purchaser will use reasonable efforts to not dispose of or destroy any of the records

received as Biorefinery Assets and will allow the Debtors and any successor thereto and any of

their respective directors, officers, employees, counsel, advisors, Representatives, accountants and

auditors reasonable access during normal business hours, upon reasonable advance notice, to any

record included in the Biorefinery Assets for the purposes relating to these cases, the wind-down

of the operations and the implementation of any plan of liquidation following the Sale Closing.

The three-year (3) period referenced in this Paragraph 50 may be extended for an additional one-

year (1) period upon reasonable request made to the Purchaser in writing and sent in accordance

with section 10.3 of the Biorefinery Purchase Agreement by the Debtors or any successor thereto or any of their respective officers, directors, counsel, advisors or Representatives.

51.     Notwithstanding anything to the contrary in this Order, the Biorefinery Purchase Agreement, or any other filings or documents in connection therewith, Biorefinery Assets shall include all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of the Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including all Claims, rights, lawsuits, rights of recovery, objections, causes of action, avoidance actions and similar rights of Seller arising under or pursuable through Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof, in each case, to the extent related to the Assigned Contracts to the extent those contracts are assumed through the Sale, or the Assumed Liabilities, along with all rights and interests to the extent necessary or appropriate for the Purchaser to effectively prosecute, defend or obtain the benefits of the foregoing (collectively, the "**<u>Avoidance Actions</u>**"); *provided*, *however*, *that* neither the Purchaser, nor any Person claiming by, through or on behalf of the Purchaser (including, but not limited to, by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an action based on, assert, sell, convey, assign or file any claim that relates to, or otherwise seeks recovery on account of, the Avoidance Actions. For the avoidance of doubt, notwithstanding anything in this Order, the Biorefinery Purchase Agreement or the Transaction Documents, the Biorefinery Assets shall not include (i) any chapter 5 claims which do not relate to an Assigned Contract that is assumed

through the Sale, or the Assumed Liabilities, (ii) any commercial tort claim; or (iii) any Insider Claims as that term is defined in the Final DIP Order.

52.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent chapter 7 case into which any such Chapter 11 Case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Biorefinery Purchase Agreement or the terms of this Sale Order. To the extent of any such conflict or derogation, the terms of this Sale Order shall govern.

53.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Accordingly, the Debtors are authorized and empowered to close the Sale and other Transactions immediately upon entry of this Sale Order.

54.     Nothing in this Sale Order shall modify or waive any closing conditions, post-closing covenants or termination rights in Articles VI and VIII of the Biorefinery Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

55.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Transactions.

56.     All payment or reimbursement obligations of the Seller owed to the Purchaser pursuant to the Biorefinery Purchase Agreement, including, without limitation, Section 9.5, or the Transaction Documents shall be paid solely in accordance with the terms thereof and in the manner provided therein, without further notice to or order of this Court. All such obligations shall

constitute allowed administrative claims against the Debtors in accordance with the Biorefinery Purchase Agreement, with administrative expense priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code. Until satisfied in full in cash, all such obligations shall continue to have the protections provided in this Sale Order, and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtors. Pursuant to Section 1107(a) of the Bankruptcy Code, the Debtors, in their capacity as debtors-in-possession in the Chapter 11 Cases, are the "trustee" of the Debtors' estates for purposes of state, local, or municipal law or regulation applicable to the transfer of any License (as defined below) to the Purchaser. The Debtors' officers shall be authorized to, and hereby have the authority to, execute, on behalf of the Debtors and all other current holders of the Licenses (if any), all documents and forms required by any applicable authorities, to transfer the Licenses to the Purchaser, subject to approval by such authorities, as applicable. The Purchaser or the Debtors' officers are further authorized to submit a copy of this Sale Order with any such transfer application to establish such authority for purposes of any state, local, municipal law or regulation applicable to the transfer of any License to the Purchaser. All existing Licenses applicable to the business shall remain in place for Purchaser's benefit until either new Licenses are obtained or existing Licenses are transferred in accordance with applicable administrative procedures. The Debtors shall reasonably cooperate with the Purchaser prior to Closing in connection with Purchaser's efforts to transfer or obtain new Licenses.

57.    To the extent provided by Section 525 of the Bankruptcy Code, no Governmental Authority may deny, revoke, suspend, or refuse to renew any permit, license, registration, governmental authorization or approval or similar grant (each a "**License**") relating to the operation of the Biorefinery Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Transactions

contemplated by the Biorefinery Purchase Agreement and the Transaction Documents. The Purchaser shall be authorized, as of the Closing to operate under the Licenses listed on Schedule 1.1(d) of the Biorefinery Purchase Agreement and, to the extent provided for in the Biorefinery Purchase Agreement and the Transaction Documents, such Licenses are deemed to have been, and are hereby directed to be, transferred to the Purchaser as of the Closing.

58.     The failure specifically to include any particular provision of the Biorefinery Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Biorefinery Purchase Agreement be authorized and approved in their entirety.

59.     The Biorefinery Purchase Agreement and Transaction Documents may be modified, amended or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, without further notice to or order of this Court, *provided that* any such modification, amendment or supplement shall not have a material adverse effect on the Debtors' estates unless approved by order of this Court.

60.     For the avoidance of doubt, nothing in this Sale Order shall constitute, pursuant to 1146(a), the grant of a tax exemption under a plan confirmed under Section 1129 or 1191 of the Bankruptcy Code.

61.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (i) interpret, implement, and enforce the terms and provisions of this Sale Order, the Biorefinery Purchase Agreement, the Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, (ii) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, (iii) compel delivery of the Biorefinery Assets to the Purchaser; (iii) enforce the injunctions and limitations of liability set

forth in this Sale Order and (iv) enter any orders under Sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

62.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

63.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated, modified, and terminated with respect to the Debtors to the extent necessary, without further order of the Court, (i) to allow the Purchaser to give the Debtors any notice provided for in the Biorefinery Purchase Agreement, (ii) to allow the Purchaser to take any and all actions permitted by the Biorefinery Purchase Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale and the other transactions contemplated by the Biorefinery Purchase Agreement and (iii) to otherwise implement the terms and provisions of the Biorefinery Purchase Agreement and this Sale Order. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of the Biorefinery Purchase Agreement and this Sale Order, and this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

64.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Sale Order shall govern. To the extent there are any inconsistencies between the terms of this Sale Order or the Bidding Procedures Order, on the one hand, and the Biorefinery Purchase Agreement or any Transaction Document, on the other hand, the terms of this Sale Order and the Bidding Procedures Order shall govern, as applicable.

**IT IS SO ORDERED**

Dated: November 14th, 2024
Wilmington, Delaware

**THOMAS M. HORAN**
**UNITED STATES BANKRUPTCY JUDGE**